**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| THE BUDD COMPANY, INC.,[1] | ) | Case No. 14-11873 |
| | ) | |
| Debtor. | ) | Honorable Jack B. Schmetterer |

### NOTICE OF HEARING

**PLEASE TAKE NOTICE** that, on March 31, 2014, the Debtor filed *Debtor's Motion to Approve Affiliate Settlement Agreement Pursuant to Section 105 of the Bankruptcy Code and Rule 9019 of the Federal Rules of Bankruptcy Procedures* (the Motion").

**PLEASE TAKE FURTHER NOTICE** that the Debtor has requested a hearing on the Motion on Friday, April 18, 2014, at 11:00 a.m. CDT, before the Honorable Jack B. Schmetterer or any other judge who may be sitting in his place and stead, in Courtroom 682 in the United States Courthouse, 219 South Dearborn Street, Chicago, Illinois, at which time you may appear if you deem fit.

**PLEASE TAKE FURTHER NOTICE** that copies of all documents filed in this case are available free of charge by visiting the case website maintained by Epiq Bankruptcy Solutions, LLC, proposed notice and claims agent for this chapter 11 case, available at http://dm.epiq11.com/Budd or by calling (646) 282-2400. You also may obtain copies of any pleadings by visiting the Court's website at www.ilnb.uscourts.gov in accordance with the procedures and subject to the fees applicable thereto.

Dated: March 31, 2014                  Respectfully submitted,

                                       **THE BUDD COMPANY, INC.**

                                       By:*/s/ Jeremy T. Stillings*
                                              One of its attorneys

                                       Jeff J. Marwil (IL #6194054)
                                       Jeremy T. Stillings (IL #6279868)
                                       Brandon W. Levitan (IL #6303819)
                                       Proskauer Rose LLP
                                       70 W. Madison St.
                                       Chicago, Illinois 60602-4342
                                       Telephone:  (312) 962-3550
                                       Facsimile:  (312) 962-3551

                                       *Proposed Counsel to the Debtor*

---

[1] The last four digits of the Debtor's federal tax identification number are 3060.

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| THE BUDD COMPANY, INC.,[1] | ) | Case No. 14-11873 |
| | ) | |
| Debtor. | ) | Honorable Jack B. Schmetterer |

**DEBTOR'S MOTION TO APPROVE AFFILIATE SETTLEMENT AGREEMENT**
**PURSUANT TO SECTION 105 OF THE BANKRUPTCY CODE AND RULE 9019 OF**
**THE FEDERAL RULES OF BANKRUPTCY PROCEDURE**

The Budd Company, Inc., the above-captioned debtor and debtor in possession ("Budd" or the "Debtor"), files this motion (the "Motion") for entry of an order, substantially in the form submitted herewith, approving that certain "Settlement Agreement Between The Budd Company, Inc. and its Corporate Affiliates", executed March 26, 2014 (attached hereto as **Exhibit A**, the "Settlement Agreement"). The factual bases for the Motion are set forth in the Declaration of Charles M. Moore, Chief Restructuring Officer of the Debtor (the "CRO"), attached hereto and incorporated herein by reference as **Exhibit C** (the "Moore Declaration").

As described in detail below and in the Moore Declaration: (1) the CRO projects that the Settlement will result in significant value for Budd's unsecured creditors, perhaps increasing by 50% their distributions in this case (the "Chapter 11 Case"); and (2) the vast majority of this benefit (valued to be well in excess of $114 million) will be realized only if the Settlement Agreement is approved.

In further support of the Motion, the Debtor respectfully states as follows:

---

[1] The last four digits of the Debtor's federal tax identification number are 3060.

## JURISDICTION AND VENUE

1.    The United States Bankruptcy Court for the Northern District of Illinois (the "Court") has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334.

2.    This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A).

3.    Venue is proper pursuant 28 U.S.C. §§ 1408 and 1409.

4.    The statutory and rule-based predicates for the relief sought herein are section 105 of title of 11 of the United States Code (11 U.S.C. §§ 101 *et seq*., the "Bankruptcy Code") and rule 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

## INTRODUCTION

5.    The Settlement Agreement is one of two agreements memorializing a global settlement (the "Settlement") between Budd, on the one hand, and Budd's sole shareholder ThyssenKrupp North America, Inc. ("TKNA"), on behalf of TKNA and all of its corporate affiliates other than Budd (TKNA and each such affiliate, an "Affiliate" and, collectively, "Affiliates"), on the other hand. Budd and the Affiliates also are party to that certain "Agreement Between The Budd Company, Inc. and ThyssenKrupp North America, Inc. on Behalf of Itself and Its Corporate Affiliates Other Than The Budd Company, Inc.", also executed March 26, 2014 (the "Prepetition Agreement"). A copy of the Prepetition Agreement is attached hereto as **Exhibit B**.

6.    As described in detail below, the Settlement was negotiated on behalf of Budd by an independent CRO and approved by Budd's board of directors (the "Board"), including by the affirmative vote of Budd's independent director, Charles Sweet (the "Independent Director"). The Settlement Agreement and the Prepetition Agreement were negotiated and executed at the same time and in connection with each other, and provide Budd and its estate with significant

2

value. Critically, however, the Prepetition Agreement was not conditioned upon approval of the Court.

