## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| THE BUDD COMPANY, INC.,[1] | ) | Case No. 14-11873 |
| | ) | |
| Debtor. | ) | Honorable Jack B. Schmetterer |

### DECLARATION OF BRIAN BASTIEN,
### PRESIDENT AND CHIEF EXECUTIVE OFFICER FOR THE DEBTOR,
### IN SUPPORT OF FIRST DAY PLEADINGS

I, Brian Bastien, hereby declare under penalty of perjury under the laws of the United States, pursuant to 28 U.S.C. §1746, that the following is true and correct (the "Declaration"):

1.      I am the President, Treasurer, Assistant Secretary, and Chief Executive Officer for The Budd Company, Inc. ("Budd", or the "Debtor"), a Michigan corporation headquartered in Chicago, Illinois. I am one of three members of the Board of Directors (the "Board") of the Debtor. I am generally familiar with the Debtor's assets, business and financial affairs, and books and records.

2.      Except as otherwise indicated, all facts set forth herein are based upon: (a) my personal knowledge; (b) information learned from my review of relevant documents; or (c) information supplied to me by other members of the Debtor's management, the Debtor's advisors, the Debtor's professionals, or advisors, employees, or professionals of certain of the Debtor's affiliates. I am authorized to submit this Declaration on behalf of the Debtor, and, if called upon to testify, I could and would testify competently to the facts set forth herein.

3.      The Debtor has a long history of manufacturing related to the automobile and other industries. However, the Debtor ceased all manufacturing activity in 2006, divested itself

---

[1]   The last four digits of the Debtor's federal tax identification number are 3060.

of its last operating subsidiary in 2012, and no longer generates revenue (directly or indirectly) from manufacturing or other operations.

4.      The Debtor has no employees, and its ordinary course of business currently consists of satisfying legacy and other liabilities. The Debtor has approximately $384 million in cash, is current on all of its current liabilities, and pays its obligations as they come due.

5.      Although the Debtor has some environmental and asbestos related liabilities, the vast majority of the Debtor's creditors are its former employees, and the vast majority of the Debtor's liabilities (by dollar amount) arise from medical, pension, and other post-retirement obligations owed to its former employees. Net of applicable insurance (discussed below), Budd had, as of September 30, 2013, approximately $1.2 billion in book-value liabilities on its books, consisting substantially of the following:

| Type of Liability | Approximate Number of Creditors | Approximate Amount of Liabilities |
|---|---|---|
| Retiree Pension / SERP | 10,000[2] | $211 million |
| Retiree Medical and OPEB | 5,900 | $933 million |
| Product Liability / Asbestos | 356 | $23 million (net of insurance) |
| Environmental | 10 | $8 million |
| Workers Compensation[3] | 66 | $4.5 million |

6.      The Debtor commenced this case (the "Chapter 11 Case") to liquidate in a manner that will provide its stakeholders with transparency, serve the best interests of its creditors, and provide fair and equitable treatment to all of its creditors. The Debtor commenced this Chapter

---

[2] This includes approximately 8,000 retirees currently receiving pension payments, the remainder of which are vested, but not yet receiving payments.

[3] As described below, ThyssenKrupp North America, Inc. ("TKNA"), an Affiliate, recently assumed all of the Debtor's workers' compensation liabilities under the Prepetition Agreement (as defined below).

11 Case principally because it realized that its significant cash assets likely will be insufficient to satisfy its long-term liabilities, the vast majority of which are owed to its retirees.

7.     A principal benefit of the Debtor liquidating in chapter 11 is the treatment afforded to retirees by chapter 11. As described below: (a) the Company is seeking appointment of a Retirees Committee (as defined below) to represent the interest of its retirees; (b) the Company expects that it will pay the costs of the Retirees Committee, pursuant to order of the Court; and (c) the Company will continue to pay benefits to its retirees as required by Section 1114 of the Bankruptcy Code until order of the Court to the contrary.

8.     The Debtor believes that all unsecured creditors (including retirees) will significantly benefit from a settlement agreement (the "Settlement Agreement") that the Debtor negotiated with its Affiliates (used herein as defined in the Settlement Agreement) prior to the Petition Date (defined below), and of which the Debtor currently is seeking approval of this Court. The Settlement Agreement provides for, among other things, the Debtor's Affiliates to assume all of the Debtor's pension plan liabilities. The Settlement Agreement is attached as an exhibit to the Settlement Motion (defined below), and the Settlement Agreement (and its expected benefits to the Debtor's estate) are described in greater detail in both: (a) the Settlement Motion; and (b) the declaration of Mr. Charles Moore, Chief Restructuring Officer (the "CRO") of the Debtor, attached to the Settlement Motion.

9.     The CRO estimates that the Settlement Agreement, if approved by the Court, will result in significant benefit to unsecured creditors, perhaps increasing unsecured creditor recoveries in this case by up to 50%. As described in the Settlement Motion, the Settlement Agreement provides for the Debtor's Affiliates (in addition to assuming the Debtor's pension plan liabilities) to pay the Debtor $10.3 million and release the Debtor of claims that the independent CRO believes are worth tens of millions of dollars.

