*__Not approved by the Bankruptcy Court.__*

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| THE BUDD COMPANY, INC., | ) | Case No. 14 B 11873 |
| | ) | |
| Debtor. | ) | |

**DISCLOSURE STATEMENT FOR FIFTH AMENDED CHAPTER 11 PLAN FOR THE**

**BUDD COMPANY, INC. DATED MARCH 1, 2016**

---

**THIS DISCLOSURE STATEMENT IS A DRAFT.  IT HAS NOT BEEN APPROVED BY
THE BANKRUPTCY COURT.  IT IS NOT BEING USED TO SOLICIT VOTES FOR
THE PLAN AT THIS TIME.  IF THE BANKRUPTCY COURT APPROVES THIS
DISCLOSURE STATEMENT, IT WILL BE CIRCULATED AT A LATER DATE.**

---

*__Not approved by the Bankruptcy Court.__*

## DISCLAIMER

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS INCLUDED FOR PURPOSES OF SOLICITING VOTES IN FAVOR OF THE FIFTH AMENDED CHAPTER 11 PLAN FOR THE BUDD COMPANY, INC. (THE "DEBTOR" OR "BUDD") DATED MARCH 1, 2016 (AS IT MAY BE AMENDED, THE "PLAN"). THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN. NO PERSON MAY GIVE ANY INFORMATION OR MAKE ANY REPRESENTATIONS, OTHER THAN THE INFORMATION AND REPRESENTATIONS CONTAINED IN THIS DISCLOSURE STATEMENT OR OTHERWISE AUTHORIZED BY THE BANKRUPTCY COURT, TO SOLICIT VOTES IN FAVOR OF THE PLAN.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE UNITED STATES BANKRUPTCY CODE AND RULE 3016 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE. PERSONS OR ENTITIES TRADING IN OR OTHERWISE PURCHASING, SELLING OR TRANSFERRING CLAIMS OF THE DEBTOR AND DEBTOR IN POSSESSION IN THIS CASE SHOULD EVALUATE THIS DISCLOSURE STATEMENT AND THE PLAN IN LIGHT OF THE PURPOSE FOR WHICH THEY WERE PREPARED.

*__Not approved by the Bankruptcy Court.__*


### *Information for Retirees About The Budd Company, Inc. Bankruptcy Plan*

The following is a summary of what retirees of The Budd Company, Inc. ("Budd" or the "Debtor") will receive on account of their pensions and what type of health and prescription drug and other insurance will be available if the Fifth Amended Chapter 11 Plan (the "Plan") is confirmed. **THERE IS A FURTHER SUMMARY OF THE DISCLOSURE STATEMENT FOLLOWING THIS, ENTITLED "THE STATE OF THE BANKRUPTCY CASE AND THE PLAN," AND A TABLE OF CONTENTS FOR THE DISCLOSURE STATEMENT TO AID YOU IN YOUR REVIEW. FOR MORE INFORMATION ON ANY TOPIC OR QUESTION, PLEASE READ THE DISCLOSURE STATEMENT ITSELF.**

- ***Why The Debtor Filed For Bankruptcy.*** The Debtor has not operated any businesses since 2006 and it sold its last operating subsidiary in 2012. Presently, the Debtor estimates that it will be holding approximately $254 million of cash as of July 1, 2016. Prior to filing for bankruptcy, the Debtor used its cash primarily to pay health, drug, vision, dental and life benefits to its retirees and to make required payments to its ERISA Pension Plans and Supplemental Executive Retirement Plan ("SERP"). The Debtor estimates that, absent a change in the benefits level paid to retirees or an infusion of cash, it will run out of cash by 2021 and at that time will not be able to meet its obligations to its retirees. The Debtor filed bankruptcy to address this problem.

- ***Retiree Representation.*** After the bankruptcy case was filed, the United States Trustee appointed four executive and administrative retirees and one surviving spouse to the "E&A Retiree Committee" to represent the interests of the "E&A" retirees. The UAW elected to represent the interests of the union retirees itself in lieu of a committee of UAW Retirees.

- ***The Choice Between the TKNA Settlement Agreement And Litigation[1].*** The Debtor, E&A Retiree Committee, and the UAW jointly investigated whether the Debtor could sue ThyssenKrupp North America ("TKNA"), and certain of its affiliates, officers and directors, and professional firms[2] for, among other things, actions they took and failed to take when the Debtor sold its subsidiary, ThyssenKrupp Waupaca, Inc., to KPS Capital Partners LP ("KPS"). The result of that investigation and the potential causes of action are described in

---

[1] While Litigation with TKNA and the other potential defendants is the most likely consequence of rejecting the TKNA Settlement Agreement, it is possible that renewed negotiations with TKNA could take place that might result in a higher settlement.

[2] The Debtor, E&A Retiree Committee and UAW's joint investigation revealed potential claims and causes of action against ThyssenKrupp AG ("TKAG"), TKNA, ThyssenKrupp Finance USA, Inc., Guido Kerkhoff, Olaf Berlien, Volkmar Dinstuhl, Christian Bender, Christof Boehm, Miroslav Georgiev, a.k.a. Miro Schmiedt, Kevin C. Backus, Jill Karana, Lawrence Paulson, Nancy L. Hutcheson, Markus Boening, Heinz Hense, Brian Bastien, Clark Hill PLC, KPS Capital Partners, LP, Perella Weinberg Partners Group LP and Dietrich Becker.

more detail in Section VI.E. of the Disclosure Statement. Following the completion of that investigation, the Debtor and the E&A Retiree Committee, but not the UAW, entered into a settlement agreement with TKNA (the "TKNA Settlement Agreement") that provides for the assumption of the Debtor's ERISA Pension Plans and SERP and payment of up to $335 million to voluntary employees' beneficiary association trusts (each, a "VEBA," or together "VEBAs") to be established to provide health, drug, and other benefits to the E&A and UAW Retirees. The TKNA Settlement Agreement will go into effect *only* if the Plan is confirmed. The Plan, in turn, is contingent on the Bankruptcy Court granting the Debtor's pending motion to modify the UAW Retirees' healthcare benefits, which is discussed further below.

- ***The Consequences of Rejecting the Plan and TKNA Settlement Agreement***. The most likely alternative to the TKNA Settlement Agreement is filing lawsuits against TKNA and the other potential defendants. Prosecuting lawsuits against TKNA and the other potential defendants involves significant risks for retirees, and there is no guarantee that such litigation would result in any recovery, let alone a greater recovery. Prosecuting lawsuits against TKNA and the other potential defendants through settlement or judgment would be time-consuming (likely taking more than 3 years[3]) and costly. The amounts spent on benefits and legal fees plus the lost value of the TKNA Settlement Agreement (i.e., $335 million cash plus the assumption of well over $200 million of underfunded pension liabilities) would need to be recovered through judgment or settlement just to "break even." These amounts are significant. Budd estimates that, absent a modification to the benefits level paid to retirees or an unforeseeable infusion of cash, Budd will run out of the $254 million that it projects will be available for distribution under the Plan in about 5 years. So, for example, if the lawsuits were to take 3 years at a cost of $15 million in legal fees (with benefit payments remaining at current levels during the pendency of the lawsuits), the *incremental* amount that the estate would have to win or be offered to "break even" would be approximately $90 million (*i.e.*, in addition to the $335 million provided under the current TKNA Settlement Agreement, for a total of $425 million). The actual time spent litigating and the legal fees in connection with such litigation may be higher or lower than the estimates provided above. In the event that the estate does not prevail in the lawsuits, retirees would have their healthcare benefits drastically reduced or terminated in five years or sooner, depending on the legal fees incurred by the estate. TKNA will also not be required to assume sponsorship of the Debtor's Pension Plans while the lawsuits are pending.

- ***The Debtor's Independent Director's and Chief Restructuring Officer's, the E&A Retiree***

---

[3] The median time a civil lawsuit takes to go to trial in the Northern District of Illinois, which is where the lawsuits likely would be filed, is approximately 33 months. (*See* http://www.uscourts.gov/statistics-reports/federal-court-management-statistics-june-2015.) The losing party would be expected to appeal if it loses the case. At the median, appeals in the 7th Circuit (which is where any appeal from a final judgment in the Northern District of Illinois would be filed) take 7.2 months. (*Id.*) Thus, it would likely take more than 3 years to prosecute the lawsuits against TKNA and the other potential defendants to a final judgment.

*Not approved by the Bankruptcy Court.*

*Committee's and the UAW's Views on the TKNA Settlement Agreement*.

o   **The E&A Retiree Committee and the Debtor's Independent Director and Chief Restructuring Officer support the TKNA Settlement Agreement for Several Reasons.**

▪   First, the E&A Retiree Committee and the Debtor's Independent Director and Chief Restructuring Officer support the TKNA Settlement Agreement because they believe that the TKNA Settlement Agreement ensures the continuation of the pensions and healthcare coverage for all retirees at affordable rates and is for substantial consideration. Under the TKNA Settlement Agreement, TKNA will pay more than $500 million, consisting of up to $335 million of cash to the UAW and E&A Retiree VEBAs and the assumption of well over $200 million of underfunded liabilities associated with the Debtor's obligations under its Pension Plans.

▪   Second, the E&A Retiree Committee and the Debtor's Independent Director and Chief Restructuring Officer believe that the benefits of the TKNA Settlement Agreement outweigh the risks of litigation against TKNA and the other potential defendants. If the Debtor were to sue TKNA and the other potential defendants, the lawsuits would likely take many years. The median time a civil lawsuit takes to go to trial in the Northern District of Illinois, which is where the lawsuit likely would be filed, is approximately 33 months. (*See* http://www.uscourts.gov/statistics-reports/federal-court-management-statistics-june-2015.) The losing party would be expected to appeal if it loses the case. At the median, appeals in the 7th Circuit (which is where any appeal from a final judgment in the Northern District of Illinois would be filed) take 7.2 months. (*Id*.) Thus, if the cases proceed as an average case it could take more than three years before any judgment is final. These numbers are median numbers and the actual length of the lawsuits could be longer. In addition, the Debtor would be required to pay all of the costs of the litigation, which could cost the estate $40 million or more. Because the Debtor's Independent Director and Chief Restructuring Officer and the E&A Retiree Committee believe it would likely take many years of litigation to get TKNA to increase the amount of its settlement, and the Debtor's cash is being used to provide benefits at the rate of approximately $43 million per year, they do not believe that there is a significant likelihood of meaningfully increasing the amount of money to fund health care benefits through litigation.

▪   Third, the E&A Retiree Committee and the Debtor's Independent Director and Chief Restructuring Officer believe that the risks of litigation are simply too great. After five years, absent a change in the level of benefits provided, the Debtor will not be able to provide health care coverage to retirees. If the Debtor loses its lawsuits against TKNA and the other potential defendants, retirees will face a disruption of pensions and the termination of all healthcare coverage.

3

*__Not approved by the Bankruptcy Court.__*

- ▪ Fourth, the E&A Retiree Committee and the Debtor's Independent Director and Chief Restructuring Officer believe the settlement is fair to all retirees. The Debtor estimates that the present value of the contributions to the VEBAs under the Plan will be approximately $111,000 per UAW Retiree for the UAW VEBA and $66,000 per E&A Retiree for the E&A VEBA. In addition, under the TKNA Settlement Agreement, the UAW has the right to sue KPS and its affiliates, including Perella Weinberg Partners Group LP, and all of the money recovered in that lawsuit will go to the UAW Retirees. The UAW has estimated that the value of those claims is very significant (see below) and therefore, a successful lawsuit could result in the UAW Retirees receiving an amount sufficient to fully fund all of their healthcare benefits.

- ▪ The E&A Retiree Committee and the Debtor's Independent Director and Chief Restructuring Officer urge retirees to vote in favor of the Plan so that the TKNA Settlement Agreement may be approved and implemented.

- o *__Without additional payments from TKNA and the other potential defendants that are acceptable to the UAW, the UAW reserves the right to oppose the Plan and the TKNA Settlement Agreement, including for the following seven primary reasons:__*

  - ▪ First, the UAW believes that the claims to be released are worth substantially more than TKNA would pay under the TKNA Settlement Agreement. The UAW believes that the claims that would be released under the TKNA Settlement Agreement are potentially worth in excess of $1.3 billion (not including potential recovery for treble (3x) damages on some claims), but TKNA is paying a present value of only about $291 million under the TKNA Settlement Agreement. Further, the UAW does not believe that a true negotiation has ever taken place, since the UAW was excluded from the negotiations of the TKNA Settlement Agreement at TKNA's insistence and the amount offered by TKNA to obtain releases for TKNA and its affiliates has not increased since TKNA's initial offer in early October. The UAW believes that a true negotiation would yield a larger settlement, resulting in higher recoveries for all constituencies.

  - ▪ Second, the UAW believes it is inappropriate that the TKNA Settlement Agreement would release from liability potential defendants in addition to TKNA, and these potential defendants would pay nothing for their releases. The UAW believes that some of the parties who would be released from liability without paying anything have substantial assets that would be available to satisfy a successful litigation recovery or contribute to a larger settlement amount.

  - ▪ Third, the UAW believes that a multiyear litigation to conclusion against TKNA and the other potential defendants is not the only possible alternative to the TKNA Settlement Agreement. The UAW believes that continued

4

*Not approved by the Bankruptcy Court.*

negotiation with TKNA can lead to an increase in settlement payments from TKNA and the other potential defendants. The UAW believes that it was excluded from the negotiations leading to the TKNA Settlement Agreement and there have been no settlement negotiations with any of the other potential defendants.

▪ Fourth, the UAW believes that the TKNA Settlement Agreement unfairly favors the E&A Retirees over the UAW Retirees. The UAW believes that E&A Retirees will recover approximately <u>91%</u> of the amounts they were owed as of September 30, 2015, while the UAW Retirees will recover only approximately <u>62%</u> of the amounts they were owed as of September 30, 2015. The UAW also believes that the E&A Retirees may recover 100% of the amounts they are owed as of the Effective Date of the Plan because the obligations owed to E&A Retirees on the Effective Date of the Plan may be less than the obligations estimated as of September 30, 2015.

▪ Fifth, the UAW believes that the TKNA Settlement Agreement provides insufficient security of payment for the UAW Retirees. The TKNA Settlement Agreement requires the UAW Retirees to accept payment from TKNA over a period of eight years. If TKNA fails, for whatever reason, to make payments, the UAW Retirees may never receive the money they are owed. By contrast, the TKNA Settlement Agreement provides that the E&A Retirees receive all their money all at once up front, so the E&A Retirees are not exposed to any of the risk that TKNA might not fulfill its payment obligations. Further, the Plan creates the additional risk of a declining recovery by UAW Retirees depending on the amount of cash in the Budd estate at the Effective Date of the Plan.

▪ Sixth, the Plan and the TKNA Settlement Agreement require that TKNA will continue to own 100% of the Debtor, which the UAW believes violates the Bankruptcy Code's Absolute Priority Rule that requires all creditors to be paid in full before equity receives any recovery.

▪ Seventh, the Plan does not provide for any claim for UAW Retirees for the reduction of their benefits, which the UAW believes is required by Sections 1114 and 1129 of the Bankruptcy Code.

**If the Plan is confirmed, the following will occur:**

- ***If you are an E&A Retiree or UAW Retiree who currently receives a pension from the Debtor***, the Plan provides that you will continue to receive your pension payments with no interruption. If the Plan and the TKNA Settlement Agreement are approved by the Bankruptcy Court, TKNA will assume full responsibility for the Debtor's ERISA Pension Plans. Even if the TKNA Settlement Agreement is not approved by the Bankruptcy Court, the Debtor's ERISA Pension Plans are insured by the Pension Benefit Guaranty Corporation ("<u>PBGC</u>"), a wholly owned United States government corporation that guarantees the

*Not approved by the Bankruptcy Court.*

payment of certain pension benefits upon termination of pension plans covered by Title IV of ERISA. What an individual retiree would receive if the PBGC were required to administer the ERISA Plans depends on a number of factors including a retiree's age at retirement, the amount of the retiree's pension and the funding level in the ERISA Pension Plans. Under federal law, TKNA and other related entities within the TKNA group of companies, including Budd, are responsible to the PBGC for any shortfall between the amount of money currently in the ERISA Pension Plans and the amount that must be paid to all Retirees under the ERISA Pension Plans. TKNA however is not required under federal law to assume sponsorship for the ERISA Pension Plans. Further, in the event that the ERISA Pension Plans are terminated, the PBGC will hold a claim against Budd that, if allowed, would greatly diminish the amount of cash available to satisfy the other claims against the Debtor. In addition, TKNA and its affiliates may also attempt to assert claims against the Debtor.

- *If you are an E&A Retiree who currently receives retirement benefits through a Supplemental Executive Retirement Plan ("SERP")* from the Debtor, the Plan provides that you will continue to receive your SERP benefits with no interruption. If the Plan is approved by the Bankruptcy Court, TKNA also will assume full responsibility for the SERP. If the Plan is not approved, what would happen to the SERP is uncertain.

- *If you are an E&A Retiree who is receiving medical, dental, vision, hearing or life insurance* from the Debtor, you will continue to receive healthcare benefits in a modified form. If the Bankruptcy Court approves the Plan, the Debtor will cease its sponsorship of the current E&A Retiree Benefits plan and, in its place, establish a VEBA for E&A Retirees (the "E&A VEBA"). The E&A VEBA will receive cash from the Debtor and from the settlement with TKNA and will use those funds to provide healthcare benefits to the E&A Retirees. The expected start date for this new program is July 1, 2016, but it may be sooner or later, depending on when the Bankruptcy Court rules on the Plan. You will continue to receive your healthcare benefits from the Debtor under its current benefits plans until the start date. Before the start date, you will receive open enrollment materials and other materials required by law to enable you to make a decision about whether you want to participate in the new healthcare plan. Only E&A Retirees who are currently participating in the Debtor's current plans will be entitled to receive healthcare benefits from the E&A VEBA. If you have previously elected not to participate in the Debtor's healthcare plans and have lost your eligibility to rejoin those plans, you will not be allowed to receive healthcare benefits through the VEBAs.

- *The E&A VEBA* will be managed by a board of five trustees, which will initially be the current members of the E&A Retiree Committee (Jacqueline Delowery, Mercedes Godin, William Kroger, James Wahlman, and Thomas Whomsley). The E&A VEBA will provide benefits to the Post-Medicare E&A Retirees through a Blue Cross Blue Shield Medicare advantage plan. For the Pre-Medicare E&A Retirees, the E&A VEBA will provide such retirees with benefits through a Blue Cross Blue Shield self-insured group plan with stop loss insurance for claims in excess of $100,000. It is expected that the funds in the E&A VEBA will last for approximately 25 years, through 2041. The average age of the E&A Retirees is 76. After the funds are exhausted, coverage for E&A Retirees will terminate.

6

*Not approved by the Bankruptcy Court.*

- ***If you are a UAW Retiree who is receiving medical, dental, vision, hearing or life insurance from Budd***, you will receive healthcare benefits in a modified form. If the Bankruptcy Court approves the Plan and the TKNA Settlement Agreement, Budd will cease its sponsorship of the UAW Retiree Benefit plans. Instead, Budd will establish a VEBA for UAW Retirees (the "UAW VEBA"). The UAW VEBA will receive cash from Budd and from the TKNA Settlement Agreement and will use those funds to provide healthcare benefits to UAW Retirees. The expected start date for this new program is July 1, 2016, but it may be sooner or later, depending on when the Bankruptcy Court rules on the Plan and the TKNA Settlement Agreement. You will continue to receive your healthcare benefits from the Debtor under its current benefits plans until the start date. Before the start date, you will receive open enrollment materials and other materials required by law to enable you to make a decision about whether you want to participate in the new healthcare plan. Only UAW Retirees who are currently participating in Budd's current plans or who have retained the option under Budd's eligibility rules to rejoin the current plans, will be entitled to receive healthcare benefits from the UAW VEBA. If you have previously elected not to participate in Budd's healthcare plans and have lost your eligibility to rejoin those plans, you will not be allowed to receive healthcare benefits through the VEBAs.

- ***If you are a UAW Retiree who is receiving medical, dental, vision, hearing or life insurance from Budd***, Budd has asked the Bankruptcy Court to modify your benefits under section 1114 of the Bankruptcy Code. Budd's proposed benefit modifications would: (1) terminate the existing UAW Retiree Benefit plans; and (2) provide you with an allocation from the UAW VEBA on an annual basis in the form of a Health Reimbursement Account ("your HRA"). A trial on this request took place from January 21, 2016 to February 5, 2016. The Bankruptcy Court has not yet ruled on Budd's request.[4] If Budd's request is approved, you will use your HRA to pay eligible medical, dental, and vision expenses, including premiums for insurance policies and Medicare supplement plans purchased on the individual insurance market and certain medical expenses that are not covered by insurance policies, Medicare, or Medicare supplement plans. The Debtor estimates that the value of the contributions to the VEBAs under the Plan will be approximately $111,000 per UAW Retiree for the UAW VEBA and $66,000 per E&A Retiree for the E&A VEBA. The Debtor further estimates that if the VEBAs fund allocations to individual HRAs for each Retiree under the Plan, the average total benefits provided over the course of a Retiree's life, including the costs associated with paying any excise taxes, will be approximately $197,000 per UAW Retiree and $94,000 per E&A Retiree. The actual total benefits provided to an individual

---

[4] On January 6, 2016 the Debtor filed a motion to modify UAW Retiree Benefits pursuant to 11 U.S.C. § 1114(g) of the Bankruptcy Code. From January 21, 2016 through February 5, 2016 the court held seven days of trial to determine whether the Debtor's proposed modifications should be allowed. The trial included both fact and expert witnesses presented by the Debtor and the UAW, as well as one fact witness presented by the E&A Retiree Committee. The Debtor and the UAW will file post-trial briefings by the end of the February, 2016 and a decision is expected thereafter.

*Not approved by the Bankruptcy Court.*

Retiree will be higher or lower than the average total benefits depending on the age/lifespan of the Retiree and the number and age/lifespan of any spouse and dependents. The UAW believes that the proposed UAW VEBA should operate in a manner consistent with the operation of other VEBAs established for UAW Retirees following the bankruptcies of General Motors, Chrysler, Dana Corporation and others.  Such a structure would permit the board of trustees of the UAW VEBA, who will act as fiduciaries for the UAW Retirees, to choose the benefit plans that would provide the best coverage available, in light of available resources, for the UAW Retirees. The Plan provides that the UAW VEBA trustees will have the authority to change the healthcare delivery method employed by the UAW VEBA, thereby allowing it to achieve its preferred structure. As a result, it is possible that an HRA structure will not be used.

- ***The UAW VEBA, as proposed by Budd***, would be managed by a board of five trustees, who will be identified prior to the Effective Date of the Plan and selected by the UAW. The Independent Director and Chief Restructuring Officer of Budd believe that the funds in the UAW VEBA will be sufficient to provide UAW Retirees with meaningful healthcare benefits for the remainder of their lives.

*__Not approved by the Bankruptcy Court.__*

### *Information for Holders of Asbestos Claims About The Budd Company, Inc. Bankruptcy Plan*

  The following is a summary of the treatment of holders of Asbestos Claims under The Budd Company, Inc.'s ("Budd") Fifth Amended Chapter 11 Plan (the "Plan"). **THERE IS A FURTHER SUMMARY OF THE DISCLOSURE STATEMENT FOLLOWING THIS, ENTITLED "THE STATE OF THE BANKRUPTCY CASE AND THE PLAN," AND A TABLE OF CONTENTS FOR THE DISCLOSURE STATEMENT TO AID YOU IN YOUR REVIEW. FOR MORE INFORMATION ON ANY TOPIC OR QUESTION, PLEASE READ THE DISCLOSURE STATEMENT ITSELF.**

  **If you filed an Asbestos Claim against Budd you can vote to accept or reject the Plan if your Asbestos Claim has not been Disallowed.**

**[NOTE TO DRAFT: THE DEBTOR AND THE ASBESTOS COMMITTEE ARE NEGOTIATING A RESOLUTION TO THE ASBESTOS COMMITTEE'S OBJECTIONS TO THE PLAN. SHOULD THOSE NEGOTIATIONS RESULT IN A SETTLEMENT, THE PLAN AND DISCLOSURE STATEMENT WILL BE AMENDED ACCORDINGLY.]**

- ***Treatment of Asbestos Claims under the Plan.*** Budd's Plan would treat Asbestos Claims as follows:

  1) **Holders of Insured Asbestos Claims** (generally, claims brought by holders of Asbestos Claims exposed to Budd's asbestos before November 1985) shall be paid 100% of the amount of their claim from proceeds of the Asbestos Insurance Policies in accordance with the terms of the Amended Asbestos Cost Sharing Agreement, attached as Exhibit D to the Plan. The Insured Asbestos Claim Fund shall be funded with $2.2 million in cash, which shall be used for the benefit of the Insurers in accordance with the Amended Asbestos Cost Sharing Agreement.

  2) **Holders of Uninsured Asbestos Claims** (Asbestos Claims that are not insured, including claimants who were only exposed to the Debtor's asbestos after October 1985) will receive 66% of the value of their claim paid from the Uninsured Asbestos Claim Fund until it is exhausted, which will be funded by the Debtor with $1,250,000 on the date the Plan becomes effective. The Uninsured Asbestos Claim Fund shall be maintained until the earlier to occur of (a) the date on which less than $1,000 remains in such Asbestos Fund, or (b) the date on which all lawsuits on account of Asbestos Claims brought as of January 1, 2045 have been resolved.

  If the Plan is approved, holders of Asbestos Claims could sue Budd for money damages in state or federal court on **the later of**:

_**Not approved by the Bankruptcy Court.**_

1)  180 days after the Effective Date of Budd's Plan; or

2)  If an objection to your Asbestos Claim has been filed by Budd (or another party) before the end of such 180-day period, then only if and after the objection is resolved in your favor. **If your Asbestos Claim is Disallowed, you could never sue Budd for money damages in state or federal court.**

- **_The Choice Between the TKNA Settlement Agreement And Litigation_**[1]. The Debtor, E&A Retiree Committee, and the UAW jointly investigated whether the Debtor could sue ThyssenKrupp North America ("TKNA"), and certain of its affiliates, officers and directors, and professional firms[2] for, among other things, actions they took and failed to take when the Debtor sold its subsidiary, ThyssenKrupp Waupaca, Inc., to KPS Capital Partners LP ("KPS"). The result of that investigation and the potential causes of action are described in more detail in Section VI.E. of the Disclosure Statement. Following the completion of that investigation, the Debtor and the E&A Retiree Committee, but not the UAW, entered into a settlement agreement with TKNA (the "TKNA Settlement Agreement") that provides for the assumption of the Debtor's ERISA Pension Plans and Supplemental Executive Retirement Plan ("SERP") and payment of up to $335 million to voluntary employees' beneficiary association trusts (each, a "VEBA," or together "VEBAs") to be established to provide health, drug, and other benefits to the E&A and UAW Retirees. The TKNA Settlement Agreement will go into effect _only_ if the Plan is confirmed. The TKNA Settlement Agreement provides no cash payment to holders of Asbestos Claims, but does require release of claims that could be pursued for the benefit of the estate's creditors, including holders of Asbestos Claims. The Debtor believes that holders of Asbestos Claims still benefit from the TKNA Settlement Agreement because it reduces the amount of other claims against the Debtor's estate, thereby leaving more funds available for remaining creditors, including holders of Asbestos Claims.

- **_The Consequences of Rejecting the Plan and TKNA Settlement Agreement_**. The most likely alternative to the TKNA Settlement Agreement is filing lawsuits against TKNA and the other potential defendants. Prosecuting lawsuits against TKNA and the other potential defendants involves significant risks for creditors, and there is no guarantee that such litigation would result in any recovery, let alone a greater recovery. Prosecuting lawsuits

---

[1] While Litigation with TKNA and the other potential defendants is the most likely consequence of rejecting the TKNA Settlement Agreement, it is possible that renewed negotiations with TKNA could take place that might result in a higher settlement.

[2] The Debtor, E&A Retiree Committee and UAW's joint investigation revealed potential claims and causes of action against ThyssenKrupp AG ("TKAG"), TKNA, ThyssenKrupp Finance USA, Inc., Guido Kerkhoff, Olaf Berlien, Volkmar Dinstuhl, Christian Bender, Christof Boehm, Miroslav Georgiev, a.k.a. Miro Schmiedt, Kevin C. Backus, Jill Karana, Lawrence Paulson, Nancy L. Hutcheson, Markus Boening, Heinz Hense, Brian Bastien, Clark Hill PLC, KPS Capital Partners, LP, Perella Weinberg Partners Group LP and Dietrich Becker.

*Not approved by the Bankruptcy Court.*

against TKNA and the other potential defendants through settlement or judgment would be time-consuming (likely taking more than 3 years[3]) and costly. The amounts spent on benefits and legal fees plus the lost value of the TKNA Settlement Agreement (i.e., $335 million cash plus the assumption of well over $200 million of underfunded pension liabilities) would need to be recovered through judgment or settlement just to "break even." These amounts are significant. Budd estimates that, absent a modification to the benefits currently paid to retirees or an unforeseeable infusion of cash, Budd will run out of the $254 million that it projects will be available for distribution under the Plan in approximately 5 years. So, for example, if the lawsuits were to take 3 years at a cost of $15 million in legal fees (with benefit payments remaining at current levels during the pendency of the lawsuits), the *incremental* amount that the estate would have to win or be offered to "break even" would be approximately $90 million (*i.e.*, in addition to the $335 million provided under the current TKNA Settlement Agreement, for a total of $425 million). The actual time spent litigating may be longer or shorter, and the legal fees in connection with such litigation, may be higher or lower than the estimates provided above. In the event that the estate does not prevail in the lawsuits, Asbestos Claimants may receive nothing on account of their claims, except the benefit of over $100 million of insurance.