7.     The Prepetition Agreement became effective immediately upon its execution, provided significant and meaningful consideration to Budd, and facilitated Budd's commencement of this Chapter 11 Case. The key benefits of the Settlement memorialized in the Prepetition Agreement are:

a.   **Release of Funds Owed to Budd under the Short Term Borrowings.** ThyssenKrupp Finance, USA, Inc. ("TK Finance"), an Affilite, released to Budd approximately $390 million in cash, constituting amounts owed to Budd under the Cash Management Agreement (defined and described below), without exercising any right to setoff with respect to claims that TK Finance, or other Affiliates, may have against Budd (other than with respect to workers' compensation claims, as discussed below).

b.   **Assumption of Workers' Compensation Obligations.** TKNA assumed liability for all of Budd's workers' compensation liabilities (in connection with such assumption, TK Finance reduced the Short Term Borrowings (defined and described below) remitted to Budd by Budd's book value of workers' compensation claims (approximately $4.5 million)).

c.   **Amendment of Tax Sharing Agreement.** Budd and certain of its Affiliates amended the Tax Sharing Agreement (defined and described below) to provide for, among other things, an obligation of TKNA to indemnify Budd from all tax obligations, including a potential $20 million known liability.

d.   **Amendment of Services Agreement.** Budd and the Affiliates amended their Services Agreement (defined and described below) to provide Budd with continued administrative services (which are critical to Budd's administration of this Chapter 11 Case) for 18 months at no cost.

e.   **Transfer of Sponsorship of the Budd 401(k) Plan.** TKNA assumed sponsorship of The Budd Company Preferred Savings and Investment Plan (the "401(k) Plan").

8.     As opposed to the Prepetition Agreement, the Settlement Agreement will not become effective until and unless it is approved by this Court. The key benefits of the Settlement memorialized in the Settlement Agreement are:

**a. Assumption of Budd's ERISA Qualified Pension Plans.** Within 30 days of the Settlement Agreement becoming effective, TKNA shall assume sponsorship of and full financial responsibility for The Budd Company Pension Plan for Executive and Administrative Employees and The Budd-UAW Consolidated Retirement Benefit Plan (together, the "ERISA Pension Plans"). The ERISA Pension Plans are tax qualified and also covered by the Pension Benefit Guaranty Corporation ("PBGC") under the pension insurance program established by the Employee Retirement Income Security Act of 1974, as amended ("ERISA"). As of February 28, 2014, the ERISA Pension Plans had unfunded benefit liabilities of approximately $197 million, as calculated on an ongoing basis.[2]

**b. Assumption of the Budd SERP.** Within 30 days of the Settlement Agreement becoming effective, TKNA shall assume sponsorship  of and full financial responsibility for The Budd Company Supplemental Pension Plan (the "SERP" and together with the ERISA Pension Plans, the "Pension Plans"), for which Budd had an estimated liability of approximately $12 million as of February 28, 2014. The SERP is not tax qualified and is not covered by the PBGC.

**c. Cash Consideration.** Within 7 days of the Settlement Agreement becoming effective, TKNA shall pay Budd $10.3 million (subject to possible reduction for missed minimum funding contributions to the ERISA Pension Plans after the Petition Date (defined below)).

**d. Global Release.** Budd shall receive a release of all claims and causes of action that Affiliates may have against Budd, which include known claims potentially worth tens of millions of dollars (net of claims Budd may hold against Affiliates).

9.     The Settlement Agreement is in the best interests of Budd and its creditors, and should be approved. The Settlement Agreement protects all of Budd's creditors from the dilutive effect the claims that the PBGC (but for the Settlement Agreement) could assert against Budd upon termination of the ERISA Pension Plans, which claims would exceed $394 million. In addition to other benefits of the Settlement Agreement, the mutual waivers and releases in the Settlement Agreement provide Budd a net release of tens of millions of dollars' worth of potential claims against it. Exchange of the releases will avoid the potential for long, complex,

---

[2] If the Settlement Agreement is not approved and the ERISA Pension Plans are terminated, the PBGC would assert a claim of approximately $394 million against Budd's estate for the ERISA Pension Plans' unfunded benefit liabilities, as calculated on a termination basis, as of July 1, 2013. The PBGC uses different actuarial assumptions established under ERISA to calculate a plan's unfunded benefit liabilities upon termination, as opposed to as a going concern. *See* 29 C.F.R. Part 4044.  The PBGC would also have certain other claims against Budd's estate upon a termination of the ERISA Pension Plans.

and expensive litigation for Budd that (if pursued) almost certainly would lead to materially lower creditor recoveries. The CRO estimates that the Settlement in its entirety will increase significantly recoveries to unsecured creditors, perhaps by 50%.

## BACKGROUND

### I.      The Debtor's Chapter 11 Case

10.     On the date hereof (the "Petition Date"), the Debtor filed with the Court a petition for relief under chapter 11 of the Bankruptcy Code, thereby commencing this Chapter 11 Case. The Debtor continues to manage its affairs as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. As of the date of the filing of the Motion, no official committees have been appointed or designated.