3

10.     To enable the Debtor to commence the tasks relating to the administration of this Chapter 11 Case, to facilitate creditor participation in the Chapter 11 Case, and to maximize recoveries on account of the Debtor's assets, the Debtor has requested various types of relief in "first day" pleadings and applications (each, a "<u>First Day Pleading</u>") described below.[4] I am familiar with the contents of each First Day Pleading (including the exhibits and schedules thereto) and I believe that the relief sought in each First Day Pleading best serves the Debtor's estate and the interests of its creditors.

**I.      Commencement of the Chapter 11 Case**

11.     On the date hereof (the "<u>Petition Date</u>"), the Debtor filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (11 U.S.C. §§ 101 *et seq*., the "<u>Bankruptcy Code</u>"), commencing the Chapter 11 Case.

**II.     Budd's Corporate History and Relationship with its Affiliates**

12.     In 1978, ThyssenKrupp AG ("<u>TKAG</u>") acquired Budd. Budd currently is a wholly owned subsidiary of ThyssenKrupp North America, Inc. ("<u>TKNA</u>"), which is a direct subsidiary of TKAG. Thus, Budd is a member of the global TKAG group. The TKAG group operates in almost 80 countries, employs over 150,000 people world-wide, and generates sales of approximately $50 billion annually. TKNA and its approximately 37 subsidiaries located in the United States generate annual revenue of over $7 billion.

13.     As a member of the TKAG group, Budd has a number of operational ties to Affiliates. Historically, three primary agreements governed the operational relationships between Budd and its Affiliates:

---

[4] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the relevant First Day Pleading.

a. The Special Services Agreement dated as of March 31, 2007, by and between ThyssenKrupp USA, Inc. ("TK USA", predecessor to TKNA) and Budd (the "Services Agreement"), and as amended and restated on or about March 26, 2014 in connection with the Prepetition Agreement (the "Amended Services Agreement");

b. The Revolving Credit and Short-Term Borrowing Agreement dated as of September 1, 2007, by and between ThyssenKrupp Finance USA, Inc. ("TK Finance") and Budd (the "Cash Management Agreement"); and

c. The Tax Sharing Agreement made and effective as of October 1, 2004, by and among Budd and certain Affiliates (the "Tax Sharing Agreement"), and as amended as to Budd on or about March 26, 2014 in connection with the Prepetition Agreement (the "Amended Tax Sharing Agreement").

14.    Budd and the Affiliates also have consolidated operational responsibility for certain of their pension obligations. Budd sponsors the following pension plans:

a. The Budd-UAW Consolidated Retirement Benefit Plan (the "UAW Plan");

b. The Budd Company Pension Plan for Executive and Administrative Employees (the "E&A Plan", and together with the UAW Plan, the "ERISA Pension Plans"); and

c. a supplemental non-ERISA[5] pension plan, The Budd Company Supplemental Pension Plan (the "SERP" and, together with the ERISA Pension Plans, the "Pension Plans").

15.    The assets for the ERISA Pension Plans are held in a master trust, with trust assets on deposit at Bank of New York Mellon. The ERISA Pension Plans hold an allocable interest in the assets of the master trust. Budd and certain of the Affiliates, including TKNA, are members of the same controlled group for determining liability under ERISA. As a result, if the ERISA Pension Plans are terminated, those Affiliates would become jointly and severally liable for underfunding of the ERISA Pension Plans. Controlled group liability would not apply to the non-ERISA qualified SERP in the event of its termination.

---

[5] The Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C.A. § 1001 et seq. (1974).

16.     In 2006, Budd sold and/or closed substantially all of its operations, including by: (a) selling its subsidiary, ThyssenKrupp Stahl (aluminum foundries) to Speyside Equity, LLC; (b) selling its plastics materials manufacturing and molding operations to Continental Structural Plastics Inc.; (c) selling its North American automotive body and chassis operations to Martinrea International Inc.; and (d) closing its Detroit plant.

17.     In 2012, Budd sold stock of its sole remaining operating facility, the Waupaca foundry operations, to KPS Capital Partners LP. In connection with and after the sale of the Waupaca facility, Budd reviewed its books and analyzed its financial ability to satisfy its legacy liabilities. It was this review that led to Budd's Investigation (discussed below) and, ultimately, commencement of the Chapter 11 Case.

## III.    Commencement of the Investigation

18.     To determine the most effective method of completing Budd's controlled liquidation, in the Spring of 2013, the Board: (a) determined an investigation was an appropriate exercise of its fiduciary duties; and (b) commenced an independent investigation (the "Investigation") into claims and causes of action between Budd, on the one hand, and the Affiliates, on the other hand (the "Affiliate Claims"). To avoid any actual or potential conflict of interest, or even the perception of a possible conflict of interest, the Board put into place a number of measures to ensure the independence and integrity of the Investigation.