- *The Debtor's Independent Director's and Chief Restructuring Officer's and the Asbestos Committee's Views on the TKNA Settlement Agreement*.

  o *The Asbestos Committee opposes the TKNA Settlement Agreement as proposed*. The Asbestos Committee opposes the TKNA Settlement Agreement because the TKNA Settlement Agreement provides no cash payment to holders of Asbestos Claims, but does require release of claims that could be pursued for the benefit of the estate's creditors, including holders of Asbestos Claims. In contrast, other creditor groups receive at least $300 million under the TKNA Settlement Agreement and, in one case, a creditor group may choose between receiving an additional $35 million or giving a release to a party that holders of Asbestos Claims are required to release without receiving any cash consideration. The Asbestos Committee believes the claims that holders of Asbestos Claims are required to release are worth far more than any consideration they would receive under the TKNA Settlement Agreement.

  o *The Debtor's Independent Director and Chief Restructuring Officer support the TKNA Settlement Agreement for Several Reasons.*

---

[3] The median time a civil lawsuit takes to go to trial in the Northern District of Illinois, which is where the lawsuits likely would be filed, is approximately 33 months. (See http://www.uscourts.gov/statistics-reports/federal-court-management-statistics-june-2015.) The losing party would be expected to appeal if it loses the case. At the median, appeals in the 7th Circuit (which is where any appeal from a final judgment in the Northern District of Illinois would be filed) take 7.2 months. (Id.) Thus, it would likely take more than 3 years to prosecute the lawsuits against TKNA and the other potential defendants to a final judgment.

*Not approved by the Bankruptcy Court.*

▪ First, the E&A Retiree Committee and the Debtor's Independent Director and Chief Restructuring Officer support the TKNA Settlement Agreement because they believe that the TKNA Settlement Agreement is for substantial consideration. Under the TKNA Settlement Agreement, TKNA will pay more than $500 million, consisting of up to $335 million of cash to the UAW and E&A Retiree VEBAs and the assumption of well over $200 million of underfunded liabilities associated with the Debtor's obligations under its Pension Plans, making more money available for the Debtor's other creditors.

▪ Second, the Debtor's Independent Director and Chief Restructuring Officer believe that the benefits of the TKNA Settlement Agreement outweigh the risks of litigation against TKNA. If the Debtor were to sue TKNA and the other potential defendants, the lawsuits would likely take many years. The median time a civil lawsuit takes to go to trial in the Northern District of Illinois, which is where the lawsuit likely would be filed, is approximately 33 months. (*See* http://www.uscourts.gov/statistics-reports/federal-court-management-statistics-june-2015.) The losing party would be expected to appeal if it loses the case. At the median, appeals in the 7th Circuit (which is where any appeal from a final judgment in the Northern District of Illinois would be filed) take 7.2 months. (*Id.*) Thus, if this case proceeds as an average case it could take more than three years before any judgment is final. These numbers are median numbers and the actual length of the lawsuits could be longer. In addition, the Debtor would be required to pay all of the costs of the litigation, which could cost the estate $40 million or more. Because the Debtor's Independent Director and Chief Restructuring Officer believe it would likely take many years of litigation to get TKNA to increase the amount of its settlement, and the Debtor's cash is being used to provide benefits at the rate of approximately $43 million per year, they do not believe that there is a significant likelihood of meaningfully increasing the amount of money available to satisfy Asbestos Claims through litigation.

▪ Third, the Debtor's Independent Director and Chief Restructuring Officer believe that the risks of litigation are simply too great. After five years, absent any modification to the benefits currently provided, the Debtor's estate will be fully depleted.

▪ The E&A Retiree Committee and the Debtor's Independent Director and Chief Restructuring Officer urge holders of Asbestos claims to vote in favor of the Plan so that the TKNA Settlement Agreement may be approved and implemented.

## THE STATE OF THE BANKRUPTCY CASE AND THE PLAN[1]

### 1.    Budd's Assets and Liabilities

Budd is no longer in business. As of the date Budd filed for bankruptcy (March 31,

2014), Budd's only activities were: (a) the making of contribution payments to the Pension Plans

and payments of Retiree Benefits to UAW Retirees and E&A Retirees; (b) defending asbestos-

related lawsuits; and (c) satisfying historical environmental obligations.

Budd does not have enough cash to pay all of its liabilities (i.e. debts and obligations) in

full. As of January 31, 2016, the Debtor had approximately $282 million in cash. Budd estimates

that, as of September 30, 2015, its Retiree Benefit obligations under the existing Retiree Benefits

plans alone were approximately $810 million (approximately $733 million on account of

obligations to UAW Retirees and approximately $77 million on account of obligations to E&A

Retirees).

Budd has only two other significant assets it can use to pay its liabilities. First, Budd has

the contractual right to receive past, and potentially future, payments from TKNA for the use of

Budd's tax losses under the Debtor's Actual Tax Sharing Agreement. Second, Budd has Causes

of Action (i.e. potential lawsuits) against TKNA and other parties. Both Budd's contractual right

to receive payment for tax losses and its Causes of Action against TKNA and others have been

contested by TKNA, and are the subject of the TKNA Settlement Agreement among Budd,

TKNA and the E&A Retiree Committee.

---

[1] Please refer to Article II(A) beginning on page 1 for definitions of capitalized terms used herein.

2.      **Voting for or against the Plan**

(a)      **The Choice**

A vote for the Plan is a vote in favor of the TKNA Settlement Agreement. Under the terms of the TKNA Settlement Agreement, Budd receives either $300 million or $335 million in cash (along with other benefits such as the assumption of the Pension Plans), in full settlement of Budd's contractual rights and Causes of Action against TKNA and other potential defendants. The Plan is premised upon approval of the TKNA Settlement Agreement by the Bankruptcy Court, which has not yet occurred. Budd had approximately $282 million in cash as of January 31, 2016. As discussed above, Budd's only other significant assets are certain contractual rights and Causes of Action against TKNA and other parties, which are the subject of the TKNA Settlement Agreement. **See Article VI(E) for a more detailed discussion of these contractual rights and Causes of Action**. The TKNA Settlement Agreement provides certainty of recovery for Budd's creditors.

A vote against the Plan is a vote against the TKNA Settlement Agreement. The TKNA Settlement Agreement will not become effective if the Plan (or an alternative chapter 11 plan incorporating the TKNA Settlement Agreement) is not confirmed by the Bankruptcy Court. If the TKNA Settlement Agreement is not approved, the most likely alternative[2] is the litigation of Budd's contractual claims and Causes of Action against TKNA and the other potential defendants. Below is a summary of Budd's claims and Causes of Action, litigation of which entails certain risks. First, litigation is inherently risky and there is no assurance that any Cause

---

[2] While Litigation with TKNA and the other potential defendants is the most likely consequence of rejecting the TKNA Settlement Agreement, it is possible that renewed negotiations with TKNA could take place that might result in a higher settlement.

2

of Action will be successful and lead to an award of damages for the Estate. **See Article X(D)(1)**

**for a more detailed discussion of the risks of litigation**. Second, if the TKNA Settlement

Agreement is not approved, then TKNA would not waive its Claims against the Debtor and

likely would pursue such Claims in litigation with the Estate, potentially reducing the amount of

money available for distribution. **See Article X(D)(3) for a more detailed discussion of**

**TKNA's Claims against Budd**.

(b)      **The E&A Retiree Committee's Position on the Plan and TKNA**
**Settlement Agreement**

The E&A Retiree Committee supports the TKNA Settlement Agreement for the following
reasons:

- First, the E&A Retiree Committee supports the TKNA Settlement Agreement because
  they believe that the TKNA Settlement Agreement ensures the continuation of the
  pensions and healthcare coverage for all retirees at affordable rates and is for substantial
  consideration. Under the TKNA Settlement Agreement, TKNA will pay more than $500
  million, consisting of up to $335 million of cash to the UAW and E&A Retiree VEBAs
  and the assumption of well over $200 million of underfunded liabilities associated with
  the Debtor's obligations under its Pension Plans.

- Second, the E&A Retiree Committee believes that the benefits of the TKNA Settlement
  Agreement outweigh the risks of litigation against TKNA. If the Debtor were to sue
  TKNA and the other potential defendants, the lawsuits would likely take many years.
  The median time a civil lawsuit takes to go to trial in the Northern District of Illinois,
  which is where the lawsuit likely would be filed, is approximately 33 months. (*See*
  http://www.uscourts.gov/statistics-reports/federal-court-management-statistics-june-
  2015.) The losing party would be expected to appeal if it loses the case. At the median,

3

appeals in the 7th Circuit (which is where any appeal from a final judgment in the Northern District of Illinois would be filed) take 7.2 months. (*Id.*) Thus, if this case proceeds as an average case it could take more than three years before any judgment is final. These numbers are median numbers and the actual length of the lawsuits could be longer. In addition, the Debtor would be required to pay all of the costs of the litigation, which could cost the estate $40 million or more. Because the E&A Retiree Committee believe it would likely take many years of litigation to get TKNA to increase the amount of its settlement, and the Debtor's cash is being used to provide benefits at the rate of approximately $43 million per year, they do not believe that there is a significant likelihood of meaningfully increasing the amount of money to fund health care benefits through litigation.

- Third, the E&A Retiree Committee believes that the risks of litigation are simply too great. After five years, absent any modification to the benefits currently provided, the Debtor will not be able to provide health care coverage to retirees. If the Debtor loses its lawsuits against TKNA and the other potential defendants, retirees will face a disruption of pensions and the termination of all healthcare coverage.

- Fourth, the E&A Retiree Committee believes the settlement is fair to all retirees. The Debtor estimates that the present value of the contributions to the VEBAs under the Plan will be approximately $111,000 per UAW Retiree for the UAW VEBA and $66,000 per E&A Retiree for the E&A VEBA. In addition, under the TKNA Settlement Agreement, the UAW has the right to sue KPS and its affiliates, including Perella Weinberg Partners Group LP, and all of the money recovered in that lawsuit will go to the UAW Retirees. The UAW has estimated that the value of those claims is very significant (see below)

4

and therefore, a successful lawsuit could result in the UAW Retirees receiving an

amount sufficient to fully fund all of their healthcare benefits.

       (c)          **The UAW's Position on the Plan and TKNA Settlement Agreement**

Without additional payments from TKNA and the other potential defendants that are acceptable to the UAW, the UAW reserves the right to oppose the Plan and the TKNA Settlement Agreement, including for the following seven primary reasons:

- First, the UAW believes that the claims to be released are worth substantially more than

  TKNA would pay under the TKNA Settlement Agreement. The UAW believes that the

  claims that would be released under the TKNA Settlement Agreement are potentially

  worth in excess of $1.3 billion (not including potential recovery for treble (3x) damages

  on some claims), but TKNA is paying a present value of only about $291 million under

  the TKNA Settlement Agreement.  Further, the UAW does not believe that a true

  negotiation has ever taken place, since the UAW was excluded from the negotiations of

  the TKNA Settlement Agreement at TKNA's insistence and the amount offered by

  TKNA to obtain releases for TKNA and its affiliates has not increased since TKNA's

  initial offer in early October.  The UAW believes that a true negotiation would yield a

  larger settlement, resulting in higher recoveries for all constituencies.

- Second, the UAW believes it is inappropriate that the TKNA Settlement Agreement

  would release from liability potential defendants in addition to TKNA, and these

  potential defendants would pay nothing for their releases. The UAW believes that some

  of the parties who would be released from liability without paying anything have

  substantial assets that would be available to satisfy a successful litigation recovery or

  contribute to a larger settlement amount.

- Third, the UAW believes that a multiyear litigation to conclusion against TKNA and the other potential defendants is not the only possible alternative to the TKNA Settlement Agreement. The UAW believes that continued negotiation with TKNA can lead to an increase in settlement payments from TKNA and the other potential defendants.  The UAW believes it was excluded from the negotiations leading to the TKNA Settlement Agreement and there have been no settlement negotiations with any of the other potential defendants.

- Fourth, the UAW believes that the TKNA Settlement Agreement unfairly favors the E&A Retirees over the UAW Retirees. The UAW believes that E&A Retirees will recover approximately 91% of the amounts they were owed as of September 30, 2015, while the UAW Retirees will recover only approximately 62% of the amounts they were owed as of September 30, 2015. The UAW also believes that the E&A Retirees may recover 100% of the amounts they are owed as of the Effective Date of the Plan because the obligations owed to E&A Retirees on the Effective Date of the Plan may be less than the obligations estimated as of September 30, 2015.

- Fifth, the UAW believes that the TKNA Settlement Agreement provides insufficient security of payment for the UAW Retirees. The TKNA Settlement Agreement requires the UAW Retirees to accept payment from TKNA over a period of eight years. If TKNA fails, for whatever reason, to make payments, the UAW Retirees may never receive the money they are owed. By contrast, the TKNA Settlement Agreement provides that the E&A Retirees receive all their money all at once up front, so the E&A Retirees are not exposed to any of the risk that TKNA might not fulfill its payment obligations.

Further, the Plan creates the additional risk of a declining recovery by UAW Retirees depending on the amount of cash in the Budd estate at the Effective Date of the Plan.

- Sixth, the Plan and the TKNA Settlement Agreement require that TKNA will continue to own 100% of the Debtor, which the UAW believes violates the Bankruptcy Code's Absolute Priority Rule that requires all creditors to be paid in full before equity receives any recovery.

- Seventh, the Plan does not provide for any claim for UAW Retirees for the reduction of their benefits, which the UAW believes is required by Sections 1114 and 1129 of the Bankruptcy Code.

### 3.    Distribution of Budd's Assets under the Plan

(a) **UAW Retiree Health Benefits:** Current health benefits to Retirees under Budd's existing benefits plans effectively will be terminated, and replaced without interruption with benefits funded from Retiree VEBAs. The UAW VEBA will be funded with an estimated $179 million cash from the Debtor's Estate[3] and either $285 million or $320 million in cash over 8 years from the TKNA Settlement Agreement. The Debtor estimates that the value of the contributions to the UAW VEBA under the Plan will be approximately $111,000 per UAW Retiree. The Debtor further projects that the UAW VEBA will be able to fund healthcare benefits to UAW Retirees for the remainder of their lives.

---

[3] The Plan provides that the amount of cash received by the UAW VEBA is dependent on the amount of Effective Date Cash remaining after payment of $55 million to the E&A VEBA and payment of, among other things, administrative claims.  The result is that the UAW Cash will decrease if the Effective Date is delayed, or as the Debtor uses available cash to satisfy other claims.

(b)      **E&A Retiree Health Benefits:** Current health benefits to Retirees under Budd's existing benefits plans effectively will be terminated, and replaced without interruption with benefits funded from Retiree VEBAs. The E&A VEBA will be funded with $70 million cash in the aggregate from the Debtor's estate and from the TKNA Settlement Agreement. The Debtor estimates that the value of the contributions to the E&A VEBA under the Plan will be approximately $66,000 per E&A Retiree. It is expected that the funds in the E&A VEBA will last for approximately 25 years, through 2041.

(c)      **Retiree Pension Benefits (UAW and E&A):** Under the TKNA Settlement Agreement (which is incorporated into the Plan), TKNA will assume responsibility for the Pension Plans so Retirees will receive their pension plan payments, uninterrupted, in full and on time.

(d)      **Holders of Asbestos Claims:** Asbestos Claims that are not objected-to during the bankruptcy case on legal grounds, will "pass through" the bankruptcy case, allowing those Asbestos Claimants to bring or continue lawsuits against Budd.

(e)      The Debtor has multiple insurance policies that will provide more than $100 million of insurance coverage to satisfy asbestos claims judgments or settlements. In connection with enforcing the Debtor's insurance policies, the Debtor will, on the Effective Date, enter into an Amended Asbestos Cost Sharing Agreement with multiple insurers, pursuant to which the insurers will coordinate defense and payment of asbestos claims judgments and settlements for insured claims. Holders of Insured Asbestos Claims (generally, claims brought by holders of Asbestos Claims exposed to Budd's asbestos before November, 1985) shall be paid 100% of the amount of their claim from proceeds of the Asbestos Insurance Policies in

8

accordance with the terms of the Amended Asbestos Cost Sharing Agreement, attached as

Exhibit D to the Plan.

   **(f)**   Holders of Uninsured Asbestos Claims (Asbestos Claims that are not

insured, including claimants who were only exposed to the Debtor's asbestos after October,

1985) will receive 66% of the value of their claim paid from the Uninsured Asbestos Claim Fund

until it is exhausted, which will be funded by the Debtor with $1,250,000 on the date the Plan

becomes effective. The Uninsured Asbestos Claim Fund shall be maintained until the earlier to

occur of (a) the date on which less than $1,000 remains in such Asbestos Fund, or (b) the date on

which all lawsuits on account of Asbestos Claims brought as of January 1, 2045 have been

resolved.

   **(g)**   The Debtor will fund the Insured Asbestos Claim Fund with $2.2

million in cash, which shall be used for the benefit of the Insurers in accordance with the

Amended Asbestos Cost Sharing Agreement. In addition, the Debtor will fund the Asbestos

Administration Fund on the Effective Date with $1,500,000 to cover the costs of administering

the Asbestos Funds.

   **(h)**   **Other General Creditors:** Unsecured creditors (not including

Retirees or holders of Asbestos Claims) will receive 66% of the allowed amount of their claims.

   **4.**   **Recommendation of Budd's Independent Director and Chief Restructuring Officer and the E&A Retiree Committee**

   Budd's Independent Director and Chief Restructuring Officer, and the E&A

Retiree Committee believe that the TKNA Settlement Agreement ensures the

uninterrupted payment of retiree pension benefits and provides the Debtor with enough

cash to fund VEBAs that will be able to provide healthcare benefits that are substantially

similar to what Retirees currently receive for the rest of the Retirees' lives. By contrast,

Budd's Chief Restructuring Officer and Independent Director, and the E&A Retiree Committee believe that pursuing litigation (the most likely alternative to walking away from the TKNA Settlement Agreement) will result in prolonged uncertainty and delay for a limited upside that is far from certain. For these reasons, Budd's Independent Director and Chief Restructuring Officer and the E&A Retiree Committee urge you to vote in favor of confirmation of the Plan and approval of the TKNA Settlement Agreement.

# TABLE OF CONTENTS

I.      INTRODUCTION ...................................................................................................1

II.     OVERVIEW OF THE PLAN.................................................................................1

    A.      Capitalized and Defined Words................................................................1
    B.      Treatment of Retiree Health Benefits Under the Plan ............................3
    C.      Retiree Pension Benefits..........................................................................5
    D.      Use of Debtor's Cash and the TKNA Settlement ....................................6
    E.      Releases....................................................................................................8
    F.      Asbestos Claims and Insurance ..............................................................9
    G.      Unsecured Creditors...............................................................................10

III.    SUMMARY OF THE PLAN...............................................................................10

    A.      The Debtor's Largest Assets: Cash on Hand and Affiliate Claims .......10
    B.      The TKNA Settlement Agreement .........................................................11
    C.      The UAW Can Elect to Preserve Claims Against Certain Third Parties...............12
    D.      The Treatment of Retiree Claims...........................................................13
    E.      Asbestos Claims Given Access to Asbestos Insurance Policies and
        Asbestos Funds ......................................................................................16
    F.      Classified Claims: Classification and Treatment..................................17
    G.      Unclassified Claims: Allowance and Treatment....................................24

IV.    PLAN VOTING INSTRUCTIONS AND PRODECURES ...............................26

    A.      Notice to Holders of Claims and Equity Interests .................................26
    B.      Voting Requirements to Confirm Plan ...................................................26
    D.      Solicitation Materials.............................................................................26
    E.      Voting Procedures, Ballots and Voting Deadline ..................................27
    F.      Confirmation Hearing and Deadline for Objections to Confirmation ...28
    G.      Plan Binding on Creditors and Parties in Interest................................28

V.     DEBTOR'S BACKGROUND AND EVENTS LEADING TO BANKRUPTCY ..........28

    A.      Brief Overview of the Debtor's Business Operations.............................28
    B.      The Debtor's Retiree Benefit Obligations .............................................28
    C.      The Debtor's Pension Obligations.........................................................30
    D.      The Debtor's Asbestos Liabilities..........................................................31
    E.      Events Leading to Commencement of the Bankruptcy Case..................31

VI.    THE BANKRUPTCY CASE ..............................................................................33

    A.      Commencement of the Bankruptcy Case................................................33
    B.      Recognition and Participation of Creditors...........................................33
    C.      The Debtor's Withdrawal of its Motion for Approval of the Original
        TKNA Settlement Agreement..................................................................33
    D.      The Status Quo Order and the 2004 Investigations ..............................33
    E.      Potential Claims Against TKNA and Others .........................................34

F.     Settlement Discussions Among the Debtor, the Retiree Representatives, and TKNA ..................................................................................................50

G.    Evaluation / Estimation of Asbestos Claims and Available Insurance .................51

VII.   IMPLEMENTATION OF THE PLAN OF REORGANIZATION ...................................51

A.    Establishment and Funding of VEBAs for the Benefit of Retirees ......................51
B.    Execution of TKNA Settlement Agreement ........................................................52
C.    Rights and Powers of the Independent Fiduciary .................................................52
D.    Rights and Powers of the Debtor .........................................................................53
E.    Dissolution of Committees and Retiree Representatives......................................53

VIII.  PLAN PROVISIONS GOVERNING ALLOWANCE OF CLAIMS AND MAKING OF DISTRIBUTIONS .........................................................................................54

A.    Liquidation and Treatment of Asbestos Claims....................................................54
B.    Allowed Claims, Distribution Rights and Objections to Claims ..........................56
C.    Disposition of Executory Contracts and Unexpired Leases .................................57
D.    Reservation of Rights Regarding Claims and Causes of Action ..........................57

IX.    OTHER PLAN PROVISIONS ...................................................................................57

A.    Releases, Injunctions, Exculpation and Related Provisions .................................57
B.    Preservation of Rights of Action..........................................................................61
C.    Retention of Jurisdiction ......................................................................................61
D.    Amendment, Alteration and Revocation of Plan ..................................................62
E.    Conditions to Effective Date................................................................................62
F.    Requirements for Confirmation of the Plan..........................................................62

X.    CERTAIN RISK FACTORS TO BE CONSIDERED ......................................................63

A.    Risks of the Chapter 11 Plan Generally................................................................63
B.    Risks Related to the TKNA Settlement Agreement .............................................63
C.    Risks Related to Proposed Treatment of Asbestos Claims...................................63
D.    Risks of Alternatives to the Plan..........................................................................64

XI.    CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ..................65

A.    U.S. Federal Income Tax Consequences to the Debtor .......................................65
B.    U.S. Federal Income Tax Implications to the VEBAs..........................................66
C.    U.S. Federal Income Tax Consequences to Retirees ...........................................66

XII.   FEASIBILITY OF THE PLAN, BEST INTERESTS OF CREDITORS, AND CONFIRMATION OF THE PLAN WITHOUT CONSENT OF ALL CREDITORS .......................................................................................................66

A.    Feasibility of the Plan .........................................................................................66
B.    Acceptance of the Plan.........................................................................................66
C.    Best Interests Test ...............................................................................................67
D.    Confirmation Without Consent to Modify Retiree Benefits.................................67
E.    Confirmation Without Acceptance of All Impaired Classes: "Cramdown"..........67

XIII.  ALTERNATIVES TO CONFIRMATION AND  CONSUMMATION OF THE PLAN ...........................................................................................................67

A.      Alternative Plan(s) of Reorganization ...................................................68
B.      Litigation of Affiliate Claims...............................................................68
C.      Interim Modification of Retiree Benefits...............................................68
D.      Litigation of Retiree Benefit Issues ......................................................69
E.      Liquidation under Chapter 7 .................................................................69

XIV.    THE SOLICITATION ORDER AND DISPUTED CLAIMANTS .................................70

A.      Solicitation Order.................................................................................70
B.      Voting Rights of Disputed Claimants ...................................................70

XV.     RECOMMENDATION AND CONCLUSION.................................................................70

## EXHIBITS TO DISCLOSURE STATEMENT

**Exhibit 1** – **TOWERS WATSON PRESENTATION ON RETIREE EXCHANGES**

**Exhibit 2** – **PROJECTIONS (based on July 1, 2016 Effective Date)**

- **Projected Effective Date Cash**

- **Projected Plan Cash Receipts and Disbursements**

- **Calculation of UAW Cash**

- **Projected UAW VEBA Cash Receipts and Disbursements**

**Exhibit 3** – **FAQS CONCERNING HEALTH REIMBURSEMENT ACCOUNTS (HRAS) FOR UAW RETIREES**

**Exhibit 4** – **LIQUIDATION ANALYSIS**

# I.    INTRODUCTION

The Budd Company, Inc. (the "Debtor" or "Budd") is the debtor in the chapter 11 case pending before the United States Bankruptcy Court for the Northern District of Illinois (Eastern Division) under case number 14 B 11873 (the "Bankruptcy Case").

The Debtor provides this Disclosure Statement for the Fifth Amended Chapter 11 Plan For the Budd Company, Inc. Dated March 1, 2016 (as it may be amended, the "Disclosure Statement") pursuant to section 1125 of title 11 of the United States Code (the "Bankruptcy Code") for use in the solicitation of votes on the Fifth Amended Chapter 11 Plan For the Budd Company, Inc. Dated March 1, 2016 (as may be amended, the "Plan"). Each capitalized term used in this Disclosure Statement but not otherwise defined herein has the meaning ascribed to such term in the Plan, including the exhibits to the Plan.

The Independent Director and Chief Restructuring Officer of Budd, the E&A Retiree Committee and TKNA each support the Plan and the TKNA Settlement Agreement and urge all Retirees and other creditors to vote for the Plan. The UAW and the Asbestos Committee do not support the Plan and have, respectively, informed the Court, the UAW Retirees and the Asbestos Claimants of their views.

# II.    OVERVIEW OF THE PLAN

## A.    Capitalized and Defined Words

Capitalized words used in this Disclosure Statement are "defined terms" and have the meanings given to them in **Exhibit A** to the Plan (the glossary of defined terms). The defined terms used most frequently in this Disclosure Statement are as follows:

**"Amended Asbestos Cost Sharing Agreement"** means the asbestos cost sharing agreement attached to the Plan as Exhibit D.

**"Causes of Action"** means all claims, actions, causes of action, chooses in action, suits, debts, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, judgments, remedies, rights of set off, third party claims, subrogation claims, contribution claims, reimbursement claims, indemnity claims, counterclaims and crossclaims of the Debtor and/or the Estate.

**"CBA"** means collective bargaining agreement.

**"Debtor"** means The Budd Company, Inc.

**"E&A Retiree"** is a Retiree whose Retiree Benefits Claim does not relate to or arise from work in an employment unit covered by a CBA or PCA.

**"E&A Retiree Committee"** means the committee of executive and administrative Retirees constituted by the office of the U.S. Trustee in the Bankruptcy Case.

**"E&A VEBA"** means the Retiree VEBA established for the benefit of the E&A Retirees pursuant to the Plan.

**"E&A VEBA Effective Date"** means the date on which the E&A VEBA goes into effect.

**"E&A VEBA Trust Agreement"** means the trust agreement setting forth the terms of the E&A VEBA.

**"E&A VEBA Trust Plan"** means the agreement setting forth the terms of benefits to be provided to eligible E&A Retirees, which are funded through the E&A VEBA.

**"Effective Date"** means the first Business Day after the entry of the Confirmation Order and on which all conditions precedent to the Effective Date specified in the Chapter 11 Plan have been satisfied or waived.

**"ERISA Pension Plans"** means the E&A Pension Plan and the UAW Pension Plan.

"HRA" means Health Reimbursement Account.

**"KPS"** means KPS Capital Partners LP.

**"PBGC"** means the Pension Benefit Guaranty Corporation.

**"PCA"** means plant closing agreement.

**"Pension Plans"** means the SERP and/or one or both of the ERISA Pension Plans.

**"Petition Date"** means March 31, 2014.

**"Retiree"** is a retired employee of the Debtor and/or a spouse, surviving spouse, domestic partner, or dependent of such a retiree who is or may be entitled to Retiree Benefits from the Debtor as a result of such retiree's employment with the Debtor.

**"Retiree Benefits"** shall have the meaning ascribed to it by section 1114 of the Bankruptcy Code, provided, however, that in no event shall Retiree Benefits include claims of individuals relating to or arising from one or more Pension Plans.

**"Retiree Claim"** means a claim for Retiree Benefits of a person receiving or entitled to receive such benefits from the Debtor.

**"Retiree VEBA"** means one or more VEBAs established for the benefit of Retirees pursuant to the Plan.

**"SERP"** means The Budd Company Supplemental Pension Plan.

**"TKAG"** means ThyssenKrupp AG, the sole parent of TKNA.

**"TKNA"** means ThyssenKrupp North America, Inc., which, as of the Petition Date, held 100% of the equity interests in the Debtor.

2

**"TKNA Settlement Agreement"** means the agreement to settle and compromise the Affiliate Claims and the Estate Claims, which agreement is attached to the Plan and fully incorporated into the Plan in the form of __Exhibit B__ to the Plan.

**"UAW"** means the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America and its local unions, the Section 1114(c) Authorized Representative of the UAW Retirees in the Chapter 11 Case.

**"UAW Pension Plan"** means The Budd-UAW Consolidated Retirement Benefit Plan.

**"UAW Retiree Benefits Claim"** means a Retiree Claim of a UAW Retiree.

**"UAW Retiree"** is a Retiree whose Retiree Benefits Claim relate to or arise from work in an employment unit covered by a CBA and/or PCA.

**"UAW VEBA"** means the Retiree VEBA established for the benefit of the UAW Retirees pursuant to the Plan and the benefits provided under the UAW VEBA will be further described in the UAW VEBA Trust Plan.

**"UAW VEBA Effective Date"** means the date on which the UAW VEBA goes into effect.

**"UAW VEBA Trust Agreement"** means the trust agreement setting forth the terms of the UAW VEBA.

**"UAW VEBA Trust Plan"** means the agreement setting forth the terms of benefits to be provided to eligible UAW Retirees, which are funded through the UAW VEBA.