11.     Further factual background relating to the Debtor's commencement of this Chapter 11 Case and the Debtor's assets and former business operations, including as summarized below, is set forth in detail in the *Declaration of Brian T. Bastien, President of the Debtor, in Support of First Day Pleadings* (the "First Day Declaration"), filed contemporaneously herewith and incorporated herein by reference.

### II.     Budd's Corporate History and Relationship with its Affiliates

12.     In 1978, ThyssenKrupp AG ("TKAG") acquired Budd. Budd currently is a wholly owned subsidiary of TKNA, which is a direct subsidiary of TKAG. Thus, Budd is a member of the global TKAG group of companies. The TKAG group operates in almost 80 countries, employs over 150,000 people world-wide, and generates sales of approximately $50 billion annually. TKAG and its approximately 37 subsidiaries located in the United States generate annual revenue of over $7 billion.

13.     As a member of the TKAG group, Budd has a number of operational ties to Affiliates. Historically, three primary agreements govern the operational relationships between Budd and its Affiliates:

   a.   The Special Services Agreement dated as of March 31, 2007, by and between ThyssenKrupp USA, Inc. ("<u>TK USA</u>", predecessor to TKNA) and Budd (the "<u>Services Agreement</u>"), and as amended and restated on or about March 26, 2014 in connection with the Prepetition Agreement (the "<u>Amended Services Agreement</u>");

   b.   The Revolving Credit and Short-Term Borrowing Agreement dated as of September 1, 2007, by and between TK Finance and Budd (the "<u>Cash Management Agreement</u>"); and

   c.   The Tax Sharing Agreement made and effective as of October 1, 2004, by and among Budd and certain Affiliates (the "<u>Tax Sharing Agreement</u>"), and as amended as to Budd on or about March 26, 2014 in connection with the Prepetition Agreement (the "<u>Amended Tax Sharing Agreement</u>").

14.     Budd and the Affiliates also have also consolidated operational responsibility for certain of their pension obligations. Budd sponsors the Pension Plans.

15.     The assets for the ERISA Pension Plans are held in a master trust, with trust assets on deposit at Bank of New York Mellon. The ERISA Pension Plans hold an allocable interest in the assets of the master trust. Budd and certain of the Affiliates, including TKNA, are members of the same controlled group for determining liability under ERISA. As a result, if the ERISA Pension Plans are terminated, those Affiliates would become jointly and severally liable for underfunding of the ERISA Pension Plans. As noted above, under the Settlement Agreement, TKNA will assume all of Budd's obligations under the ERISA Pension Plans, which will relieve the Debtor's estate of liability in the amount of $197 million (on an ongoing basis) or $394 million (on a termination basis), and TKNA will release Budd of any contribution or reimbursement claim associated with such assumption.

16.    In 2006, Budd sold and/or closed substantially all of its operations, including by: (a) selling its subsidiary, ThyssenKrupp Stahl (aluminum foundries) to Speyside Equity, LLC; (b) selling its plastics materials manufacturing and molding operations to Continental Structural Plastics Inc.; (c) selling its North American automotive body and chassis operations to Martinrea International Inc. ("Martinrea"); and (d) closing its Detroit plant.

17.    In 2012, Budd sold stock of its sole remaining operating facility, the Waupaca foundry operations, to KPS Capital Partners LP. In connection with and after the sale of the Waupaca facility, Budd reviewed its books and analyzed its financial ability to satisfy its legacy liabilities. It was this review that led to Budd's independent investigation (discussed below) and, ultimately, commencement of the Chapter 11 Case.

## III.    Commencement of the Investigation

18.    To determine the most effective method of completing Budd's controlled liquidation, in the Spring of 2013, the Board: (a) determined that an independent investigation was an appropriate exercise of its fiduciary duties; and (b) commenced an independent investigation (the "Investigation") into claims and causes of action between Budd, on the one hand, and the Affiliates, on the other hand (the "Affiliate Claims"). To avoid any actual or potential conflict of interest, or even the perception of a possible conflict of interest, the Board put into place a number of measures to ensure the independence and integrity of the Investigation.

19.    In May 2013, the Board tasked Mr. Moore as CRO to head the Investigation, and authorized the utilization of Conway MacKenzie Management Services, LLC ("Conway") as crisis manager to assist the CRO in the Investigation. The Board authorized the retention of Dickinson Wright PLLC ("Dickinson") as independent special counsel for purposes of assisting the CRO to conduct the Investigation and prosecuting and defending against the Affiliate Claims.

7

Neither Conway, Mr. Moore, nor Dickinson has a meaningful relationship with any Affiliate, other than by virtue of their work for Budd.

20.    Budd also instituted significant governance changes. On May 22, 2013, Budd appointed Mr. Sweet as Independent Director to the Board. Mr. Sweet had no previous connections with Budd or any Affiliate. The Board also issued a unanimous resolution requiring the approval and consent of the Independent Director to: (a) negotiate, settle, compromise, or otherwise resolve any claim or cause of action between Budd, on the one hand, and the Affiliates, on the other; (b) commence the prosecution of any cause of action against the Affiliates; or (c) waive the attorney-client privilege with respect to any cause of action against the Affiliates.