19.     In May 2013, the Board tasked Mr. Moore as CRO to head the Investigation, and authorized the utilization of Conway MacKenzie Management Services, LLC ("Conway") as crisis manager to assist the CRO in the Investigation. The Board authorized the retention of Dickinson Wright PLLC ("Dickinson") as independent special counsel for purposes of assisting the CRO to conduct the Investigation. Neither Conway, Mr. Moore, nor Dickinson has a meaningful relationship with any Affiliate, other than by virtue of their work for Budd.

20.     Budd also instituted significant governance changes. On May 22, 2013, Budd appointed Charles Sweet as independent director to the Board (the "Independent Director"). Mr. Sweet had no previous connections with Budd or any Affiliate. The Board also issued a unanimous resolution requiring the approval and consent of the Independent Director to: (a) negotiate, settle, compromise, or otherwise resolve any claim or cause of action between Budd, on the one hand, and the Affiliates, on the other; (b) commence the prosecution of any cause of action against the Affiliates; or (c) waive the attorney-client privilege with respect to any cause of action against the Affiliates.

21.     The CRO commenced the Investigation in or around May 2013. The Investigation led the CRO to negotiate the Settlement Agreement and a related Prepetition Agreement (used herein as defined in the Settlement Motion), which the CRO recommended that the Board approve.

22.     On May 26, 2013, the Board (including with the affirmative approval and consent of the Independent Director): (a) approved the Settlement Agreement and the Prepetition Agreement, which was negotiated and executed in connection with the Settlement Agreement; and (b) authorized and directed that the Prepetition Agreement be executed and performed.

23.     The Prepetition Agreement became effective on May 26, 2014 and has been consummated. Between March 26th and the Petition Date, I coordinated Budd's receipt of approximately $384 million of cash from TK Finance, as required by the Prepetition Agreement.

24.     The scope and results of the Investigation, as well as the benefits of the Prepetition Agreement and the Settlement Agreement, are described in great detail in the Settlement Motion and the CRO declaration attached thereto.

## IV.    The Debtor's Current Operations

25.    Largely because it does not engage in manufacturing operations, the Debtor currently has no employees. The Debtor is directed by its Board, which currently consists of: (a) me; (b) Heinz Hense, an employee of the TK group who is based in Germany; and (c) Charles Sweet, the Independent Director. In addition to my role at Budd, I currently am employed by Component Technologies, which is an Affiliate.

26.    Because the Debtor has no employees, to conduct its day to day operations it relies upon: (a) employees of Affiliates working under the Amended Services Agreement; and (b) a variety of ordinary course professionals and vendors.

27.    The individuals who provide services to the Debtor pursuant to the Amended Services Agreement have significant operational and historical knowledge of the Debtor, including as to the Debtor's legacy and other liabilities. If the Debtor did not receive services under the Amended Services Agreement, I would have to hire multiple employees or retain multiple different professionals or professional services in order to operate the Debtor in the ordinary course of business, and to administer this Chapter 11 Case.

28.    The professionals, vendors, and service providers that the Debtor uses in the ordinary course of its business consist substantially of the following: (a) Towers Watson, who provides actuarial services to the Debtor; (b) Benefits Outsourcing Solutions, who administers certain of the Debtor's retiree benefits; (c) Blue Cross Blue Shield of Michigan, who administers retiree medical benefits to the Debtor's retirees; (d) Unicare Life and Health Insurance Company, who administers life, dental, vision, and hearing retiree benefits; (e) CVS Caremark, who provides prescription benefits services to the Debtor's retirees; (f) Silverscript Insurance Company, who provides retiree prescription drug plans; (g) the law firm of Stevenson Keppelman and Associates, who represents the Debtor with respect to pension, ERISA, and other

issues; (h) the law firm Montgomery, McCracken, Walker & Rhoades, who represents the Debtor with respect to its environmental claims and remediation obligations; (i) the law firm Butzel Long, a Professional Corporation, that represents the Debtor in asbestos related lawsuits and coordinates the Debtor's asbestos litigation strategy and its asbestos attorneys nationwide; and (j) a variety of law firms across the country who represent the Debtor in asbestos related lawsuits.

29.     Prior to TKNA assuming the Debtor's workers' compensation claims, the Debtor used Gallagher Bassett Services, Inc. to administer its workers' compensation obligations.

30.     The Debtor generally spends between $4 million and $5 million per month on retiree benefits and payment to the vendors, professionals, and benefits providers described above. Other than contribution payments required under or in connection with the Pension Plans, these payments constitute materially all of Budd's ordinary course expenditures.

## V.     The Debtor's Assets

31.     As of the Petition Date, substantially all of the Debtor's material assets consist of: (a) approximately $384 million cash; (b) a long term tax attribute recorded on the Debtor's balance sheet (the "Tax Attribute"), which I believe has no actual value; (c) interests in insurance policies, including substantial insurance policies to cover asbestos liability claims; and (d) the Debtor's interests in the Settlement Agreement.