**"VEBA"** means a Voluntary Employees' Beneficiary Association trust.

**"Waupaca"** means ThyssenKrupp Waupaca, Inc., the Wisconsin corporation previously owned by the Debtor.

**"Waupaca Transaction"** means the 2012 sale of Waupaca by Budd to KPS.

B.         **Treatment of Retiree Health Benefits Under the Plan**

1.   Current health benefits to Retirees under Budd's existing benefits plans effectively will be terminated, and replaced without interruption with benefits funded from Retiree VEBAs, as discussed below. See Exhibit 1 Towers Watson Presentation on Retiree Exchanges. Each of the E&A VEBA and the UAW VEBA are expected to invest the cash funded to each in order to provide healthcare benefits to the Retirees in a manner and structure determined and implemented by the E&A Committee for the E&A Retirees and the UAW (or the Debtor, if the UAW declines) for the UAW Retirees. The Debtor estimates that the value of the contributions to the VEBAs under the Plan will be approximately $111,000 per UAW Retiree for the UAW VEBA and

3

$66,000 per E&A Retiree for the E&A VEBA.  The Debtor further estimates that if the VEBAs fund allocations to individual HRAs for each Retiree under the Plan, the average total benefits provided over the course of a Retiree's life, including the costs associated with paying any excise taxes, will be approximately $197,000 per UAW Retiree and $94,000 per E&A Retiree. The actual total benefits provided to an individual Retiree will be higher or lower than the average total benefits depending on the age/lifespan of the Retiree and the number and age/lifespan of any spouse and dependents.

2.  The E&A VEBA will be funded with $70 million cash from the Debtor's estate and from the TKNA Settlement Agreement. The E&A VEBA will provide benefits to the Post-Medicare E&A Retirees through a Blue Cross Blue Shield Medicare advantage plan. For the Pre-Medicare E&A Retirees, the E&A VEBA will provide benefits through a  Blue Cross Blue Shield group plan with stop loss insurance for claims in excess of $100,000.   It is expected that the funds in the E&A VEBA will last for approximately 25 years, through 2041. The average age of the E&A Retirees (including surviving spouses) is 78. After the funds are exhausted, coverage for the E&A Retirees will terminate.

3.  The Plan and TKNA Settlement Agreement provide that the UAW VEBA will be funded with an estimated $179 million cash from the Debtor's estate [1]and either $285 million or $320 million in cash over 8 years from the TKNA Settlement Agreement. **See __Exhibit 2__ Calculation of UAW Cash, and Projected UAW VEBA Cash Receipts and Disbursements.** Each UAW Retiree shall receive an allocation from the UAW VEBA to his or her HRA on an annual basis. Each UAW Retiree may then use his or her HRA to pay eligible medical, dental, and vision expenses, including premiums for insurance policies and Medicare supplement plans purchased on the individual insurance market and certain medical expenses that are not covered by

---

[1] The Plan provides that the amount of cash received by the UAW VEBA is dependent on the amount of Effective Date Cash remaining after payment of $55 million to the E&A VEBA and payment of, among other things, administrative claims.  The result is that the UAW Cash will decrease if the Effective Date is delayed, or as the Debtor uses available cash to satisfy other claims.

insurance policies, Medicare, or Medicare supplement plans. See Exhibit 3 FAQS Concerning Health Reimbursement Accounts (HRAs) for UAW Retirees.

4. The Debtor estimates that, under the Plan, the Retirees can obtain lifetime healthcare coverage and benefits under their respective VEBAs that would be consistent with and substantially similar to the benefits currently being provided under the Debtor's current healthcare benefit plans. The E&A Retiree Committee has chosen a different structure, as set forth in Section III(F)(4) hereof, at page 19. Budd offered the UAW the opportunity to choose the healthcare delivery method for the UAW Retirees' benefits, but the UAW has refused to provide Budd with more than a cursory description of the UAW's preferred structure to deliver healthcare benefits to UAW Retirees. Accordingly, the Debtor believes the UAW is acting in its own self-interest, and not in the interests of its retirees.

## C.        Retiree Pension Benefits

5. In addition to making payments under the TKNA Settlement Agreement, TKNA is assuming the Pension Plans, including the ERISA Pension Plans and the SERP. Even without the TKNA Settlement Agreement, TKNA is co-liable under federal law for the ERISA Pension Plans, and, the Debtor believes, contractually liable to make certain payments under the SERP. Accordingly, TKNA is agreeing to make all required contributions and payments thereunder so the Retirees will receive their pension plan payments, uninterrupted, in full and on time. Even if the Plan and the TKNA Settlement are not approved by the Bankruptcy Court, however, the ERISA Pension Plans are insured by the PBGC, a wholly owned United States government corporation that guarantees the payment of certain pension benefits upon termination of pension plans covered by Title IV of ERISA. Under federal law, TKNA and its Affiliates are also liable in the event one or both ERISA Pension Plans are terminated. However, in the event that the ERISA Pension Plans are terminated, the PBGC will  assert a claim against Budd that would, if allowed, greatly diminish the amount of cash available to satisfy the Debtor's obligations to Retirees to provide healthcare benefits and other claims against Budd.  TKNA and 26 of its Affiliates

5

also will assert claims against Budd that, if allowed, would greatly diminish the amount of cash available to satisfy the Debtor's obligations to Retirees to provide healthcare benefits and the other claims against Budd.

**D.**      **Use of Debtor's Cash and the TKNA Settlement**

6.   The Plan is premised upon the use and distribution by the Debtor of all of its existing cash and TKNA Settlement Agreement proceeds to and for the benefit of its creditors and Retirees.

7.   The Debtor projects it will have $254 million of cash on the projected Effective Date of July 1, 2016. **See <u>Exhibit 2</u> Projected Effective Date Cash, and Projected Plan Cash Receipts and Disbursements**.

8.   The Plan and the TKNA Settlement Agreement provide that the TKNA Settlement Agreement payments will equal $300 million, to be paid over eight (8) years, unless the UAW elects to release KPS and its affiliates, including Perella Weinberg Partners Group LP, in connection with the Waupaca Transaction, in which case the payments will equal $335 million, to be paid over eight (8) years.

9.   The Plan and the TKNA Settlement Agreement provide that on the Effective Date, TKNA will pay for the benefit of the E&A VEBA, the first $15 million due under the Settlement Agreement, which amount, together with $55 million of the Debtor's cash, will be transferred to the E&A VEBA.

10.  Also, the Plan and the TKNA Settlement provide that, on the Effective Date, $179 million of the Debtor's cash will be transferred to the UAW VEBA. From and after the Effective Date, all remaining payments due under the TKNA Settlement Agreement will be paid to the UAW VEBA ($285 million or $320 million, in either case, paid over 8 years).

11.  The Plan and the TKNA Settlement Agreement provide that Budd will continue to exist after the Effective Date and will be owned by TKNA.  Budd proposes that the UAW will select the individual who will serve as the Independent Fiduciary and who cannot be removed or influenced by TKNA, to enforce the TKNA Settlement Agreement against TKNA for the benefit of the UAW VEBA and, if the UAW does

6

not elect to release KPS and its affiliates, including Perella Weinberg Partners Group LP, to pursue Causes of Action against KPS and its affiliates, including Perella Weinberg Partners Group LP. Budd proposes that the UAW VEBA will, as an express third-party beneficiary under the TKNA Settlement Agreement, have the right to enforce the Settlement Agreement against TKNA.

12. The Plan and the TKNA Settlement Agreement provide that if TKNA fails to make a Settlement Agreement payment, the Independent Fiduciary and/or the UAW VEBA may accelerate all remaining payments due under the Settlement Agreement, draw on the Letter of Credit (which will fund, in cash, to the UAW VEBA the amount of one missed Settlement Agreement payment) and sue TKNA to collect the amount of all remaining payments under the Settlement Agreement.

13. The TKNA Settlement Agreement provides no cash payment to holders of Asbestos Claims, but does require release of claims that could be pursued for the benefit of the estate's creditors, including holders of Asbestos Claims. The Debtor believes that holders of Asbestos Claims still benefit from the TKNA Settlement Agreement because it reduces the amount of other claims against the Debtor's estate, thereby leaving more funds available for remaining creditors, including holders of Asbestos Claims.

14. The Debtor believes TKNA has more than sufficient resources (including untapped credit lines, cash and property) to make the payments under the TKNA Settlement Agreement. Although, there can be no assurance that TKNA will have sufficient resources to satisfy any demand made or judgment obtained against TKNA, the TKNA Settlement Agreement includes certain protections against nonpayment , including (a) an acceleration provision upon default; (b) the Letter of Credit described above; and (c) a requirement that TKNA make an annual equity certification and financial disclosures. In addition, the Chief Restructuring Officer conducted diligence into TKNA's financial wherewithal to satisfy its obligations under the TKNA Settlement Agreement.

**E.**        **Releases**

15. The Plan and the TKNA Settlement Agreement provide that TKNA, including its subsidiaries and affiliates (including TKAG), and its current and former officers and directors and employees (including individuals who also served as officers and directors of Budd), as well as its agents and professionals, are receiving releases by the Debtor of any and all claims and Causes of Action held by the Debtor or its Chapter 11 estate (these released parties are more fully set forth in Article IX(A) of the Plan and the TKNA Settlement Agreement). TKNA's consent to make the payments described in the TKNA Settlement Agreement is conditioned upon the approval of these releases. Other potential defendants, including Clark Hill, a law firm that represented both Budd and TKNA in Budd's sale of Waupaca, Bank of America Merrill Lynch ("BAML"), an investment bank that served as a financial advisor to TKNA and TKAG in the Waupaca Transaction, KPS, the purchaser of Waupaca, and Perella Weinberg Partners Group LP, the financial advisor to KPS in the Waupaca Transaction, are also receiving similar releases. The only exception is if the UAW elects to have Budd retain the right to sue KPS and its affiliates, including Perella Weinberg Partners Group LP, in connection with the Waupaca Transaction, in which case KPS and its affiliates, including Perella Weinberg Partners Group LP, would not receive a release. A total of 21 parties, including TKNA, would receive releases if the TKNA Settlement is approved.

16. The releases provided for in the TKNA Settlement Agreement and the Plan do not release any direct claims that a creditor or Retiree may have against any of the released parties. In other words, the TKNA Settlement Agreement and the Plan only release claims that are property of the Debtor's estate, including claims that are only able to be pursued through derivative standing in the name of the Debtor.

17. The Causes of Action being released by the Debtor include:

   **(a)**        Claims and Causes of Action relating to the Debtor's Actual Tax Sharing Agreement (see Section VI(E)(1), pp. 32–36).

8

      **(b)**    Claims and Causes of Action relating to the Waupaca Transaction (see Section VI(E)(2), pp. 36–43).

**F.**    **Asbestos Claims and Insurance**

18. Asbestos Claims that are not objected-to during the bankruptcy case on legal grounds, will "pass through" the bankruptcy case, allowing those Asbestos Claimants to bring or continue lawsuits against Budd.

19. The Debtor has multiple insurance policies that will provide more than $100 million of insurance coverage to satisfy asbestos claims judgments or settlements. In connection with enforcing the Debtor's insurance policies, the Debtor will, on the Effective Date, enter into an Amended Asbestos Cost Sharing Agreement with multiple insurers, pursuant to which the insurers will coordinate defense and payment of asbestos claims judgments and settlements for insured claims. Holders of Insured Asbestos Claims (generally, claims brought by holders of Asbestos Claims exposed to Budd's asbestos before November, 1985) shall be paid 100% of the amount of their claim from proceeds of the Asbestos Insurance Policies in accordance with the terms of the Amended Asbestos Cost Sharing Agreement, attached as Exhibit D to the Plan.

20. Holders of Uninsured Asbestos Claims (Asbestos Claims that are not insured, including claimants who were only exposed to the Debtor's asbestos after October, 1985) will receive 66% of the value of their claim paid from the Uninsured Asbestos Claim Fund until it is exhausted, which will be funded by the Debtor with $1,250,000 on the date the Plan becomes effective. The Uninsured Asbestos Claim Fund shall be maintained until the earlier to occur of (a) the date on which less than $1,000 remains in such Asbestos Fund, or (b) the date on which all lawsuits on account of Asbestos Claims brought as of January 1, 2045 have been resolved.

21. The Debtor will fund the Insured Asbestos Claim Fund with $2.2 million in cash,

which shall be used for the benefit of the Insurers in accordance with the Amended

Asbestos Cost Sharing Agreement. In addition, the Debtor will fund the Asbestos

Administration Fund on the Effective Date with $1,500,000 to cover the costs of

administering the Asbestos Funds.

22. Currently pending are claims objections the Debtor filed to various Asbestos Claims

on legal grounds.  Once those objections are resolved, all remaining asbestos claims

will "pass through" the Chapter 11 case and revert back to the non-bankruptcy tort

system where those claims will be adjudicated.

**G.       Unsecured Creditors**

23. Unsecured creditors (not including Retirees or holders of Asbestos Claims) will

receive 66% of the allowed amount of their claims.

### III.    SUMMARY OF THE PLAN

**A.     The Debtor's Largest Assets: Cash on Hand and Affiliate Claims**

As of January 31, 2016, the Debtor had approximately $282 million in cash. As set forth
in monthly reports filed with the Bankruptcy Court, during the course of the Bankruptcy Case to
date, the Debtor generally has spent between $4 million and $5 million each month on Retiree
Benefits.

The Debtor believes that it holds claims and Causes of Action against ThyssenKrupp
North America, Inc. ("TKNA") and other parties that have substantial value.[2] These claims and
Causes of Action are described beginning on page 32 below.

---

[2] The Debtor's assets include a directors and officers (D&O) liability insurance policy (the
"D&O Policy") with a $30,000,000 aggregate limit with a policy period of February 28, 2014 to
February 28, 2015. The D&O Policy contains a wind-down endorsement that allows the Debtor
to tender claims under the D&O Policy for an additional period of seven years following the end
of the policy period. This policy does not cover acts by former directors and officers that are to
be released pursuant to the TKNA Settlement Agreement and the Plan.

**B.**        **The TKNA Settlement Agreement**

To obtain value for the Debtor's largest Causes of Action, the Plan seeks approval of the TKNA Settlement Agreement attached to the Plan as **Exhibit B**. The TKNA Settlement Agreement has been signed by the Debtor and the E&A Retiree Committee.  It has not been signed nor agreed to by the UAW in any capacity, including as the authorized representative of UAW Retirees under Section 1114 of the Bankruptcy Code.

By way of summary, the TKNA Settlement Agreement provides for, among other things, the following:

1. TKNA will pay on behalf of the Debtor directly to the UAW VEBA for the benefit of the UAW Retirees $285 million Cash, over a period of eight (8) years, starting on October 3, 2016, subject to adjustment as set forth in the TKNA Settlement Agreement.

2. If the Confirmation Order includes the Waupaca Claims Release (Attachment 4 to the TKNA Settlement Agreement), then TKNA will pay on behalf of the Debtor directly to the UAW VEBA for the benefit of the UAW Retirees an additional $35 million Cash, over a period of eight (8) years starting on October 3, 2016, subject to adjustment as set forth in the TKNA Settlement Agreement. If the Confirmation Order does not include the Waupaca Claims Release, then the proposed Independent Fiduciary shall have authority to prosecute claims against KPS (defined below) and its affiliates, including Perella Weinberg Partners Group LP, for the sole benefit of the UAW Retirees.

3. TKNA will pay on behalf of the Debtor directly to the E&A VEBA for the benefit of the E&A Retirees $15 million Cash, as soon as possible after the Effective Date, subject to upward adjustment as set forth in the TKNA Settlement Agreement.

4. The Cash contributed by TKNA, as well as what is projected to be more than $200 million of the Debtor's Effective Date Cash, will fund the UAW VEBA and the E&A VEBA, and be used to provide modified healthcare benefits to the UAW and E&A Retirees (discussed in greater detail below).

5. TKNA will issue the Letter of Credit in an amount not less than $35 million, which Letter of Credit will secure TKNA's payment obligations to the UAW VEBA.

6. TKNA will assume the Pension Plans (which means that the ERISA Pension Plans and the SERP would remain in effect without change). This assumption will have the effect of eliminating the claims against the Debtor filed by the PBGC, asserting liability well over $100 million.

7. TKNA will affirm that it is solely responsible for the Debtor's Workers Compensation Claims.

8. TKNA will assume financial responsibility for Claim number 521 Filed by Waupaca Foundry, Inc. in the Chapter 11 Case.

9. TKNA will continue to provide administrative services to the Debtor under the terms of the Amended Services Agreement (which is attached to the TKNA Settlement Agreement).

10. TKNA and the other Affiliates, including without limitation, TKAG, will waive and release all of their respective Claims and potential Claims against the Debtor, which Claims TKNA asserts may be worth hundreds of millions of dollars, if not more, subject to TKNA's reserved setoff rights as set forth in the TKNA Settlement Agreement.

11. TKNA will continue to own the Equity Interests of the Debtor.

12. TKNA will appoint an Independent Fiduciary selected by the UAW, who will be responsible for enforcing the TKNA Settlement Agreement and will oversee contributions to the Retiree VEBAs pursuant to the Plan.

13. The UAW VEBA and the E&A VEBA are third party beneficiaries of the TKNA Settlement Agreement and have authority to enforce the TKNA Settlement Agreement.

In exchange for the benefits to be received by the Debtor and its creditors, the Debtor would release TKNA, other Affiliates, including TKAG, and their officers, directors, agents and professionals, including Clark Hill and BAML, from all potential claims and Causes of Action, including the Causes of Action related to the Debtor's Actual Tax Sharing Agreement and the Waupaca Transaction that are described in Article VI below. KPS and its affiliates, including Perella Weinberg Partners LP, would also be released if the UAW so elects.

## C.        The UAW Can Elect to Preserve Claims Against Certain Third Parties

If the Confirmation Order does not include the Waupaca Claims Release, then the Estate shall retain Causes of Action against KPS and its affiliates, including Perella Weinberg Partners Group LP, that are described below, and the Independent Fiduciary shall have authority to pursue such Causes of Action for the benefit of the UAW Retirees. The Independent Fiduciary will have access to up to $5 million of Operating Cash to pursue such claims. All Net Proceeds of these Causes of Action would be contributed 100% to the UAW VEBA.

Alternatively, if the Confirmation Order includes the Waupaca Claims Release, then TKNA shall make the Additional Payments to the UAW VEBA totaling $35 million, payable in eight annual installments of $4.375 million each, starting on October 3, 2016, as set forth in section 3(b) of the TKNA Settlement Agreement.

The UAW may elect between these two options. If the UAW does not make any election, then the Estate shall retain Causes of Action against KPS and its affiliates, including Perella Weinberg Partners Group LP, as set forth in the TKNA Settlement Agreement, and the Independent Fiduciary shall have authority to pursue such Causes of Action for the benefit of the UAW Retirees.

D.          The Treatment of Retiree Claims

The Plan describes modifications to Retiree Benefits (healthcare benefits), which in the case of the UAW Retirees would occur pursuant to an order entered by the Bankruptcy Court pursuant to Bankruptcy Code section 1114, and in the case of the E&A Retirees would occur pursuant to a consensual agreement recognized in the Confirmation Order.The modifications would replace the Retiree Benefits currently available to the UAW Retirees and the E&A Retirees with new benefits that will be funded with Cash from the Debtor and the TKNA Settlement Agreement and contributed to the UAW VEBA and the E&A VEBA, respectively. If the Plan and the TKNA Settlement Agreement are approved: (a) the UAW VEBA will be funded with an estimated $499 million, consisting of an estimated $179 million[3] of Effective Date Cash, $285 million from the Settlement Payments, and either $35 million from the Additional Payments or the proceeds from the KPS Causes of Action[4]; (b) the UAW Settlement Payments and the Additional Payments, if applicable, will be funded annually over 8 years beginning in October 2016; (c) the E&A VEBA will be funded on the Effective Date with $70 million, consisting of $55 million of Effective Date Cash and $15 million from the Settlement Payments; and (d) the VEBAs will also be funded with any Settlement Increase, with 12.5% going to the E&A VEBA and 87.5% going to the UAW VEBA.[5]

If the Bankruptcy Court approves the modifications the Debtor seeks to make to the retiree benefits of the UAW Retirees and the Plan and the TKNA Settlement Agreement are approved, the UAW Retirees will receive Retiree Benefits pursuant to the terms of the UAW VEBA Trust Plan. The UAW VEBA will fund allocations to HRAs for each UAW Retiree. UAW Retirees could then use the funds in their HRAs to pay for eligible medical, dental, and vision expenses, including insurance premiums for coverage as further described herein. Retirees eligible for Medicare (post-65) would have access individual health insurance available through traditional Medicare coverage as well as through commonly available Medicare Supplement, Medicare Advantage, and Medicare Part D plans. The amounts allocated each year to HRAs for Retirees eligible for Medicare (post-65) would be set at levels sufficient to cover the estimated premiums for Medicare Supplement Plan F (most comprehensive), Medicare Part B (medical care), and Medicare Part D (drug coverage). Retirees not eligible for Medicare (pre-65) would

---

[3] The estimated $179 million of Effective Date Cash for the UAW VEBA assumes an Effective Date of July 1, 2016, payment of Retiree Benefits through the Effective Date consistent with payments made post-petition, and the incurrence of professional fees through the Effective Date consistent with recent experience.

[4] The Debtor estimates that the present value of the $179 million of Effective Date Cash, the $285 million of Settlement Payments and the $35 million of Additional Payments is approximately $455 million. If the UAW elects to not to grant the Waupaca Claims Release (which would result in KPS and its affiliates, including Perella Weinberg Partners Group LP, not receiving a release), the recovery in that litigation may or may not be substantially greater than $35 million.

[5] Note that "Settlement Increase" does not include any additional money that might be paid in the event that the UAW elects to grant the Waupaca Claims Release.

access individual health insurance products commonly available subsequent to the implementation of the Patient Protection and Affordable Care Act or through other products available in the health insurance market. The amounts allocated each year to HRAs for those Retirees not eligible for Medicare (pre-65) would be set at a level approximately equal to 100% of the current employer plan subsidy for the Debtor's retiree medical benefits and would be adjusted annually for increases/decreases in the cost of medical care and prescription drugs.[6] A third-party vendor with experience in advising retiree populations on health insurance options will assist the UAW Retirees in selecting the appropriate form of health insurance that could provide them with various options, including options that could provide the maximum level of benefits available with their HRA allocations.

The E&A Retirees will receive Retiree Benefits pursuant to the terms of the E&A VEBA Trust Plan. The E&A VEBA will provide benefits to the Post-Medicare E&A Retirees either through a Blue Cross Blue Shield Medicare advantage plan. For the Pre-Medicare E&A Retirees, the E&A VEBA will provide benefits through a Blue Cross Blue Shield group plan with stop loss insurance for claims in excess of $100,000. It is expected that the funds in the E&A VEBA will last for approximately 25 years, through 2041. The average age of the E&A Retirees (including surviving spouses) is 78. After the funds are exhausted, coverage for the E&A Retirees will terminate. The Debtor negotiated this coverage with the E&A Retiree Committee, who elected this type of plan coverage instead of providing all individual E&A Retirees with access to HRAs funded from the E&A VEBA.

To compare treatment of E&A and UAW Retirees under the Plan, and assuming that E&A Retirees were to benefit from individual allocations to HRAs funded by allocations from the E&A VEBA instead of the plan coverage negotiated for them by the Retire Committee, the initial average annual HRA values would be estimated to be as summarized below:[7]

---

[6] Given the change in structure, individual Retirees (whether or not eligible for Medicare) could pay more or less in unreimbursed out of pocket costs than they currently pay from year to year depending on claim experience, plans selected, and because not all plans include annual maximums.

[7] The current UAW plans provide comprehensive medical, dental and pharmacy coverage at essentially no cost to the UAW Retirees. The vast majority of the UAW Retirees pay no premiums, deductibles, co-pays or co-insurance for medical benefits and pay no premiums or deductibles and de minimis co-pays ($3-$6) for pharmacy benefits. By contrast, even the "grandfathered" E&A Retirees pay substantial premiums (e.g., $1,350), deductibles ranging from $250 to $500, co-pays of $35, and co-insurance of 10% to 20% for medical benefits and substantial premiums (e.g., $380) and co-pays ($10-$160) for pharmacy benefits. The "non-grandfathered" E&A Retirees pay considerably higher premiums.

| | Not Medicare Eligible (Pre-65) | Medicare Eligible (Post-65) |
|---|---|---|
| UAW Retirees | $10,000 | $4,500 |
| E&A Retirees: | | |
| Grandfathered | $8,900 | $3,100 |
| Non-Grandfathered | $6,500 | $1,000 |

Based on an actuarial analysis prepared by Towers Watson, it is estimated that the UAW VEBA will disburse approximately $822 million for retiree medical benefits, including administration expenses and potential excise taxes, from 2016 until 2094.[8] The Debtor believes that the estimated $499 million over time in funding under the Plan (if fully paid by TKNA through 2023) and investment returns of less than 4.5% per year will be sufficient to cover the estimated disbursements. The Debtor anticipates that the trustees for the UAW VEBA will invest in a broadly diversified portfolio of stocks, bonds, annuities, real estate, commodities, private equity, and alternative investments.[9]

Based on an actuarial analysis prepared by Towers Watson, it is estimated that the E&A VEBA, if an HRA structure were selected, would disburse approximately $105 million for retiree medical benefits, including administration expenses and potential excise taxes, from 2016 until 2089.[10] The Debtor believes that the $70 million in funding under the Plan and investment returns of less than 3.5% per year would be sufficient to cover estimated disbursements. The Debtor anticipates that the E&A VEBA will invest in a diversified portfolio of stocks, bonds, annuities, real estate, and commodities.[11]

The Debtor believes that by providing for the funding of the UAW VEBA, the UAW Retirees will have the ability to obtain meaningful healthcare benefits for the rest of their lives. The UAW reserves the right to oppose the Plan. The UAW has stated that it will provide its retirees with further information about its views on the Plan outside of this Disclosure Statement. Any such information supplied to retirees directly by the UAW has not been approved by the Bankruptcy Court.

---

[8] Assumes cost of living adjustments (COLA) of 7% annually.
[9] Based on research performed by Towers Watson, return on investment expectations for retiree medical plans average 6.5%.
[10] Assumes COLA of 7% annually.
[11] Based on research performed by Towers Watson, return on investment expectations for retiree medical plans average 6.5%.

Although the Debtor believes that the funding to the E&A VEBA would be sufficient to provide E&A Retirees with the ability to obtain meaningful healthcare benefits for the rest of their lives if they elected to pursue an HRA structure, the E&A Retiree Committee negotiated different treatment that will provide healthcare benefits to E&A Retirees for approximately 25 years, through 2041.

For the avoidance of doubt, no unused assets of the UAW VEBA or the E&A VEBA will revert to the Debtor or TKNA.

The Plan also provides for the assumption of the Pension Plans (pension benefits) by TKNA, in accordance with the TKNA Settlement Agreement, including the UAW Pension Plan, the E&A Pension Plan, and the SERP. The funding of the Pension Plans will become the sole responsibility of TKNA, with the timing and amount of the funding for the two ERISA Pension Plans continuing to be subject to ERISA and the Code (including applicable regulations) and funding of the SERP continuing to be subject to the terms of the SERP. As a result of the assumption of the Pension Plans by TKNA, full pension benefits for the UAW Retirees and E&A Retirees will continue uninterrupted.

Even if the TKNA Settlement is not approved by the Bankruptcy Court, the ERISA Pension Plans are insured by the PBGC, a wholly owned United States government corporation that guarantees the payment of certain pension benefits upon termination of pension plans covered by Title IV of ERISA. Under federal law, TKNA and its Affiliates are also liable in the event one or both ERISA Pension Plans are terminated. TKNA cannot be compelled to assume sponsorship of the ERISA Plans.   In the event that the ERISA Pension Plans are terminated, the PBGC has asserted claims against Budd that, if allowed, would greatly diminish the amount of cash available to satisfy Budd's obligation to provide healthcare benefits to its retirees and other claims against Budd.  TKNA and 26 of its Affiliates also have asserted claims against Budd, that if allowed, would further reduce the cash available to provide benefits to Budd's retirees and to pay other claims.  Finally, what an individual retiree would receive if the PBGC were required to administer the ERISA Plans depends on a number of factors including a retiree's age at retirement, the amount of the retiree's pension and the funding level in the ERISA Pension Plans.

**E.       Asbestos Claims Given Access to Asbestos Insurance Policies and Uninsured Asbestos Fund**

Asbestos Claims that are not Disallowed by the Bankruptcy Court or a court of competent jurisdiction will be liquidated by a court of competent jurisdiction and satisfied by: (1) proceeds of Asbestos Insurance Policies, which remain in effect and provide substantial coverage for defense and indemnity costs of Asbestos Claims, and (2) the Uninsured Asbestos Claim Fund, which provides $1,250,000 for defense and indemnity costs of Asbestos Claims that are not covered by the Amended Asbestos Cost Sharing Agreement or the Asbestos Insurance Policies. In addition, on the Effective Date, the debtor shall fund (i) the Asbestos Administration Fund with $1.5 million in cash to cover the costs of administering the Asbestos Funds, and (ii) the Insured Asbestos Claim Fund with $2.2 million in cash, which shall be used for the benefit of the Insurers in accordance with the Amended Asbestos Cost Sharing Agreement. Except from the Uninsured Asbestos Claim Fund, no holder of an Asbestos Claim shall have the right to seek payment on account of such Asbestos Claim from the Debtor or its property (other than under an

16

Asbestos Insurance Policy in accordance with the Plan), even if there are insufficient funds in the Uninsured Asbestos Claim Fund to pay the holder of an Asbestos Claim the Distribution to which he or she otherwise would be entitled under this Plan. The Amended Asbestos Cost Sharing Agreement sets forth details regarding the manner in which Asbestos Claims will be administered.