## IV.    The Scope of the Investigation

21.    The scope of the CRO's charge was intentionally broad, encompassing all potential claims and causes of action between Budd and the Affiliates. As described in detail in the Moore Declaration, the Investigation focused on five primary areas: (a) intercompany transactions; (b) transactions related to ThyssenKrupp Budd Canada, Inc. ("Budd Canada"), including the sale of Budd's stock in Budcan Holdings, Inc. ("Budcan Holdings"); (c) Pension Plan issues; (d) tax issues; and (e) theories of shared liability.[3] The CRO investigated[4] all material transactions between Budd and the Affiliates occurring on or after October 1, 2007. This look back period was based on the longest applicable statutes of limitation under applicable Michigan and federal law.

---

[3] In preparation for commencing the Chapter 11 Case, Budd established a data room, which contains substantially all of the diligence related documents and information reviewed and uncovered during the course of the Investigation. The purpose of establishing the data room is to provide parties in interest with the ability to meaningfully analyze the information relating to the Investigation and the Settlement Agreement. Budd is willing to provide access to the data room to parties in interest upon request and after execution of a non-disclosure agreement.

[4] All references to actions taken or reviewed by the CRO include actions taken under his direction by Conway and Dickinson.

## V.        Affiliate Claims Uncovered by the Investigation

22.        As a result of his Investigation, the CRO determined that Budd held the following potential claims against the Affiliates: (a) avoidance claims based on the recharacterization of certain intercompany loans as equity contributions and the subsequent "repayment" of these "loans"; (b) claims arising from Budd's sale of Budcan Holdings to an Affiliate; (c) reimbursement claims for amounts Budd paid in pension and welfare benefits to former Budd employees after those employees had transferred to Affiliates; and (d) claims arising from the Tax Sharing Agreement.

### a.    Avoidance Claims

23.        The CRO determined that three transfers (the "Transfers") to TKNA and TK Finance totaling approximately $407 million may be subject to avoidance on the basis that such Transfers were constructively fraudulent (the "Avoidance Claims"). As discussed in detail in the Moore Declaration, although the amount subject to avoidance is large, the facts and circumstances surrounding these claims and applicable law are unfavorable to Budd. The CRO concluded that Budd was unlikely to be successful in litigation of the Avoidance Claims, and that their actual value is a very small fraction of their face value.

### b.    Claims Arising from the Sale of Budd Canada

24.        On May 31, 2011, Budd sold the shares of its subsidiary, Budcan Holdings, to ThyssenKrupp Canada, Inc. for CAD $5 million. As set forth in the Moore Declaration, (a) Budd has a potential claim for avoiding this transaction as a constructively fraudulently transfer (the "Budd Canada Claim") because an argument can be made that the sale price was for less than reasonably equivalent value; but (b) the CRO believes that the value of the Budd Canada Claim does not exceed $5 million.

### c.  Payment of Non-Budd Employee Benefits

25.     As Budd wound down it manufacturing operations, many of its employees transferred to Affiliates. In some cases Budd continued to make benefit and pension payments to these employees after they had been transferred to an Affiliate. The CRO determined that Budd has not been reimbursed for approximately $1.2 million of these payments (the "Benefit Reimbursement Claims").

### d.  Claims under the Tax Sharing Agreement

26.     Budd is part of a consolidated tax filing group that includes TKNA and its U.S. subsidiaries. The members of the TKNA consolidated tax filing group are parties to the Tax Sharing Agreement, which provides a mechanism for allocating the tax benefits and burdens of the consolidated tax filing group. As described in detail in the Moore Declaration, the CRO believes that Budd and the Affiliates each have potential claims against the other related to the Tax Sharing Agreement. As described in the Moore Declaration, the CRO concluded that, if these claims were to be litigated, there is substantial risk that Budd would be found to owe Affiliates a significant amount, perhaps up to $70 million, largely on account of past payments received by Budd from Affiliates that Affiliates were not obligated to make.

## VI.     The CRO's Settlement Negotiations with the Affiliates

27.     On October 28, 2013, the CRO (via counsel) initiated settlement discussions with Affiliates by issuing a demand letter that set forth the Avoidance Claims, the Budd Canada Claims, the Benefit Reimbursement Claims, and the Tax Claims, and offered a settlement and compromise that included assumption by TKNA of the Pension Plans. As described in detail in the Moore Declaration, Affiliates issued a written response that: (a) asserted full or partial defenses to many of the claims asserted by the CRO, (b) asserted counterclaims against Budd,

and (c) offered to settle and compromise all such claims on terms that did not include assuming the Pension Plans.

28.     On January 22, 2014, counsel for the CRO and the Affiliates met in person to discuss the CRO's demand letter and the Affiliates' response. After that meeting, respective counsel for Budd and the Affiliates met several times, had numerous telephone conferences, exchanged many emails, and ultimately exchanged several draft settlement term sheets. An all-hands settlement conference was held on February 27, 2014. After nearly a full day of spirited and extensive negotiations, the CRO and Affiliates agreed to two non-binding term sheets for the terms of the Prepetition Agreement and the Settlement Agreement.