32.     A substantial portion of the Debtor's ordinary course expenditures are payment of retiree benefits, and thus are deductible under applicable provisions of the Internal Revenue Code (the "Tax Code"). In the past, when the Debtor generated income from operations, the Debtor was able to deduct from its otherwise taxable income portions of payments made on account of retiree benefits, and thus recognize value on account of the Tax Attribute (as it existed at any point in time). At some points in the past, even if the Debtor did not have income from

operations against which losses could be offset, Affiliates were able to use the Debtor's tax attributes under the Tax Sharing Agreement, and would pay Budd in cash on account of their use of the Debtor's tax attributes. Under current facts and circumstances (*i.e.*, because (a) the Debtor no longer generates a meaningful amount of taxable income, (b) the Debtor will not in the future generate a meaningful amount of taxable income, (c) the amount of losses already available to Affiliates that would have to be exhausted before Affiliates could attempt to recognize value on account of the Tax Attribute, and (d) by operation of the Tax Sharing Agreement) the Tax Attribute has little or no actual value to the Debtor. The Tax Sharing Agreement is discussed in the Settlement Motion.

33.     The value of the Settlement Agreement is described in great detail in the Settlement Motion.

**VI.     The Debtor's Liabiities**

34.     As summarized in the chart above, the Debtor has approximately $1.2 billion of known liabilities.

35.     The Debtor currently provides health care and other benefits (the "Retiree Benefits") to approximately 5,900 of its retired employees and/or their respective spouses, surviving spouses, domestic partners, and dependents (collectively, the "Retirees") pursuant to certain ERISA qualified welfare plans. The actuarial value of liabilities associated with the Budd Retire Benefits is approximately $933 million, as set forth in greater detail below and in the Retirees Committee Motion (defined below).

36.     Approximately 10,000 former employees are vested to participate in the Pension Plans. Budd is current on all of its funding obligations under the Pension Plans. However, as of February 28, 2014: (a) the book value of the ERISA Pension Plans' underfunding was approximately $197 million (on a going concern basis); and (b) the Debtor had an estimated

book-value liability under the SERP of approximately $12 million. Each month, the Debtor pays approximately $95,000 in benefits under the SERP. The Debtor's next minimum funding contribution payment under the ERISA Pension Plans is due July 15, 2014 in the amount of approximately $3.9 million. As described in detail in the Settlement Motion, TKNA will assume all of the Debtor's sponsorship, administrative, and payment obligations under the Pension Plans if the Settlement Agreement is approved and becomes effective.

37.     As a result of its historic manufacturing operations, the Debtor has known (and perhaps unknown) environmental liabilities: (a) arising under the federal Superfund law ("CERCLA") and/or under various state and local environmental laws and regulations (possibly including common law); and (b) arising under and/or memorialized by consent decrees, cost sharing agreements, consent orders, settlement agreements, and other documents executed by or otherwise binding upon the Debtor. The Debtor is not currently engaged in any manufacturing activities, does not own or lease any real property, and believes that it is current on all of its known environmental liability obligations. Accordingly, the Debtor believes that all of its environmental liabilities are contingent, unliquidated, and/or disputed.

38.     As of the Petition Date, the Debtor was a defendant in approximately 356 actions pending before state and federal district courts asserting claims based upon asbestos-related diseases or conditions. In the ordinary course of business, new asbestos-related suits are filed against Budd. The Debtor has interests in myriad insurance policies, some dating back decades,[6] that provide varying levels of coverage against asbestos-related claims, and uses its cash assets and insurance interests to both: (a) aggressively defend itself from asbestos-related suits; and (b) pay asbestos-related judgments and settlements. Historically, (a) a significant majority of the

---

[6] Most of these liabilities are related to a rail car division of Budd sold in 1985.

asbestos-related lawsuits filed against the Debtor have been withdrawn, dismissed, or otherwise resulted in no liability for the Debtor; and (b) the remaining have been resolved for a relatively small amount.

39.    The Debtor has now and may in the future incur obligations to former employees that were injured in the course of employment for the Debtor (whether liquidated, known, unknown, or otherwise, collectively "Workers Compensation Claims"). As of March 1, 2014, Workers Compensation Claims known to Budd consisted of approximately 66 claims arising under laws of the States of Kentucky, Michigan, Ohio, Pennsylvania, and Tennessee having a book-value liability of approximately $4.5 million. Amounts drawn under the letters of credit could have been offset against Budd's cash, under the terms of the Cash Management Agreement. Under the Prepetition Agreement, TKNA: (a) on account of the Workers' Compensation Claims, reduced by $4.5 million the Short Term Borrowings (cash) remitted to Budd and, in connection therewith; (b) assumed all Workers Compensation Claims; (c) agreed to make all payments due on account of Workers Compensation Claims in the ordinary course of its business; and (d) agreed to indemnify and hold harmless Budd, its officers, directors, agents, professionals, and legal representatives to the fullest extent permitted by law from and against any losses, claims, damages, obligations, penalties, judgments, awards, fees (including legal fees), costs, disbursements or liabilities relating to or arising out of Workers Compensation Claims.