Budd historically maintained substantial insurance coverage with policy periods spanning 1950-1985. Subject to their terms, conditions and exclusions, these policies provide coverage for defense, settlement and judgments associated with asbestos-related bodily injury claims. Some policies provide defense costs in excess of limits. The Debtor and several of its primary and umbrella and excess insurers have reached an agreement as to payment, handling and allocation of future defense and indemnity for asbestos-related bodily injury claims as set forth in the attached Amended Asbestos Cost Sharing Agreement. As of the filing of this Disclosure Statement, eight (8) insurers have indicated to the Debtor that they will enter into the Amended Asbestos Cost Sharing Agreement if approved as part of this Plan, and the policies subject to the Amended Asbestos Cost Sharing Agreement are listed on its Exhibit 1.

The total limit of the policies identified on Exhibit 1 is estimated to be approximately $90 million per occurrence and $140 million in annual aggregate limits. The insurers have confirmed that from these policies they have spent approximately $10 million. Accordingly, subject to applicable aggregate, per occurrence or other limits, including non-cumulation provisions, Budd anticipates that the remaining limits of the Subject Policies (as defined in the Amended Asbestos Cost Sharing Agreement) should total more than $130 million in annual aggregate limits, and approximately $80 million in per occurrence limits.

The Amended Asbestos Cost Sharing Agreement also provides for the ability to add additional insurers or additional policies at a later date. The Debtor and certain of its insurers have had discussions with five (5) additional insurers that, if subject to the Amended Asbestos Cost Sharing Agreement, could provide millions of additional aggregate limits

## F.        Classified Claims: Classification and Treatment

The Plan classifies holders of Claims and Equity Interests into the following eight categories.

1.    **Class 1 Non-Tax Priority Claims**

**Estimated[12] Number of Allowed Claims – 0**

**Estimated Aggregate Allowed Amount - $0**

**Estimated Percentage Recovery – 100%**

---

[12] Estimates of the number of Allowed Claims, amounts of Allowed Claims, and recoveries for each Class of Claims are set forth below. Estimates have been calculated based upon a number of assumptions and no representation can be or is being made with respect to whether the estimates shown will actually be realized.

**(a)**        *Classification*: Class 1 consists of all Non-Tax Priority Claims. The Debtor estimates there will be no Allowed Non-Tax Priority Claims.

**(b)**        *Treatment:* Each holder of an Allowed Class 1 Non-Tax Priority Claim shall receive, in the sole discretion of the Debtor, in full satisfaction, settlement, release, extinguishment, and discharge of such Claim: (i) Cash equal to the amount of such Allowed Non-Tax Priority Claim on or as soon as practicable after the latest of (x) the Effective Date, (y) the date that such Claim becomes Allowed, and (z) a date agreed to by the Debtor and the holder of such Claim; or (ii) such other, less favorable treatment on such other terms and conditions as may be agreed upon in writing by the holder of such Claim and the Debtor, or as the Bankruptcy Court may order.

**(c)**        *Voting*: Class 1 is not Impaired, and holders of Non-Tax Priority Claims are not entitled to vote to accept or reject the Plan.

**2.**        **Class 2 Secured Claims**

**Estimated Number of Allowed Claims – 0**

**Estimated Aggregate Allowed Amount - $0**

**Estimated Percentage Recovery – 100%**

(a) *Classification*: Class 2 consists of all Secured Claims. The Debtor estimates there will be no Allowed Secured Claims. The Indiana Department of Revenue Filed one Secured Claim, but the Debtor is unaware of any collateral securing such Claim. Accordingly, this Claim is and will be treated as a Class 6 General Unsecured Claim.

(b) *Treatment:* Each holder of an Allowed Class 2 Secured Claim shall receive, in the sole discretion of the Debtor, in full satisfaction, settlement, release, extinguishment and discharge of such Claim: (i) Cash equal to the amount of such Allowed Secured Claim on or as soon as practicable after the latest of (x) the Effective Date, (y) the date that such Secured Claim becomes Allowed, and (z) a date agreed to by the Debtor and the holder of such Class 2 Secured Claim; (ii) treatment that such Secured Claim is reinstated; (iii) the property securing such Secured Claim, with any deficiency to result in a Class 6 General Unsecured Claim; or (iv) such other, less favorable treatment on such other terms and conditions as may be agreed upon in writing by the holder of such Claim and the Debtor, or as the Bankruptcy Court may order.

(c) *Voting*: Class 2 is not Impaired, and holders of Secured Claims are not entitled to vote to accept or reject the Plan.

   3.   __Class 3 UAW Retiree Benefit Claims__

__Estimated Number of Allowed Claims – Approximately 4,000[13]__

   __Estimated Aggregate Allowed Amount – Unliquidated[14]__

__Recovery – modified Retiree Benefits__

   (a) *Classification*: Class 3 consists of UAW Retiree Benefits Claims.

   (b) *Allowance of UAW Retiree Benefits Claims for Voting:* Each UAW Retiree Benefits Claim shall be allowed solely for purposes of voting on the Plan in the amount of $1.

   (c) *Treatment:* In satisfaction of the UAW Retiree Benefits Claims, the UAW VEBA shall be established and funded as set forth in the Plan for the benefit of the UAW Retirees. The UAW VEBA shall be governed by the UAW VEBA Trust Agreement, which shall: (i) be in form and substance reasonably acceptable to the Debtor and the UAW; (ii) substantially conform to the trust agreement adopted in connection with the emergence from chapter 11 of Dana Corporation; and (iii) provide for the establishment of a committee (the "Committee") of trustees to manage the affairs of the UAW VEBA, which Committee shall be the Settlor of the UAW VEBA trust.

   The Committee shall be comprised of five (5) individual persons consisting of three (3) independent members with expertise in healthcare, employee benefits, asset management, human resources, labor relations, economics, and/or law, and two (2) members appointed by the UAW. The Committee shall have the ability to establish investment guidelines for the UAW VEBA assets, hire investment managers, and compromise, settle, and release claims held by the UAW Retirees under the Plan and TKNA Settlement Agreement.

   In light of the UAW's refusal to provide the Debtor with sufficient detail to adequately disclose to the UAW Retirees what the UAW's preferred healthcare delivery

---

[13] This number represents retirees and surviving spouses. Under the Plan, however, dependents of living retirees are also entitled to their own UAW VEBA allocation even though such dependents may not have a bankruptcy claim.

[14] The claim amounts listed on existing Schedule F for Budd's retiree obligations "represent the present value of future benefit payments as of September 30, 2013 under IAS 19 (International Accounting Standards), as calculated by the Debtor's actuary, Towers Watson, as of September 30, 2013." See Schedules of Assets and Liabilities of The Budd Company, Inc., filed on April 15, 2014 [Docket No. 73]. On or around the date that the Bankruptcy Court approves this Disclosure Statement, the Debtor will file an amended Schedule F, reflecting that the Class 3 UAW Retiree Benefit Claims are unliquidated.

model would be, each UAW Retiree shall receive an allocation from the UAW VEBA to his or her HRA on an annual basis as set forth in the UAW VEBA Trust Plan, as the same may be amended from time to time. Each UAW Retiree will be able to use his or her HRA to pay eligible medical, dental, and vision expenses, including premiums for insurance policies and Medicare supplement plans purchased on the individual insurance market and certain medical expenses that are not covered by insurance policies, Medicare, or Medicare supplement plans.

From and after the UAW VEBA Effective Date, the Committee shall have sole discretion to determine the healthcare benefits delivery model to be implemented by the UAW VEBA for the benefit of the UAW Retirees.

Until the UAW VEBA Effective Date, the Debtor shall continue to provide Retiree Benefits to the UAW Retirees pursuant to the terms and conditions of the Debtor's existing retiree medical plans, the cost of which shall be paid by the Estate. Claims for Retiree Benefits that are incurred but not paid prior to the UAW VEBA Effective Date shall likewise be paid by the Estate pursuant to the terms and conditions of the Debtor's existing retiree medical plans.

(d) *Voting*: Class 3 is Impaired, and holders of UAW Retiree Benefits Claims are entitled to vote to accept or reject the Plan.

**4.** **Class 4 E&A Retiree Benefit Claims**

**Estimated Number of Allowed Claims – Approximately 1,000**

**Estimated Aggregate Allowed Amount - Unliquidated[15]**

**Recovery – modified Retiree Benefits**

(a) *Classification*: Class 4 consists of E&A Retiree Benefits Claims.

(b) *Allowance of E&A Retiree Benefits Claims for Voting:* Each E&A Retiree Benefits Claim shall be allowed solely for purposes of voting on the Plan in the amount of $1.

(c) *Treatment:* In satisfaction of the E&A Retiree Benefits Claims, the E&A Retirees will receive Retiree Benefits through the E&A VEBA.

---

[15] The claim amounts listed on existing Schedule F for Budd's retiree obligations "represent the present value of future benefit payments as of September 30, 2013 under IAS 19 (International Accounting Standards), as calculated by the Debtor's actuary, Towers Watson, as of September 30, 2013." See Schedules of Assets and Liabilities of The Budd Company, Inc., filed on April 15, 2014 [Docket No. 73]. On or around the date that the Bankruptcy Court approves this Disclosure Statement, the Debtor will file an amended Schedule F, reflecting that the Class 4 E&A Retiree Benefit Claims are unliquidated.

From and after the E&A VEBA Effective Date, each E&A Retiree will receive Retiree Benefits funded by the E&A VEBA pursuant to the terms of the E&A VEBA Trust Plan, as the same may be amended from time to time. The E&A VEBA will be managed by a board of five trustees, which will initially be the current members of the E&A Retiree Committee (Jacqueline Delowery, Mercedes Godin, William Kroger, James Wahlman, and Thomas Whomsley). The E&A VEBA will provide benefits to the Post-Medicare E&A Retirees through a Blue Cross Blue Shield Medicare advantage plan.  For the Pre-Medicare E&A Retirees, the E&A VEBA will provide benefits through a Blue Cross Blue Shield group plan with stop loss insurance for claims in excess of $100,000. It is expected that the funds in the E&A VEBA will last for an estimated 25 years, through 2041. The average age of the E&A Retirees (including surviving spouses) is 78.  After the funds are exhausted, coverage for the E&A Retirees will terminate.

From and after the Effective Date until the E&A VEBA Effective Date, the Debtor shall continue to provide Retiree Benefits to the E&A Retirees pursuant to the terms and conditions of the Debtor's existing retiree medical plans, the cost of which shall be paid by the Estate. Claims for Retiree Benefits that are incurred but not paid prior to the E&A VEBA Effective Date shall likewise be paid by the Estate pursuant to the terms and conditions of the Debtor's existing retiree medical plans.

(d) *Voting*: Class 4 is Impaired, and holders of E&A Retiree Benefits Claims are entitled to vote to accept or reject the Plan.

**5.**   **Class 5 Asbestos Claims**

**Estimated Number of Allowed Claims – Unknown**

**Estimated Aggregate Allowed Amount - $ Unknown**

**Estimated Percentage Recovery – 100% – Insured Asbestos Claims; 66% – Uninsured Asbestos Claims**

(a) *Classification:* Class 5 consists of Asbestos Claims.

(b) *Allowance*: Unless otherwise explicitly Allowed or Disallowed by the Bankruptcy Court or another court of competent jurisdiction prior to the Effective Date, all Asbestos Claims on the Debtor's schedules or for which proofs of claims were filed are, upon the Effective Date, hereby deemed objected to and shall not be deemed Allowed pursuant to Section 502(a) of the Bankruptcy Code or any other statutory provision or Bankruptcy Rule. Unless otherwise explicitly Allowed and liquidated by the Bankruptcy Court or another court of competent jurisdiction prior to the Effective Date, all Asbestos Claims must be filed and prosecuted by the claimant in a court of competent jurisdiction (not the Bankruptcy Court) in order to receive compensation.

Upon the later of (a) 180 days after the Effective Date or (b) if an objection has been filed in the Bankruptcy Court or a court of competent jurisdiction before the end of such 180-day period, the entry of a Final Order overruling any objection to an Asbestos Claim, any holder of an Asbestos Claim that has not been explicitly Disallowed by the Bankruptcy Court (by a Final Order, non-final order, or otherwise) and as to which an

objection is not pending shall be relieved of all stays or injunctions provided for in the Plan and the Confirmation Order and may thereafter pursue such Claim against the Debtor in the state or federal court of competent jurisdiction for the sole purposes of determining the extent and validity of such Asbestos Claim, with any recovery, if any, limited to (i) the proceeds of Asbestos Insurance Policies and (ii) the Uninsured Asbestos Claim Fund. Notwithstanding anything herein to the contrary, if the Bankruptcy Court or another court of competent jurisdiction at any time entered or enters a Final Order disallowing any Asbestos Claim, then all stays or injunctions provided for in the Plan and the Confirmation Order shall apply to such Asbestos Claim.

(c) *Treatment*:

(i) *Insured Asbestos Claims*:  Upon the entry of (a) a Final Order by a court of competent jurisdiction determining the extent of the Debtor's liability for an Insured Asbestos Claim, or (b) a definitive written settlement agreement with the Debtor consented to by Participating Carriers determining the extent of the Debtor's liability for an Insured Asbestos Claim, the holder of such Insured Asbestos Claim shall receive Cash equal to 100% of the amount of its Insured Asbestos Claim from the proceeds of Asbestos Insurance Policies in accordance with the terms of the Amended Asbestos Cost Sharing Agreement. Any right to recover or pursue recovery on account of any Asbestos Claim from an Asbestos Insurance Policy shall be subject to all coverage and other defenses asserted by a Participating Carrier. On the Effective Date, the Debtor will fund the Insured Asbestos Claim Fund with $2.2 million in cash, which shall be used for the benefit of the Insurers in accordance with the Amended Asbestos Cost Sharing Agreement.

(ii) *Uninsured Asbestos Claims*:  On the Effective Date, the Debtor shall fund the Uninsured Asbestos Claim Fund in the amount of $1.25 million. Upon the entry of (a) a Final Order by a court of competent jurisdiction determining the extent of the Debtor's liability for an Uninsured Asbestos Claim, or (b) a definitive written settlement agreement with the Debtor determining the extent of the Debtor's liability for an Uninsured Asbestos Claim, then payments on account of such Uninsured Asbestos Claim shall be made in Cash solely from the Uninsured Asbestos Claim Fund; *provided however,* in no event shall the holder of an Uninsured Asbestos Claim receive from the Uninsured Asbestos Claim Fund more on account of its Uninsured Asbestos Claim than it would have received if such Uninsured Asbestos Claim had been an Allowed Class 6 Claim.

Except from the Uninsured Asbestos Claim Fund, no holder of an Asbestos Claim shall have the right to seek payment on account of such Asbestos Claim from the Debtor or its property (other than under an Asbestos Insurance Policy in accordance with the Plan), even if there are insufficient funds in the Uninsured Asbestos Claim Fund to pay the holder of an Asbestos Claim the Distribution to which he or she otherwise would be entitled under this Plan.

(d) *Voting*: Class 5 is Impaired, and holders of Allowed Asbestos Claims are entitled to vote to accept or reject the Plan. All Asbestos Claims that have not been Disallowed and that are not subject to a pending objection (in each case, as of the Voting Record Date) shall be allowed in the amount of $1 solely for the purpose of voting on the Plan.

6. **Class 6 General Unsecured Claims**

 **Estimated Number of Allowed Claims– 11**

 **Estimated Aggregate Allowed Amount - $7,500,000**

 **Estimated Percentage Recovery– 66%**

(a) *Classification:* Class 6 consists of General Unsecured Claims.

(b) *Description*: The Debtor believes that the significant majority of General Unsecured Claims asserted consist of Claims (1) asserted by the MDEQ, EPA, or other Persons related to alleged environmental damage / response costs; and (2) miscellaneous Claims for professional services and other services related to the operation of the Debtor prior to the Petition Date.

(c) *Treatment:* Each Allowed Class 6 General Unsecured Claim shall receive from the Debtor and in full satisfaction, settlement, release, extinguishment, and discharge of such Claim, Cash equal to the amount of 66% of the Allowed amount of such Allowed Class 6 General Unsecured Claim on or as soon as practicable after the later of (x) the Effective Date, (y) the date that such Claim becomes Allowed.

(d) *Voting*: Class 6 is Impaired, and holders of General Unsecured Claims are entitled to vote to accept or reject the Plan.

7. **Class 7: Claims Assumed by TKNA**

 **Estimated Number of Allowed Claims– 78**

 **Estimated Aggregate Allowed Amount - $228 million**

 **Estimated Percentage Recovery– 100%**

(a) *Classification:* Class 7 consists of Claims that TKNA will assume under the TKNA Settlement Agreement, which are: (i) approximately 24 Claims of Retirees arising under the SERP, which plan TKNA is assuming as of the Effective Date; (ii) Claims arising under either of the ERISA Pension Plans (both of which TKNA is assuming as of the Effective Date); (iii) Claim number 521 Filed by Waupaca Foundry, Inc. in the Chapter 11 Case; and (iv) all Workers Compensation Claims (estimated to be 51 claims).

(b) *Description:* Class 7 Claims are: (i) Claims of Retirees arising under the SERP, which plan TKNA is assuming as of the Effective Date; (ii) Claims arising under either of the ERISA Pension Plans (both of which TKNA is assuming as of the Effective

Date); (iii) Claim number 521 Filed by Waupaca Foundry, Inc. in the Chapter 11 Case; and (iv) all Workers Compensation Claims.

(c) *Treatment:* Each Allowed Class 7 Claim shall be assumed by TKNA under the TKNA Settlement Agreement and, as of the Effective Date, TKNA shall bear full financial responsibility for payment and/or other satisfaction in full of all such Claims. No holder of a Class 7 Claim shall receive or retain any property of the Estate on account of such Claim.

(d) *Voting*: Class 7 is Impaired, and holders of Class 7 Claims are entitled to vote to accept or reject the Plan.

8.    **Class 8 Equity Interests**

**Estimated Number of Allowed Equity Interests – 1**

(a) *Classification:* Class 8 consists of Equity Interests.

(b) *Treatment*: TKNA shall retain 100% of the Equity Interests in the Debtor, in accordance with the TKNA Settlement Agreement.

(c) *Voting*: Class 8 is Impaired, and holder of Equity Interests is entitled to vote to accept or reject the Plan.

G.    **Unclassified Claims: Allowance and Treatment**

The Plan includes the following categories of Claims that, in accordance with the Bankruptcy Code, are not classified for purposes of voting or distributions under the Plan:

1.    **Administrative Claims**

**Estimated Additional Administrative Claims – approximately $5.8 million**

(a) *Time for Filing Administrative Claims*

The holder of any Administrative Claim that is incurred, accrued or in existence prior to the Effective Date, other than an Allowed Administrative Claim or a claim incurred in the ordinary course of business, must File and serve on all parties required to receive such notice a request for the allowance of such Administrative Claim on or before the date that is twenty-eight (28) days after the Effective Date. Such request must comply with applicable sections of the Bankruptcy Code, the Bankruptcy Rules, and orders of the Bankruptcy Court, and must include: (a) the name of the holder of the Claim, (b) the amount of the Claim, and (c) the basis of the Claim. Failure to timely and properly File and serve an application for payment of an Administrative Claim may result in such Administrative Claim being forever barred and discharged. Objections to Administrative Claim applications must be filed and served pursuant to the Bankruptcy Rules and served on the requesting party and the Debtor within twenty-eight (28) days after the filing of such application.

24

(b) *Allowance of Administrative Claims*

An Administrative Claim that is not incurred and paid by the Debtor in the ordinary course of business shall become an Allowed Administrative Claim only to the extent Allowed by a Final Order.

The Debtor estimates that as of the Effective Date there will be approximately $2.9 million of Administrative Claims that will have been incurred under the traditional Retiree Benefits claim programs and that will not have been reported. The Debtor will reserve for these amounts and pay these Administrative Claims as they are received in the ordinary course of business.

(c) *Payment of Administrative Claims*

The Debtor shall pay in Cash in the ordinary course of business and without further order of the Bankruptcy Court all Administrative Claims incurred in the ordinary course of the Debtor's business. All other Allowed Administrative Claims incurred, accrued, or in existence prior to the Effective Date shall be paid in Cash: (1) on the Effective Date or as soon as practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as practicable thereafter); (2) if such Claim is Allowed after the Effective Date, on the date such Claim is Allowed or as soon as practicable thereafter; (3) at such time and upon such terms as may be agreed upon by such holder and the Debtor; or (4) at such time and upon such terms as set forth in any order of the Bankruptcy Court.

The Estate shall pay the cost of all Retiree Benefits incurred by UAW Retirees prior to the UAW VEBA Effective Date, including costs for Retiree Benefits incurred prior to the UAW VEBA Effective Date that are submitted and/or paid on or after the UAW VEBA Effective Date. The Estate shall pay the cost of all Retiree Benefits incurred by E&A Retirees prior to the E&A VEBA Effective Date, including costs for Retiree Benefits incurred prior to the E&A VEBA Effective Date that are submitted and/or paid on or after the E&A VEBA Effective Date. The Estate shall pay the costs, fees, and expenses of the Debtor, the UAW, the E&A Retiree Committee, and their respective professionals associated with establishing the UAW VEBA and the E&A VEBA. To the extent incurred after the Effective Date, all of the foregoing amounts shall be paid from administrative reserves established by the Debtor prior to its determination of Effective Date Cash.

## 2.    Priority Tax Claims

### Estimated Allowed Claims – approximately $3,000

All Allowed Priority Tax Claims shall be paid on the later of: (1) the date the Priority Tax Claim becomes an Allowed Priority Tax Claim, or (2) the date a Priority Tax Claim first becomes payable pursuant to any agreement between the Debtor and the holder of such Priority Tax Claim. At the sole option of the Debtor, such holder of an Allowed Priority Tax Claim shall be entitled to receive, on account of such Priority Tax Claim, (i) Cash equal to the unpaid portion of such Allowed Priority Tax Claim, (ii) treatment in any other manner such that its Allowed Priority Tax Claim shall not be Impaired, including periodic payments on a quarterly basis over a period ending not later than five (5) years after the Petition Date, in accordance with the

provisions of sections 511 and 1129(a)(9)(C) of the Bankruptcy Code, or (iii) such other treatment as to which the Debtor and such holder shall have agreed upon in writing. Clause (iii) of the preceding sentence shall not be construed to avoid the need for Bankruptcy Court approval of a Priority Tax Claim when such Bankruptcy Court approval is otherwise required by the Bankruptcy Code.

## IV.    PLAN VOTING INSTRUCTIONS AND PROCEDURES

### A.    Notice to Holders of Claims and Equity Interests

The Bankruptcy Court has approved this Disclosure Statement as providing information of a kind and in sufficient and adequate detail to enable holders of Claims entitled to vote on the Plan to make an informed judgment whether to accept or reject the Plan. The Bankruptcy Court's approval of this Disclosure Statement does not constitute a guaranty of the accuracy or the completeness of the information contained herein or an endorsement of the Plan by the Bankruptcy Court.

### B.    Voting Requirements to Confirm Plan

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan. Section 1129(a)(7) of the Bankruptcy Code requires that each class of Claims either (a) accepts the Plan or (b) is not Impaired under the Plan. Classes 1 and 2 are not Impaired under the Plan. Under Section 1126 of the Bankruptcy Code, each of Classes 3 through 8 accepts the Plan if creditors holding (i) 2/3 in amount and (ii) 1/2 in number of the Allowed Claims or Equity Interests in such Class that cast ballots vote to accept the Plan.

### C.    Voting Rights

Pursuant to the provisions of the Bankruptcy Code, only classes of Claims or Equity Interests that are (a) "impaired" by a chapter 11 plan and (b) entitled to receive a distribution under such plan are entitled to vote to accept or reject such plan.  In the Bankruptcy Case, Classes 3 through 8 are Impaired by and may be entitled to retain property or receive a Distribution under the Plan on account of such Claims or Equity Interests. Accordingly, the holders of Allowed Claims and Equity Interests in Classes 3 through 8 are entitled to vote to accept or reject the Plan. Claims in Classes 1 and 2 are not Impaired by the Plan; accordingly, holders of Class 1 Claims and Class 2 Claims are conclusively presumed to have accepted the Plan and are not eligible to vote on the Plan.

### D.    Solicitation Materials

In soliciting votes for the Plan pursuant to this Disclosure Statement, the Debtor, through the Estate's balloting agent, Epiq Bankruptcy Solutions, LLC (the "Balloting Agent") will send to holders of Claims and Equity Interests who are entitled to vote copies of:  (a) the Disclosure Statement and Plan; (b) the notice of, among other things, (i) the date, time and place of the hearing to consider confirmation of the Plan and related matters and (ii) the deadline for filing objections to confirmation of the Plan (the "Confirmation Hearing Notice"); (c) a Ballot (and return envelope) to be used in voting to accept or to reject the Plan; and (d) other materials as authorized by the Bankruptcy Court.

If you are the holder of a Claim that is entitled to vote, but you did not receive a Ballot, or if your Ballot is damaged or illegible, or if you have any questions concerning voting procedures, you may contact the Balloting Agent:

### By regular mail to:

> The Budd Company, Inc. Ballot Processing
> c/o Epiq Bankruptcy Solutions, LLC
> P.O. Box 4422
> Beaverton, OR  97076-4422

### By overnight courier or hand delivery to:

> The Budd Company, Inc. Ballot Processing
> c/o Epiq Bankruptcy Solutions, LLC
> 10300 SW Allen Blvd.
> Beaverton, OR  97005

### By telephone at: (877) 559-8630

**By email to:**  tabulation@epiqsystems.com    (please reference "The Budd Company in the subject line of your email)

**E.        Voting Procedures, Ballots and Voting Deadline**

After reviewing the Plan and this Disclosure Statement, you are asked to indicate your acceptance or rejection of the Plan by voting in favor of or against the Plan on the accompanying Ballot.

You should complete and sign your original Ballot (copies will not be accepted) and return it to the Balloting Agent in the envelope provided. Do not return your Ballot to the Debtor.

Each Ballot has been coded to reflect the Claim it represents. Accordingly, in voting to accept or reject the Plan, you must use only the coded Ballot sent to you with this Disclosure Statement.

IN ORDER FOR YOUR VOTE TO BE COUNTED, YOUR BALLOT MUST BE PROPERLY COMPLETED AS SET FORTH ABOVE AND IN ACCORDANCE WITH THE VOTING INSTRUCTIONS ON THE BALLOT AND RECEIVED BY THE BALLOTING AGENT BY DELIVERY TO THE US MAIL OR OVERNIGHT DELIVERY ADDRESSES ABOVE NO LATER THAN _____ (THE "VOTING DEADLINE"). BALLOTS WILL NOT BE ACCEPTED VIA FACSIMILE OR OTHER ELECTRONIC MEANS.

Copies of this Disclosure Statement, the Plan and any appendices and exhibits to such documents are available to be downloaded free of charge at http://dm.epiq11.com/TBC

27

## F.          Confirmation Hearing and Deadline for Objections to Confirmation

The Bankruptcy Court has scheduled a Confirmation Hearing for _____ at __:__ .m. prevailing Central time. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for the announcement of the adjournment date made at the Confirmation Hearing or at any subsequent adjourned Confirmation Hearing.

Objections to confirmation of the Plan or proposed modifications to the Plan, if any, must:  (a) be in writing; (b) conform to the Federal Rules of Bankruptcy Procedure and the Local Rules of the Bankruptcy Court; (c) state the name and address of the objecting party and the amount or nature of the claim or interest of such party; (d) state with particularity the basis and nature of any objection to the Plan; and (e) be filed electronically, together with proof of service, with the United States Bankruptcy Court for the Northern District of Illinois, 219 South Dearborn, Chicago, IL 60604, and served on the parties listed in the Confirmation Hearing notice, in each case so as to be actually received on or before _____.

## G.          Plan Binding on Creditors and Parties in Interest

If the Plan is approved by the Bankruptcy Court, the Plan will bind all holders of Claims against and Equity Interests in the Debtor, whether or not they were entitled to vote or did vote to accept or reject the Plan and whether or not they receive or retain any distributions or property under the Plan.

# V.     DEBTOR'S BACKGROUND AND EVENTS LEADING TO BANKRUPTCY

## A.     Brief Overview of the Debtor's Business Operations

The Debtor has a long history of manufacturing related to the automobile and other industries.

In 1978, a predecessor of TKAG acquired the Debtor.

The Debtor currently is a wholly owned subsidiary of TKNA, which is a direct subsidiary of TKAG. Thus, the Debtor is a member of the global ThyssenKrupp group. The ThyssenKrupp group operates in almost 80 countries, employs over 150,000 people world-wide, and in fiscal year ending September 30, 2014, generated sales of approximately €41 billion (Euros). TKNA and its myriad subsidiaries located in the United States employ almost 15,000 people and, in fiscal year ending September 30, 2014, generated sales of almost €7 billion (Euros).

Budd ceased all manufacturing activity in 2006, divested itself of Waupaca, its last operating subsidiary, in 2012 and, as of the Petition Date, did not generate revenue (directly or indirectly) from manufacturing or other operations.

## B.     The Debtor's Retiree Benefit Obligations

As of the Petition Date, Budd provided Retiree Benefits to UAW Retirees and E&A Retirees.

The Debtor provides Retiree Benefits to UAW Retirees pursuant to the terms and conditions of various CBAs and/or PCAs.  The Claims relating to these Retiree Benefits are classified under the Plan as Class 3 Claims.

28

The Debtor provides Retiree Benefits to E&A Retirees pursuant to the terms and conditions of various insurance plans, their summary plan descriptions, and, in certain cases, employment agreements with E&A Retirees.  The Claims relating to these Retiree Benefits are classified under the Plan as Class 4 Claims.

The Debtor estimates that, as of the Petition Date, its defined benefit Retiree Benefit obligations under the existing Retiree Benefits plans were approximately $932 million (approximately $830.5 million on account of obligations to UAW Retirees and approximately $101.5 million on account of obligations to E&A Retirees). The Debtor estimates that, as of September 30, 2015, its defined benefit Retiree Benefit obligations under the existing Retiree Benefits plans were approximately $810 million (approximately $733 million on account of obligations to UAW Retirees and approximately $77 million on account of obligations to E&A Retirees).