29.     On March, 20, 2014, after continued negotiation of the term sheets and substantial completion of the Settlement Agreement and the Prepetition Agreement, the CRO presented his findings to the Independent Director and recommended that the Independent Director approve the Settlement.

30.     On March 26, 2014, after receiving final versions of the Settlement Agreement and the Prepetition Agreement, the Board unanimously (on the recommendation of and affirmative vote of the Independent Director) approved the Settlement Agreement and the Prepetition Agreement, which were then executed.

## VII.     The Settlement

31.     The principal terms of the Settlement are set forth above, and both agreements memorializing the Settlement are attached to this Motion as exhibits.

32.     The Prepetition Agreement was fully performed prior to the Petition Date. Accordingly: (a) the Amended Tax Sharing Agreement and the Amended Services Agreement are effective; (b) TK Finance has remitted to Budd approximately $390 million of Short Term Borrowings (as defined in the Cash Management Agreement); and (c) TKNA has assumed

11

(i) liability for all of Budd's workers' compensation liabilities and (ii) sponsorship of the 401(k) Plan. Remittance to Budd of its approximately $390 million of Short Term Borrowing was especially significant because it eliminated the Affiliates' ability to offset amounts they claim to be owed by Budd.

33.     The effectiveness of the Settlement Agreement is contingent upon entry of an order by this Court approving the Settlement Agreement.

## RELIEF REQUESTED

34.     The Debtor seeks entry of an order, pursuant to section 105(a) of the Bankruptcy Code and rule 9019(a) of the Bankruptcy Rules, approving the Settlement Agreement.

## BASIS FOR RELIEF REQUESTED

### I.     The Settlement Agreement Should Be Approved.

35.     The Settlement Agreement should be approved because its benefits far exceed the value of Budd's claims being compromised. The CRO estimates that the value of the claims against Budd that Affiliates will release under the Settlement Agreement greatly exceed the value of the claims against Affiliates that Budd will release. Moreover, Budd will receive the following additional benefits that provide Budd and its chapter 11 estate with significant additional value, and render the settlement unquestionably in Budd's best interests: (a) TKNA assuming the ERISA Pension Plans and waiving claims for contribution or reimbursement, with the result that the PBGC will not successfully assert a $394 million unsecured claim for termination damages (an estimated value to Budd and its creditors of $114 million); (b) TKNA assuming the SERP (a liability of approximately of $12 million, which will provide an estimated value to Budd and its creditors of approximately $3.4 million); (c) Budd receiving $10.3 million in cash; and (d) Budd receiving the benefits of the Prepetition Agreement (including the tax

indemnification, receipt of cash without offset, and services provided under the Amended Services Agreement).

36.     A substantial portion of the benefit of the Settlement is realized only if the Settlement Agreement is approved. The Settlement (as well as the Settlement Agreement on its own) is intrinsically fair to Budd, and more than satisfies the business judgment standard.

37.     "On motion by the trustee [or debtor in possession] and after notice and a hearing, the court may approve a compromise or settlement." Bankruptcy Rule 9019(a). Approval of a compromise or settlement is left to the discretion of the bankruptcy court. *In re Quay Corp., Inc.*, 372 B.R. 378, 382 (Bankr. N.D. Ill. 2007) (citing *In re Del Grosso*, 106 B.R. 165, 167 (Bankr. N.D. Ill. 1989)). In general, a court will approve a settlement if it finds that such settlement "is in the best interests of the bankruptcy estate." *In re Holly Marine Towing, Inc.*, 669 F.3d 796, 801 (7th Cir. 2012) (citing *In re Doctors Hosp. of Hyde Park, Inc.*, 474 F.3d 421, 426 (7th Cir. 2007)). In determining if a settlement is in the estate's best interests, a court weighs the costs and benefits of litigation against the terms of the settlement. *Id.* at 802 (citing *Doctors Hosp.*, 474 F.3d at 426). In general, a proposed settlement will be approved by a court if it falls within the "reasonable range of litigation outcomes." *Id.*

38.     The Court is not required to decide issues of law and fact raised by the settlement, but rather should "canvass the issues and see whether the settlement 'fall[s] below the lowest point in the range of reasonableness.'" *Finkelstein v. W.T. Grant Co. (In re W.T. Grant Co.)*, 699 F.2nd 599, 608 (2d. Cir. 1983) (*citing Newman v. Stein*, 464 F.2d 689, 693 (2d Cir. 1972)); *see also Purofeed Down Prods.*, 150 B.R. at 522 ("the court need not conduct a 'mini-trial' to determine the merits of the underlying [dispute]").

39.    Furthermore, while the standards for analyzing a board of director's settlement decisions under rule 9019 of the Bankruptcy Rules are different from those used to analyze board decisions outside of bankruptcy, one factor that courts will consider is whether the settlement was the result of the Debtor's business judgment. *In re Dewey & LeBoeuf LLP*, 478 B.R. 627, 642 (Bankr. S.D.N.Y. 2012).