## VII.    Events Leading to Commencement of the Chapter 11 Case and Purpose for Filing

40.    Shortly after approval of the Settlement Agreement and execution and performance of the Prepetition Agreement, the Board determined that the best interests of the Debtor's creditors would be served by the Debtor commencing the Chapter 11 Case to, among other things: (a) prosecute the Settlement Motion; (b) file the Retirees Committee Motion in

order to negotiate with retiree representatives regarding modification of certain retiree obligations; and (c) subsequently seek to negotiate and confirm a chapter 11 plan to provide fair and equitable treatment to all of the Debtor's creditors.

41.     The Debtor will continue to honor without interruption obligations to its Retirees in accordance with section 1114 of the Bankruptcy Code, and at this time does not expect to modify those obligations prior to the effective date of a chapter 11 plan. The Debtor believes that this is a favorable outcome for Retirees, who will continue to receive benefits uninterrupted while a Retirees Committee (expenses of which Budd expects to pay in accordance with any orders of the Court) negotiates on their behalf. By commencing the Chapter 11 Case now, while the Debtor has approximately $384 million in cash, the Debtor hopes to provide Retirees and other creditors with significant cash distributions on account of their allowable claims. Among other things, this will allow Retirees to use that cash (or any other form of consideration they may receive under a chapter 11 plan) to make informed decisions about their health care and retirement.

42.     It is for this reason that the Debtor believed it prudent, if not essential, to commence this Chapter 11 Case now. The Debtor anticipates that the structure and transparency of the Chapter 11 Case will provide a forum to achieve equitable and expedient resolutions of all of its outstanding issues.

43.     The Debtor hopes and expects that discussions regarding a consensual chapter 11 plan will proceed productively and in good faith so that a chapter 11 plan that fairly and equitably treats all creditors can be confirmed.

## VIII.   Retirees Committee Motion

44.    Concurrently with the Petition, the Debtor filed the *Debtor's Motion For Entry of an Order: (1) Directing the United States Trustee to Appoint a Retirees Committee; and (2) Approving Retirees Committee Selection Procedures* (the "Retirees Committee Motion").

45.    For purposes of the Retires Committee Motion, the Retirees are categorized into two groups: (a) former employees, or their respective spouses, surviving spouses, domestic partners, and dependents (the "UAW Retirees"), who worked in an employment unit covered by a collective bargaining agreement ("CBA") and/or a plant closing agreement between the Debtor and the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America and its Local Unions ("UAW"); and (b) former full-time management and other salaried individuals who did not work in an employment unit covered by a CBA between the Debtor and the UAW, and their respective spouses, surviving spouses, domestic partners, and dependents (the "Non-Union Retirees").

46.    As of the Petition Date: (a) approximately 4,691, or approximately 80%, of the Retirees were UAW Retirees; and (b) the actuarial value of the Retiree Benefits owed to the UAW Retirees was approximately $830.5 million.

47.    Pursuant to certain CBAs and national insurance plans (together, the "National Insurance Plans") which are attached as exhibits to, and explicitly incorporated by reference within, each respective national collective bargaining agreement (together, the "National Agreements"), the UAW Retirees receive the following benefits: (a) medical, prescription-drug, dental, vision, and hearing benefits; and (b) life insurance, which constitute welfare benefits under ERISA.

48.    The National Agreements, along with each corresponding National Insurance Plan, were negotiated so as to continue in effect for periods ranging from three to five years.

14

Case 14-11873   Doc 14   Filed 04/01/14   Entered 04/01/14 13:26:42   Desc Main
Document     Page 15 of 25

Around the expiration of each National Agreement, the terms and conditions of the subsequent National Agreement were re-negotiated. This process continued until 2001, when the Debtor and UAW entered into the last National Agreement, which was given an expiration date of October 28, 2005. All of Budd's CBAs have expired by their own terms.

49.     As of the Petition Date: (a) approximately 1,209, or approximately 20%, of the Retirees were Non-Union Retirees; and (b) the actuarial value of the Retiree Benefits owed to Non-Union Retirees was approximately $101.5 million.[7] The Non-Union Retirees life insurance, as well as medical, prescription-drug, dental, vision, and hearing benefits pursuant to benefits plans that constitute welfare plans under ERISA

50.     The Debtor strongly believes that it is in the best interests of the Debtor's estate, the Retirees, and judicial economy that the Debtor engage in discussions regarding modification of Retiree Benefits with authorized representatives of both UAW Retirees and Non-Union Retirees (if not together, then on parallel tracks). Moreover, the Debtor believes there is no reason to delay these discussions, which should begin as soon as practicable, and that there is potential prejudice to Retirees if discussions are significantly delayed.