During the course of the Bankruptcy Case, the UAW Retirees have been represented by the UAW and the E&A Retirees have been represented by the E&A Retiree Committee, each in accordance with section 1114 of the Bankruptcy Code. Pursuant to section 1114 of the Bankruptcy Code, the Debtor has continued to pay Retiree Benefits in full and without modification for the benefit of both the E&A Retirees and UAW Retirees. During the course of the Bankruptcy Case, the Debtor generally has spent between $4 million and $5 million each month on Retiree Benefits, and received the benefit of approximately $500,000 each month in the forms of rebates and premiums paid.

The Plan modifies Retiree Benefits by terminating, on the respective UAW VEBA Effective Date and E&A VEBA Effective Date, the existing UAW and E&A Retiree Benefits Plans. In the case of the E&A Retiree Benefits, the modification is authorized by section 1114(e)(1)(B) of the Bankruptcy Code as a result of the agreement to such modification by the E&A Committee. In the case of the UAW Retiree Benefits, assuming the Bankruptcy Court grants the Debtor's pending request, the modification will be authorized by an order of the Bankruptcy Court pursuant to Section 1114(e)(1)(A) of the Bankruptcy Code. From and after the Effective Date until the respective E&A VEBA Effective Date and the UAW VEBA Effective Date, the Debtor shall continue to provide Retiree Benefits to the E&A Retirees and the UAW Retirees pursuant to the terms and conditions of the Debtor's existing retiree medical plans, the cost of which shall be paid by the Estate. Claims for Retiree Benefits that are incurred but not paid prior to the applicable E&A VEBA Effective Date or UAW VEBA Effective Date shall likewise be paid by the Estate pursuant to the terms and conditions of the Debtor's existing retiree medical plans. After the respective E&A Retiree VEBA Effective Date and the UAW Retiree VEBA Effective Date, the E&A Retirees and the UAW Retirees will have the rights afforded to them under the Retiree VEBAs and will receive Retiree Benefits pursuant to the terms of the E&A VEBA Trust Plan and the UAW VEBA Trust Plan, as the same may be amended from time to time.

As discussed below, the Debtor believes that by providing for the funding of the UAW VEBA and the E&A VEBA, Retirees will have the ability for the rest of their lives to obtain meaningful healthcare benefits.

Moreover, the Debtor believes that if it were to continue to pay Retiree Benefits under the existing plans, the Debtor would run out of Cash to fund those plans (even with the Cash Settlement Payments that will be made under the TKNA Settlement Agreement) prior to the end of many of the Retirees' lifetimes. Because of the larger scale of plans accessible on the insurance market, individual Retirees should be able to purchase insurance that provides benefits comparable to the benefits they currently receive under their UAW or E&A Plan for a cost that is substantially lower than what the Debtor currently pays for Retiree Benefits. In addition, a vendor with experience advising retiree populations on health insurance options will assist the UAW Retirees in selecting from among available options the appropriate form of health insurance for their benefit, including options that provide them with the maximum level of benefits available with their HRA allocations. Accordingly, the Debtor proposes to use its Effective Date Cash and the Settlement Payments to fund the Retiree VEBAs in order to provide Retirees with meaningful Retiree Benefits. Although the Retiree VEBAs will not be controlled by the Debtor, it is expected that, consistent with common practice, the Retiree VEBAs would invest their plan assets to increase the amount ultimately payable to Retirees. For the avoidance of doubt, no unused assets of the UAW VEBA or the E&A VEBA will revert to the Debtor or TKNA.

## C.        The Debtor's Pension Obligations

The Debtor currently sponsors three defined-benefit Pension Plans. Two of the Pension Plans are the ERISA Pension Plans, each a defined benefit pension covered by Title IV of ERISA. The ERISA Pension Plans are insured by the PBGC, a wholly owned United States government corporation that guarantees the payment of certain pension benefits upon termination of pension plans covered by Title IV of ERISA.

The ERISA Pension Plans are also subject to certain rules and regulations. Among other things, upon any termination of the ERISA Pension Plans, the Debtor and its "controlled group" members, including TKNA and certain other Affiliates, will become jointly and severally liable for the underfunded portion of the ERISA Pension Plans. The Debtor estimates that, as of September 30, 2015, the ERISA Pension Plans had a combined funding deficit of approximately $365 million on a "termination basis."

The ERISA Pension Plans will not be modified or affected by the Plan, and will be continued after the Effective Date in accordance with the respective terms of each ERISA Pension Plan. Under the Plan, on the Effective Date, TKNA shall assume all liabilities associated with the ERISA Pension Plans under ERISA and the Code and shall be obligated to: (a) satisfy each ERISA Pension Plan's minimum funding standards under 26 U.S.C. §§ 412, 430 and 29 U.S.C. § 1082; (b) pay statutory premiums to the PBGC with respect to each ERISA Pension Plan in accordance with 29 U.S.C. §§ 1306 and 1307; and (c) administer each ERISA Pension Plan in accordance with the provisions of each of the ERISA Pension Plans, ERISA and the Code.

After the Effective Date, TKNA will have the authority to terminate or amend either ERISA Pension Plan in accordance with the respective terms of each ERISA Pension Plan, ERISA, and the Code. In general, if either ERISA Pension Plan terminates after the Effective Date, TKNA and all members of TKNA's controlled group (as defined in 29 U.S.C. §§

30

1301(a)(14)) will be jointly and severally liable to PBGC for any unpaid minimum funding contributions owed to the terminated ERISA Pension Plan(s), and any statutory premiums owed to PBGC, along with any underfunded benefit liabilities of the terminated ERISA Pension Plan(s).

No provision within this Disclosure Statement, the Plan, the Confirmation Order, or section 1141 of the Bankruptcy Code shall be deemed or construed to discharge, release, or relieve the Debtor, TKNA, any member of TKNA's controlled group, or any other entity or person, in any capacity, from any current or future liability with respect to either ERISA Pension Plan, and the PBGC and the ERISA Pension Plans will not be enjoined or precluded from enforcing such liability as a result of the Plan's provisions or confirmation.

PBGC has filed contingent claims against the Debtor (collectively, the "PBGC Claims"), including estimated claims for the ERISA Pension Plans' underfunded benefit liabilities on a termination basis in an unliquidated amount.  Upon the Effective Date, PBGC will be deemed to have withdrawn the PBGC Claims with prejudice. But for the TKNA Settlement Agreement and assumption by TKNA of the Pension Plans under the TKNA Settlement Agreement, these Claims would be Class 6 General Unsecured Claims under the Plan that would receive a Distribution if Allowed. Similarly, TKNA and 26 other Affiliates also filed Claims asserting joint and several liability against the Debtor in the event one or both ERISA Pension Plans are terminated. The allowance of the PBGC Claims and the claims of TKNA and the Affiliates would greatly diminish the amount of cash available to satisfy the Debtor's other claims.

The third Pension Plan is the SERP, which is an underfunded defined benefit plan for the benefit of certain E&A Retirees. The SERP is not covered by the PBGC. Liabilities under the SERP are general unsecured obligations of the Debtor and the benefits are paid only from the Debtor's general assets. The Debtor believes that TKNA has guaranteed certain of the obligations of the Debtor under the SERP. Under the Plan, the SERP will be assumed by TKNA and TKNA will continue to pay in full obligations arising under the SERP, and thus holders of Claims alleging SERP liability will not receive any Distribution from the Estate on account of such Claims, thereby leaving more Cash to satisfy the Debtor's other claims. The Debtor estimates that, as of September 30, 2015, its underfunded obligations under the SERP were approximately $11.2 million.

**D.      The Debtor's Asbestos Liabilities**

Over the past several decades, Budd has been named as a defendant in suits involving more than 40,000 claimants alleging exposure to asbestos. The vast majority of such claims were resolved without payment from Budd. As of the Petition Date, approximately 336 suits alleging injury from asbestos were pending against the Debtor. During the Bankruptcy Case approximately 2,000 Asbestos Claims were filed against the Debtor. All Asbestos Claims are classified as Class 5 Claims under the Plan.

**E.      Events Leading to Commencement of the Bankruptcy Case**

In 2012, Budd sold all of the stock of Budd's wholly-owned subsidiary, Waupaca, to KPS. At the time of the sale, Waupaca owned the sole remaining operating facility under Budd's direct or indirect control, the Waupaca foundry operations.

31

Also in or about 2012, Budd reviewed its books and analyzed its financial ability to satisfy its legacy liabilities, which consisted primarily of its obligation to pay Retiree Benefits. The Debtor's review indicated that Budd was insolvent on a balance-sheet basis, due to long-term obligations to pay Retiree Benefits and fund the Pension Plans. Because Budd had Cash, however, it continued to pay Retiree Benefits and all other obligations as they came due.

In order to determine if Budd had any valuable Causes of Action that it could pursue to supplement its cash and pay its long term obligations, it retained an independent Chief Restructuring Officer and appointed an Independent Director. In or around the Spring of 2013, Budd's Board of Directors: (a) delegated to the Debtor's Chief Restructuring Officer (then Mr. Charles Moore) the task of commencing an independent investigation of potential claims against the Affiliates (the "Affiliate Investigation"); (b) authorized the retention of Conway MacKenzie Management Services, LLC ("Conway MacKenzie") as crisis manager to assist the conduct of the Affiliate Investigation; (c) authorized the retention of Dickinson Wright PLLC ("Dickinson Wright") as independent special counsel for purposes of assisting the Chief Restructuring Officer to conduct the Affiliate Investigation; (d) appointed Mr. Charles Sweet as Independent Director; and (e) passed a corporate resolution that, among other things, required the consent of the Independent Director to compromise or otherwise resolve the Debtor's claims against the Affiliates. At the time they were retained, none of Conway MacKenzie, Mr. Moore, Dickinson Wright, or Mr. Sweet had any meaningful relationship with any Affiliate, other than by virtue of their work for Budd.

After conducting the Affiliate Investigation,  the Chief Restructuring Officer negotiated in the month prior to the Petition Date, and the Independent Director approved on behalf of Budd: (1) a settlement agreement with TKNA (the "Original TKNA Settlement Agreement"); and (2) a "Prepetition Agreement," pursuant to which, among other things, (a) TKNA assumed certain workers compensation and other liabilities, and (b) Budd and TKNA executed a purported amendment (by execution of the "Non-Debtor TSA Amendment," which was part of the Prepetition Agreement) to a tax sharing agreement to which the Chief Restructuring Officer was led to believe Budd was a party (the "Non-Debtor TSA"). Copies of the Original TKNA Settlement Agreement, the Prepetition Agreement, and the Non-Debtor TSA Amendment, all of which were executed by authorized representatives of TKNA and Budd on or about March 25, 2014, are attached to and described in detail in the Debtor's motion to approve the Original TKNA Settlement Agreement. [*See* Docket No. 11].

Among other things, the Original TKNA Settlement Agreement provided for: (1) assumption by TKNA of the Pension Plans; (2) payment by TKNA of a cash settlement amount of approximately $10 million, which amount was subject to adjustment; and (3) the exchange of mutual general waivers and releases by the Debtor and Affiliates. Budd agreed to the Prepetition Agreement, the Non-Debtor TSA Amendment, and the Original TKNA Settlement Agreement based on information regarding the Non-Debtor TSA that the Debtor would later find out was untrue, as described below.

32

## VI.    THE BANKRUPTCY CASE

### A.    Commencement of the Bankruptcy Case

On March 31, 2014 (the Petition Date), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. Also on the Petition Date, the Debtor filed multiple pleadings, including a motion seeking approval of the Original TKNA Settlement Agreement. [*See* Docket No. 11].

### B.    Recognition and Participation of Creditors

On April 14, 2014, with the support of the Debtor, the Bankruptcy Court entered an order that recognized the UAW as the representative of the UAW Retirees under section 1114 of the Bankruptcy Code and directed the Debtor to pay the reasonable expenses of professionals for the UAW in connection with the Bankruptcy Case. [*See* Docket No. 60].

On April 14, 2014, the Bankruptcy Court granted a motion of the Debtor and directed the office of the United States Trustee to appoint a committee to represent E&A Retirees under section 1114 of the Bankruptcy Code. [*See* Docket No. 61]. On April 30, 2014, the US Trustee constituted the E&A Retiree Committee. [*See* Docket No. 113].

On July 30, 2014, upon order of the Bankruptcy Court, the office of the United States Trustee constituted the Asbestos Plaintiffs Committee. [*See* Docket No. 364].

### C.    The Debtor's Withdrawal of its Motion for Approval of the Original TKNA Settlement Agreement

Subsequent to recognition of the UAW as the representative of the UAW Retirees and appointment of the E&A Retiree Committee, the Bankruptcy Court entered multiple orders establishing dates for discovery related to hearings on the motion seeking approval of the Original TKNA Settlement Agreement. [*See* Docket Nos. 106, 274, 371, 374, 406, 431, and 436]. During this time, the E&A Retiree Committee and the UAW conducted discovery regarding the merits of the Original TKNA Settlement Agreement, including the potential value of the claims against TKNA and other Affiliates proposed to be released.

During the course of this discovery, counsel to the Debtor discovered that the Non-Debtor TSA was not the actual tax sharing agreement to which Budd and TKNA were parties.  As set forth in the Debtor's subsequent statement to the Bankruptcy Court: (1) in contrast to the Non-Debtor TSA, the tax sharing agreement to which the Debtor and TKNA were parties (the "Debtor's Actual Tax Sharing Agreement") was in fact valuable to the Debtor, and (2) as a result of obtaining this new information, the Debtor determined that it would not continue to seek approval of the Original TKNA Settlement Agreement. [*See* Docket No. 447]. As a result, the Bankruptcy Court dismissed the Debtor's motion seeking approval of the Original TKNA Settlement Agreement for want of prosecution on October 17, 2014.  [*See* Docket No. 616].

### D.    The Status Quo Order and the 2004 Investigations

After the Debtor determined not to seek approval of the Original TKNA Settlement Agreement, the Debtor commenced the TKNA Adversary Proceeding to preserve its rights under the Debtor's Actual Tax Sharing Agreement. Shortly after commencing the TKNA Adversary Proceeding, the Bankruptcy Court entered (upon motion of the Debtor and with the consent of

TKNA) the Status Quo Order. The Status Quo Order remains in effect, and absent further order of the Bankruptcy Court, it prevents TKNA from transferring its equity interests in the Debtor or taking other steps to impair the Debtor's rights under and/or interest in the Debtor's Actual Tax Sharing Agreement.

At or about the same time, the Debtor, the UAW, and the E&A Retiree Committee sought and obtained a series of orders of the Bankruptcy Court authorizing them to issue discovery to TKNA and others under Bankruptcy Rule 2004. [*See* Docket Nos. 532, 571, 623, 841, 842]. The Debtor's discovery was principally aimed at investigating the potential value of future payments that could become owed to the Debtor by TKNA under the Debtor's Actual Tax Sharing Agreement and other transactions, including the Debtor's sale of Waupaca in 2012. Discovery conducted by the Debtor, UAW and the E&A Retiree Committee investigated potential claims that the Debtor may hold against TKNA, Affiliates, and others that may not have been uncovered by the Affiliate Investigation. Ultimately, the Debtor, the UAW and the E&A Retiree Committee conducted more than 10 depositions and reviewed more than 30,000 documents.

## E.    Potential Claims Against TKNA and Others

The discovery conducted by the Debtor, the UAW and the E&A Retiree Committee revealed multiple Causes of Action that the Debtor holds against TKNA, other Affiliates and other parties, including Clark Hill and KPS, that were not uncovered by the Affiliate Investigation. As discussed immediately below, these Causes of Action largely relate to either: (1) the Debtor's rights under the Debtor's Actual Tax Sharing Agreement (discussed below); or (2) the Debtor's June 29, 2012 sale of the stock of Waupaca to KPS for a cash purchase price of $544 million (discussed below). The discussion of the Debtor's potential claims and Causes of Action against TKNA, its Affiliates and others in this Disclosure Statement represent the Debtor's position, as to which there is or may be disagreement on the part of TKNA, its Affiliates and others (*e.g.*, Clark Hill and KPS).[16]

### 1.    Claims Related to the Debtor's Actual Tax Sharing Agreement

TKNA and each of its U.S. Affiliates, including the Debtor, are part of the TKNA Tax Group. Pursuant to the consolidated return Treasury Regulations (i.e., tax regulations issued by the IRS that constitute the official interpretation of the Code), if one or more members of the TKNA Tax Group has net taxable income in a taxable year, the other members' losses incurred in that same taxable year will offset that taxable income on a pro-rata basis, and, subject to certain limitations, unused losses from other years may be carried forward or backwards as

---

[16] Without additional payments from TKNA or the other potential defendants that are acceptable to the UAW, the UAW reserves the right to oppose the Plan and the TKNA Settlement Agreement because, among other reasons, it believes that the claims to be released are worth substantially more than the amounts that TKNA is required to pay under the TKNA Settlement Agreement. The Asbestos Committee opposes the TKNA Settlement Agreement. The UAW's views on the TKNA Settlement Agreement are set forth below.

appropriate to offset income beyond the current-year losses.[17] TKNA has entered into tax sharing agreements with certain members of the TKNA Tax Group, governing, among other things, the terms under which a member shall be paid by TKNA for the use of its losses.

The Debtor's Actual Tax Sharing Agreement provides for the cash payment by TKNA to the Debtor to the extent losses incurred by the Debtor are used to offset the taxable income of other members of the TKNA Tax Group in a given year. Further, in the three years prior to the Petition Date, the Debtor received payments from TKNA in connection with the Debtor's Actual Tax Sharing Agreement on account of losses incurred by the Debtor, even though some of those losses were carried forward to future years and were not used to offset current or past taxable income of other members of the TKNA Tax Group. Accordingly, TKNA has claimed that Budd was overpaid for those years and must refund the amount of such alleged overpayments, which TKNA claims is approximately $59,400,000 for the tax years 2010 forward according to TKNA's March 30, 2015 Proof of Claim.

Each dollar of Retiree Benefits paid by the Debtor was deductible for U.S. federal income tax purposes. As a result, the Debtor's payment of Retiree Benefits each year gave rise to a sizable loss that was available to the TKNA Tax Group to offset the income of other members.

During the Affiliate Investigation, TKNA provided the Chief Restructuring Officer and his advisors (i.e., the Chief Restructuring Officer's then-firm, Conway MacKenzie, Inc.; his legal counsel, Dickinson Wright LLP; and the accounting firm UHY LLP (collectively, the "CRO's Advisors")) with a copy of the Non-Debtor TSA, which is a form of a tax sharing agreement that was used by certain U.S. Affiliates other than the Debtor and which had terms substantially less favorable than the terms of the Debtor's Actual Tax Sharing Agreement. Specifically, the Non-Debtor TSA provided that the signatory Affiliate would be paid for losses used to offset income of other members of the TKNA Tax Group only to the extent that the Affiliate had future income of its own. Unbeknownst to the Chief Restructuring Officer and the CRO's Advisors until well after execution of the Original TKNA Settlement Agreement, the execution of the Non-Debtor TSA Amendment and the Petition Date, Budd never was a party to the Non-Debtor TSA. The analysis of the Chief Restructuring Officer and the CRO's Advisors of issues concerning rights and liabilities for tax sharing payments was based on the terms of the Non-Debtor TSA. Based on, among other things, that analysis, Budd and TKNA entered into the Original TKNA Settlement Agreement and the Non-Debtor TSA Amendment.

Once the Debtor's Actual Tax Sharing Agreement was discovered by the Debtor's counsel (after the Non-Debtor TSA Amendment had been executed), the Debtor determined that

---

[17] Where the aggregate current losses of those members with losses ("loss members") do not exceed the taxable income of those members with income ("income members"), each loss member's current loss is used in full to offset the taxable income of the group, and unused losses from prior years (or subsequent years), if any, may be carried forward (or carried back) to offset the remaining taxable income, subject to certain limitations. However, where the loss members' aggregate current losses exceed the income members' aggregate taxable income, each loss member's current loss is used pro-rata (in the ratio that the aggregate taxable income of the income members bears to the aggregate current losses of all loss members).

on a going forward basis it would be entitled to receive payments from TKNA under that agreement as the Debtor's losses were used by the TKNA Tax Group to reduce its taxable income, and that these payments to the Debtor would not depend upon the Debtor's ability to generate taxable income in the future.  Moreover, the Debtor had over $300 million in cash and expected to spend the majority of that money to pay Retiree Benefits, which payments should be deductible for U.S. federal income tax purposes and therefore should give rise to a significant amount of losses.  The Debtor concluded that it could receive up to $200 million or more (on a non-present value basis) in future payments under the Debtor's Actual Tax Sharing Agreement if it were not terminated for a number of years.  The amount of payments would depend upon the application of a variety of factors discussed below.  This estimate by the Debtor also includes amounts that Debtor believes are owed by TKNA to the Debtor for past years under the Debtor's Actual Tax Sharing Agreement.

Accordingly, the Debtor believes that it holds at least the following Causes of Action related to the Debtor's Actual Tax Sharing Agreement and execution of the Non-Debtor TSA Amendment: (1) a judicial declaration that the terms of the Non-Debtor TSA Amendment are not binding on the Debtor because the amendment purports to amend a contract to which Budd was never a party; (2) alternatively, a judicial declaration that the Non-Debtor TSA Amendment is void due to mutual or unilateral mistake or fraudulent inducement; (3) alternatively, a judicial declaration that TKNA is equitably estopped from enforcing the Non-Debtor TSA Amendment; (4) alternatively, a judicial declaration that the Non-Debtor TSA Amendment is an unenforceable fraudulent transfer under section 547, 548, and/or 544 of the Bankruptcy Code and/or under sections 5(a)(2), 6(a) and/or 6(b) of the Illinois Uniform Fraudulent Transfer Act; and (5) a claim for breach of the Debtor's Actual Tax Sharing Agreement by TKNA for sums that should have been paid to Budd by TKNA to date.

Absent a settlement with TKNA, the Debtor's ability to receive payments under the Debtor's Actual Tax Sharing Agreement from TKNA in the future (and the amount of any such payments) depends upon a number of factors, including without limitation, (1) the amount of future deductible expenses incurred by the Debtor; (2) the future profitability of the TKNA Tax Group and its individual members; (3) the continued ownership by TKNA of the Debtor after the Effective Date of the Plan, which, if not consented to by TKNA, would likely require the incorporation in the Plan of some form of the Status Quo Order; (4) whether the Debtor could continue to be a member of the TKNA Tax Group under the consolidated return Treasury Regulations after the Effective Date of the Plan, even if TKNA continued to own 100 percent of the stock of the Debtor; (5) the Debtor prevailing on the argument, which has been contested by TKNA, that the Debtor's Actual Tax Sharing Agreement is not unilaterally terminable by TKNA following the expiration of the Status Quo Order; (6) the Debtor prevailing on the argument, which has been contested by TKNA, that the Non-Debtor TSA Amendment is not enforceable against the Debtor; and (7) there being no future changes in tax law or regulation that would adversely affect the application of the Debtor's Actual Tax Sharing Agreement, the tax deductibility of future payments the Debtor would make on account of Retiree Benefits or that would reduce corporate tax rates, any of which would affect the value of the Causes of Action.

The Debtor believes that it has a relatively strong basis for arguing that the Non-Debtor TSA Amendment should be deemed void, that the Debtor's Actual Tax Sharing Agreement is valid and enforceable, and that it is entitled to recover payments due under the Debtor's Actual

Tax Sharing Agreement for the fiscal years ending September 30, 2013, 2014 and 2015. The amount of such recovery for those years, however, is a relatively small portion of the overall $200 million of potential recovery identified above (the Debtor estimates that the total amounts due for the fiscal years ending September 30, 2013 and September 30, 2014 is about $25 million, but TKNA estimates the amount at only $21 million).  The bulk of the $200 million potential recovery is from projected future tax sharing agreement payments that the Debtor estimates could be due from TKNA.  The Debtor's ultimate ability to recover such future sums, however, is subject to significant uncertainty.  TKNA may be able to take steps that could cause the Debtor to cease to be a member of the TKNA Tax Group and therefore terminate all future tax sharing payments that would otherwise be due to the Debtor under the Debtor's Actual Tax Sharing Agreement.[18]  TKNA has also indicated that, in the absence of a settlement, it intends to litigate its argument that it can terminate the Debtor's Actual Tax Sharing Agreement at will.  In addition, potential changes in the applicable tax laws could reduce or eliminate TKNA's ability to deduct the Debtor's benefit payments, which, in turn, could negatively impact the amount of any future tax sharing payments that TKNA might owe to the Debtor under the Debtor's Actual Tax Sharing Agreement.

In addition, TKNA has asserted a Claim in the Bankruptcy Case, seeking to recover approximately $80 million that it claims to have overpaid the Debtor under the Debtor's Actual Tax Sharing Agreement. The Debtor contests this Claim on the grounds that, among other things, the alleged "overpayments" were voluntary capital contributions (i.e., equity investments by TKNA in the Debtor) that were intentionally made by TKNA in full knowledge that they exceeded the amounts called for by the Debtor's Actual Tax Sharing Agreement and that there is no provision in the Debtor's Actual Tax Sharing Agreement allowing TKNA to recover such payments and no documentation suggesting such payments were intended to be treated as loans. There is, however, still a risk that a court may reject these defenses on one or more equitable or other legal theories (e.g., because the Debtor received more than it was entitled to under the Debtor's Actual Tax Sharing Agreement), notwithstanding that the equities appear to favor the Debtor, and require the Debtor to refund the amount of the alleged overpayments to TKNA.  If the TKNA Settlement Agreement is approved, TKNA will be releasing this $80 million Claim.

In addition to its Causes of Action arising under or related to the Non-Debtor TSA Amendment and the Debtor's Actual Tax Sharing Agreement, the Debtor contends that TKNA improperly charged Budd in 2013 for approximately $76 million in respect of taxable income (the "Waupaca Gain Payment") that was attributable to Waupaca on a separate company basis and arose from the 2012 sale of stock of Waupaca that was treated as a deemed sale of assets by Waupaca for U.S. federal income tax purposes (the "Waupaca Tax Claim").  The Debtor contends that Budd had no obligation to pay Waupaca's separate company liability to TKNA under the Debtor's Actual Tax Sharing Agreement, any other agreement to which the Debtor was a party, or any decision by Budd's board of directors authorizing TKNA's unilateral

---

[18] If TKNA were to take such steps, TKNA would very likely claim a substantial tax deduction in respect of the stock of the Debtor. If successful, TKNA would receive tax benefits similar to those for which the Debtor otherwise would be paid under the Debtor's Actual Tax Sharing Agreement; however, the Debtor would have no claim to any tax sharing payments from TKNA.

determination that Budd should make the Waupaca Gain Payment.[19] Moreover, TKNA prevented Budd from participating meaningfully in the decision to sell Waupaca, without which the relevant taxable gain would not have been realized, and did not consult Budd regarding whether or not to agree with the purchaser to treat the sale of Waupaca stock as a sale of assets for tax purposes, which likely increased the amount of the tax gain recognized in connection with the sale. Alternatively, if Budd was properly charged by TKNA for the Waupaca Gain Payment, the Debtor believes it can be recovered by the Estate as an avoidable preference or fraudulent transfer (and the Waupaca Tax Claim includes this alternative theory of relief).

The Debtor anticipates TKNA will argue that it is not obligated to return the $76 million Waupaca Gain Payment because inter alia: (a) Budd assumed Waupaca's contractual liability to TKNA as part of the liquidation of Waupaca that was deemed to occur for U.S. federal income tax purposes in connection with the sale; (b) if Waupaca, itself, had paid its own liability under its tax sharing agreement with TKNA, Budd would have received the same amount of cash it did through the sale by Waupaca (i) receiving 100% of the sale proceeds, (ii) making the Waupaca Gain Payment to TKNA, and (iii) remitting the balance to Budd, such that requiring TKNA to pay the $76 million to the Debtor now would result in an unfair windfall to the Debtor; and (c) the Waupaca Gain Payment is not a voidable preference because (i) TKNA did not receive more than it would have in bankruptcy and/or (ii) the Waupaca Gain Payment constituted a contemporaneous exchange of value, was made in the ordinary course of business and Budd received new value as a result of the payment.

Given the foregoing, there is a not insubstantial risk that the Debtor may recover nothing in respect of the Waupaca Tax Claim.

## 2.  Claims Related to the Sale of Waupaca ("Waupaca Sale Claims")

The investigation conducted by the Debtor, UAW and the E&A Retiree Committee during the course of this chapter 11 case revealed potential claims and Causes of Action that may be brought by the Debtor against certain of Budd's current and former officers and directors, TKNA and TKAG and certain of their respective current and former officers, directors and agents, KPS (the ultimate purchaser of Waupaca), Clark Hill and potentially others in connection with the 2012 sale of Waupaca.  In connection therewith, the Debtor contends that certain of Budd's current and former directors and officers failed to act in the best interests of Budd and its creditors by, among other things, being completely disengaged and uninvolved in the decision to sell Waupaca, the resulting sale process and the sale itself.  The Debtor further believes that there existed significant conflicts of interest between Budd and its then directors and officers, on the one hand, and TKNA, TKAG and their then respective directors and officers, on the other hand, which resulted in decisions and actions – including the decision to sell Waupaca, the way in which the sale process was conducted, and the sale itself – that were contrary to the interests of

---

[19] The taxable income recognized by the TKNA Tax Group in connection with the Waupaca Transaction was entirely offset by losses of other members of the TKNA Tax Group, including substantial losses for which TKNA was not required to make any tax sharing payments, and did not result in any liability to pay tax.

Budd and its creditors.  From conception to closing, TKAG and TKNA directed the sale of Waupaca for TKAG and TKNA's benefit and without regard to the interests of Budd or its creditors. An argument can be made that the sale of Waupaca, including the timing of the sale and the way in which the sale process was conducted, deprived Budd of significant value which Budd could have used to pay some or all of its retiree medical benefit obligations and other obligations.  There is evidence that TKAG and TKNA pushed the Waupaca sale process forward in haste, despite being advised by the investment bankers who were retained to run the sale process that market conditions at the time presented a challenging environment for the sale of Waupaca.  Moreover, there is evidence that a TKAG executive shared material non-public information with KPS, which may have affected KPS's bidding strategy and had a negative impact on the ultimate sale price.  In addition, there is evidence that Clark Hill, as counsel to TKAG, TKNA and Budd, was ethically conflicted and failed to properly advise Budd with respect to the Waupaca sale.