40.    The standard does not change merely because this is a settlement between a parent and subsidiary. While some courts have indicated that, under certain circumstances, heightened scrutiny of parent-subsidiary or related party settlements might be appropriate, application of such heightened scrutiny would be inappropriate here, where Budd took steps to ensure that no conflict of interest existed that could taint the settlement process. Those steps included:  (a) determining that an independent investigation was appropriate; (b) appointing an independent CRO to head the investigation; (c) engaging an outside crisis management firm to assist in conducting the investigation; (d) engaging independent counsel to assist and advise in the investigation; and (e) appointing an independent director with no prior connection to Budd or its Affiliates and requiring his approval of all significant steps in the prosecution and/or settlement of any potential claims.    Under these circumstances, the Settlement cannot be considered a related party or insider transaction. *See Dewey*, 478 B.R. at 642 (declining to apply heightened standards to a settlement negotiated by debtors' CRO, outside counsel and financial advisor without interference from insiders).

41.    Moreover, even where heightened scrutiny applies, the purpose of the court's inquiry is the same:  ascertaining whether the settlement is fair and reasonable and in the best interest of the estate. *See In Re Drexel Burnham Lambert Group*, 134 B.R. 493, 499 (Bankr.

S.D.N.Y. 1991); *Forster Mortg. Corp. v. United Co. Fin. Corp.*, 68 F.3d 914, 918-919 (5th Cir.

1995).  If it is, the settlement should be approved.

42.    As shown below, the Settlement is fair and reasonable and in the best interests of

the estate, regardless of the level of scrutiny applied, and therefore should be approved.

43.    Finally, public policy weighs in favor of the Court exercising its discretion to

approve the Settlement. *See In re Hibbard Brown & Co., Inc.*, 217 B.R. 41, 46 (Bankr. S.D.N.Y.

1998); *see also Nellis v. Shugrue*, 165. B.R. 115, 123 (Bankr. S.D.N.Y. 1994) ("[T]he general

rule [is] that settlements are to be favored and, in fact, encouraged.")

## II.    The Value of the Proposed Settlement Exceeds the Value of the Claims Being Compromised.

44.    In light of the relative value of the claims Budd holds against the Affiliates, the

cost, time, and risks of prosecuting those claims, and the consideration Budd is receiving under

the terms of the Settlement Agreement (including a release of claims that the Affiliates have

against Budd), approval of the Settlement Agreement is in the best interests of the Debtor's

estate.

### a.  Consideration Provided to Budd Under the Settlement Agreement

45.    In exchange for a release of the claims Budd holds against the Affiliates, the

Settlement Agreement provides that Budd will receive the benefit of the following:

(a) assumption by TKNA of the Pension Plans and waiver of any related claims of TKNA for

contribution or reimbursement (with an estimated value to Budd and its creditors of $114

million); (b) assumption of the SERP (with an estimated value to Budd and its creditors of over

$3 million); (c) payment to Budd of cash consideration in the amount of $10.3 million; and (d) a

release of all claims that the Affiliates now hold against Budd, which claims the CRO believes

greatly exceed the value of claims being released by Budd (which releases are the only

consideration that Budd provides to Affiliates under the Settlement). Budd also gained the benefits of the Prepetition Agreement as a direct result of executing the Settlement Agreement. Each of these benefits is discussed in turn below.

### i. Assumption of the Pension Plans

46.     The Settlement Agreement provides that TKNA shall assume sponsorship of and full financial responsibility for the Pension Plans, including the SERP. As of February 28, 2014, Budd's two ERISA Pension Plans were underfunded by approximately $197 million (on an ongoing basis) and the SERP liability was approximately $12 million. If TKNA did not assume the ERISA Pension Plans, it is likely that the Chapter 11 Case would result in termination of the ERISA Pension Plans and the PBGC asserting against Budd's estate an unsecured claim for approximately $394 million (the underfunding of the ERISA Pension Plans on a termination basis). While upon termination TKNA would become jointly and severally liable with Budd for the underfunding of the ERISA Pension Plans, this would not stop the PBGC from receiving a distribution on account of its $394 million unsecured claim against Budd before pursuing the TKNA controlled group for the balance of the claim. Distributions to the PBGC could dilute recoveries to Budd's unsecured creditors by approximately $114 million.[5] In addition, TKNA is waiving and releasing any claim it may have for contribution or subrogation in connection with assuming the Pension Plans. That potential claim would, if valid, similarly dilute recoveries by Budd's other unsecured creditors.

### ii. Receipt of $10.3 Million Settlement Payment

47.     If the Settlement Agreement is approved, TKNA will pay to Budd $10.3 million, subject to reduction for any post-petition ERISA funding obligations that Budd does not make.

---

[5] The bases for this estimate are set forth in the Moore Declaration.

### iii.  Release of Affiliate Claims

48.      The Settlement Agreement provides that Budd will be released from all past claims and causes of action of the Affiliates. The CRO believes that Affiliates hold claims against Budd that greatly exceed the claims Budd holds against Affiliates, meaning that the value of the releases alone make the Settlement favorable to Budd.