51.     I believe that the Selection Procedures are useful and appropriate.

## IX.    Motion to Approve Settlement Agreement

52.     Concurrently with the Petition, the Debtor filed the *Debtor's Motion to Approve Affiliate Settlement Agreement Pursuant to Section 105 of the Bankruptcy Code and Rule 9019 of the Federal Rules of Bankruptcy Procedure* (the "Settlement Motion").

53.     The Settlement Agreement is one of two agreements memorializing a global settlement (the "Settlement") between Budd, on the one hand, and TKNA, on behalf of TKNA

---

[7]  The actuarial value of the Retiree Benefits owed to the Non-Union Retirees is based on the Towers Watson Valuation Report.

and the other Affiliates, on the other hand. Budd and the Affiliates also are party to the Prepetition Agreement, which is the second agreement memorializing the Settlement.

54.    The Settlement was negotiated on behalf of Budd by the CRO and approved by the Board, including by the affirmative vote of the Independent Director. The Settlement Agreement and the Prepetition Agreement were negotiated and executed at the same time and in connection with each other, and provide Budd and its estate with significant value.

**X.    Cash Management Motion**

55.    Concurrently with the Petition, the Debtor filed the *Debtor's Motion for Entry of Interim and Final Orders Authorizing Maintenance of Existing Bank Accounts, Continued Use of Existing Business Forms, Continued Use of Existing Cash Management System and For Related Relief* (the "Cash Management Motion").

56.    As of the Petition Date, the Debtor's centralized cash management system (the "Cash Management System") consists of: (a) an investment account (the "Investment Account") at Fidelity Brokerage Services, LLC, opened in advance of the Petition Date in anticipation of the Debtor's receipt of its cash under the Prepetition Agreement and its chapter 11 filing, (b) a concentration account (the "Concentration Account") at Citibank, N.A. ("Citibank") and (c) three disbursing accounts, as identified on **Exhibit A** to the Cash Management Motion (the "Disbursing Accounts" and, collectively, with the Investment Account and the Concentration Account, the "Bank Accounts"), at Citibank and J.P. Morgan Chase Bank, N.A.

57.    The Investment Account is invested in certain mutual funds that, in turn, invest principally in: (a) short-term U.S. Treasury securities; (b) U.S.-dollar-denominated money market securities of domestic and foreign issuers rated in the highest category by at least two nationally recognized rating services; or (c) U.S. Government securities and repurchase

16

agreements for those securities. As needed to satisfy the Debtor's obligations, the Debtor intends to move cash from the Investment Account to the Concentration Account.

58.    From the Concentration Account, cash is disbursed through either: (a) one dedicated account for Unicare Life and Health Insurance Company, one of the Debtor's benefits administrators, from which payments are made on account of the Debtor's retiree obligations; or (b) a general accounts payable account from which the Debtor pays its vendors and makes other payments to benefits administrators, ultimately for the benefit of the Retirees.

59.    The Cash Management System is set forth in the cash flow diagram attached to the Cash Management Motion as **Exhibit B**.

60.    As of the Petition Date, the Debtor had very few, if any, outstanding checks. Strict enforcement of the UST's requirements that the Bank Accounts be closed and new postpetition accounts opened would cause undue disruption to the Debtor's operations, namely the continued payment of the Debtor's retiree medical obligations, which the Debtor is obligated to continue to make pursuant to section 1114(e) of the Bankruptcy Code.

61.    The Debtor maintains current and accurate accounting records of daily cash transactions and submits that maintenance of its Cash Management System will prevent undue disruption to the Debtor's operations, while protecting the Debtor's cash for the benefit of its estate.

62.    The Concentration Account and the Disbursing Accounts are maintained at financial institutions that are authorized depositories in this jurisdiction. Moreover, the cash in the Investment Account is invested only in extremely low-risk investments.

**XI.    Application to Retain Proskauer**

63.    The Debtor has filed the *Debtor's Application for Entry of Order Authorizing and Approving Retention of Proskauer Rose LLP as Chapter 11 Counsel*. The Debtor selected

Proskauer because its attorneys have extensive experience, knowledge and resources in the area of debtors' and creditors' rights and the restructuring and liquidation of large, complex companies under the Bankruptcy Code. Proskauer is well suited to represent the Debtor in its Chapter 11 Case.

64.     Proskauer has vast experience in bankruptcy and restructuring matters. Proskauer has the ability to commit substantial resources to legal problems on an urgent basis. The Debtor, therefore, believes that Proskauer is well qualified to represent the Debtor in this Chapter 11 Case.

65.     Moreover, Proskauer's prepetition representation of the Debtor has given it extensive knowledge of the Debtor's assets and liabilities. Proskauer's attorneys and other professionals have become intimately familiar with the complex factual and legal issues that will have to be addressed in the Debtor's Chapter 11 Case. The retention of Proskauer, with its knowledge of and experience with the Debtor, its assets and obligations, will assist in the efficient administration of the estate, thereby minimizing the expense to the estate.