In sum, the Debtor contends that: (1) TKAG and TKNA orchestrated and forced Budd's premature sale of Waupaca in a tainted sale process for reasons that benefitted TKAG only and without regard for either the fact that Budd was insolvent or the interests of Budd's creditors; and (2) as a result, TKAG and TKNA forced Budd to needlessly sell Waupaca at a time when, among other things, the market was depressed, and thereby Budd received an unreasonably low sale price.  There is also evidence that KPS may have purchased Waupaca for less than reasonably equivalent value due to the tainted nature of the sale process itself and its use of material non-public information.

The Debtor holds the following potential claims and Causes of Action related to the sale of Waupaca: (1) against TKAG, TKNA, and certain of their respective current and former directors, officers, agents, and/or employees, claims for breach of fiduciary duty, aiding and abetting breach of fiduciary duty, conspiring in breach of fiduciary duty, equitable subordination, and veil piercing and/or alter ego liability; (2) against certain current and former officers and directors of the Debtor, claims for breach of fiduciary duty; (3) against Clark Hill, the attorneys for TKNA, TKAG, and the Debtor in connection with the Waupaca sale, claims for malpractice, breach of fiduciary duty, and aiding and abetting breach of fiduciary duty; and (4) against KPS, claims for actual or constructively fraudulent transfer, in addition to other potential Causes of Action.  Although there are other potential legal claims that could, as a technical matter, be asserted against the various potential defendants, the Debtor believes that the claims discussed below are of the most significance in terms of potential recoveries for the Estate.

With respect to the claims against certain of Budd's current and former officers and directors, the gist is that these individuals breached their fiduciary duty of care to Budd because they did not take sufficient steps, if any, to ensure that, among other things: (a) selling Waupaca was in the best interests of Budd and its creditors (because Budd was insolvent at the time); (b) Waupaca was not sold prematurely at a time when the market was depressed, such that the resulting sale proceeds would be less than they otherwise could have been had the sale been delayed (as was recommended by the investment bankers retained by TKNA and TKAG); and (c) Waupaca was sold in a fair and untainted process that maximized value for Budd.  The Debtor contends that instead of undertaking appropriate analyses, certain of Budd's current and former officers and directors abdicated complete control over the decision-making and sale process to Budd's parent, TKNA, and ultimate parent, TKAG, and simply rubber-stamped their

decisions without receiving any independent advice on whether those decisions were in the best interests of Budd and its creditors.  In addition, there is a basis to claim that these individuals also breached their fiduciary duty of loyalty to Budd by favoring the interests of Budd's owners, TKNA and ultimately TKAG, over those of Budd and its creditors.

### (a) UAW's Statement Concerning Waupaca

The UAW has requested that the following *italicized* statement about the Waupaca claims be included in the Disclosure Statement. The following do not necessarily represent the views of Budd or the E&A Retiree Committee.

*The UAW believes that for so long as Budd owned Waupaca, Budd could continue to meet its obligations to its creditors. The UAW believes that it was thus in the best interests of Budd and its creditors for Budd to retain ownership of Waupaca or, if Budd were to sell Waupaca, to do so only for an amount sufficient to meet Budd's obligations to its creditors. Budd's best interests, however, were disregarded when TKAG and TKNA decided to cause Budd to sell Waupaca, and in how TKAG and TKNA conducted the sale process.*

*Budd was victimized by: (a) its parent companies, TKAG and TKNA, which decided to sell Waupaca out from under Budd, and without any meaningful input from Budd, and then controlled the sale process, all in order to serve their own interests to the detriment of Budd and its creditors; (b) TKAG's and TKNA's directors, officers and employees who helped TKAG and TKNA to victimize Budd; (c) Budd's own officers and directors, who ignored Budd's best interests and merely "rubber stamped" the decisions made by their masters at TKAG and TKNA without analysis or discussion; and (d) Budd's legal counsel, Clark Hill, which violated conflict of interest rules by representing each of Budd, TKAG, TKNA and Waupaca in the sale process and in the sale itself, without first obtaining their informed consent to Clark Hill's representation of all of them despite their conflicting interests, and which failed to competently advise Budd's directors and officers. At the same time, Budd also was victimized by the purchaser of Waupaca, KPS, which manipulated the sale process by inducing one of TKAG's directors to disclose to KPS inside information concerning that process and contrary to his fiduciary duties, including by providing KPS with material, non-public information that allowed KPS to buy Waupaca at an artificially depressed price.*

*In particular, in May 2011, TKAG decided to cause Budd to sell Waupaca to reduce its debt and to finance a major strategic initiative TKAG was then pursuing.  TKAG and TKNA also wanted Budd to sell Waupaca to strip Budd of its last source of material income, in order to facilitate a process that would enable Budd to discharge a substantial portion of its retiree liabilities.  Thus, without any meaningful consultation with or involvement by any Budd director or officer, TKAG, TKNA and certain of each of their directors, officers and employees proceeded to market Waupaca for sale, dominate the sale process and select a buyer.  Moreover, they did so despite clear warnings from their financial advisor and other analysts that, due to prevailing market conditions, selling Waupaca at that time would result in "[r]educed valuations" and buyers "not willing to pay the fair values for the assets you want to dispose right now."  They also did so while knowing and intending that the sale would render Budd unable to satisfy its obligations to its creditors, so that they could subsequently force Budd's creditors – primarily Budd's UAW retirees – to accept less than the amounts they were owed.  Further, as discussed above, following the sale, TKNA caused Budd to pay $76 million to TKNA, the amount of the*

*income tax on Waupaca's gain on the sale, even though Budd had no obligation, contractual or otherwise, to pay this amount to TKNA.*

*Due to the actions of KPS and its financial advisor, Perella Weinberg, Waupaca was sold in an unfair process. Specifically, throughout the sale process, KPS "back channeled" into TKAG's and TKNA's confidential consideration and evaluation of competing bids and sale strategies by exploiting a close personal relationship between one of KPS's financial advisors at Perella Weinberg and a TKAG board member who was among the TKAG fiduciaries in charge of the sale process. That TKAG board member acted disloyally to TKAG by disclosing to KPS highly confidential information that enabled KPS to gain an "inside track" and submit lower bids for Waupaca than it would have otherwise submitted. This misconduct so dramatically tainted the sale process that another bidder complained to TKAG that the process was rigged. KPS also obtained from Waupaca's Chief Financial Officer material, non-public information about Waupaca's future earnings potential that he told KPS he did not want to reveal to others for fear of disrupting the sale process. KPS clearly understood the import of this inside information it received from Waupaca's disloyal Chief Financial Officer, stating that the information should not be disclosed to TKAG, TKNA or their financial advisor. As a consequence of this misconduct, KPS achieved its goal of paying substantially less for Waupaca than the company's true value. And KPS proceeded to pursue its own unlawful scheme while knowing full well that TKAG, TKNA and their directors, officers and employees were causing Budd to sell Waupaca for far less than it was truly worth.*

*All the while, Budd's directors and officers and TKAG's and TKNA's directors, officers and employees, as well as their legal counsel, Clark Hill, facilitated the sale rather than protect Budd's best interests. Budd's directors and officers – who were also employed and compensated by TKAG, TKNA or one of their affiliates – completely abdicated their fiduciary duties and "rubber stamped," at the insistence of TKAG and TKNA, the sale of Waupaca that they knew would leave Budd without the income it needed to satisfy its obligations to its creditors. As for Clark Hill, while it purported to serve as counsel to Budd, it also represented TKAG, TKNA and Waupaca, in the sale process and the sale itself, without ever once informing any of its clients of the clear conflicts of interest that precluded Clark Hill from representing all of these entities without first obtaining their informed consent to Clark Hill's multiple roles. Clark Hill neither sought nor obtained that informed consent from any of its clients. Moreover, Clark Hill acted at all times to further the interests of TKAG and TKNA, and wholly failed to advise the Budd directors or others concerning either Clark Hill's conflicts of interest, the directors' fiduciary duties or the advisability of engaging directors who were independent of TKAG and TKNA to evaluate whether and on what terms Waupaca should be sold.*

*Not surprisingly in light of these circumstances, the participants in the Waupaca sale achieved their objectives, acting contrary to Budd's best interests to serve their own interests, and leaving Budd without the resources to satisfy its obligations to its creditors, in the process fraudulently transferring enormous value from Budd and its creditors to the participants' own coffers. As for TKAG, it decreased its debt, financed its strategic initiative, used the proceeds of the Waupaca sale to fund certain swap transactions and forced Budd's bankruptcy filing, thereby – as TKAG and TKNA intended – seeking to discharge a substantial portion of Budd's obligations – principally owed to Budd's UAW retirees – which TKAG wanted to expunge from its consolidated balance sheet. As for TKNA, it too decreased its debt and improved its balance*

41

*sheet, and took for itself a payment from Budd of $76 million, the amount of the income tax on Waupaca's gain on the sale. As for KPS, it and its investors received cash well in excess of $1 billion when, a mere 26 months after KPS purchased Waupaca, it agreed to re-sell the company for a price more accurately reflecting its true value.*

*The victims of the ill-conceived and improperly conducted Waupaca sale are Budd and its creditors, principally Budd's UAW retirees. Budd had no reason to sell Waupaca. If Waupaca had not been sold, Budd could have continued to pay its creditors in the ordinary course. However, immediately after the sale, and as TKAG had intended when it caused Budd to sell Waupaca, TKAG and TKNA initiated a process that led directly to Budd's bankruptcy filing. As a result, and absent relief from this Court, Budd will be able to pay its creditors only a fraction of the amounts they are due. By contrast, if Waupaca had not been sold as the result of the defendants' misconduct, Budd would have been able to pay its creditors in full or nearly in full.*

*Budd is therefore entitled to damages in excess of $1 billion, the benefit it would have received had Waupaca not been taken away from Budd by TKAG, TKNA and its other fiduciaries and their cohorts.*

*In light of the foregoing, Budd could assert the following claims, among others: (i) for breaches of fiduciary duty against several of Budd's current and former directors and officers; (ii) for aiding and abetting the breaches of fiduciary duty by the Budd director and officer defendants, against TKAG, TKNA and those TKAG and TKNA directors, officers and employees who directed and materially participated in the sale of Waupaca and related events, including TKAG's current Chief Financial Officer, Guido Kerkhoff (collectively, the "TK Defendants"); (iii) for breach of fiduciary duty against the TK Defendants; (iv) for malpractice and breach of fiduciary duty against Clark Hill; (v) for aiding and abetting breaches of fiduciary duty against former TKAG director Olaf Berlien, KPS, Perella Weinberg and Dietrich Becker (vi) for conspiring in breaches of fiduciary duty against Berlien, KPS, Perella Weinberg and Becker, (vii) for fraudulent concealment against Berlien and KPS; (viii) for aiding and abetting fraudulent concealment against KPS, Perella Weinberg and Becker; (ix) for securities fraud and insider trading, in violation of Section 110(b) of the Securities Exchange Act of 1934 and Rule 10b-5 thereunder against KPS; (x) for conversion against the TK Defendants and KPS, and (xi) for avoidance of the sale of Waupaca against TKAG, TKNA and KPS, pursuant to Sections 548 and 550 of the Bankruptcy Code. Further discovery, including from Clark Hill, TKAG and Perella Weinberg, could reveal additional causes of action. The corporate defendants—TKAG, TKNA, KPS and Perella Weinberg, likely have substantial assets that could be accessed to satisfy a judgment against them. The individual defendants may be covered by substantial insurance policies that could be used to satisfy a judgment against them.*

    **(b)**        **Additional Comments from the Debtor Concerning the Waupaca Claims**

These prospective defendants will likely raise non-negligible defenses to liability (e.g., that they were entitled to delegate control of the sale process to TKNA and TKAG and then to reasonably rely on these entities to maximize the sale price since it was in TKNA's and TKAG's best interests to receive maximum value for Waupaca as Budd's ultimate shareholders. These prospective defendants may also raise certain defenses regarding damages, such as that: (a) the

price paid by KPS was higher than first projected by TKAG's independent investment banker; (b) a claim of damages based on the post-sale rise in the value of Waupaca is too speculative given prevailing market conditions, anticipated foreign competition and other factors; and (c) the suggestion that Waupaca was worth hundreds of millions if not billions more than what KPS ultimately paid is belied by the fact that there were multiple bidders in the sale process and it is unlikely that all of them would undervalue Waupaca by such a wide margin in their own respective bids.

Also, any ultimate recovery from the Budd officers and directors could be limited to insurance policies that may be available, if these defendants do not have material assets. TKNA and/or TKAG could fund the defense for these prospective defendants (thus limiting the possibility of an early settlement with them out of their concern for large litigation costs), particularly if they are sued in the same lawsuit against TKNA and/or TKAG. And since TKAG reportedly has a market capitalization of over $8 billion, the Debtor must assume that TKNA and TKAG have the wherewithal and incentive to mount a strenuous defense to any claim related to the sale of Waupaca. The claims need not necessarily be litigated to final judgment, as the defendants could agree to a new settlement—larger than the TKNA Settlement Agreement—out of a desire to avoid public disclosure of their actions giving rise to the claims or the uncertainty of extended litigation. However, if the claims were to be litigated to final judgment, given the inherently complex legal and factual issues, including the likely need to engage expert witnesses, the prosecution costs will likely be very substantial and litigation to final judgment could take several years, particularly if there are appeals.

With respect to the claims against TKNA, TKAG and certain of their respective current and former officers and directors, the essence is that these entities and individuals: (a) disregarded all corporate formalities by unilaterally and improperly making the decision to sell Waupaca and then conducting the actual sale process, all without any meaningful input from or notice to Waupaca's owner, Budd, and without any regard for whether it was in the best interests of Budd and its creditors; (b) knew that Budd's then officers and directors were breaching their fiduciary duties by allowing TKNA and TKAG to control the sale without any input from them and instructing Budd's directors to approve the sale without any deliberation, and thereby aided and abetted those breaches of fiduciary duty; (c) failed to disclose material information to Budd's then officers and directors that would have impacted their decision on whether or not to approve the Waupaca sale; (d) engaged in actions that tainted the sale process by, inter alia, selectively providing and/or withholding material non-public information to certain bidders; (e) caused Budd to sell Waupaca at a time and in a manner that benefitted only TKAG to the financial detriment of Budd and its creditors, and thereby appropriated for TKAG benefits associated with Waupaca that otherwise properly belonged to Budd.

The Debtor believes that certain of the potential claims against TKNA and TKAG and certain of their respective current and former officers and directors (particularly claims for aiding and abetting breach of fiduciary duty) are strong from a liability perspective. TKAG and the potential defendants who are German nationals might argue that they are not subject to suit in a U.S. court, although due to their extensive actions both taken within the United States and directed toward the United States, such an argument may not be successful. From a damages perspective, these potential defendants may raise the same types of defenses mentioned above with respect to Budd's officers and directors. There is a colorable basis for arguing that the

43

"corporate veil" should be pierced in this case (a result that is sometimes referred to as "alter ego" liability) – in which case TKNA and potentially TKAG would be liable for all of Budd's debts (including all of Budd's obligations to its retirees) – although a successful result cannot be guaranteed. Findings that the corporate veil should be pierced are fairly infrequent and the Debtor expects TKNA and TKAG will raise significant defenses, including that they had no intent to use Budd as a vehicle to defraud or injure creditors  And, while TKNA and TKAG have the financial ability to pay a large judgment, the ultimate upside recovery distributable to creditors, if any, should be capped at the difference between the Debtor's existing assets and the cost of satisfying the Debtor's creditors.  Anything in excess of that amount would belong to subordinate creditors, including the Debtor's equity holders (i.e., TKNA).  Moreover, as TKNA and TKAG are well financed, the Debtor anticipates they will engage in a robust defense of these claims.  Additionally, as noted above, given the complex legal and factual issues, including the likely need to engage expert witnesses, the prosecution costs will likely be very substantial and litigation to final judgment could take several years, particularly if there are appeals.

    With respect to the claims against Budd's counsel, Clark Hill, the substance is that the firm: (a) knew about TKNA's and TKAG's domination of the Waupaca sale process and the lack of any meaningful involvement by Budd's officers and directors, and provided no advice to those officers or directors about what steps they should have taken, including potentially retaining independent counsel and potentially other professionals to advise them on the transaction or appointing one or more independent directors to be in charge of all decisions concerning the Waupaca sale; (b) knew that Budd's officers and directors were uninformed about the specifics of the Waupaca sale process and the sale itself, and did nothing to rectify the situation; (c) failed to advise Budd's officers and directors about the potential conflict of interest that might exist between Budd, TKNA and TKAG concerning the Waupaca sale and Clark Hill's own potential conflict as counsel for all three entities; (d) failed to advise Budd's officers and directors about the specifics of the Waupaca sale process and sale to ensure that they had all available information before being asked to make a decision to approve the sale; and (e) failed to advise Budd's officers and directors about the need to properly analyze whether it was in Budd's best interests to sell Waupaca, and if so, at that time and for that amount, including the need to consult appropriate independent professionals about such issues. While the Debtor believes that these claims are viable, it anticipates that Clark Hill will vigorously defend them.  With respect to damages, the Debtor anticipates that Clark Hill may have a malpractice insurance policy that could be available to satisfy a judgment against it. The Debtor also anticipates that Clark Hill will assert both legal and factual defenses, including that: (a) it did not represent TKAG; (b) it did not represent Waupaca; (c) it did not represent the officers or directors of Budd or TKNA; and (d) obtained informed consent from its clients. Clark Hill may defend against liability and may raise the same defenses to damages as discussed above as to other potential defendants.  In any event, it does not appear that an award of damages against Clark Hill would result in any incremental value to the Estate since, apart for the potential for an award of punitive damages, Clark Hill's damages exposure would be no greater than the exposure of any other potential defendant and, as noted, the total recovery available to creditors would likely be capped at the difference between the Debtor's existing assets and the cost of satisfying the Debtor's obligations to its creditors.

    As for the claims against KPS, it is potentially liable as the recipient of an actually fraudulent transfer of Budd's Waupaca stock on the basis that TKNA and TKAG allegedly

44

caused Budd to sell Waupaca as part of an effort to defraud its retiree creditors. KPS is also potentially liable for securities fraud, and other claims, as discussed above. There is evidence that KPS improperly solicited and received material non-public information from a TKAG executive that led KPS to bid less than it otherwise may have, and there is also evidence that KPS believed Waupaca was worth far more than the purchase price it paid. However, KPS may argue that it is immune from liability under 11 U.S.C. §546(e) because the sale of Waupaca constitutes a settlement payment made by or to a financial institution or financial participant, or a transfer made in connection with a securities contract. KPS may also argue that the Debtor cannot assert a viable claim to recover additional value on the grounds that the Debtor could have made more money selling Waupaca had it delayed the sale, since KPS did not have any role in determining the timing. Additionally, KPS may also argue that any claim against it should be limited to the difference, if any, between Waupaca's actual value at the time of the sale (June 2012) and what KPS paid for the company. In connection therewith, KPS will likely point to the fact that it bought Waupaca as the successful bidder in a lengthy bidding process with multiple bidders, each of whom, KPS would likely argue, had every incentive to not let KPS acquire Waupaca at a significant discount and to outbid KPS if Waupaca was actually being undervalued. As with TKNA and TKAG-related potential defendants, KPS is also presumably well-funded and has the ability to mount a significant and costly defense. Also, as with Clark Hill, it does not appear that an award of damages against KPS would result in any incremental value to the Estate since KPS's damages exposure would be no greater than the exposure of any other potential defendant and, as noted, the total recovery available to creditors would likely be capped at the difference between the Debtor's existing assets and the cost of satisfying the Debtor's obligations to its creditors.

Under the TKNA Settlement Agreement, the UAW can elect to include the Waupaca Claims Release in the Confirmation Order, in which event: (1) KPS and its affiliates, including Perella Weinberg Partners Group LP, as set forth in the TKNA Settlement Agreement, would receive the benefit of Waupaca Claims Release; and (2) TKNA would pay to the UAW VEBA the Additional Payments in the aggregate amount of $35 million (a value the Debtor believes is a reasonable amount to settle the potential claims against KPS). The UAW also has the election to exclude the Waupaca Claims Release from the Confirmation Order, in which event the Independent Fiduciary acceptable to the UAW would have sole authority to prosecute claims against KPS and its affiliates, including Perella Weinberg Partners Group LP, for the benefit of the UAW VEBA and the E&A VEBA. In the event the UAW does not make an election, it will be deemed to have elected to exclude the Waupaca Claims Release so that the Independent Fiduciary can pursue the Causes of Action against KPS for the benefit of the UAW.

### (c)  TKNA's Comments Concerning Defenses to the Waupaca Claims

TKNA has requested that the following italicized statement about their defenses to the Waupaca claims be included in the Disclosure Statement. The following do not necessarily represent the views of Budd or the E&A Retiree Committee.

TKNA will assert defenses to any claims relating to the Waupaca transaction including, but not limited to, the following:  (a) that the sale of Waupaca was fully exposed to the investment community; (b) that Waupaca was marketed by internationally respected investment bankers, (c) that the price obtained for Waupaca was dictated by the marketplace and represented reasonably equivalent value (and exceeded the originally estimated valuation), (d) that numerous

well-respected private equity firms competed for Waupaca, and (e) that the information provided to the investment community was consistent with transactions of this nature.  Further, the prospective defendants will likely defend against any claims brought against Budd's directors on grounds that, under applicable law, the directors could delegate control of the sale process to Budd's parent and could reasonably rely on the expertise of TKNA and others to manage the sale process as Budd did not have such expertise.  Finally, with respect to any alleged damages that might be sought in connection with the sale of Waupaca, TKNA will assert as a defense (in addition to the potential defenses identified by the Debtor above) that KPS injected significant capital into Waupaca after the purchase, enabling it to later sell Waupaca at a higher price. TKNA will mount an aggressive defense to the allegations set forth in the UAW's position statement above. TKNA expects that the other potential defendants will mount a similarly aggressive defense. In addition, under the TKNA Settlement Agreement,TKNA has the benefit of the Claims Bar and Indemnity Order (attached as Attachment 3 thereto).

3.   **Claims Related to the Recharacterization and
Avoidance of Intercompany Transactions (the "Recharacterization Claims")**

During the Affiliate Investigation, the then-Chief Restructuring Officer and the CRO's Advisors identified three transactions totaling $407 million that were characterized as "loan" repayments by the Debtor to TKNA's predecessor (ThyssenKrupp USA, Inc. ("TKUSA")) and one of its affiliates (ThyssenKrupp Finance USA, Inc. ("TK Finance"))).  These transfers relate to the following three transactions:

(a)  Thyssen Acquisition Corp. ("TAC"), the Debtor's former parent, allegedly accumulated around $244 million in debt owed to TKUSA as a result of certain intercompany transactions used primarily to fund the pension and OPEB obligations of Transit America, Inc. ("Transit"), an affiliate of the Debtor.  (TAC, Transit and the Debtor merged in December 2010, with Budd the surviving entity.)  On or about June 30, 2009, TKUSA transferred about $244 million to TAC, which was then used in or about July 2009 to pay the outstanding loan balance with TKUSA.

(b)  As of September 2009, the Debtor allegedly owed TK Finance approximately $105 million as a result of day-to-day intercompany account activity.  The majority of the balance purportedly related to $75 million in funds used to contribute to the UAW pension plan as part of a settlement with the PBGC stemming from the closure of the Debtor's Detroit facility.  Thereafter, TKUSA transferred about $200 million to TAC, which money was down-streamed to the Debtor.  In or about October 2009, the Debtor used $105 million of the $200 million to repay its alleged obligation to TK Finance.

(c)  In or about May 2010, the Debtor purportedly received a $57 million term loan from TK Finance, which funds were then down-streamed to Buddcan Holdings, Inc. ("Buddcan") (another affiliate of the Debtor) allegedly to fund (a) ongoing operating expenses of Buddcan, and (b) a $54 million Buddcan pension escrow. On or about December 31, 2011, the Debtor repaid the purported term loan to TK Finance.

In short, TKNA and TK Finance essentially transferred about $407 million to the Debtor (and/or its then parent) so that the Debtor (and/or its then parent) could repay obligations that the Debtor (and/or its then parent) owed to them.  In other words, TKNA (and TK Finance) were giving the Debtor (and/or its parent) money for the purpose of repaying money that the Debtor (and/or its parent) allegedly owed to TKNA (and TK Finance).

An argument could be made that the transfers from TKNA and TK Finance to the Debtor and its parent were not "loans" but, in fact, capital contributions (or equity investments), and that, as a result, the Debtor and/or its parent had no obligation to transfer those sums back to TKNA or TK Finance.  Assuming that to be the case, the Debtor could further argue that the subsequent transfers of that same money back to TKNA or TK Finance constituted fraudulent transfers because the transfers were either (a) made with the intent to hinder, delay or defraud the Debtor's creditors, including its retirees or (b) made at a time when the Debtor was insolvent and for which it received less than reasonably equivalent value.  Were such a claim asserted, TKNA could defend on the grounds, *inter alia*, that there were no fraudulent transfers because, among other things: (a) the transfers were not made with the intent to hinder, delay or defraud any of the Debtor's creditors by siphoning money out of the Debtor because, if that was the intent, TKNA would never have initially transferred the $407 million to the Debtor in the first place; (b) the Debtor did receive reasonably equivalent value in the form of satisfaction of an equivalent amount of debt owed to TKNA and/or TK Finance; (c) the funds that TKNA funneled through its subsidiaries were always earmarked to be paid back to TKNA and/or TK Finance; and (d) if the transactions are collapsed, the Debtor suffered no damages because TKNA was, in essence, using its own money – as opposed to other assets belonging to the Debtor – to repay itself.  Thus, while a potential claim may be asserted to recover some or all of the about $407 million at issue, the chance of ultimately succeeding is, the Debtor believes, uncertain.

### 4. Debtor's Conclusion Regarding Potential Claims Against TKNA and Others

Under the TKNA Settlement Agreement, all of the foregoing Causes of Action would be released against TKNA, TKAG, other Affiliates, Clark Hill, and the other defendants (*e.g.* KPS and its affiliates, including Perella Weinberg Partners Group LP, in the event the Confirmation Order includes the Waupaca Claims Release) and certain of these entities' respective current and former officers, directors, agents and employees.  In exchange, TKNA would pay the Settlement Payments as set forth in the TKNA Settlement Agreement.  In particular, TKNA would make a stream of payments to the UAW VEBA and the E&A VEBA on behalf of the Debtor in the amount of $300 million (subject to adjustment, including upward adjustment of $35 million in the event that the Confirmation Order includes the Waupaca Claims Release) and assume Pension Plans and other obligations that likely represent more than $200 million in Claims that otherwise would be Allowed against the Estate.  The UAW VEBA will receive future Settlement Payments under the TKNA Settlement Agreement irrespective of future changes in tax law, future taxable losses of the TKNA Tax Group, or the ability to enforce the Debtor's Actual Tax Sharing Agreement in the absence of a settlement.

The Debtor believes, in the reasonable exercise of its independent business judgment, that the TKNA Settlement Agreement and the Plan represent a reasonable, appropriate compromise considering the potential value of, and the risks of litigating, the claims under the Debtor's

Actual Tax Sharing Agreement, the Waupaca Tax Claim, the Waupaca Sale Claims and the Recharacterization Claims.

If, however, the Plan and the TKNA Settlement Agreement are not approved, all of the Causes of Action released pursuant to the TKNA Settlement Agreement likely could be litigated. Alternatively, some or all of the prospective defendants could agree to a new settlement or settlements resulting in more value to the Debtor's Estate than the TKNA Settlement Agreement. If some or all of these Causes of Action were to be successful, either through litigation or through a new settlement, it is not certain what damages the Debtor would receive, although it is possible that such damages could be in excess of the value that TKNA would provide under the TKNA Settlement Agreement (and, with respect to TKNA and TKAG, it is also possible that a court might award an alter ego remedy and hold TKNA or both entities responsible for the Debtor's obligations to its creditors until they are completely satisfied). As discussed, there are legal and economic risks involved with suing and recovering on account of these Causes of Action, which include risks related to defenses that TKNA and others would assert, the cost, uncertainty, and passage of time inherent in large and complex litigation, and potentially the inability of the Debtor to remain part of the TKNA Tax Group and thus to seek future payments under the Debtor's Actual Tax Sharing Agreement while the litigation is ongoing. In addition, if the Plan and the TKNA Settlement Agreement are not approved, the Debtor's Estate might need to defend against the various claims that could be asserted by TKNA and address the Estate's potential liability under the various Pension Plans being assumed by TKNA as part of the TKNA Settlement Agreement, which could further diminish the assets available to the Estate's existing creditors. Further, if litigation with TKNA is pursued, TKNA may demand and then seek standing to pursue termination of one or more of the benefit plans and/or union contracts for the UAW Retirees and/or the E&A Retirees

The Debtor's Retirees cannot recover more on account of their healthcare benefits than the anticipated future cost of procuring those same benefits at the same or similar levels as provided for under Budd's current benefit plans. Towers Watson, in its September 30, 2015 report, has estimated that, Budd's Retiree Benefit obligations under its current benefit plans are approximately $733 million for the UAW Retirees, and approximately $77 million for the E&A Retirees, to provide such benefits throughout the anticipated lifetime of the Debtor's Retirees. The aggregate amount of the Allowed Claims for the rest of the Debtor's creditors is approximately $11.07 million. Since the Debtor believes that the amounts paid and payable pursuant to the Plan to the UAW and E&A VEBAs will be sufficient to provide future benefits to all Retirees at levels commensurate with the levels currently being provided for under Budd's current benefit plans, it believes that the potential incremental benefit to the Estate from prosecuting the above claims is far outweighed by the risks and burdens to the Estate posed by litigation. Nonetheless, should the UAW argue that the litigation upside calculus should be based on the future costs of providing future benefits under the Debtors' current benefit plans, i.e., at the costs set forth in September 30, 2015 report of Towers Watson, the litigation upside would be approximately $233 million as illustrated in the following chart.

| Claimant: | Allowed Claim Amount | |
|---|---|---|

| | | |
|---|---|---|
| UAW Retirees | $733 million[20] | As per Towers Watson Report, dated September 30, 2015 |
| E&A Retirees | $77 million[21] | As per Towers Watson Report, dated September 30, 2015 |
| Asbestos Insured Claims | $2.2 million | Under the Amended Asbestos Cost Sharing Agreement, the Debtor must create a $2.2 million Insured Asbestos Claim Fund to be used by, and for the benefit of, the Insurers in accordance with the Amended Asbestos Cost Sharing Agreement |
| Asbestos Uninsured Claims[22] | $1.9 million | $1.25 million Fund divided by 66% pro rata recovery |
| General Unsecured and Environmental Claims | $7.5 million | |
| **Aggregate of allowable claims against the debtor** | $821.6 million | |
| Less Effective Date Cash | ($254 million) | |
| **DAMAGES CAP** | $567.6 million | |
| Less payments under the TKNA Settlement Agreement, including for the Waupaca Claims Release | ($335 million) | |
| **LITIGATION UPSIDE** | $232.6 million | |

Based on the above calculations, if the Debtor were to forego the benefits afforded by the TKNA Settlement Agreement, it may potentially recover (at an indeterminate time in the future) an additional approximately $233 million (or may be awarded a finding of alter ego liability

---

[20] These figures do not represent claims of the retirees against the estate in accordance with 11 U.S.C. §1114.  Rather, they represent the present cost of providing future healthcare benefits under the Debtor's current healthcare plans.
[21] These figures do not represent claims of the retirees against the estate in accordance with 11 U.S.C. §1114.  Rather, they represent the present cost of providing future healthcare benefits under the Debtor's current healthcare plans.
[22] The Asbestos Committee disputes the Debtor's estimate of amounts needed to satisfy its Uninsured Claims.

against TKNA and possibly TKAG, which would provide an equivalent benefit) for the benefit of the Estate's creditors, less the potentially significant and possibly unrecoverable costs of pursuing litigation.    However, given that payments under the existing TKNA Settlement Agreement are estimated to be sufficient to allow the Debtor's Retirees to purchase insurance on the open market comparable to the benefits they are currently receiving under the Debtor's existing benefit plans, the risk of foregoing the concrete benefit of the TKNA Settlement Agreement to pursue complex claims where no recovery is guaranteed is not, in the Debtor's view, in the best interests of the creditors of the Debtor's Estate.