### b.  Consideration Provided to Budd Under the Prepetition Agreement

49.      The Settlement Agreement was executed in connection with the Prepetition Agreement, which provides a number of additional benefits and value to Budd. Most importantly, it required the Affiliates to remit to Budd approximately $390 million of cash held under the Cash Management Agreement. This was extremely important because it eliminated the Affiliates' ability to offset amounts they claim to be owed by Budd if the Settlement Agreement is not approved.

50.      Additionally, in the Prepetition Agreement, the Affiliates: (a) assumed all of Budd's workers' compensation liabilities (with a book value of approximately $4.5 million as of March 1, 2014) in exchange for offsetting from the amount of Short Term Borrowings (used as defined in the Cash Management Agreement) remitted to Budd $4.5 million (instead of $9.9 million, which is the amount of the letters of credit securing these obligations for which TK Finance will retain liability); (b) assumed sponsorship of the 401(k) Plan; (c) amended the Tax Sharing Agreement, which includes an obligation by TKNA to indemnify Budd for state and federal income tax liabilities (including with respect to an approximate $20 million known potential liability described in the next paragraph); and (d) amended the Services Agreement to continue to provide Budd with administrative services without charge for 18 months.

51.      Under the amended Tax Sharing Agreement, TKNA indemnifies Budd and holds Budd harmless from tax losses. This provides a significant benefit to Budd. Specifically, TKNA

advised the CRO that TKNA has established an approximate $20 million uncertain tax position

reserve with respect to a $55 million to $60 million dollar expense deduction taken by Budd in

2011 related to a capital contribution made by Budd to Budcan Holdings. The CRO believes that,

if that deduction is audited and the contribution is recharacterized, the potential exposure to

Budd would be approximately $20 million. The CRO further believes that there is material risk

that this exposure could lead to an actual loss, for which Budd is indemnified as a result of the

Settlement.

52.    Amending the Services Agreement was very significant to Budd because Budd

has no employees, and many of its administrative functions are provided by the Affiliates under

the Services Agreement. Pursuant to the Amended Services Agreement, Affiliates will continue

to provide Budd office space and the following services: (a) accounting services/ledger

maintenance, (b) financial services and reporting, (c) tax services, (d) risk management services,

(e) bill review and payment services, (f) maintenance of books and records, (g) legal support, (h)

healthcare administration, (i) pension administration, and (j) logistical and tech support. If Budd

did not receive these services and benefits from TKNA, it would incur significant cost in

obtaining them on its own. Under the Amended Services Agreement, TKNA is providing these

benefits to Budd at no cost for 18 months. Moreover, the lack of familiarity with Budd's history

and operations would require new, outside professionals and service providers to spend

significant time, at Budd's expense, in bringing themselves up to speed.

53.    TKNA may terminate the Amended Services Agreement upon 30 days' notice. If

the Settlement Agreement is not approved and Budd and TKNA litigate the Affiliate Claims, the

CRO expects that TKNA may terminate the Amended Services Agreement. Alternatively, in that

instance Budd may determine that TKNA's continued performance under the Amended Services

Agreement would be inappropriate. In either case, terminating the Amended Services Agreement would be a substantial detriment to Budd and lead to significant additional costs to Budd.

### c.   The Risks and Costs of Litigating the Affiliate Claims

54.   The face value of Budd's claims against Affiliates is approximately $467 million. The Avoidance Claims, however, are the most significant claims in terms of face value (approximately $407 million), and the CRO believes that these are the weakest of Budd's claims, and that the Affiliates would prevail if the Avoidance Claims were litigated.

55.   With respect to Budd's claims under the Tax Sharing Agreement, the CRO believes that if these claims were litigated, there is a substantial risk that not only would Budd receive nothing on account of its claims, but that it could well incur liability to the Affiliates in an amount up to $70 million.[6]

56.   The next highest face amount claims are the Budd Canada Claims, which the CRO believes: (a) Budd is unlikely to win; and (b) even if Budd did win, would lead to a maximum recovery of $25.8 million.

57.   Budd's remaining claims together are, if successfully litigated, worth less to Budd than the $10.3 million of cash that the Affiliates are paying to Budd under the Settlement Agreement.

58.   In sum, for Budd to obtain from litigating the Affiliate Claims a result more favorable to it than that achieved under the Settlement, Budd would have to prevail on its Avoidance Claims, which the CRO believes to be highly unlikely.

59.   The Settlement is overwhelmingly favorable to Budd, and more than qualifies as a fair compromise of the legal positions of the parties. Under the Settlement Agreement, Budd will

---

[6] Had the Affiliates not entered into the Prepetition Agreement, they likely would have been entitled to set off these claims against the approximately $390 million receivable of Budd's cash that TK Finance: (1) held and managed under the Cash Management Agreement, and (2) remitted to Budd in the week prior to the Petition Date.

receive more value from the releases it receives from Affiliates than it provides by the releases it is granting to Affiliates. Moreover, the other elements of the Settlement (none of which require Budd to provide any consideration) provide Budd significant value, estimated by the CRO to be well in excess of $114 million.