66.     Proskauer provided the Debtor with a Budget setting forth the aggregate fees and expenses it expects to incur, and a general Staffing Plan setting forth some of the tasks it anticipates undertaking and the Proskauer professionals primarily responsible for those tasks, during the ninety-day period following the Petition Date. Proskauer's Budget and Staffing Plan has been approved by the Debtor.

67.     The Debtor understands and has agreed that Proskauer will apply to the Court for allowance of compensation and reimbursement of expenses in accordance with sections 330 and 331 of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules and any further orders of the Court for all professional services performed and expenses incurred after the Petition Date.

18

68.     The Debtor has reviewed and approved Proskauer's standard rate structure and determined that it is appropriate and is not significantly different from: (a) the rates that Proskauer charges for other non-bankruptcy representations; or (b) the rates of other comparably-skilled professionals. The Debtor believes that Proskauer's rates and policies stated in the Marwil Declaration are reasonable.

69.     To the best of the Debtor's knowledge: (a) Proskauer is a "disinterested person" within the meaning of section 101(14) of the Bankruptcy Code, as required by section 327(a) of the Bankruptcy Code and does not hold or represent any interest adverse to the Debtor's estate; and (b) Proskauer has no connection to the Debtor, its creditors or related parties, except as may be disclosed in the Marwil Declaration.

70.     The Debtor believes that for all the reasons stated above and in the Marwil Declaration, the retention of Proskauer as counsel is warranted and satisfies Bankruptcy Rule 2014(a).

71.     The Debtor believes that the employment of Proskauer is in the best interests of the Debtor and its estate and desires to employ Proskauer, effective as of the Petition Date, with compensation to be approved upon application to this Court. Were the Debtor required to engage counsel other than Proskauer in connection with this Chapter 11 Case, the Debtor, its estate and all parties in interest would be unduly prejudiced by the time and expense necessarily attendant to such counsel's familiarization with the intricacies of the Debtor's circumstances and financial affairs.

## XII.    Application to Retain Dickinson Wright

72.     The Debtor has filed the *Debtor's Application for Entry of Order Authorizing and Approving Retention of Dickinson Wright PLLC as Special Counsel*.

73.     Prior to the Petition Date, the Debtor retained Dickinson as counsel to provide advice and assistance in connection with the Investigation and the evaluation, analysis and negotiation of a resolution of Affiliate Claims. Dickinson's continued retention will be required to: (a) obtain Court approval of the Settlement; (b) respond to inquiries and discovery requests from parties in interest regarding the Investigation and the terms of the Settlement; and (c) further prosecute and defend against Affiliate Claims, if necessary.

74.     The Debtor has determined that it is necessary to retain special counsel to represent the Debtor in connection with the Settlement and the Affiliate Claims to ensure the appearance of independence of the Investigation.

75.     The Debtor believes that retaining Dickinson is reasonable and necessary for the Debtor to pursue approval of the Settlement and to discharge its responsibilities to its estate and creditors.

76.     The Debtor originally selected Dickinson because its attorneys have expertise, experience and knowledge in the field of litigation, including bankruptcy-related litigation, as well as other areas of the law where the Debtor may need legal services relating to the Settlement and the Affiliate Claims. The Debtor believes that Dickinson is well qualified to represent it with respect to the Settlement and Affiliate Claims, especially in light of the fact that Dickinson was prepetition counsel responsible for assisting the Debtor's chief restructuring officer in conducting the Investigation and negotiating the Settlement. Dickinson has performed substantial work on this matter and is highly knowledgeable regarding the Affiliate Claims, the Investigation, the Settlement, and the Debtor's litigation strategy.

77.     Rather than resulting in any extra expense to the Debtor's estate, the retention of Dickinson as special counsel for the limited purpose of pursuing approval of the Settlement (including responding to inquiries and discovery requests from parties in interest regarding the

20

Investigation and the terms of the Settlement) and further prosecuting and defending against Affiliate Claims, if necessary, will promote the effective and economical representation of the Debtor in this Chapter 11 Case. It would be wasteful if the Debtor were to terminate its engagement of Dickinson and retain a new firm to handle these matters. Dickinson will coordinate its efforts to ensure that the legal services it provides to the Debtor are not duplicative of services being provided by Proskauer.

78.     The Debtor understands that Dickinson intends to apply for compensation for professional services rendered in connection with this Chapter 11 Case, subject to the Court's approval and in compliance with applicable provisions of the Bankruptcy Code, Bankruptcy Rules, the Local Rules, any order of this Court governing professional compensation and further orders of this Court. Dickinson shall submit with its fee applications detailed daily time entries for each individual in one-tenth (.10) of an hour increments explaining the services provided, as well as a categorized summary of all disbursements and expenses for which Dickinson is seeking reimbursement.

79.     To the best of the Debtor's knowledge, and except as disclosed in the Sylwestrzak Declaration, Dickinson does not hold or represent any interests adverse to the Debtor's estate as it relates to the work for which it is being engaged.  Dickinson's employment is necessary and in the best interests of the Debtor and the Debtor's estate.