**F.      Settlement Discussions Among the Debtor, the Retiree Representatives, and TKNA**

On August 11, 2015, counsel to the Debtor, TKNA, the UAW and the E&A Retiree Committee convened and the Debtor, the UAW and the E&A Retiree Committee made a non-exhaustive presentation of the findings of their investigations and outlined the Debtor's potential claims against TKNA, TKAG, and certain of their officers, directors, employees and agents related to the Debtor's Actual Tax Sharing Agreement and the sale of Waupaca.

The Debtor, UAW, the E&A Retiree Committee, and TKNA all participated in negotiations concerning the Waupaca-related claims. Specifically, in the 4-month period from July 6, 2015 (the date of the last Bankruptcy Rule 2004 examination relating to the sale of Waupaca) and November 19, 2015 (the date on which the Debtor filed its First Amended Chapter 11 Plan [Docket No. 1228]:

(a) the Debtor, TKNA, UAW, and the E&A Retiree Committee held global settlement conferences (in person or via telephone) 6 times (4 of which occurred between October 7 and October 22)[23];

(b) the Debtor, which negotiated on behalf of the Estate with the knowledge and support of the UAW and E&A Retiree Committee, held at least 9 scheduled settlement conferences (in person or via telephone) with TKNA, and 9 joint scheduled settlement conferences (including one substantive email update, and otherwise in person or via telephone) with both the E&A Retiree Committee and UAW;

(c) at omnibus hearings on July 7, August 14, September 25, and October 14, the parties informed the Court that settlement discussions were continuing in good faith. Counsel for the UAW attended each of these hearings, and did not express any concern about the negotiations or the UAW's participation in them.

During this time the E&A Retiree Committee and the UAW had separate settlement-related communications with each other, to which the Debtor was not invited and did not

---

[23] The Debtor has reason to believe that all settlement discussions referenced were confidential settlement discussions subject to Federal Rule of Evidence 408, and thus does not present certain information regarding the substance of the discussions for any purpose not permitted by that rule.

participate. The E&A Retiree Committee and the Debtor also had separate settlement communications with TKNA during this time.

The Debtor negotiated the TKNA Settlement Agreement with TKNA (who negotiated on behalf of all potential defendants in the Causes of Action proposed to be compromised by the TKNA Settlement Agreement) and the E&A Retiree Committee.

## G.     Evaluation / Estimation of Asbestos Claims and Available Insurance

During the Bankruptcy Case, the Asbestos Committee conducted discovery related to past, present, and future asbestos-related claims against Budd, as well as insurance coverage available for asbestos-related claims against Budd. [*See* Docket No. 535 and 605]. Also during the Bankruptcy Case, the Asbestos Committee and the Debtor each retained valuation experts to estimate the scope and extent of the Debtor's current and future Asbestos Claims.

In September 2015, the Debtor and counsel for various companies that issued or were responsible for Asbestos Insurance Policies mediated several issues related to certain types of Asbestos Claims. As a result of this mediation and related discussions, the Debtor and certain insurers agreed to the Amended Asbestos Cost Sharing Agreement, which memorializes certain elements of the treatment of certain Insured Asbestos Claims under the Plan.

## VII.     IMPLEMENTATION OF THE PLAN OF REORGANIZATION

## A.     Establishment and Funding of VEBAs for the Benefit of Retirees

The Plan is premised upon providing to or for the benefit of the Retirees: (1) Effective Date Cash estimated to be in excess of $200 million; (2) Cash over an 8 year period beginning on the Effective Date in the aggregate amount of either $300 million or $335 million if the Confirmation Order includes the Waupaca Claims Release (in each case in accordance with the terms of the TKNA Settlement Agreement and subject to adjustment) under a series of eight (8) payments to be made by TKNA on behalf of the Debtor pursuant to the TKNA Settlement Agreement; and (3) additional Cash from the proceeds of Causes of Action and other assets of the Estate liquidated after the Effective Date. This Cash will be made available to or for the benefit of Retirees under the Retiree VEBAs as described in the Plan and in this Disclosure Statement.

Consistent with Bankruptcy Code section 1129(a)(13) and section 1114, the Debtor's Plan contemplates that on or before the entry of the Confirmation Order, the Bankruptcy Court shall enter the UAW Section 1114 Order, which order, as described below, may be contingent upon approval of the TKNA Settlement Agreement. The Debtor's Plan also contemplates recognition of the agreement modifying E&A Retiree Benefits reached with the E&A Retiree Committee (the "E&A Section 1114 Agreement"). The UAW Section 1114 Order and E&A Section 1114 Agreement will modify the obligations of the Debtor to provide Retiree Benefits to the E&A Retirees and the UAW Retirees by funding through the Plan the E&A VEBA and the UAW VEBA. The UAW Section 1114 Order and the E&A Section 1114 Agreement will not be effective unless and until: (1) the Bankruptcy Court enters the Confirmation Order; and (2) the Effective Date has occurred. After the respective E&A Retiree VEBA Effective Date and the UAW Retiree VEBA Effective Date, the E&A Retirees and the UAW Retirees will have the rights afforded to them under the Retiree VEBAs and will receive Retiree Benefits pursuant to the terms of the E&A VEBA Trust Plan and the UAW VEBA Trust Plan, as the same may be

amended from time to time, in lieu of all rights otherwise afforded to them under the Debtor's existing retiree medical plans (including rights under applicable laws, such as, but not limited to, the Consolidated Omnibus Budget Reconciliation Act of 1986, as amended, ERISA, and the Patient Protection and Affordable Care Act).

A VEBA is a tax-exempt trust created to pay for certain types of employee welfare benefits, including medical benefits, to current or former employees and their spouses and dependents. Paying for benefits through a VEBA can provide a tax advantage to the Debtor and the Retirees.

Prior to the Effective Date, the UAW VEBA and the E&A VEBA will be established to meet the requirements of Code section 501(c)(9) and ERISA section 3(1). The UAW VEBA Trust Agreement, the UAW VEBA Trust Plan, the E&A VEBA Trust Agreement, and the E&A VEBA Trust Plan will be filed with the Plan Supplement. The Debtor shall pay all costs and expenses of the Debtor, the UAW, and the E&A Retiree Committee (and their respective professionals) associated with establishing the UAW VEBA and the E&A VEBA. Each Retiree VEBA will be separate from the other, and assets of the Retiree VEBAs will not be commingled. From and after the Effective Date until the respective E&A VEBA Effective Date and the UAW VEBA Effective Date, the Debtor shall continue to provide to the E&A Retirees and the UAW Retirees Retiree Benefits pursuant to the terms and conditions of the Debtor's existing retiree medical plans, the cost of which shall be paid by the Estate. Claims for Retiree Benefits that are incurred but not paid prior to the applicable E&A VEBA Effective Date or UAW VEBA Effective Date shall likewise be paid by the Estate pursuant to the terms and conditions of the Debtor's existing retiree medical plans.

## B.      Execution of TKNA Settlement Agreement

To implement the Plan, the Debtor, the E&A Retiree Committee, and TKNA have executed the TKNA Settlement Agreement.  It is subject to court approval, confirmation of the Plan and the Plan becoming effective pursuant to its terms.

## C.      Rights and Powers of the Independent Fiduciary

The UAW will select the individual who will serve as the Independent Fiduciary. In accordance with the Amended and Restated Bylaws of The Budd Company, Inc., the Independent Fiduciary shall enforce the TKNA Settlement Agreement, oversee TKNA's payments to the UAW VEBA required by the TKNA Settlement Agreement, and exercise sole authority to pursue, litigate, settle, compromise, and retain and pay professionals from assets of the Debtor to assist in such actions as to all Causes of Action not released pursuant to the Plan. The Independent Fiduciary shall have sole authority to: (1) retain and use Operating Cash to pay professionals to pursue Causes of Action not released pursuant to the Plan and to pay fees due and payable to the U.S. Trustee; (2) to enforce payment of the Settlement Payments, Additional Payments (if applicable), and any additional payments that TKNA agrees to pay to UAW (as defined and set forth in section 11(c) of the TKNA Settlement Agreement, a "Settlement Increase"); and (3) to enforce the Letter of Credit to be obtained and maintained by TKNA under the TKNA Settlement Agreement from the Effective Date until all Settlement Payments (including any Settlement Increase) and Additional Payments (if applicable) have been made, as more fully described in, and subject to, the conditions set forth in TKNA Settlement Agreement. The Independent Fiduciary shall have no ability to modify in any way, without the express

52

written consent of the E&A Retiree Committee, the TKNA Effective Date Payment or any other distribution to the E&A VEBA provided for by the Plan.

**D.      Rights and Powers of the Debtor**

After the Effective Date, the Debtor shall not require authority of the Bankruptcy Court to act, other than as specifically set forth in the TKNA Settlement Agreement, the Plan, or the Confirmation Order. Specifically, and without limitation, the Debtor shall have the right to, among other things, (1) object to Claims and prosecute, settle, compromise, withdraw or resolve in any manner approved by the Bankruptcy Court such objections; and (2) conduct examinations in accordance with Bankruptcy Rules 2004 or 7001 *et. seq.* or otherwise in accordance with applicable law.

**E.      Dissolution of Committees and Retiree Representatives**

**1.      _The Asbestos Committee_**

The duties and powers of the Asbestos Committee, and the duties and powers of its respective Professionals, will terminate on the later of: (1) completion of performance of those actions required to be executed on or about the Effective Date; and (2) resolution of any Fee Applications filed or objected to by the Asbestos Committee, or its respective Professionals. The fees and expenses of the Asbestos Committee and its Professionals through the date that the Asbestos Committee is dissolved shall be paid by the Debtor, and after the Effective Date from administrative reserves, after entry of an order of the Bankruptcy Court authorizing such payment. Upon the termination of the duties and powers of the Asbestos Committee, the Asbestos Committee will be dissolved, its members will be deemed released by the Debtor and its Estate from their duties, responsibilities and obligations in connection with the Bankruptcy Case, and the Debtor shall have no further obligation to pay any costs, fees, or expenses of the Asbestos Committee, or its respective members or Professionals.

Upon the dissolution of the Asbestos Committee, no notice to that Committee that might otherwise be required pursuant to an order of the Bankruptcy Court shall be required.

**2.      _The E&A Retiree Committee and the UAW_**

The duties and powers of the E&A Retiree Committee and the UAW in their respective capacity as authorized representative of Retirees under section 1114 of the Bankruptcy Code, and the duties and powers of their respective Professionals, will terminate on the latest of: (1) completion of performance of those actions required to be executed on or about the Effective Date; (2) resolution of any Fee Applications filed or objected to by either the E&A Retiree Committee, the UAW, or their respective Professionals; and (3) (i) for the E&A Retiree Committee, the E&A VEBA Effective Date; and (ii) for the UAW, the UAW VEBA Effective Date. The fees and expenses of the E&A Retiree Committee, the UAW, and their respective Professionals through the date(s) the E&A Retiree Committee is dissolved and the UAW is relieved of its obligations as the authorized representative of the Retirees shall be paid by the Debtor, and after the Effective Date from administrative reserves, after entry of an order of the Bankruptcy Court authorizing such payment. Upon the respective termination of the duties and powers of the E&A Retiree Committee and the UAW, the E&A Retiree Committee will be dissolved, the UAW will no longer be the authorized representative of the UAW Retirees under section 1114 of the Bankruptcy Code, their members will be deemed released by the Debtor and

its Estate from their duties, responsibilities and obligations in connection with the Bankruptcy Case, and the Debtor shall have no further obligation to pay any costs, fees, or expenses of the E&A Retiree Committee, the UAW, or their respective members or Professionals.

Upon the respective dissolution of the E&A Retiree Committee and termination of the UAW's Section 1114 representation of the UAW Retirees, no notice to the E&A Retiree Committee or the UAW that might otherwise be required pursuant to an order of the Bankruptcy Court shall be required.

## VIII.  PLAN PROVISIONS GOVERNING ALLOWANCE OF CLAIMS AND MAKING OF DISTRIBUTIONS

### A.  Liquidation and Treatment of Asbestos Claims

### 1.  Funding of Asbestos Funds and Asbestos Administration Fund

On the Effective Date, the Debtor shall deposit $2,200,000 Cash into the Insured Asbestos Claim Fund, $1,250,000 Cash into the Uninsured Asbestos Claim Fund, and $1,500,000 Cash into the Asbestos Administration Fund. Each of the Asbestos Funds and the Asbestos Administration Fund shall be maintained until the earlier to occur of (a) the date on which less than $1,000 remains in such Asbestos Fund, or (b) the date on which all lawsuits on account of Asbestos Claims brought as of January 1, 2045 have been resolved. In the event that funds remain in an Asbestos Funds or the Asbestos Administration Fund on the date on which all lawsuits on account of Asbestos Claims brought as of January 1, 2045 have been resolved, then such remaining funds shall be given to the UAW VEBA. Each of the Asbestos Funds and the Asbestos Administration Fund shall be segregated, not commingled with any other Cash or other property of the Debtor, the E&A VEBA or the UAW VEBA, and shall not be used to pay any obligation of the Debtor other than pursuant to (a), (b), or (c) below.

(a) *Insured Asbestos Claim Fund.*  The Insured Asbestos Claim Fund shall be used solely in accordance with the terms of the Amended Asbestos Cost Sharing Agreement.

(b) *Uninsured Asbestos Claim Fund.*  The Uninsured Asbestos Claim Fund shall be used by the Budd Funds Administrator to pay Defense Costs and make Distributions to holders of Uninsured Asbestos Claims at the Plan Percentage Amount and pursuant to Article II of the Plan until such time as the Uninsured Asbestos Claim Fund is exhausted; provided, however, that in no event shall Budd or the Budd Funds Administrator be required to pay Defense Costs or make Distributions to holders of Allowed Uninsured Asbestos Claims after the Uninsured Asbestos Claim Fund is exhausted.

(c) *Asbestos Administration Fund.*  The Asbestos Administration Fund shall be used by the Budd Funds Administrator to fund the expenses of discharging the obligations of the Debtor in connection with the Insured Asbestos Claim Fund, the Uninsured Asbestos Claim Fund, and the Amended Asbestos Cost Sharing Agreement.

54

2. **Formation of Asbestos Springing Trust**

The Amended and Restated Bylaws of the Budd Company, Inc. shall include a provision that in the event of the dissolution of the Debtor, any remaining balance of the Asbestos Funds and the Asbestos Administration Fund, the Debtor's rights and obligations under the Asbestos Insurance Policies, the Debtor's rights and obligations under the Plan with respect to Asbestos Claims, and the Debtor's rights and obligations under the Amended Asbestos Cost Sharing Agreement all shall be transferred into a trust (the "<u>Asbestos Springing Trust</u>"), which shall be established as set forth in this Plan. Upon dissolution of the Debtor, the Asbestos Springing Trust shall: (a) be a successor of the Debtor (under the Plan and otherwise) for all purposes related to treatment and administration of Asbestos Claims, but for no other purpose; (b) have authority to accept service of Asbestos Claims against the Debtor; and (c) be authorized to serve on behalf of the Debtor notice under or in connection with Asbestos Insurance Policies. As a successor to the Debtor, the Asbestos Springing Trust shall obtain the benefit of all injunctions and other protections in the Plan regarding Asbestos Claims and other Claims. The Asbestos Administration Fund shall be used to establish and pay the expenses of the Asbestos Springing Trust. The Asbestos Springing Trust Shall dissolve upon the earlier of: (i) the date on which all lawsuits on account of Asbestos Claims brought as of January 1, 2045 have been resolved (in which event the remaining balances of the Asbestos Funds and the Asbestos Administration Fund shall be transferred to the UAW VEBA), and (ii) the date on which the balance of both Asbestos Funds is less than $1,000. This provision of the Amended and Restated Bylaws of the Budd Company, Inc. shall be subject to amendment only with the approval of the Bankruptcy Court.

3. **Injunction on Future Asbestos Claims**

The Confirmation Order shall include an injunction that limits recovery on account of any Asbestos Claim, whether manifested or filed before or after the Petition Date, to the Asbestos Funds and the Asbestos Insurance Policies, and prevents any Person from collecting, recovering, or receiving payment or recovery with respect to any Asbestos Claim from assets of the Debtor or the Estate, other than the Asbestos Funds or one or more Asbestos Insurance Policies.

4. **Amended Asbestos Cost Sharing Agreement**

On the Effective Date, the Debtor shall execute and perform under the Amended Asbestos Cost Sharing Agreement (a copy of which is attached as **<u>Exhibit D</u>** to the Plan).

5. **Litigation of Insured Asbestos Claims After the Effective Date**

After the Effective Date, litigation of Insured Asbestos Claims will be administered in accordance with the Amended Asbestos Cost Sharing Agreement. Following the Effective Date, the Debtor or its agents shall notify the pertinent Insurer(s) of any Insured Asbestos Claim that the Debtor determines may be an Insured Asbestos Claim. No Insurer shall have any obligation with respect to any Insured Asbestos Claim for which such notice has not been given; *provided however,* that such notice will be deemed to have been given with respect to Insured Asbestos Claims for which any Insurer had undertaken to provide a defense prior to the Petition Date. Following the Effective Date, the Participating Carriers, in accordance with the Amended Asbestos Cost Sharing Agreement, shall be authorized to settle and compromise Insured Asbestos Claims without further order of the Bankruptcy Court.

### 6.        Litigation of Uninsured Asbestos Claims After the Effective Date

After the Effective Date, litigation of Uninsured Asbestos Claims will be administered by the Budd Funds Administrator.

Following the Effective Date, the Budd Funds Administrator may retain defense counsel retained before the Bankruptcy Case without further order of the Bankruptcy Court to defend Uninsured Asbestos Claims and such defense counsel shall provide such information as requested by the Budd Funds Administrator. Following the Effective Date, the Budd Funds Administrator shall be authorized to settle and compromise Uninsured Asbestos Claims without further order of the Bankruptcy Court.

## B.        Allowed Claims, Distribution Rights and Objections to Claims

### 1.        Allowance Requirement

Only holders of Allowed Claims are entitled to receive distributions under the Plan. The Debtor has filed and may file additional objections to Claims that have not been previously Allowed or are Allowed by the Confirmation Order. Under the Plan, Insurers shall be granted standing to object to Asbestos Claims. Prior to making any Distribution to holders of Allowed Claims, the Debtor may establish one or more reserves for Disputed Claims. The Debtor shall reserve in Cash or other property for Distribution on account of any Claim so reserved the full asserted amount (or such lesser amount as may be reasonably estimated) of such Claim or expense.

### 2.        Date of Distribution

All Distributions to holders of Allowed Claims will be made as and when provided in the Plan. Initial distributions will be made as soon as practicable after the Effective Date.

### 3.        Making of Distributions

Distributions to holders of Allowed Claims will be made: (a) to the last known addresses of such holders; or (b) to the addresses set forth in any filed proof of claim or written notices of address changes delivered to the Debtor by the holder of an Allowed Claim. If any Distribution is returned as undeliverable, no further Distributions to the recipient shall be made unless and until the Debtor is notified of such holder's then current address, at which time all missed distributions shall be made to such holder without interest.

### 4.        Objection Procedures

Unless otherwise ordered by the Court after notice and a hearing, under the Plan, the Debtor shall have the exclusive right, on and after the Effective Date, to File objections to Claims, provided, however, that any Asbestos Insurer may File and prosecute objections to Asbestos Claims in accordance with the Amended Asbestos Cost Sharing Agreement.

5.      **Estimation of Claims**

As set forth in the Plan, the Debtor reserves the right to seek to have Disputed Claims estimated by the Bankruptcy Court.

C.    **Disposition of Executory Contracts and Unexpired Leases**

Pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code, all Executory Contracts that exist between the Debtor and any person or Entity shall be deemed rejected by the Debtor as of the Effective Date, other than: (1) the Affiliate Services Agreement, which shall be amended and restated pursuant to the TKNA Settlement Agreement, (2) any Executory Contract that was terminated before the Effective Date or has been assumed or rejected pursuant to an order of the Bankruptcy Court entered before the Effective Date, or (3) the Asbestos Insurance Policies or any other insurance policy of the Debtor (to the extent they are or can be construed as executory). The Confirmation Order (except as otherwise provided therein) shall constitute an order of the Bankruptcy Court pursuant to section 365 of the Bankruptcy Code, effective as of the Effective Date, rejecting all executory contracts of the Debtor. Rejection claims arising out of the rejection of any executory contract or unexpired lease pursuant to the Plan must be filed with the Bankruptcy Court no later than the later of thirty (30) days after the entry of an order rejecting such executory contract or unexpired lease. Any Claim not filed within such time period shall be forever barred.

Any Claim arising out of the rejection of an executory contract or unexpired lease shall, pursuant to section 502(g) of the Bankruptcy Code, be treated as Class 6 General Unsecured Claim under the Plan.

D.    **Reservation of Rights Regarding Claims and Causes of Action**

Except as otherwise explicitly provided in the Plan, nothing will affect the Estate's rights and defenses, both legal and equitable, with respect to any Claims, including, but not limited to, all rights with respect to legal and equitable defenses to alleged rights of setoff or recoupment. All such rights, remedies, claims, defenses and Causes of Action shall remain with the Estate after the Effective Date.

Among other Causes of Action held by the Estate disclosed in the Schedules, the Debtor believes that the Estate holds Causes of Action against: (1) Conway MacKenzie, in connection with the resignation of Charles M. Moore as Chief Restructuring Officer; and (2) Martinrea International, Inc., in connection with tax refunds due to the Estate under sale and purchase agreements to which Martinrea International, Inc. is a party.


IX.    **OTHER PLAN PROVISIONS**

A.    **Releases, Injunctions, Exculpation and Related Provisions**

1.    **Compromise and Settlement**

**Pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the Distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise of all Claims and Equity Interests. Specifically, the Plan shall constitute a good faith compromise of all Affiliate Claims and Estate Claims under the terms and provisions of the TKNA Settlement**

57

Agreement. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all Claims and Equity Interests and of the TKNA Settlement Agreement, as well as a finding by the Bankruptcy Court that such compromise or settlement is fair, equitable, reasonable and in the best interests of the Debtor, the Estate, and holders of Claims and Equity Interests.

2.     <u>Exculpation</u>

The Exculpated Parties and any property of the Exculpated Parties will not have or incur any liability to any Person for any act taken or omission occurring on or after the Petition Date or for any and all Claims and Causes of Action arising on or after the Petition Date, in connection with or related to the Estate, including, but not limited to, (i) the commencement and administration of the Bankruptcy Case, (ii) the operation of the business of the Debtor or administration of the Estate during the pendency of the Bankruptcy Case, (iii) formulating, negotiating, preparing, disseminating, soliciting, implementing, administering, confirming or consummating the Plan, the Disclosure Statement, the TKNA Settlement Agreement, the Amended Asbestos Cost Sharing Agreement, or any other contract, instrument, release or other agreement or document created or entered into in connection with the Plan or any other post -petition act taken or omitted to be taken in connection with the administration of the Estate; (iv) submission of and statements made in, the Disclosure Statement or any contract, instrument, release or other agreement or document entered into, or any action taken or omitted to be taken in connection with the Plan; or (v) any Distributions made pursuant to the Plan, except for acts constituting willful misconduct, gross negligence, or fraud and in all respects such parties shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under the Plan. The entry of the Confirmation Order shall constitute a determination by the Court that the Exculpated Parties shall have acted in good faith and in compliance with the applicable provisions of the Bankruptcy Code, pursuant to, among other provisions of law, sections 1125(e) and 1129(a)(3) of the Bankruptcy Code, with respect to the foregoing, provided, further, that the foregoing provisions of the Plan shall not apply to any acts, omissions, Claims, Causes of Action or other obligations expressly set forth in and preserved by the Plan or Plan Supplement or any defenses thereto.

3.     <u>Injunction</u>

Subject to Articles II(B)(5)(b) and IV(I)(2) of the Plan and the corresponding injunction in the Confirmation Order, all Persons who have held, hold, or may hold Equity Interests or Claims against the Estate shall, with respect to any such Equity Interests or Claims, be permanently enjoined from and after the Effective Date, from taking any of the following actions (other than actions to enforce any rights or obligations under the Plan): (i) commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind (including, without limitation, any proceeding in a judicial, arbitral, administrative or other forum) against or affecting the Estate, Debtor, or any of their respective representatives or property; (ii) enforcing, levying, attaching (including, without limitation, any prejudgment attachment), collecting or otherwise recovering by any manner or means, whether directly or indirectly, any judgment, award, decree or order against the Estate, the Debtor, or any of their respective representatives or property; (iii) creating, perfecting or otherwise enforcing in any manner, directly or

58

indirectly, any encumbrance of any kind against the Estate, the Debtor, or any of their representatives or property; (iv) asserting any right of setoff, directly or indirectly, against any obligation due the Estate, the Debtor, or any of their property, except as contemplated or allowed by the Plan or the Confirmation Order; (v) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan; (vi) pursuing, prosecuting, or recovering proceeds on account of any claims belonging to the Estate; and (vii) prosecuting or otherwise asserting any right, claim, or cause of action released pursuant to the Plan.

4.    **Releases by the Estate of the Release Parties**

Effective as of the Effective Date, and except as otherwise set forth in the Plan or the Confirmation Order, the Debtor will be deemed to have forever released, waived and discharged each of the Release Parties from any and all Claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action and liabilities (other than the rights of the Debtor to act in accordance with or otherwise enforce the Plan and the contracts, instruments, releases, indentures and other agreements or documents delivered or executed thereunder), whether for tort, contract, violations of federal or state securities laws, or otherwise, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise that are based in whole or part on any act, omission, transaction, event or other occurrence, taking place on or prior to the Effective Date in any way relating to the Debtor, the Bankruptcy Case, or the Plan.

5.    **Release of the Released TKNA Parties and Injunction**

In accordance with the TKNA Settlement Agreement, and subject to and conditioned upon the occurrence of the Effective Date and the payment of the E&A Payment, the Debtor, the Estate and the E&A Retiree Committee, on behalf of themselves and their agents, members, predecessors, successors, and assigns, and all Persons who have held, hold, or may hold Claims against the Debtor or the Estate, acting derivatively through the Debtor or the Estate, shall be deemed to have unconditionally, absolutely, irrevocably and forever released and discharged the Released TKNA Parties with respect to all causes of action, suits, debts, liabilities, accounts, promises, warranties, damages and consequential damages, agreements, costs, expenses, claims or demands that have been or could have been asserted by or on behalf of the Debtor, the Estate, and/or the E&A Retiree Committee against the Released TKNA Parties related to or arising out of any act or thing that occurred or failed to occur prior to the Effective Date, whether known or unknown, direct, indirect, or derivative, liquidated or unliquidated, disputed or undisputed, fixed or contingent, inchoate or matured, foreseen or unforeseen, whether based in contract, tort, statute or otherwise, including, without limitation, avoidance actions or other causes of action available under chapter 5 of the Bankruptcy Code and claims arising from or relating to the Debtor's Actual Tax Sharing Agreement, the Non-Debtor TSA Amendment, the Affiliate Services Agreement (as amended and restated by this Plan or the TKNA Settlement Agreement), the Debtor's sale of Waupaca, and/or the ownership and/or control of the Debtor by TKNA or Affiliates or the equity securities of the Debtor (collectively, the "Released Estate Claims"); provided, however, that nothing contained in this paragraph shall be deemed or construed to be a covenant, release, waiver or discharge of the terms

59

and conditions of this Plan, the TKNA Settlement Agreement, or the Affiliate Services Agreement (as amended and restated by this Plan and the TKNA Settlement Agreement).