60.     The estimated effect of the Settlement is that distributions to Budd's unsecured creditors (through a combination of consideration received and hundreds of millions of dollars of claims that will not be allowed) will increase significantly, perhaps by 50%. Moreover, TKNA's assumption of the Pension Plans and Budd's worker's compensation obligations will provide needed stability to Budd's retirees during a time of uncertainty, and assure payment of workers' compensation claims and pensions in full and without interruption.

### III.     The Proposed Settlement Constitutes a Reasonable Exercise of the Budd's Business Judgment.

61.     Even were the significant benefits of the Settlement Agreement not evident on their face (which the Debtor believes they are), the Court should give significant weight to the Independent Director's business judgment. The Settlement Agreement was approved by the Independent Director as an exercise of his sound business judgment following arm's-length negotiations with the Affiliates. Budd and the Affiliates each were represented by competent and sophisticated counsel who would vigorously prosecute and defend their clients' respective positions with respect to the matters resolved by the Settlement Agreement.

62.     Budd's independent CRO engaged in a lengthy (nearly 10 month) Investigation. This process was conducted with the assistance of independent professionals and counsel. Participation by these independent and sophisticated parties is an additional factor considered by courts. *See In re Ionosphere Clubs*, 156 B.R. 414, 426 (S.D.N.Y. 1993), aff'd, 17 F.3d 600 (2d Cir. 1994).

63.     Approval of the Settlement Agreement is in the best interests of Budd and its estate. The negotiations were hard-fought, and the resulting Settlement represents the sound business judgment of Budd's Independent Director. Thus, the Settlement Agreement should be approved in all respects by the Court pursuant to Bankruptcy Rule 9019(a) and as otherwise requested herein.

64.     Under the terms of the Settlement Agreement, Budd must obtain approval of the Settlement Agreement by the later of: (a) the date that is seventy-five (75) days after the formation of the first official committee to be constituted in the Chapter 11 Case, whether under section 1102 or 1114 of the Bankruptcy Code or otherwise, provided that such committee is formed on or before June 29, 2014; or (b) June 30, 2014. If the Settlement Agreement is approved by the Court and becomes effective prior to July 15, 2014, then TKNA (and not Budd) will be responsible for all minimum funding contributions due to the Pension Plans on and after that date. Accordingly, there is material advantage to Budd in the expeditious approval of the Settlement Agreement.[7]

### WAIVER OF STAY UNDER BANKRUPTCY RULE 6004(h)

65.     Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property ... is stayed until the expiration of 10 days after entry of the order, unless the court orders otherwise." The purpose of Bankruptcy Rule 6004(h) is to provide sufficient time for an objecting party to appeal before an order can be implemented. *See* Advisory Committee Notes to Fed. R. Bankr. P. 6004(h).

66.     In this case, the Debtor anticipates providing diligence materials to parties in interest, and facilitating additional discovery, if necessary, in advance of any hearing on the

---

[7] The minimum funding contribution due on July 15, 2014 is approximately $3.9 million.

Motion. Thus, any party wishing to object any order of this Court approving the Motion will have ample time to do so in advance of any substantive hearing. Moreover, if an objection is filed and overruled, and the objecting party informs the Court of their intent to appeal, the stay may be modified to the amount of time actually necessary to file such appeal.

67.     The Settlement Agreement, however, only becomes effective upon the order approving the Settlement Agreement becoming final and no longer subject to objection or appeal. There is significant value to the Debtor's estate in the Settlement Agreement becoming effective as soon as possible, because: (a) if the Settlement Agreement becomes effective prior to July 15, then TKNA (and not the Debtor) will be obligated to make the minimum funding payment due on that date in the amount of $3.9 million; and (b) failure of the Settlement Agreement to become effective by the outside date identified in the Settlement Agreement may lead to the Settlement Agreement no longer being enforceable against the Affiliates. Accordingly, the Debtor hereby requests that the Court waive the ten-day stay period under Bankruptcy Rule 6004(h).

## NOTICE

68.     Notice of this Motion has been given to: (a) the United States Trustee; (b) the Debtor's twenty (20) largest unsecured creditors; (c) the Internal Revenue Service; and (d) the Environmental Protection Agency and similar state environmental agencies for states in which the Debtor may have environmental liabilities. In light of the nature of the relief requested herein, the Debtor respectfully submits that no further notice is necessary. The Debtor submits that such notice is sufficient and adequate under the circumstances.

## NO PRIOR REQUEST

69.     No prior request for the relief sought in this Motion has been made to this or any

other court.

**WHEREFORE**, Budd respectfully requests that the Court enter an order approving the

Settlement Agreement and granting any other relief the Court deems appropriate.


Dated: March 31, 2014                    Respectfully submitted,

                                         **THE BUDD COMPANY, INC.**


                                         By:*/s/Jeremy T. Stillings*_____
                                             One of Its Attorneys

                                         Jeff J. Marwil (IL #6194054)
                                         Jeremy T. Stillings (IL #6279868)
                                         Brandon W. Levitan (IL #6303819)
                                         Proskauer Rose LLP
                                         70 W. Madison St.
                                         Chicago, Illinois 60602-4342
                                         Telephone: (312) 962-3550
                                         Facsimile: (312) 962-3551

                                         *Proposed Counsel to the Debtor*