## XIII.   Motion to Approve Agreement With Conway MacKenzie

80.     The Debtor has filed the *Debtor's Motion for Approval of Agreement With Conway MacKenzie Management Services, LLC to Provide the Services of Charles M. Moore as Chief Restructuring Officer and Other Support Personnel* (the "Conway Motion").

81.     Conway is a leading advisory services firm with extensive experience in chapter 11 cases and assisting clients in negotiations with lenders, debt holders, creditors, chapter 11

committees and other constituencies. Conway's and Mr. Moore's prepetition service to the Debtor has given it and him extensive knowledge of the Debtor's assets and liabilities. Mr. Moore has become intimately familiar with the complex issues that will have to be addressed in the Debtor's Chapter 11 Case. Mr. Moore is well-qualified to serve as CRO of the Debtor in this Chapter 11 Case.

82.     The Debtor understands that the hourly rates set forth in the Conway Motion are subject to periodic adjustments to reflect economic and other conditions.

83.     The Debtor does not believe that Conway is a "professional" whose retention is subject to approval under section 327 of the Bankruptcy Code.

84.     The terms and conditions of the Engagement Letter were negotiated by the Debtor and Conway at arm's-length and in good faith.

85.     The Debtor submits that the employment of Conway is a sound exercise of its business judgment and satisfies section 363 of the Bankruptcy Code as Conway services are necessary and essential to the compromise or prosecution and recovery of causes of action that constitute significant assets of the Debtor.

**XIV.   Application to Retain Epiq as Claims Agent**

86.     The Debtor has filed the *Debtor's Application for Order Authorizing and Approving the Retention of Epiq Bankruptcy Solutions, LLC as Noticing, Claims and Balloting Agent for the Court*.

87.     The Debtor has thousands of creditors, holding claims against the Debtor in excess of $1 billion. Given the size of the Debtor's creditor body, it will be more efficient and less burdensome on the Clerk of the Court to have Epiq undertake the tasks associated with noticing the Debtor's creditors and parties in interest and processing proofs of claim that may be filed.  The process of receiving, docketing, maintaining, photocopying and transmitting proofs of

claim and related notices in this case can be effectively served by engaging an independent third party to act as agent for the Court. Moreover, the Debtor requires a balloting and voting agent to assist the Debtor with the solicitation and voting in respect of any chapter 11 plan.

88.    Epiq is one of the nation's leading providers of noticing, claims administration and balloting services in large and complex chapter 11 cases.  Epiq specializes in claims and balloting agent and noticing services, and has a proprietary claims management system in which claims are effectively managed for the Clerk of the Court.  The Debtor has selected Epiq as its claims, balloting and noticing agent because of the firm's experience in serving in such capacity in chapter 11 cases of this size and the reasonableness of its fees.  The Debtor believes that Epiq is both well-qualified and uniquely able to serve as the claims, balloting and noticing agent in this Chapter 11 Case.  In short, engaging Epiq to serve designated notices, manage the plan balloting process and manage claims files and maintain the claims register will expedite service of Bankruptcy Code Rule 2002 notices, streamline the claims administration process and permit the Debtor to focus its efforts on confirming a chapter 11 plan.

89.    Epiq will perform the balloting agent and claims management function of its employment at the direction of the Debtor, and the noticing agent function at the direction of the Clerk of the Court.

90.    Epiq has represented to the Debtor, among other things, that:

   a.  Epiq will not consider itself employed by the United States Government and shall not seek any compensation from the United States Government in its capacity as the Claims Agent in this Chapter 11 Case;

   b.  by accepting appointment in this Chapter 11 Case, Epiq waives any rights to receive compensation from the United States Government;

   c.  in its capacity as the Claims Agent in this Chapter 11 Case, Epiq will not be an agent of the United States and will not act on behalf of the United States;

   d.  in its capacity as the Claims Agent in this Chapter 11 Case, Epiq will not misrepresent any fact to any person; and

23

e.  Epiq will not employ any past or present employees of the Debtor in connection with its work as the Claims Agent in this Chapter 11 Case.

91.    Epiq has further represented to the Debtor that the officers and employees of Epiq do not have any connection with, or any interest adverse to, the Debtor's estate or creditors, except as set forth herein and in the Schneider Declaration.

92.    The Debtor firmly believes that Epiq is appropriately qualified to serve in the capacity as claims, noticing and balloting agent.

93.    The terms of Epiq's compensation under the Services Agreement stem from a competitive process in which the Debtor interviewed and received quotes from multiple potential notice and claims agents. During this process, the Debtor negotiated price and cost reductions with Epiq.

94.    The Debtor submits that the retention of Epiq will inure to the benefit of the Debtor, its estate and all parties in interest by expediting the claims docketing and reconciliation process, as well as the plan solicitation process, by permitting them to be conducted in a cost-effective manner by a firm with proven abilities in providing such services.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on March 31, 2014

_____
Brian Bastien