In furtherance of the foregoing release, and subject to and conditioned upon the occurrence of the Effective Date and the payment of the E&A Payment, each of the Debtor, the Estate, and the E&A Retiree Committee, on behalf of themselves and their agents, members, predecessors, successors, and assigns, and all Persons who have held, hold, or may hold Claims against the Debtor or the Estate, acting derivatively through the Debtor or the Estate, shall be deemed to have unconditionally, absolutely, irrevocably and forever released, waived and discharged each of the Released TKNA Parties from each of the Released Estate Claims; and each of the foregoing Persons are permanently precluded and enjoined from: (i) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind (including, without limitation, any proceeding in a judicial, arbitral, administrative or other forum) against the Released TKNA Parties or any of their property based upon, arising out of or related to the Released Estate Claims; or (ii) enforcing, levying, attaching (including, without limitation, any prejudgment attachment), collecting or otherwise recovering by any manner or means, whether directly or indirectly, any judgment, award, decree or order against the Released TKNA Parties or any of their property with respect to the Released Estate Claims.

The Released TKNA Parties are TKNA, each Affiliate, and each of their respective current and former officers, directors and employees (including, without limitation, Kevin Backus, Jill Karana, Lawrence Paulson, Robert Aginian, Guido Kerkhoff, Olaf Berlien, Volkmar Dinstuhl, Christian Bender, Christof Boehm, Miroslav Georgiev, Brian Bastien, Heinz Hense, Markus Boening, and Nancy Hutcheson), agents (including, without limitation, Bank of America Merrill Lynch), professionals, members, legal representatives, insurers, attorneys (including, without limitation, Clark Hill PLC) predecessors, heirs, successors and assigns, of each, each in his, her, or its capacity as such, and each of them.

6.   **Release of the Released Estate Parties**

Subject to and conditioned upon the occurrence of the Effective Date, and expressly subject to the reservation of TKNA's setoff rights as expressly reserved in Section 6 of the TKNA Settlement Agreement, each of the Released TKNA Parties, as of the Effective Date, shall be deemed to have unconditionally, absolutely and irrevocably released the Debtor, the Estate, and their current and former officers (including, without limitation, the Debtor's past and current Chief Restructuring Officers Mr. Carl Lane and Mr. Charles Moore), directors (including, without limitation, the current Independent Director, Mr. Charles Sweet, and directors Brian Bastien and Heinz Hense), agents, professionals, employees, members, legal representatives, attorneys, predecessors, heirs, successors and assigns, each in his, her, or its capacity as such, and each of them, and the E&A Retiree Committee, and its members, agents, professionals, legal representatives, attorneys, actuaries, financial advisors, predecessors, heirs, successors and assigns, each in his, her or its capacity as such, and each of them, and, solely in the event that the UAW elects to accept on behalf of the UAW VEBA the Additional Payments as provided for in Section 17 of the TKNA Settlement Agreement, then also including the UAW, and its agents, professionals, legal representatives, attorneys, actuaries, financial advisors, predecessors, heirs, successors and assigns, each in his or its capacity as such and each of them

60

(collectively, the "Released Estate Parties") with respect to all causes of action, suits, debts, liabilities, accounts, promises, warranties, damages and consequential damages, agreements, costs, expenses, claims or demands that the Released TKNA Parties has or ever had or claims to have currently or at any future date against the Released Estate Parties related to or arising out of any act or thing that occurred or failed to occur prior to the Effective Date, whether known or unknown, direct, indirect, or derivative, liquidated or unliquidated, disputed or undisputed, fixed or contingent, inchoate or matured, foreseen or unforeseen, whether arising in law, equity, contract, tort, statute or otherwise, including, without limitation, any claims relating to or arising from the Pension Plans, TKNA's assumption of the Pension Plans, or any funding of the Pension Plans, and claims arising under or related to the Debtor's Actual Tax Sharing Agreement, the Non-Debtor TSA Amendment, and/or the Affiliate Services Agreement (as amended and restated by the Plan and/or the TKNA Settlement Agreement) (collectively, the "Released TKNA/Affiliate Claims"); provided, however, that nothing contained in this paragraph shall be deemed or construed to be a covenant, release, waiver or discharge of the terms and conditions of the Plan, the TKNA Settlement Agreement, the Affiliate Services Agreement (as amended and restated by the TKNA Settlement Agreement), or any claim or cause of action that is wholly unrelated to Budd; or of any claim or cause of action relating to work performed by Towers Watson in connection with its Benefits Investment Committee, or by Stevenson Keppelmen for TKNA in connection with any PBGC related issue.

**B.      Preservation of Rights of Action**

Except to the extent that any Claim is Allowed during the Bankruptcy Case or expressly by the Plan, nothing, including, but not limited to, the failure of the Debtor to object to a Claim or Equity Interest for any reason, shall affect, prejudice, diminish or impair the rights and legal and equitable defenses of the Estate or the Debtor with respect to any Claim or Equity Interest, including, but not limited to, all rights of the Estate or the Debtor to contest or defend itself against such Claims or Equity Interests in any lawful manner or forum when and if such Claim or Equity Interest is sought to be enforced by the holder thereof.

**C.      Retention of Jurisdiction**

Pursuant to Sections 105, 1123(a)(5), and 1142(b) of the Bankruptcy Code, and notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall, after the Effective Date, retain such jurisdiction over the Bankruptcy Case and all Entities with respect to all matters related to the Bankruptcy Case, the Debtor and the Plan as is legally permissible. Notwithstanding anything herein to the contrary, after 180 days after the Effective Date, the Bankruptcy Court shall not retain jurisdiction over any Asbestos Claim for which the Bankruptcy Court has not entered a Final Order allowing or disallowing such Asbestos Claim; provided, however, the Bankruptcy Court shall retain jurisdiction over any Asbestos Claims for which the Bankruptcy Court or another court of competent jurisdiction has entered an order disallowing any Asbestos Claim within 180 days of the Effective Date, and such order is subject to an unexpired appeal or challenge period or has been appealed or otherwise challenged.

### D.        Amendment, Alteration and Revocation of Plan

Subject to the provisions of the TKNA Settlement Agreement and the limitations contained in the Plan: (1) the Debtor reserves the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules and with the consent of TKNA and the E&A Retiree Committee, to amend or modify the Plan prior to the entry of the Confirmation Order, including amendments or modifications to satisfy section 1129(b) of the Bankruptcy Code; and (2) after the entry of the Confirmation Order, the Debtor may, with the consent of TKNA and the E&A Retiree Committee, upon order of the Bankruptcy Court, amend or modify the Plan, in accordance with section 1127(b) of the Bankruptcy Code, or remedy any defect or omission or reconcile any inconsistency in the Plan in such manner as may be necessary to carry out the purpose and intent of the Plan; *provided, however,* that the E&A Payment and any other distributions to the E&A VEBA provided for by this Plan may not be modified in any way without the express written consent of the E&A Retiree Committee.

The Debtor reserves the right to revoke or withdraw the Plan prior to the entry of the Confirmation Order and to File subsequent chapter 11 plans. If the Debtor revokes or withdraws the Plan or if entry of the Confirmation Order or the Effective Date does not occur, then the Plan shall be null and void in all respects, and nothing herein shall be deemed an admission, acknowledgement, offer, or undertaking of any sort by the Debtor or any other Entity including with respect to the amount or allowability of any Claim or the value of any property of the Estate.

### E.        Conditions to Effective Date

The Plan specifies conditions precedent to the Effective Date.  Each of the specified conditions must be satisfied or waived in whole or in part pursuant to the Plan.

### F.        Requirements for Confirmation of the Plan

Before the Plan can be confirmed, the Bankruptcy Court must determine at the Confirmation Hearing that the requirements for confirmation, set forth in section 1129 of the Bankruptcy Code, have been satisfied. The Debtor believes that, upon receipt of the votes required to confirm the Plan, the Plan will satisfy all the statutory requirements of chapter 11 of the Bankruptcy Code, that the Debtor has complied or will have complied with all of the requirements of chapter 11, and that the Plan has been proposed and submitted to the Bankruptcy Court in good faith.

## X.    CERTAIN RISK FACTORS TO BE CONSIDERED

The holders of Claims should read and carefully consider the following factors, as well as the other information set forth in this Disclosure Statement (and the documents delivered together herewith and/or incorporated by reference herein), before deciding whether to vote to accept or reject the Plan.  These risk factors should not, however, be regarded as constituting the only risks associated with the Plan and its implementation.

### A.    Risks of the Chapter 11 Plan Generally

#### 1.    Claims Estimations

There can be no assurance that any estimated Claim amounts set forth in this Disclosure Statement are correct. The actual Allowed amount of Claims likely will differ in some respect from the estimates set forth in this Disclosure Statement. The estimated amounts are subject to certain risks, uncertainties, and assumptions. Should one or more of these risks or uncertainties materialize, or should any underlying assumptions prove incorrect, the actual Allowed amount of Claims may vary from those estimated herein.

#### 2.    Modifications to Retiree Benefits

There can be no assurance that the Bankruptcy Court will determine that the modifications to Retiree Benefits proposed by the Plan satisfies section 1114 of the Bankruptcy Code.

#### 3.    Status of Laws Governing Health Insurance

The laws governing health insurance have undergone enormous change in recent years, and there can be no assurance that relevant federal, state, or local laws, regulations, or conditions will remain the same or not change in a way that materially disadvantages Retirees.

#### 4.    Conditions Precedent to Consummation

The Plan provides for certain conditions that must be satisfied (or waived) prior to the Effective Date. As of the date of this Disclosure Statement, there can be no assurance that any or all of the conditions in the Plan will be satisfied (or waived). Accordingly, even if the Plan is confirmed by the Bankruptcy Court, there can be no assurance that the Plan will be consummated or that the Effective Date will occur.

#### 5.    Confirmation Risk

Even if creditors vote in numbers and amounts sufficient to confirm the Plan, the Bankruptcy Court may choose not to confirm the Plan.

### B.    Risks Related to the TKNA Settlement Agreement

The Plan is predicated upon TKNA performing under the TKNA Settlement Agreement, which requires significant future cash payments secured in part by the Letter of Credit. There can be no assurance that TKNA will continue to be financially sound or continue to perform under the TKNA Settlement Agreement.  In the event that TKNA does not satisfy its obligations under the TKNA Settlement Agreement, there is a risk that the UAW VEBA will not be fully funded as contemplated under the Plan. Although, there can be no assurance that TKNA will have sufficient resources to satisfy any demand made or judgment obtained against TKNA, the TKNA Settlement Agreement includes certain protections against nonpayment, including (a) an

63

acceleration provision upon default; (b) the Letter of Credit described above; and (c) a requirement that TKNA make an annual equity certification and financial disclosures. In addition, the Chief Restructuring Officer conducted diligence into TKNA's financial wherewithal to satisfy its obligations under the TKNA Settlement Agreement.

## C.    Risks Related to Proposed Treatment of Asbestos Claims

There is no guarantee that the Bankruptcy Court will approve the treatment of Asbestos Claims, including, without limitation, the Plan and injunction provisions that limit recovery of future Asbestos Claims to the Asbestos Funds and proceeds of Asbestos Insurance Policies.

## D.    Risks of Alternatives to the Plan

Alternatives to the Plan are discussed below in Article XII of the Disclosure Statement. Failure to confirm the Plan imposes significant risks on creditors and the Estate, including those discussed below.

### 1.    Risk of Litigating Claims Proposed to be Compromised by the Plan

Failure to compromise the Claims and Causes of Action compromised by the TKNA Settlement Agreement is risky. The Causes of Action against TKNA and others that would be compromised by the TKNA Settlement Agreement are large and complex claims that may take years to litigate at significant cost and expense. During this time, the Estate would reserve amounts for continued litigation of such Claims, and likely would establish a reserve in the event that Claims of TKNA are Allowed as a result of such litigation (which is discussed further below). Many of the litigation targets already have indicated defenses to the Causes of Action that would be asserted against them, and certain of the litigation targets have filed claims against the Debtor that may reduce or offset, in some cases, in their entirely, any damages otherwise obtained. Litigation is inherently risky and there is no assurance that any Cause of Action will be successful and lead to an award of damages for the Estate.

### 2.    Risk that Pension Plans are Terminated

If the TKNA Settlement Agreement is not approved and the Plan is not confirmed, it is possible that TKNA would not assume the Pension Plans. In that event, because the Debtor will not continue to fund the Pension Plans, it is possible that the PBGC will initiate a termination of the ERISA Pension Plans. In the event of a termination of the ERISA Pension Plans, (1) the PBGC would assume responsibility for the payment of benefits under the ERISA Pension Plans, (2) it is possible that some Retirees' benefits under the ERISA Pension Plans would exceed the statutory maximum guaranteed by the PBGC, which may result in reduced amounts of benefits being paid to such Retirees, (3) the PBGC likely would pursue significant Claims against the Debtor (to the extent permitted under applicable law) and its Affiliates under ERISA, (4) certain of the Affiliates likely would pursue contribution Claims filed against the Debtor in the Bankruptcy Case, (5) it is likely that one or more of the foregoing Claims would be Allowed in an aggregate amount that may exceed $300 million, and (6) Allowance of such Claim(s) would materially reduce Distributions to holders of other Allowed Claims, including Retirees.

### 3.    Risk that TKNA Claims are Allowed

If the TKNA Settlement Agreement is not approved, then TKNA would not waive its Claims against the Debtor and likely would pursue such Claims in litigation with the Estate. It is

possible that TKNA's Claim would be allowed, potentially in a material amount. If Allowed, such a Claim may reduce any award the Estate ultimately may obtain against TKNA, and likely would reduce Distributions on account of other Allowed Claims.

## XI.  CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

THE U.S. FEDERAL INCOME TAX CONSEQUENCES APPLICABLE TO THE IMPLEMENTATION OF THE PLAN ARE COMPLEX AND NOT FREE FROM DOUBT. THE DEBTOR DOES NOT INTEND TO SEEK A RULING FROM THE INTERNAL REVENUE SERVICE. THIS SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND DOES NOT ADDRESS THE U.S. FEDERAL INCOME TAX CONSEQUENCES TO HOLDERS OF CLAIMS AGAINST OR EQUITY INTERESTS IN THE DEBTOR. EACH HOLDER OF A CLAIM OR EQUITY INTEREST IS URGED TO CONSULT HIS, HER, OR ITS OWN TAX ADVISOR FOR THE U.S. FEDERAL, STATE, LOCAL, AND FOREIGN TAX CONSEQUENCES OF THE PLAN TO SUCH HOLDER.

### A.  U.S. Federal Income Tax Consequences to the Debtor

#### 1.  Introduction

The following discussion is a summary of certain U.S. federal income tax consequences of the consummation of the Plan to the Debtor. This summary is based on the Internal Revenue Code of 1986, as amended (the "Code"), the U.S. Treasury Regulations promulgated thereunder, judicial authorities, published administrative positions of the IRS and other applicable authorities, all as in effect on the date of this Disclosure Statement and all of which are subject to change or differing interpretations, possibly with retroactive effect.

This summary does not discuss the U.S. federal income tax consequences of the Plan to holders of Claims against or Equity Interests in the Debtor.

#### 2.  Discussion of Potential Tax Consequences of TKNA Settlement Agreement

The Settlement Payments made by TKNA to the UAW VEBA and the E&A VEBA should be treated for U.S. federal income tax purposes as tax-free capital contributions made by TKNA to the Debtor followed by the Debtor's payment of these amounts to the UAW VEBA and the E&A VEBA, and the Settlement Payments should be deductible by the Debtor.

The IRS might view the Settlement Payments as TKNA's capital contribution to the Debtor of a debt instrument consisting of a promise to pay in installments without interest. In that case, the IRS could compute the principal amount of the debt instrument as equal to the present value of the installment payments discounted at the mid-term Applicable Federal Rate (currently 1.67 percent), with the difference being so computed constituting original issue discount, accruable in income over the installment payment period.

TKNA's assumption of the ERISA Pension Plans should not give rise to taxable income to the Debtor. Because TKNA is jointly and severally liable for those obligations, the assumption could be viewed as the satisfaction of TKNA's own obligation. In addition, even if TKNA is treated as assuming the Debtor's obligations with respect to the ERISA Pension Plans, the

Debtor ought not to be treated as realizing cancellation of indebtedness income ("<u>COD income</u>") under a Code exception that provides that COD income is not recognized to the extent that the payment of the liability would have given rise to a deduction. The Debtor is not entitled to deduct amounts it owes its Pension Plans prior to payment and, therefore, this exception should be available to it.

**B.      U.S. Federal Income Tax Implications to the VEBAs**

To qualify as tax-exempt trusts, each of the Retiree VEBAs must obtain a favorable determination letter recognizing such VEBA's tax-exempt status from the IRS. The application for a determination letter may be submitted to the IRS at any time within fifteen months of the VEBA's establishment. Although it is possible that the IRS might decline to issue such a favorable determination letter, the Debtor believes that the Retiree VEBAs would meet the requirements to obtain determination letters from the IRS. Contributions could be made to the Retiree VEBAs from time to time and benefits could be paid from the Retiree VEBAs prior to the receipt of the determination letters.

**C.      U.S. Federal Income Tax Consequences to Retirees**

The Debtor believes that payments to Retirees from the Retiree VEBAs to reimburse the Retirees for otherwise unreimbursed health insurance premiums and qualified medical expenses should not be included in the Retirees' taxable income and, therefore, should not be subject to federal income taxation. Qualified medical expenses are medical expenses that the IRS allows taxpayers to deduct from taxable income for the year under IRC Section 213. Medical expenses are expenses paid for the costs of diagnosis, cure, mitigation, treatment or prevention of disease, and the costs for treatments affecting any part or function of the body. The expenses must be primarily to alleviate or prevent a physical or mental defect or illness, and not just for the benefit of general health. Some examples of qualified medical expenses include copayments for doctors' visits or prescription drugs, any amounts for medical care not covered by health insurance such as cost-sharing or expenses for services not covered under a health plan, and medical devices and equipment such as crutches, hearing aids, or prosthetic devices.

### XII.    FEASIBILITY OF THE PLAN, BEST INTERESTS OF CREDITORS, AND CONFIRMATION OF THE PLAN WITHOUT CONSENT OF ALL CREDITORS

**A.      Feasibility of the Plan**

In connection with confirmation of the Plan, the Bankruptcy Court will be required to determine that the Plan is feasible pursuant to section 1129(a)(11) of the Bankruptcy Code, which means that the confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtor. Because the Plan provides for the structured liquidation of the Debtor's assets and Distribution of the proceeds to creditors, the Debtor asserts that the Plan is feasible.

**B.      Acceptance of the Plan**

As a condition to Confirmation, the Bankruptcy Code requires that each Class of Impaired Claims vote to accept the Plan, except under certain circumstances.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds ($^2/_3$) in dollar amount and more

than one-half ($^1/_2$) in number of Allowed claims in that class that actually voted to accept or to reject the Plan. Holders of Claims who fail to vote are not counted as either accepting or rejecting the Plan.

## C.    Best Interests Test

Even if a plan is accepted by each class of Claims, the Bankruptcy Code requires a bankruptcy court to determine that the plan is in the best interests of all holders of claims or interests that are impaired by the plan and that have not accepted the plan.  The "best interests" test, as set forth in section 1129(a)(7) of the Bankruptcy Code, requires a bankruptcy court to find either that all members of an impaired class of claims or interests have accepted the plan or that the plan will provide a member who has not accepted the plan with a recovery of property of a value, as of the effective date of the plan, that is not less than the amount that such holder would recover if the debtor were liquidated under chapter 7 of the Bankruptcy Code.

A Chapter 7 liquidation would produce no greater liquidation proceeds than the proceeds that will be produced under the Plan. Moreover, the Debtor believes that costs and expenses incurred by a Chapter 7 trustee and his professionals in liquidating and administering the Estates would be duplicative of work already performed by the Debtor and his professionals. Accordingly, the Debtor believes that the "best interests" test of section 1129 of the Bankruptcy Code is satisfied.

## D.    Confirmation Without Consent to Modify Retiree Benefits

The Plan modifies Retiree Benefits provided to UAW Retirees and E&A Retirees, and changes the obligations of the Debtor from "defined benefit" obligations to "defined contribution" obligations. Under the Plan, Plan Cash is distributed to Retirees through the mechanism of Retiree VEBAs. The Debtor has reached agreement with the E&A Retiree Committee about the terms of an E&A Section 1114 Agreement modifying E&A Retiree Benefits in a manner consistent with the terms of the Plan. The Debtor has sought entry of a UAW Section 1114 Order modifying the UAW Retiree Benefits over the UAW's objection. Accordingly, the Debtor believes that the Plan satisfies section 1129(a)(13) of the Bankruptcy Code.

## E.    Confirmation Without Acceptance of All Impaired Classes: "Cramdown"

In the event any Class of Impaired Claims rejects the Plan, the Debtor may seek confirmation of the Plan pursuant to the "cramdown" provisions of the Bankruptcy Code.

## XIII.   ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

The Debtor believes that the Plan is fair and equitable and in the best interests of all holders of Claims. If, however, the requisite acceptances are not received, or the Plan is not confirmed and consummated, the theoretical alternatives include: (a) formulation of an alternative plan or plans of reorganization; (b) liquidation of the Debtor under chapter 7 of the Bankruptcy Code; or (c) an extended stay of the Debtor in chapter 11 to allow the Debtor to pursue Causes of Action against TKNA and others prior to exiting chapter 11.

## A. Alternative Plan(s) of Reorganization

If the requisite acceptances are not received or if the Plan is not confirmed, the Debtor or any other party in interest could attempt to formulate and propose a different plan or plans of reorganization. An alternative Plan may not provide for the Settlement Payments and other benefits provided by the TKNA Settlement Agreement. An alternative chapter 11 plan predicated on litigation with TKNA and others would be subject to the risk, cost, delay and uncertainty of litigation discussed above and below. Moreover, while an alternative chapter 11 plan was developed, the Debtor would continue to incur professional costs in the Bankruptcy Case. The Debtor believes that the Plan allows creditors to realize the greatest possible value under the circumstances.

## B. Litigation of Affiliate Claims

If the Plan does not become effective, it is possible for the Debtor to remain in chapter 11 administration while it pursues its Causes of Action against TKNA and others. The benefit of such a course of action would be to allow the Estate to liquidate potentially valuable Causes of Action. Continued administration in chapter 11, however, is expensive and risks the benefits available to the Debtor under the TKNA Settlement Agreement. Moreover, litigation is inherently uncertain and risky. Among other risks, risks of litigation of the Causes of Action that would otherwise be settled and compromised under the TKNA Settlement Agreement include the following:

> 1.      The Cash proceeds of the Causes of Action against the TKNA Released Parties net of fees and expenses could be less, and perhaps materially less, than the value that TKNA will provide under the TKNA Settlement Agreement.

> 2.      The Cash available for Distribution to Retirees and other creditors after such litigation may be insufficient to provide the same or similar benefits to those that would be available to Retirees for their lifetimes under the Plan.

> 3.      If such litigation were to commence, TKNA may not assume the Pension Plans, which could give rise to a multi-hundred million dollar Claim in favor of the PBGC. The PBGC Claims, if allowed, would share *pro rata* with recoveries to other unsecured creditors (including Retirees) and would materially diminish the amount of Cash the Estate would have to pay for Retiree Benefits.

The Debtor believes that the relative certainty of the Retiree's recovery under the Plan, namely projected lifetime Retiree Benefits at meaningful levels that are comparable to those currently being provided to Retirees, is preferable to engaging in expensive, lengthy, and risky litigation.

## C. Interim Modification of Retiree Benefits

If the Plan is not confirmed the Debtor may seek to modify benefits under section 1114 of the Bankruptcy Code to conserve its remaining Cash while in chapter 11. Any such modification would reduce Retiree Benefits (compared to the Retiree Benefits provided now) and there would be no assurance that such modified benefits would continue for the foreseeable lives of all Retirees or would not be subject to further modification after the Debtor realized or failed to realize value on account of its non-Cash assets.

The Debtor cannot indefinitely sustain its current level of Retiree Benefits without obtaining recoveries from Causes of Action by way of settlement or litigation that are substantially greater than even the $300 million plus provided under the TKNA Settlement Agreement. If the Retiree Benefits are not modified, many Retirees will end up receiving no healthcare benefits from the Debtor. Furthermore, the healthcare benefits will cease when the Retirees are at a more advanced age and most financially vulnerable. The Debtor's current proposal to provide modified benefits through VEBAs with HRAs for most Retirees will provide greater flexibility for Retirees in choosing benefits, regardless of how much additional funding is received on account of a TKNA settlement or, if none, proceeds of the Causes of Action. In short, the VEBA structure is a more efficient way to provide healthcare benefits to Retirees, and assures that the Retirees will receive meaningful benefits for a very long time.[24] Thus, the modifications are necessary to assure long-term healthcare benefits for the Retirees.

**D.     Litigation of Retiree Benefit Issues**

Certain of the plans that provide Retiree Benefits to the Retirees include provisions that the Debtor asserts may permit it to amend, modify, and/or terminate Retiree Benefits provided thereunder. Under these provisions, the Debtor may have the right to reduce or terminate Retiree Benefits to a significant majority of Retirees. Under the Plan, the Retiree VEBAs will not include any provisions that allow for modification by the Debtor, and Retiree Benefits as modified by the Plan will not be subject to future modification or termination by the Debtor under the terms of the Retiree VEBAs. If the Plan is not confirmed, the Debtor may seek to amend, modify or terminate Retiree Benefits currently provided, either in accordance with section 1114 of the Bankruptcy Code or under other applicable law.

**E.     Liquidation under Chapter 7**

If the Plan is not confirmed or does not become effective, the Debtor's case may be converted to a case under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be elected or appointed to liquidate the Debtor's assets for distribution in accordance with the priorities established by the Bankruptcy Code. The Debtor believes that a liquidation under chapter 7 is inferior to the Plan because, among other reasons: (1) a Chapter 7 trustee would incur additional costs and expenses of liquidation; (2) section 1114 of the Bankruptcy Code is not applicable to cases under chapter 7 of the Bankruptcy Code, thus (a) the UAW and the Retire Committee would lose their respective status as Retiree representatives and Retirees would not have the benefit of their official standing and representation, (b) a Chapter 7 trustee would not be

---

[24] Pursuant to the proposed modifications, Budd's current cash allocable to Retiree healthcare will be transferred out of Budd's control to the VEBAs for the provision of future healthcare benefits and the current benefits plans will be terminated. The alternative – leaving the current plans in place – leaves Budd in control of those plans (and the cash).  Arguments exist that these plans, by their own terms, might be terminable at Budd's discretion, which could result in the termination  of the Retirees' health benefits if the requirements of § 1114 of the Bankruptcy Code are satisfied. Accordingly, without modifications proposed by the Debtor, a scenario exists where in the future many, most, or all Retirees could be left without any healthcare benefits.

able to continue to pay Retiree Benefits under section 1114 of the Bankruptcy Code, and (c) a Chapter 7 trustee would not be able to modify Retiree Benefits under section 1114 of the Bankruptcy Code, likely rendering Cash Distributions to Retirees taxable; (3) conversion to Chapter 7 would remove the Debtor from the TKNA Tax Group, thus destroying the value to the TKNA Tax Group of the Debtor's future tax losses, the payment for which pursuant to the Debtor's Actual Tax Sharing Agreement constitutes a significant basis of the TKNA Settlement Agreement and a significant basis of potential recovery under an alternate chapter 11 plan; and (4) Chapter 7 would disenfranchise creditors, who currently have a right to vote on a plan that will determine how the significant Cash and valuable Causes of Action will be administered for their benefit.

Also attached as **Exhibit 4** is a detailed Liquidation Analysis.

## XIV.   THE SOLICITATION ORDER AND DISPUTED CLAIMANTS

### A.   Solicitation Order

Upon approval of this Disclosure Statement, the Bankruptcy Court entered an order that, among other things, determines the dates, procedures and forms applicable to the process of soliciting votes on the Plan and establishes certain procedures with respect to the tabulation of such votes (the "Solicitation Order"). Parties in interest may obtain a copy of the Solicitation Order through the Bankruptcy Court's electronic case filing system, by downloading the Solicitation Order from the Debtors' case website at http://dm.epiq11.com/TBC or by making written request upon the Debtors' counsel or the Balloting Agent.

### B.   Voting Rights of Disputed Claimants

Holders of Claims in Class 6 that are (a) asserted as wholly unliquidated or wholly contingent in Proofs of Claim filed prior to the Distribution Record Date or (b) whose Claims are asserted in Proofs of Claim as to which an objection to the entirety of the Claim is pending as of the Distribution Record Date are not permitted to vote to accept or reject the Plan except as provided in the Solicitation Order. Pursuant to the procedures outlined in the Solicitation Order, Disputed Claimants may obtain a Ballot for voting on the Plan only by filing a motion under Bankruptcy Rule 3018(a) seeking to have their Claims temporarily Allowed for voting purposes (a "Rule 3018 Motion"). Any such Rule 3018 Motion must be filed and served upon counsel to the Debtor and the Balloting Agent no later than _____. The Ballot of any creditor filing such a motion will not be counted unless temporarily allowed by the Bankruptcy Court for voting purposes, after notice and a hearing.

## XV.   RECOMMENDATION AND CONCLUSION

For all of the reasons set forth in this Disclosure Statement, the Debtor believes that confirmation and consummation of the Plan is preferable to all other alternatives and urges all holders of Claims in Classes 3 through 8 to vote to ACCEPT the Plan and to complete and return their ballots so that they will be RECEIVED on or before _____.

Dated: March 1, 2016


**PROSKAUER ROSE LLP**                           The Budd Company, Inc.

Jeff J. Marwil (IL 6194054)
Jeremy T. Stillings (IL 6279868)
Brandon W. Levitan (IL 6303819)                  <u>x /s/Carl S. Lane</u>
70 W. Madison St., Suite 3800
Chicago, IL 60602                                     By:  Carl S. Lane
Phone:  (312) 962-3550
Facsimile:  (312) 962-3551                       Its:  Chief Restructuring Officer


*Counsel for Debtor*