# EXHIBIT B

*__Not approved by the Bankruptcy Court.__*

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| THE BUDD COMPANY, INC., | ) | Case No. 14 B 11873 |
| | ) | |
| Debtor. | ) | |

**DISCLOSURE STATEMENT FOR ~~EIGHTH~~NINTH AMENDED CHAPTER 11 PLAN**

**FOR THE BUDD COMPANY, INC. DATED ~~APRIL 27,~~MAY 4, 2016**

<div style="border:1px solid black">

**THIS DISCLOSURE STATEMENT IS A DRAFT.  IT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT.  IT IS NOT BEING USED TO SOLICIT VOTES FOR THE PLAN AT THIS TIME.  IF THE BANKRUPTCY COURT APPROVES THIS DISCLOSURE STATEMENT, IT WILL BE CIRCULATED AT A LATER DATE.**

</div>

*Not approved by the Bankruptcy Court.*

*__Not approved by the Bankruptcy Court.__*

### DISCLAIMER

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS INCLUDED FOR PURPOSES OF SOLICITING VOTES IN FAVOR OF THE ~~EIGHTH~~NINTH AMENDED CHAPTER 11 PLAN FOR THE BUDD COMPANY, INC. (THE "DEBTOR" OR "BUDD") DATED ~~APRIL 27,~~MAY 4, 2016 (AS IT MAY BE AMENDED, THE "PLAN"). THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN. NO PERSON MAY GIVE ANY INFORMATION OR MAKE ANY REPRESENTATIONS, OTHER THAN THE INFORMATION AND REPRESENTATIONS CONTAINED IN THIS DISCLOSURE STATEMENT OR OTHERWISE AUTHORIZED BY THE BANKRUPTCY COURT, TO SOLICIT VOTES IN FAVOR OF THE PLAN.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE UNITED STATES BANKRUPTCY CODE AND RULE 3016 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE.  PERSONS OR ENTITIES TRADING IN OR OTHERWISE PURCHASING, SELLING OR TRANSFERRING CLAIMS OF THE DEBTOR AND DEBTOR IN POSSESSION IN THIS CASE SHOULD EVALUATE THIS DISCLOSURE STATEMENT AND THE PLAN IN LIGHT OF THE PURPOSE FOR WHICH THEY WERE PREPARED.

# GUIDE TO INTRODUCTION

| | | |
|---|---|---|
| **I.** | **Information for Retirees About The Budd Company, Inc. Bankruptcy Plan.** | **I-1** |
| | A. Why the Debtor Filed for Bankruptcy | I-1 |
| | B. Retiree Representation | I-1 |
| | C. Support for the Plan | I-1 |
| | D. If the Plan is Confirmed, the Following Will Occur | I-1 |
| | E. The Choice Between Settlement and Litigation | I-12 |
| | F. The Consequences of Rejecting the Plan and TKNA Settlement Agreement | I-13 |
| | G. The Debtor's Independent Director and Chief Restructuring Officer, the E&A Retiree Committee, and the UAW Support the Plan and TKNA Settlement Agreement for Several Reasons | I-13 |
| **II.** | **Information for Holders of Asbestos Claims About The Budd Company, Inc. Bankruptcy Plan** | **II-14** |
| | A. Treatment of Asbestos Claims under the Plan | II-14 |
| |     i. Holders of Insured Asbestos Claims | II-14 |
| |     ii. Holders of Uninsured Asbestos Claims | II-14 |
| | B. The Choice Between the TKNA Settlement Agreement and Litigation | II-14 |
| | C. The Consequences of Rejecting the Plan and TKNA Settlement Agreement | II-15 |
| | D. The Asbestos Committee, the Debtor's Independent Director, and the Debtor's Chief Restructuring Officer Support the Plan and the TKNA Settlement Agreement | II-16 |
| **III.** | **The State of the Bankruptcy Case and the Plan** | **III-18** |
| | A. Budd's Assets and Liabilities | III-18 |
| | B. Voting for or against the Plan | III-18 |
| |     i. The Choice | III-18 |
| |     ii. Distribution of Budd's Assets under the Plan | III-19 |
| |     iii. Recommendation of Budd's Independent Director and Chief Restructuring Officer, the E&A Retiree Committee, the UAW, and the Asbestos Committee | III-20 |

*__Not approved by the Bankruptcy Court.__*

## I.      Information for Retirees About The Budd Company, Inc. Bankruptcy Plan

The following is a summary of what retirees of The Budd Company, Inc. ("Budd" or the "Debtor") will receive on account of their pensions and what type of health and prescription drug and other insurance will be available if the ~~Eighth~~Ninth Amended Chapter 11 Plan (the "Plan") is confirmed. **SECTION III CONTAINS A FURTHER SUMMARY OF THE DISCLOSURE STATEMENT, ENTITLED "THE STATE OF THE BANKRUPTCY CASE AND THE PLAN," AND A TABLE OF CONTENTS FOR THE DISCLOSURE STATEMENT TO AID YOU IN YOUR REVIEW. FOR MORE INFORMATION ON ANY TOPIC OR QUESTION, PLEASE READ THE DISCLOSURE STATEMENT ITSELF.**

A.      ***Why The Debtor Filed For Bankruptcy.*** The Debtor has not operated any businesses since 2006 and it sold its last operating subsidiary in 2012. Presently, the Debtor estimates that it will be holding approximately $252 million of cash as of August 1, 2016. Prior to filing for bankruptcy, the Debtor used its cash primarily to pay health, drug, vision, dental and life benefits to its retirees and to make required payments to its ERISA Pension Plans and Supplemental Executive Retirement Plan ("SERP"). The Debtor estimates that, absent a change in the benefits currently paid to retirees or an unforseeable infusion of cash, it will run out of cash by 2021 and at that time will not be able to meet its obligations to its retirees. The Debtor filed bankruptcy to address this problem.

B.      ***Retiree Representation.*** After the bankruptcy case was filed, the United States Trustee appointed four executive and administrative retirees and one surviving spouse to the "E&A Retiree Committee" to represent the interests of the Debtor's executive and administrative "E&A" retirees. The UAW elected to represent the interests of the UAW Retirees, as provided for in the Bankruptcy Code.

The UAW and the  E&A Retiree Committee conducted an investigation of the Debtor's financial and other relationships with its parent corporation, ThyssenKrupp North America, Inc. ("TKNA") and other ThyssenKrupp entities, including ThyssenKrupp AG. As a result of that investigation, the E&A Retiree Committee and the Debtor entered into a Settlement Agreement with TKNA. The UAW subsequently entered into a settlement agreement with ThyssenKrupp Finance USA, Inc. ("TK Finance"). The additional consideration that will be provided under those agreements forms the basis for the Plan and will fund the benefits described below. The reasons why the E&A Retiree Committee and the UAW support these settlements and the Plan over litigation against TKNA and its related companies is explained in paragraphs E-G below.

C.      ***Support for the Plan.*** Both the E&A Retiree Committee and the UAW support the Plan and urge retirees to vote to accept the Plan.

D.      **If the Plan is confirmed, the following will occur:**

***If you are an E&A Retiree or UAW Retiree who currently receives a pension from the Debtor***, the Plan provides that you will continue to receive your pension payments with

no interruption. If the Bankruptcy Court approves the Plan, TKNA will assume full responsibility for and sponsorship of the Debtor's ERISA Pension Plans.

*If you are an E&A Retiree who currently receives retirement benefits through a SERP* from the Debtor, the Plan provides that you will continue to receive your SERP benefits with no interruption. If the Bankruptcy Court approves the Plan, TKNA will assume full responsibility for the SERP and continue to make payments to those retirees receiving SERP benefits.

*If you are an E&A Retiree who is currently receiving medical, vision, hearing, prescription drug, dental or life insurance* from the Debtor, the Plan provides that you will continue to receive these benefits in a modified form. If the Bankruptcy Court approves the Plan, the Debtor will stop providing these benefits under the current E&A Retiree Benefits plan and, in its place, the Debtor will establish what is commonly called a VEBA for E&A Retirees (the "E&A VEBA"). A VEBA is a form of trust fund that is permitted under federal tax laws to hold money to be used to provide health and welfare benefits to retirees. The E&A VEBA will receive $70 million in cash, and will use those funds, along with retiree payments and any investment earnings, to provide medical/vision.hearing, prescription drug, and dental benefits and life insurance to the E&A Retirees.

● *When will the new benefits start for E&A Retirees and what will happen before that date?* The expected start date for this new program is August 1, 2016 (the "E&A VEBA Effective Date"), but it may be sooner or later, depending on when the Bankruptcy Court rules on the Plan. E&A Retirees will continue to receive healthcare benefits and life insurance from the Debtor under the current E&A benefits plan until the E&A VEBA Effective Date.

● *What do I have to do to receive benefits from the E&A VEBA?* Nothing. As of the E&A VEBA Effective Date, E&A Retirees will be automatically enrolled for the same coverage that they are receiving from the Debtor. For example, assuming the E&A VEBA Effective Date is August 1, 2016, if on July 31, 2016, you were enrolled to receive all four types of coverage that the Debtor currently offers to E&A Retirees (1) medical/vision/hearing, (2) prescription drug, (3) dental, and (4) life insurance, you will automatically be enrolled on August 1, 2016 to receive the same types of coverage from the E&A VEBA. If your monthly payments for this coverage are currently being deducted from your pension checks, that will continue after the start date and the payments will be sent to the E&A VEBA. If you are currently billed for your coverage, you will receive monthly bills from the E&A VEBA. If you do not receive benefits from the Debtor as of the E&A VEBA Effective Date, you will not be able to receive benefits from the E&A VEBA.

● *Can I change the types of coverage I receive or join the E&A VEBA plans after the E&A VEBA Effective Date?* After the E&A VEBA Effective Date, an E&A Retiree will only be able to drop coverage and will not be able to add

additional coverage. In addition, the E&A VEBA will only offer coverage to E&A Retirees actually receiving coverage as of the E&A VEBA Effective Date from the Debtor's E&A Retiree Benefits plan and only for the same type of coverage that such E&A retiree is receiving from the Debtor's E&A Retiree Benefits plan. For example, assuming the E&A VEBA Effective Date is August 1, 2016, if on July 31, 2016, you had elected to receive only prescription drug and dental coverage and were not enrolled for medical/vision/hearing coverage, then on August 1, 2016 and thereafter, you would only be eligible to continue to receive prescription drug or dental coverage and would not be eligible to enroll for medical/vision/hearing coverage. The only changes you could make after the E&A VEBA Effective Date would be to drop the prescription drug or dental coverage or both. You would not be eligible to enroll for medical/vision/hearing coverage. Currently E&A Retirees receive life insurance coverage at no additional charge.

● **What is the Coverage?**  The following tables set forth certain key information about the coverage that the E&A VEBA will provide to E&A Retirees for the balance of 2016 and for calendar year 2017. On an annual basis, beginning for the calendar year 2018, the E&A VEBA will re-evaluate the types of coverage, the design of the benefits plans, and the amounts that E&A Retirees are required to pay for the coverage. There are no guarantees that the types of coverage, the particular benefits offered or the amounts charged to E&A Retirees for such coverage will not change after 2017.

The Debtor classified E&A Retirees into two groups for purposes of determining what an E&A Retiree would be required to pay to participate in the Debtor's E&A Retiree Benefit plans and those groups were known as the "Grandfathered" and "Non-Grandfathered" E&A Retirees. Those two classifications will continue under the E&A VEBA.

In summary, the E&A VEBA will initially provide medical/vision/hearing and prescription drug benefits to the Post-Medicare E&A Retirees through a Blue Cross Blue Shield of Michigan Medicare advantage plan. The E&A VEBA will provide pre-Medicare E&A Retirees with medical/vision/hearing and prescription drug benefits through a Blue Cross Blue Shield of Michigan self-insured group plan with stop loss insurance for claims in excess of $100,000, which means that the insurer, and not the E&A VEBA, will be responsible for paying the portion of any claim that exceeds $100,000. The E&A Retiree Committee has obtained Blue Cross Blue Shield of Michigan's agreement to waive the annual deductible for 2016 and to reduce the yearly out-of-pocket maximums for 2016.  The dental plan will be a self-insured plan offered through Unicare or another comparable provider. The E&A VEBA will purchase life insurance coverage through Unicare or another comparable provider.  The life insurance coverage amount will be at the same dollar amount as the E&A Retiree would have received under the Debtor's E&A Retiree Benefit plan and is provided at no cost to the retiree for 2016-2017. A summary plan description will be sent to you by the E&A VEBA providing                               further                               information.

3

| | 2016 Budd Premier Plan for E&A Retirees | | E&A VEBA Premier Plan for 2016-2017 | |
|---|---|---|---|---|
| | Over 65 (Medicare) | Under 65 | Over 65 (Medicare) | Under 65 |
| **Monthly Premiums for Grandfathered Retirees** | $128.01 (Single) or $256.02 (Two-Person) (including both health/vision/hearing and prescription drug) | $151.55 (Single) or $255.93 (Two-Person) (including both health/vision/hearing and prescription drug) | $128.01 (Single) or $256.02 (Two-Person) (including both health/vision/hearing and prescription drug) | $151.55 (Single) or $255.93 (Two-Person) (including both health/vision/hearing and prescription drug) |
| **Monthly Premiums for Non-Grandfathered Retirees** | Premiums offset by Fixed Dollar Credits based on Budd Years of Service . | Premiums offset by Fixed Dollar Credits based on Budd Years of Service. | No change in cost to the E&A Non-grandfathered retiree | No change in cost to the E&A Non-grandfathered retiree |
| **Office Visit Copayment** | $35 | $35 | $35 | $35 |
| **Retiree Coinsurance** | Approximately 2% (10% After Medicare Payment) | 10% | 10% of all charges except items with fixed copayments | 10% |
| **Yearly Deductible (Per Person)** | $250 after Medicare Payments | $250 | $250 of **All** charges except office visits (waived for 2016) | $250 (waived for 2016) |
| **Yearly Out of Pocket Maximum (Per Person)** | $1,500 not including deductible and copayments (for medical and prescription drug) | $1,500 not including deductible and copayments (for medical and prescription drug) | $1,500 including deductible (does not apply to prescription drug) (will be reduced for 2016 partial year) | $1,500 not including deductible and copayments (for medical and prescription drug) (will be reduced for 2016 partial year) |
| **Prescription Drugs** Retail (30 Day) | | | | |
| Generic | $10 | $10 | $10 | $10 |
| Preferred Brand | $20 | $20 | $20 | $20 |
| Non-Preferred   Brand | $30 | $30 | $20 | $20 |
| Mail Order (90 Day) | | | | |
| Generic | $20 | $20 | $20 | $20 |
| Preferred Brand | $50 | $50 | $40 | $50 |
| Non-Preferred Brand | $60 | $60 | $40 | $60 |

4

| | 2016 Budd Premier Plan for E&A Retirees | | E&A VEBA Premier Plan for 2016-2017 | |
| --- | --- | --- | --- | --- |
| | 2016 Budd Standard Plan for E&A Retirees[1] | | E&A VEBA Standard Plan for 2016-2017 | |
| | Over 65 (Medicare) | Under 65 | Over 65 (Medicare) | Under 65 |
| **Monthly Premiums for Non-Grandfathered Retirees** | Premiums offset by Fixed Dollar Credits based on Budd Years of Service | Premiums offset by Fixed Dollar Credits based on Budd Years of Service. | No change in cost to the E&A Non-grandfathered retiree | No change in cost to the E&A Non-grandfathered retiree |
| **Office Visit Copayment** | $35 | $35 | $35 | $35 |
| **Retiree Coinsurance** | 10% | 20% | 10% of all charges except items with fixed copayments | 20% |
| **Yearly Deductible (Per Person)** | $250 before Medicare Payments | $2,000 | $250 of **All** charges except office visits (waived for 2016) | $2000 (waived for 2016) |
| **Yearly Out of Pocket Maximum (Per Person)** | $1,750 not including deductible and copayments (for medical and prescription drugs) | $5000 not including deductible and copayments (for medical and prescription drugs) | $1,750 including deductible (does not apply to prescription drug) (will be reduced for 2016 partial year) | $5,000 not including deductible (for medical and prescription drug) (will be reduced for 2016 partial year) |
| **Prescription Drugs** Retail (30 Day)    Generic    Preferred Brand    Non-Preferred Brand | $15 $60 $80 | $15 $60 $80 | $15 $60 $60 | $15 $60 $80 |
| Mail Order (90 Day)    Generic    Preferred Brand    Non-Preferred Brand | $30 $120 $160 | $30 $120 $160 | $30 $120 $120 | $30 $120 $180 |

---

[1] No Grandfathered Retirees participate in the Standard Plan.

5

|  | **2016 Budd Hearing and Vision Plans for E&A Retirees** | **E&A VEBA Hearing and Vision Plans for 2016-2017** |
|---|---|---|
| **Hearing Coverage** | | |
| Services covered:<br>  Audiometric Exam<br>  Hearing Aid<br>    Evaluation<br>  Hearing Aid<br>  Hearing Aid<br>    Conformity Test | 0% retiree coinsurance<br>(one every 36 months) | 0% retiree coinsurance<br>(one every 36 months) |
| Monaural Hearing<br>  Aid Dollar Max: | $1,500 | $1,500 |
| **Vision Coverage** | | |
| Services covered: | In-Network Copays | In-Network Copays |
| Eye Exams | $5 (one every 12 months) | $5 (one every 12 months) |
| Eyeglass Frames | $10 (one every 24 months) | $10 (one every 24 months) |
| Eyeglass Lenses | $10 (one copay for both lenses & frames) | $10 (one copay for both lenses & frames) |
| Contact Lenses –<br>  prescribed not<br>  medically necessary | $130 allowance (one every 12 months) | $130 allowance (one every 12 months) |
| Contact Lenses –<br>  medically necessary | Covered at 100% (one every 12 months) | Covered at 100% (one every 12 months) |

| | 2016 Dental Plan for E&A Retirees | | E&A VEBA Dental Plan for 2016-2017 | |
|---|---|---|---|---|
| | Over 65 (Medicare) | Under 65 | Over 65 (Medicare) | Under 65 |
| **Monthly Premiums for Grandfathered Retirees** | $11.48 (Single) or $25.21 (Two-Person) | $13.32 (Single) or $29.33 (Two-Person) | $11.48 (Single) or $25.21 (Two-Person) | $13.32 (Single) or $29.33 (Two-Person) |
| **Monthly Premiums for Non-Grandfathered Retirees** | Premiums offset by Fixed Dollar Credits based on Budd Years of Service. | Premiums offset by Fixed Dollar Credits based on Budd Years of Service. | Premiums offset by Fixed Dollar Credits based on Budd Years of Service. | Premiums offset by Fixed Dollar Credits based on Budd Years of Service. |
| **Retiree Coinsurance** Preventive | 0% | 0% | 0% | 0% |
| Diagnostic, Therapeutic and Restorative | 20% | 20% | 20% | 20% |
| Prosthodontic and Orthodontic | 50% | 50% | 50% | 50% |
| **Deductible (per person)** | $50 (waived for preventive services & supplies) | $50 (waived for preventive services & supplies) | $50 (waived for preventive services & supplies) | $50 (waived for preventive services & supplies) |
| **Maximum Benefit** Calendar year maximum (excludes Orthodontia) | $1,300 | $1,300 | $1,300 | $1,300 |
| Lifetime maximum for Orthodontia | $1,400 | $1,400 | $1,400 | $1,400 |

● ***How long will the E&A VEBA be able to provide benefits to E&A Retirees?***
It is expected that the funds in the E&A VEBA will last for approximately twenty-five years, although depending on investment returns, the funds may run out either earlier or later. The average age of an E&A Retiree (including surviving spouses) is 78 years old and so for most E&A Retirees, the E&A VEBA should be able to provide coverage for the balance of their lives. Nonetheless, it is expected that the E&A VEBA will not have sufficient cash to provide coverage through the date on which the last E&A Retiree might be expected to pass. The alternative would be to increase the contributions required from E&A Retirees and/or reduce benefit levels to make the funds last for a longer period of time. The E&A Retiree Committee, in consultation with its health care experts, determined that it was more important to provide affordable benefits today to E&A Retirees. It also is important to note that it is not economically feasible to

administer a VEBA after the number of participating retirees drops below certain minimal levels.

- **How will the E&A VEBA be managed?** The E&A VEBA will be managed by a board of five trustees, which will initially be the current members of the E&A Retiree Committee (Jacqueline Delowery, Mercedes Godin, William Kroger, James Wahlman, and Thomas Whomsley). The members of the E&A Retiree Committee also will be the members of the E&A VEBA Committee, which E&A VEBA Committee will be the sponsor of the E&A VEBA. The E&A Retiree Committee has selected Central Data Services Inc. to serve as the third-party administrator for the E&A VEBA.

*If you are a UAW Retiree who is receiving medical, dental, vision, hearing or life insurance from Budd*, you will receive healthcare benefits in a modified form pursuant to the Bankruptcy Court's order. If the Bankruptcy Court approves the Plan and the TKNA Settlement Agreement, Budd will cease its sponsorship of the UAW Retiree Benefit plans. Instead, Budd will establish a VEBA for UAW Retirees (the "UAW VEBA"). The UAW VEBA will receive cash from Budd, including the proceeds of the TKNA Settlement Agreement (in addition to the cash provided by TK Finance pursuant to the TK Finance Settlement Agreement, as discussed below) and will use those funds to provide healthcare benefits to UAW Retirees. The expected start date for this new program is in the third quarter of 2016, but it may be sooner or later, depending on when the Bankruptcy Court rules on the Plan and the TKNA Settlement Agreement and the timing that the committee of UAW VEBA trustees  (the "UAW VEBA Committee") determines to be in your best interests. The UAW VEBA Committee will be comprised of five (5) individuals consisting of three (3) independent members, Suzanne Daniels, Francine Parker and Gary Petroni, with expertise in health care, employee benefits, asset management, human resources, labor relations, economics, and/or law, and two (2) additional members to be appointed by the UAW.

*If you have previously elected not to participate in Budd's healthcare plans* and have lost your eligibility to rejoin those plans, you will not be allowed to receive healthcare benefits through the VEBAs. Only UAW Retirees who are currently participating in Budd's current plans or who have retained the option under Budd's eligibility rules to rejoin the current plans, will be entitled to receive healthcare benefits from the UAW VEBA.

*Healthcare benefits for the UAW Retirees will remain in place at their current levels until modified by the trustees of the UAW VEBA Committee* (who have yet to be appointed). If the Debtor's Plan is approved, it is expected that this modification will occur no earlier than the third quarter of 2016. Before the start date, UAW Retirees will receive open enrollment materials and other materials required by law to enable you to make a decision about whether you want to participate in the new healthcare plan. The UAW VEBA Committee will have discretion to determine the delivery mechanism for your future health insurance benefits, and they may provide for different benefit structures for different groups of participants. Those benefits could include, in addition to medical

and prescription drug benefits, benefits such as dental benefits, long-term disability, vision benefits, and/or hearing benefits.

***It is anticipated that the UAW VEBA Committee will offer UAW Retirees initial benefits through group insurance*** similar in structure to the VEBAs that cover UAW Retirees of companies such as General Motors, Ford, Chrysler and Dana Corporation. The UAW VEBA Committee will have the ability to modify benefits based upon, among other things, the amount of money paid to the UAW VEBA, as well as other factors such as claim experience, medical and prescription drug inflation, earnings on UAW VEBA trust assets, and unexpected changes in the demographics of UAW VEBA participants.

***The following chart reflects an estimate of what future benefit levels can be provided for the UAW Retirees*** if the Plan and TKNA Settlement Agreement are ultimately approved, given the funds to be made available to the UAW VEBA under the Plan and the TKNA Settlement Agreement. Based on funds proposed to be made available to the UAW VEBA under the TKNA Settlement Agreement, the TK Finance Settlement Agreement, and the Debtor's Plan, it is estimated that your benefits would be reduced to levels similar to those reflected in the following chart, but please keep in mind that these are only estimates, with the final decision regarding benefit levels to be made by the UAW VEBA Committee.  It is also possible that, if the UAW VEBA Committee does not offer ancillary benefits such as dental, vision and hearing benefits, the cost to UAW VEBA Retiree participants for medical and prescription drug coverage could be less.

|  | Current Budd Plan for UAW Retirees | | Potential Plan for UAW Retirees to be Determined by the UAW VEBA Trustees | |
|---|---|---|---|---|
|  | Over 65 (Medicare) | Under 65 | Over 65 (Medicare) | Under 65 |
| Monthly Premiums | Medicare Part B Premium (currently $104.90/mo. deducted from Social Security benefit) [2] | None | No Change | None |
| Office Visit Copayment | 100% | 100% | $25 | $25 |
| Retiree Coinsurance [3] | 0% | 0% |  |  |

[2] Note that the Social Security deduction listed in the chart above on account of the Medicare Part B premium: (a) applies to all retirees that participate in Medicare Part B, and is not the result of the replacement healthcare coverage that would be provided to UAW Retirees under the Plan; and (b) UAW Retirees currently receive and will continue to receive under the Plan a special post-65 increase in their pension to cover a significant portion of the cost of the Medicare Part B premium.

[3] ~~UAW Retirees are responsible to pay the first $400 of medical expenses (not including prescription drugs).  After you have paid $400, your cost will be 20% of the cost of medical services, but no more than $800 (including the deductible)~~This figure does not apply to services for which copayments are charged.

| | Current Budd Plan for UAW Retirees | | Potential Plan for UAW Retirees to be Determined by the UAW VEBA Trustees | |
|---|---|---|---|---|
| | | | 20%[4] | 20%[34] |
| **Yearly Deductible (Per Person)** | $0 | $0 | $400 | $400 |
| **Yearly Out of Pocket Maximum (Per Person) (Out of Pocket Maximum does not apply to prescription drugs)** | N/A | N/A | $800 | $800 |
| **Prescription Drugs** | | | | |
| Retail (30 Day) | | | | |
|   Generic | $4 | $4 | $10 | $10 |
|   Preferred Brand | $6 | $6 | $20 | $20 |
|   Non-Preferred Brand | $6 | $6 | $40 | $40 |
| Mail Order (90 Day) | | | | |
|   Generic | $3 | $3 | $20 | $20 |
|   Preferred Brand | $4 | $4 | $40 | $40 |
|   Non-Preferred Brand | $4 | $4 | $80 | $80 |
| **Hearing Coverage** | Included | Included | Included | Included |
| **Dental Coverage** | Included | Included | Included | Included |
| **Life Insurance Coverage** | Included | Included | Included | Included |
| **Vision Coverage** | Included | Included | Included | Included |

E.      ***The Choice Between Settlement And Litigation***. Before the Debtor and the E&A Retiree Committee entered into the TKNA Settlement Agreement with TKNA, the Debtor, the UAW, and the E&A Retiree Committee jointly investigated whether the Debtor could sue TKNA, and certain of its affiliates, officers and directors, and professional firms[5] for, among other things, actions they took and failed to take when the Debtor sold its subsidiary, ThyssenKrupp Waupaca, Inc., to KPS Capital Partners LP ("KPS"). The result of that investigation and the potential causes of action are described in more detail in Section VI.E. of the Disclosure Statement. Following the completion of that

---

[4] ~~This figure does not apply to services for which copayments are charged~~UAW Retirees are responsible to pay the first $400 of medical expenses (not including prescription drugs).  After you have paid $400, your cost will be 20% of the cost of medical services, but no more than $800 (including the deductible).

[5] The Debtor's, the E&A Retiree Committee's and UAW's joint investigation revealed potential claims and causes of action against ThyssenKrupp AG ("TKAG"), TKNA, ThyssenKrupp Finance USA, Inc., Guido Kerkhoff, Olaf Berlien, Volkmar Dinstuhl, Christian Bender, Christof Boehm, Miroslav Georgiev, a.k.a. Miro Schmiedt, Kevin C. Backus, Jill Karana, Lawrence Paulson, Nancy L. Hutcheson, Markus Boening, Heinz Hense, Brian Bastien, Clark Hill PLC, KPS Capital Partners, LP, Perella Weinberg Partners Group LP and Dietrich Becker.

investigation, the Debtor and the E&A Retiree Committee entered into a settlement agreement with TKNA (the "TKNA Settlement Agreement") that provides for the assumption of the Debtor's ERISA Pension Plans and SERP and payment of $335 million to the VEBAs described above to be established to provide health, drug, and other benefits to the E&A and UAW Retirees. Following the execution of the TKNA Settlement Agreement by the E&A Retiree Committee and the Debtor, the UAW entered into further negotiations with Budd's Affiliates, including ThyssenKrupp Finance USA, Inc. ("TK Finance"). These negotiations led to the UAW reaching a settlement agreement with TK Finance (the "TK Finance Settlement Agreement") through which TK Finance will pay $10 million in cash consideration to the UAW VEBA. The TK Finance Settlement Agreement will go into effect *only* if the Plan is confirmed.

F.    ***The Consequences of Rejecting the Plan and TKNA Settlement Agreement.*** The most likely alternative to the TKNA Settlement Agreement is filing lawsuits against TKNA and the other potential defendants. Prosecuting lawsuits against TKNA and the other potential defendants involves significant risks for retirees, and there is no guarantee that such litigation would result in any recovery, let alone a greater recovery. Prosecuting lawsuits against TKNA and the other potential defendants through settlement or judgment would be time-consuming (possibly taking more than 3 years) and costly. The amounts spent on benefits and legal fees plus the lost value of the TKNA Settlement Agreement and the TK Finance Settlement Agreement (i.e., $345 million cash plus the assumption of well over $200 million of underfunded pension liabilities) would need to be recovered through judgment or settlement just to "break even." These amounts are significant. Budd estimates that, absent a modification to the benefits currently paid to retirees or an unforeseeable infusion of cash, Budd will run out of the $252 million that it projects will be available for distribution under the Plan in about 5 years. So, for example, if the lawsuits were to take 3 years at a cost of $15 million in legal fees (with benefit payments remaining at current levels during the pendency of the lawsuits), the *incremental* amount that the estate would have to win or be offered to "break even" would be approximately $90 million (*i.e.*, in addition to the $345 million provided under the TKNA Settlement Agreement and the TK Finance Settlement Agreement, for a total of $435 million). The actual time spent litigating and the legal fees in connection with such litigation may be higher or lower than the estimates provided above. In the event that the estate does not prevail in the lawsuits, retirees would have their healthcare benefits drastically reduced or terminated in five years or sooner, depending on the legal fees incurred by the estate. TKNA will also not be required to assume sponsorship of the Debtor's Pension Plans while the lawsuits are pending.

G.    **The Debtor's Independent Director and Chief Restructuring Officer, the E&A Retiree Committee, and the UAW Support the Plan and the TKNA Settlement Agreement for Several Reasons:**

First, the TKNA Settlement Agreement ensures the continuation of the pensions and healthcare coverage for all retirees at affordable rates and is for substantial consideration. Under the TKNA Settlement Agreement, TKNA will pay $335 million of cash (with an additional $10 million to the UAW VEBA from TK Finance under the

TK Finance Settlement Agreement) to the UAW and E&A Retiree VEBAs and assume well over $200 million of underfunded liabilities associated with the Debtor's obligations under its Pension Plans.

Second, the benefits of the TKNA Settlement Agreement outweigh the risks of litigation against TKNA and the other potential defendants. If the Debtor were to sue TKNA and the other potential defendants, the lawsuits could take many years. The median time a civil lawsuit takes to go to trial in the Northern District of Illinois, which is where the lawsuit likely would be filed, is approximately 33 months. (*See* http://www.uscourts.gov/statistics-reports/federal-court-management-statistics-june-2015.) Some or all of the losing parties could be expected to appeal if they lose the case. At the median, appeals in the 7th Circuit (which is where any appeal from a final judgment in the Northern District of Illinois would be filed) take 7.2 months. (*Id.*) Thus, if the cases proceed as an average case it could take more than three years before any judgment is final. These numbers are median numbers and the actual length of the lawsuits could be longer or shorter. In addition, the Debtor would be required to pay all of the costs of the litigation, which could cost the estate $40 million or more. Because the Debtor's Independent Director and Chief Restructuring Officer, the E&A Retiree Committee, and the UAW believe it could take many years of litigation to get TKNA to increase the amount of its settlement, and the Debtor's cash is being used to provide benefits at the rate of approximately $43 million per year, they do not believe that there is a significant likelihood of meaningfully increasing the amount of money to fund health care benefits through litigation.

Third, the risks of litigation are simply too great. After five years, absent a change in the level of benefits currently provided, the Debtor will not be able to provide health care coverage to retirees. If the Debtor loses its lawsuits against TKNA and the other potential defendants, retirees will face a disruption of pensions and the termination of all healthcare coverage.

The Debtor's Independent Director and Chief Restructuring Officer, the E&A Retiree Committee, and the UAW urge retirees to vote in favor of the Plan so that the TKNA Settlement Agreement may be approved and implemented.

II.     **Information for Holders of Asbestos Claims About The Budd Company, Inc.
Bankruptcy Plan**

The following is a summary of the treatment of holders of Asbestos Claims under The Budd Company, Inc.'s ("Budd") ~~Eighth~~Ninth Amended Chapter 11 Plan (the "Plan"). **SECTION III CONTAINS A SUMMARY OF THE DISCLOSURE STATEMENT, ENTITLED "THE STATE OF THE BANKRUPTCY CASE AND THE PLAN," AND A TABLE OF CONTENTS FOR THE DISCLOSURE STATEMENT TO AID YOU IN YOUR REVIEW. FOR MORE INFORMATION ON ANY TOPIC OR QUESTION, PLEASE READ THE DISCLOSURE STATEMENT ITSELF.**

**If you filed an Asbestos Claim against Budd you can vote to accept or reject the Plan.**

A.     *Treatment of Asbestos Claims under the Plan.* Budd's Plan would treat Asbestos Claims as follows:

i.     **Holders of Insured Asbestos Claims** (generally, claims brought by holders of Asbestos Claims exposed to Budd's asbestos before November 1985) shall be paid 100% of the amount of their claim from proceeds of the Asbestos Insurance Policies in accordance with the terms of the Amended Asbestos Cost Sharing Agreement, attached as <u>Exhibit D</u> to the Plan. The Insured Asbestos Claim Fund shall be funded with $2.2 million in cash, which shall be used for the benefit of the Insurers in accordance with the Amended Asbestos Cost Sharing Agreement.

ii.     **Holders of Uninsured Asbestos Claims** (Asbestos Claims that are not insured, including claimants who were only exposed to the Debtor's asbestos after October 1985) will receive 67% of the value of their claim paid from the Uninsured Asbestos Claim Fund until it is exhausted, which will be funded on the date of entry of the Confirmation Order by the Debtor with $3,500,000 ~~and by assignment of the E&A Retiree~~(and an additional $950,000 on the Effective Date from the UAW Cash in full and final satisfaction of the Asbestos Committee ~~of the first $1.5 million of any's~~ Settlement Increase ~~payable to or for the benefit of the E&A Retirees~~Claim (as defined below). The Uninsured Asbestos Claim Fund shall be maintained until the earlier to occur of (a) the date on which less than $1,000 remains in such Asbestos Fund, or (b) the date on which all lawsuits on account of Asbestos Claims brought as of January 1, 2045 have been resolved.

If the Plan is approved, holders of Asbestos Claims could sue Budd for money damages in state or federal court immediately after the Confirmation Order is entered.

B.     ***The Choice Between Settlement And Litigation***. The Debtor, E&A Retiree Committee, and the UAW jointly investigated whether the Debtor could sue ThyssenKrupp North America ("TKNA"), and certain of its affiliates, officers and directors, and professional

13

firms[6] for, among other things, actions they took and failed to take when the Debtor sold its subsidiary, ThyssenKrupp Waupaca, Inc., to KPS Capital Partners LP ("KPS"). The result of that investigation and the potential causes of action are described in more detail in Section VI.E. of the Disclosure Statement. Following the completion of that investigation, the Debtor and the E&A Retiree Committee entered into a settlement agreement with TKNA (the "TKNA Settlement Agreement") that provides for the assumption of the Debtor's ERISA Pension Plans and Supplemental Executive Retirement Plan ("SERP") and payment of $335 million to voluntary employees' beneficiary association trusts (each, a "VEBA," or together "VEBAs") to be established to provide health, drug, and other benefits to the E&A and UAW Retirees. The TKNA Settlement Agreement will go into effect *only* if the Plan is confirmed. Following the execution of the TKNA Settlement Agreement by the E&A Retiree Committee and the Debtor, the UAW entered into further negotiations with Budd's Affiliates, including TK Finance. These negotiations led to the UAW reaching a settlement agreement with TK Finance (the "TK Finance Settlement Agreement") through which TK Finance will pay $10 million in cash consideration. The TK Finance Settlement Agreement will go into effect only if the Plan is confirmed.

C.     ***The Consequences of Rejecting the Plan and TKNA Settlement Agreement***. The most likely alternative to the TKNA Settlement Agreement is filing lawsuits against TKNA and the other potential defendants. Prosecuting lawsuits against TKNA and the other potential defendants involves significant risks for retirees, and there is no guarantee that such litigation would result in any recovery, let alone a greater recovery. Prosecuting lawsuits against TKNA and the other potential defendants through settlement or judgment would be time-consuming (possibly taking more than 3 years) and costly. The amounts spent on benefits and legal fees plus the lost value of the TKNA Settlement Agreement and the TK Finance Settlement Agreement (i.e., $345 million cash plus the assumption of well over $200 million of underfunded pension liabilities) would need to be recovered through judgment or settlement just to "break even." These amounts are significant. Budd estimates that, absent a modification to the benefits currently paid to retirees or an unforeseeable infusion of cash, Budd will run out of the $252 million that it projects will be available for distribution under the Plan in about 5 years. So, for example, if the lawsuits were to take 3 years at a cost of $15 million in legal fees (with benefit payments remaining at current levels during the pendency of the lawsuits), the *incremental* amount that the estate would have to win or be offered to "break even" would be approximately $90 million (*i.e.*, in addition to the $345 million provided under the TKNA Settlement Agreement and the TK Finance Settlement Agreement, for a total of $435 million). The actual time spent litigating and the legal fees in connection with such litigation may be higher or lower than the estimates provided above. In the event that the estate does not

---

[6] The Debtor, E&A Retiree Committee and UAW's joint investigation revealed potential claims and causes of action against ThyssenKrupp AG ("TKAG"), TKNA, ThyssenKrupp Finance USA, Inc., Guido Kerkhoff, Olaf Berlien, Volkmar Dinstuhl, Christian Bender, Christof Boehm, Miroslav Georgiev, a.k.a. Miro Schmiedt, Kevin C. Backus, Jill Karana, Lawrence Paulson, Nancy L. Hutcheson, Markus Boening, Heinz Hense, Brian Bastien, Clark Hill PLC, KPS Capital Partners, LP, Perella Weinberg Partners Group LP and Dietrich Becker.

prevail in the lawsuits, Asbestos Claimants may receive nothing on account of their claims, except the benefit of over $100 million of insurance.

D.    ***The Asbestos Committee, and the Debtor's Independent Director and Chief Restructuring Officer Support the Plan and the TKNA Settlement Agreement.***

First, the Asbestos Committee supports the TKNA Settlement Agreement because it preserves substantial insurance policies for the benefit of holders of Asbestos Claims and contributes sufficient cash to provide distributions to holders of Asbestos Claims that may not receive the benefit of the Debtor's insurance.

Second, the Asbestos Committee believes that the TKNA Settlement Agreement is for substantial consideration. Under the TKNA Settlement Agreement, TKNA will pay up to $335 million of cash to the UAW and E&A Retiree VEBAs and assume well over $200 million of underfunded liabilities associated with the Debtor's obligations under its Pension Plans, making more money available for the Debtor's other creditors.

Third, the Asbestos Committee agrees with the Debtor's Independent Director and Chief Restructuring Officer that the benefits of the TKNA Settlement Agreement outweigh the risks of litigation against TKNA. If the Debtor were to sue TKNA and the other potential defendants, the lawsuits could take many years. The median time a civil lawsuit takes to go to trial in the Northern District of Illinois, which is where the lawsuit likely would be filed, is approximately 33 months. (*See* http://www.uscourts.gov/statistics-reports/federal-court-management-statistics-june-2015.) Certain of the losing parties could be expected to appeal if they lose the case. At the median, appeals in the 7th Circuit (which is where any appeal from a final judgment in the Northern District of Illinois would be filed) take 7.2 months. (*Id.*) Thus, if this case proceeds as an average case it could take more than three years before any judgment is final. These numbers are median numbers and the actual length of the lawsuits could be longer or shorter. In addition, the Debtor would be required to pay all of the costs of the litigation, which could cost the estate $40 million or more. Because the Debtor's Independent Director and Chief Restructuring Officer believe (and the Asbestos Committee agrees) that it could take many years of litigation to get TKNA to increase the amount of its settlement, and the Debtor's cash is being used to provide benefits at the rate of approximately $43 million per year, they do not believe that there is a significant likelihood of meaningfully increasing the amount of money available to satisfy Asbestos Claims through litigation.

Fourth, the Asbestos Committee agrees that the risks of litigation are simply too great. After five years, absent any modification to the benefits currently provided, the Debtor's estate will be fully depleted.

The Asbestos Committee, and the Debtor's Independent Director and Chief Restructuring Officer urge holders of Asbestos Claims to vote in favor of the Plan so that the TKNA Settlement Agreement may be approved and implemented.

15

### III.    The State of the Bankruptcy Case and the Plan[7]

A.    **Budd's Assets and Liabilities**

Budd is no longer in business. As of the date Budd filed for bankruptcy (March 31, 2014), Budd's only activities were: (a) the making of contribution payments to the Pension Plans and payments of Retiree Benefits to UAW Retirees and E&A Retirees; (b) defending asbestos-related lawsuits; and (c) satisfying historical environmental obligations.

Budd does not have enough cash to pay all of its liabilities (i.e. debts and obligations) in full. As of March 31, 2016, the Debtor had approximately $272 million in cash. Budd estimates that, as of September 30, 2015, its Retiree Benefit obligations under the existing Retiree Benefits plans alone were approximately $810 million (approximately $733 million on account of obligations to UAW Retirees and approximately $77 million on account of obligations to E&A Retirees).

Budd has only two other significant assets it can use to pay its liabilities. First, Budd has the contractual right to receive past, and potentially future, payments from TKNA for the use of Budd's tax losses under the Debtor's Actual Tax Sharing Agreement. Second, Budd has Causes of Action (i.e. potential lawsuits) against TKNA and other parties. Both Budd's contractual right to receive payment for tax losses and its Causes of Action against TKNA and others have been contested by TKNA, and are the subject of the TKNA Settlement Agreement among Budd, TKNA and the E&A Retiree Committee.

B.    **Voting for or against the Plan**

i.    **The Choice**

A vote for the Plan is a vote in favor of the TKNA Settlement Agreement. Under the terms of the TKNA Settlement Agreement, Budd receives $335 million in cash (along with other benefits such as the assumption of the Pension Plans), in full settlement of Budd's contractual rights and Causes of Action against TKNA and other potential defendants. The Plan is premised upon approval of the TKNA Settlement Agreement by the Bankruptcy Court, which has not yet occurred. Budd had approximately $272 million in cash as of March 31, 2016. As discussed above, Budd's only other significant assets are certain contractual rights and Causes of Action against TKNA and other parties, which are the subject of the TKNA Settlement Agreement. **See Article VI(E) for a more detailed discussion of these contractual rights and Causes of Action**. The TKNA Settlement Agreement provides certainty of recovery for Budd's creditors.

A vote against the Plan is a vote against the TKNA Settlement Agreement. The TKNA Settlement Agreement will not become effective if the Plan (or an alternative chapter 11 plan incorporating the TKNA Settlement Agreement) is not confirmed by the Bankruptcy Court. If the TKNA Settlement Agreement is not approved, the most likely alternative is the litigation of Budd's contractual claims and Causes of Action against TKNA and the other potential

---

[7] Please refer to Article II(A) beginning on page 1 for definitions of capitalized terms used herein.

defendants. In addition, the UAW Retirees would lose the benefit of the additional $10 million from TK Finance available under the TK Settlement Agreement. Below is a summary of Budd's claims and Causes of Action, litigation of which entails certain risks. First, litigation is inherently risky and there is no assurance that any Cause of Action will be successful and lead to an award of damages for the Estate. **See Article X(D)(1) for a more detailed discussion of the risks of litigation**. Second, if the TKNA Settlement Agreement is not approved, then TKNA would not waive its Claims against the Debtor and likely would pursue such Claims in litigation with the Estate, potentially reducing the amount of money available for distribution. **See Article X(D)(3) for a more detailed discussion of TKNA's Claims against Budd**.

ii.    **Distribution of Budd's Assets under the Plan**

1.    **UAW Retiree Health Benefits:** Current health benefits to Retirees under Budd's existing benefits plans effectively will be terminated, and replaced without interruption with benefits funded from Retiree VEBAs. The UAW VEBA will be funded with an estimated $179 million cash from the Debtor's Estate[8], together with $320 million in cash over 8 years as provided under the TKNA Settlement Agreement.[9]

2.    **E&A Retiree Health Benefits:** Current health benefits to Retirees under Budd's existing benefits plans effectively will be terminated, and replaced without interruption with benefits funded from Retiree VEBAs. The E&A VEBA will be funded with $70 million cash in the aggregate from the Debtor's estate and from the TKNA Settlement Agreement. It is expected that the funds in the E&A VEBA will last for approximately 25 years, through 2041.

3.    **Retiree Pension Benefits (UAW and E&A):** Under the TKNA Settlement Agreement (which is incorporated into the Plan), TKNA will assume responsibility for the Pension Plans so Retirees will receive their pension plan payments, uninterrupted, in full and on time.

4.    **Holders of Asbestos Claims:** Asbestos Claims will "pass through" the bankruptcy case, allowing those Asbestos Claimants to bring or continue lawsuits against Budd.

The Debtor has multiple insurance policies that will provide more than $100 million of insurance coverage to satisfy asbestos claims, judgments, or settlements, and to pay defense costs (*see* section III.E of the Disclosure Statement for more information). In connection with enforcing the Debtor's insurance policies, the Debtor will, no later than the date of entry of the Confirmation Order,

---

[8] The Plan provides that the amount of cash received by the UAW VEBA is dependent on the amount of Effective Date Cash remaining after payment of $55 million to the E&A VEBA and payment of, among other things, administrative claims. The result is that the UAW Cash will decrease if the Effective Date is delayed, or as the Debtor uses available cash to satisfy other claims.

[9] In addition, the TK Finance Settlement Agreement provides for the payment of $10 million in cash from TK Finance to the UAW VEBA.

enter into an Amended Asbestos Cost Sharing Agreement with multiple insurers, pursuant to which the insurers will coordinate defense and payment of asbestos claims judgments and settlements for insured claims. Holders of Insured Asbestos Claims (generally, claims brought by holders of Asbestos Claims exposed to Budd's asbestos before November 1985) shall be paid 100% of the amount of their claim from proceeds of the Asbestos Insurance Policies in accordance with the terms of the Amended Asbestos Cost Sharing Agreement, attached as Exhibit D to the Plan.

Holders of Uninsured Asbestos Claims (Asbestos Claims that are not insured, including claimants who were only exposed to the Debtor's asbestos after October 1985) will receive 67% of the value of their claim paid from the Uninsured Asbestos Claim Fund until it is exhausted, which will be funded no later than the date of entry of the Confirmation Order with $3,500,000 from the Debtor and ~~assignment by the E&A Retiree~~an additional $950,000 from the UAW Cash in full and final satisfaction of the Asbestos Committee ~~of the first $1,500,000 of any~~'s Settlement Increase ~~payable to or for the benefit of the E&A Retirees~~Claim (as defined below). The Uninsured Asbestos Claim Fund shall be maintained until the earlier to occur of (a) the date on which less than $1,000 remains in such Asbestos Fund, or (b) the date on which all lawsuits on account of Asbestos Claims brought as of January 1, 2045 have been resolved.

The Debtor will fund the Insured Asbestos Claim Fund with $2.2 million in cash, which shall be used for the benefit of the Insurers in accordance with the Amended Asbestos Cost Sharing Agreement. In addition, the Debtor will fund the Asbestos Administration Fund no later than the date of entry of the Confirmation Order with $500,000 to cover the costs of administering the Asbestos Funds.

5. **Other General Creditors:** Unsecured creditors (not including Retirees or holders of Asbestos Claims) will receive 67% of the allowed amount of their claims.

### iii. Recommendation of Budd's Independent Director and Chief Restructuring Officer, the E&A Retiree Committee, the UAW and the Asbestos Committee

Budd's Independent Director and Chief Restructuring Officer, the E&A Retiree Committee, the UAW, and the Asbestos Committee each believe that the TKNA Settlement Agreement ensures the uninterrupted payment of retiree pension benefits, provides the Debtor with enough cash to fund VEBAs that will be able to provide replacement healthcare benefits, and appropriately and adequately provides for holders of Asbestos Claims. By contrast, they each believe that pursuing litigation (the most likely alternative to walking away from the TKNA Settlement Agreement) will result in prolonged uncertainty and delay for a limited upside that is far from certain. For these reasons, Budd's Independent Director and Chief Restructuring Officer, the E&A Retiree Committee, the UAW, and the Asbestos Committee urge you to vote in favor of confirmation of the Plan and approval of the TKNA Settlement Agreement.

18

# TABLE OF CONTENTS

I.      INTRODUCTION ...................................................................................................... 1

II.     OVERVIEW OF THE PLAN ................................................................................... 1

    A.    Capitalized and Defined Words ................................................................... 1
    B.    Treatment of Retiree Health Benefits Under the Plan .................................. 3
    C.    Retiree Pension Benefits .............................................................................. 5
    D.    Use of Debtor's Cash and proceeds of the TKNA Settlement
       Agreement and the TK Finance Settlement Agreement ................................. 6
    E.    Releases ....................................................................................................... 7
    F.    Asbestos Claims and Insurance .................................................................... 8
    G.    Unsecured Creditors .................................................................................. 10

III.    SUMMARY OF THE PLAN ................................................................................. 10

    A.    The Debtor's Largest Assets: Cash on Hand and Affiliate Claims ............. 10
    B.    The TKNA Settlement Agreement .............................................................. 10
    C.    The UAW's Election to Grant the Waupaca Claims Release ...................... 12
    D.    The TK Finance Settlement Agreement ....................................................... 12
    E.    The Treatment of Retiree Claims ............................................................... ~~14~~13
    F.    Asbestos Claims Given Access to Asbestos Insurance Policies and
       Uninsured Asbestos Claim Fund ................................................................ ~~16~~15
    G.    Classified Claims: Classification and Treatment ........................................ ~~17~~16
    H.    Unclassified Claims: Allowance and Treatment ......................................... 24

IV.     PLAN VOTING INSTRUCTIONS AND PROCEDURES ................................... 25

    A.    Notice to Holders of Claims and Equity Interests ...................................... 25
    B.    Voting Requirements to Confirm Plan ........................................................ 26
    D.    Solicitation Materials ................................................................................. 26
    E.    Voting Procedures, Ballots and Voting Deadline ....................................... 27
    F.    Confirmation Hearing and Deadline for Objections to Confirmation .......... 27
    G.    Plan Binding on Creditors and Parties in Interest ...................................... 28

V.      DEBTOR'S BACKGROUND AND EVENTS LEADING TO BANKRUPTCY ... 28

    A.    Brief Overview of the Debtor's Business Operations .................................. 28
    B.    The Debtor's Retiree Benefit Obligations ................................................... 28
    C.    The Debtor's Pension Obligations .............................................................. 29
    D.    The Debtor's Asbestos Liabilities .............................................................. 31
    E.    Events Leading to Commencement of the Bankruptcy Case ....................... 31

VI.     THE BANKRUPTCY CASE .................................................................................. 32

    A.    Commencement of the Bankruptcy Case ..................................................... 32
    B.    Recognition and Participation of Creditors ................................................ 32
    C.    The Debtor's Withdrawal of its Motion for Approval of the Original
       TKNA Settlement Agreement ..................................................................... 32

|  | D. | The Status Quo Order and the 2004 Investigations | 33 |
|  | E. | Potential Claims Against TKNA and Others | 33 |
|  | F. | Settlement Discussions Among the Debtor, the Retiree Representatives, and TKNA | 43 |
|  | G. | Evaluation / Estimation of Asbestos Claims and Available Insurance | 44 |
| VII. |  | IMPLEMENTATION OF THE PLAN OF REORGANIZATION | 45 |
|  | A. | Establishment and Funding of VEBAs for the Benefit of Retirees | 45 |
|  | B. | Execution of TKNA Settlement Agreement | 46 |
|  | C. | Rights and Powers of the Independent Fiduciary | 46 |
|  | D. | Rights and Powers of the Debtor | 47 |
|  | E. | Dissolution of Committees and Retiree Representatives | 47 |
| VIII. |  | PLAN PROVISIONS GOVERNING ALLOWANCE OF CLAIMS AND MAKING OF DISTRIBUTIONS | 48 |
|  | A. | Liquidation and Treatment of Asbestos Claims | 48 |
|  | B. | Allowed Claims, Distribution Rights and Objections to Claims | 51 |
|  | C. | Disposition of Executory Contracts and Unexpired Leases | 52 |
|  | D. | Reservation of Rights Regarding Claims and Causes of Action | 52 |
| IX. |  | OTHER PLAN PROVISIONS | ~~52~~53 |
|  | A. | Releases, Injunctions, Exculpation and Related Provisions | ~~52~~53 |
|  | B. | Preservation of Rights of Action | ~~56~~57 |
|  | C. | Retention of Jurisdiction | ~~56~~58 |
|  | D. | Amendment, Alteration and Revocation of Plan | ~~56~~58 |
|  | E. | Conditions to Effective Date | ~~57~~58 |
|  | F. | Requirements for Confirmation of the Plan | ~~57~~58 |
| X. |  | CERTAIN RISK FACTORS TO BE CONSIDERED | ~~57~~59 |
|  | A. | Risks of the Chapter 11 Plan Generally | ~~57~~59 |
|  | B. | Risks Related to the TKNA Settlement Agreement | ~~58~~59 |
|  | C. | Risks Related to Proposed Treatment of Asbestos Claims | ~~58~~60 |
|  | D. | Risks of Alternatives to the Plan | ~~58~~60 |
| XI. |  | CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN | ~~59~~61 |
|  | A. | U.S. Federal Income Tax Consequences to the Debtor | ~~60~~61 |
|  | B. | U.S. Federal Income Tax Implications to the VEBAs | ~~60~~62 |
|  | C. | U.S. Federal Income Tax Consequences to Retirees | ~~61~~62 |
| XII. |  | FEASIBILITY OF THE PLAN, BEST INTERESTS OF CREDITORS, AND CONFIRMATION OF THE PLAN WITHOUT CONSENT OF ALL CREDITORS | ~~61~~63 |
|  | A. | Feasibility of the Plan | ~~61~~63 |
|  | B. | Acceptance of the Plan | ~~61~~63 |
|  | C. | Best Interests Test | ~~61~~63 |
|  | D. | Confirmation and Consent to Modify Retiree Benefits | ~~62~~63 |

     E.     **Confirmation Without Acceptance of All Impaired Classes:** ................ ~~62~~64
         **"Cramdown"**

XIII.  ALTERNATIVES TO CONFIRMATION AND  CONSUMMATION OF THE
     PLAN ....................................................................................................... ~~62~~64

     A.     **Alternative Plan(s) of Reorganization** ...................................... ~~62~~64
     B.     **Litigation of Affiliate Claims** .................................................. ~~62~~64
     C.     **Interim Modification of Retiree Benefits** ................................ ~~63~~65
     D.     **Litigation of Retiree Benefit Issues** ........................................ ~~64~~66
     E.     **Liquidation under Chapter 7** .................................................... ~~64~~66

XIV.  THE SOLICITATION ORDER AND DISPUTED CLAIMANTS .................. ~~65~~67

     A.     **Solicitation Order** ..................................................................... ~~65~~67
     B.     **Voting Rights of Disputed Claimants** ...................................... ~~65~~67

XV.  RECOMMENDATION AND CONCLUSION ............................................... ~~65~~67

## EXHIBITS TO DISCLOSURE STATEMENT

**Exhibit 1** – **PROJECTIONS (based on August 1, 2016 Effective Date)**

- **Projected Effective Date Cash**

- **Projected Plan Cash Receipts and Disbursements**

- **Calculation of UAW Cash**

**Exhibit 2** – **LIQUIDATION ANALYSIS**

## I.     INTRODUCTION

The Budd Company, Inc. (the "Debtor" or "Budd") is the debtor in the chapter 11 case pending before the United States Bankruptcy Court for the Northern District of Illinois (Eastern Division) under case number 14 B 11873 (the "Bankruptcy Case").

The Debtor provides this Disclosure Statement for the ~~Eighth~~Ninth Amended Chapter 11 Plan For the Budd Company, Inc. Dated ~~April 27,~~May 4, 2016 (as it may be amended, the "Disclosure Statement") pursuant to section 1125 of title 11 of the United States Code (the "Bankruptcy Code") for use in the solicitation of votes on the ~~Eighth~~Ninth Amended Chapter 11 Plan For The Budd Company, Inc. Dated ~~April 27,~~May 4, 2016 (as may be amended, the "Plan"). Each capitalized term used in this Disclosure Statement but not otherwise defined herein has the meaning ascribed to such term in the Plan, including the exhibits to the Plan.

The Independent Director and Chief Restructuring Officer of Budd, the E&A Retiree Committee, the UAW, the Asbestos Committee, and TKNA each support the Plan and the TKNA Settlement Agreement and urge all Retirees, holders of Asbestos Claims, and other creditors to vote for the Plan.

## II.     OVERVIEW OF THE PLAN

### A.     Capitalized and Defined Words

Capitalized words used in this Disclosure Statement are "defined terms" and have the meanings given to them in **Exhibit A** to the Plan (the glossary of defined terms). The defined terms used most frequently in this Disclosure Statement are as follows:

**"Amended Asbestos Cost Sharing Agreement"** means the asbestos cost sharing agreement attached to the Plan as Exhibit D.

**"Causes of Action"** means all claims, actions, causes of action, choses in action, suits, debts, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, judgments, remedies, rights of set off, third party claims, subrogation claims, contribution claims, reimbursement claims, indemnity claims, counterclaims and crossclaims of the Debtor and/or the Estate.

**"CBA"** means collective bargaining agreement.

**"Debtor"** means The Budd Company, Inc.

**"E&A Retiree"** is a Retiree whose Retiree Benefits Claim does not relate to or arise from work in an employment unit covered by a CBA or PCA.

**"E&A Retiree Benefits Claim"** means a Retiree Claim of a E&A Retiree.

**"E&A Retiree Committee"** means the committee of executive and administrative Retirees constituted by the office of the U.S. Trustee in the Bankruptcy Case.

**"E&A VEBA"** means the Retiree VEBA established for the benefit of the E&A Retirees pursuant to the Plan.

**"E&A VEBA Effective Date"** means the date on which the E&A VEBA goes into effect.

**"E&A VEBA Trust Agreement"** means the trust agreement setting forth the terms of the E&A VEBA.

**"E&A VEBA Trust Plan"** means the agreement setting forth the terms of benefits to be provided to eligible E&A Retirees, which are funded through the E&A VEBA.

**"Effective Date"** means the first Business Day after the entry of the Confirmation Order and on which all conditions precedent to the Effective Date specified in the Chapter 11 Plan have been satisfied or waived.

**"ERISA Pension Plans"** means the E&A Pension Plan and the UAW Pension Plan.

**"KPS"** means KPS Capital Partners LP.

**"PBGC"** means the Pension Benefit Guaranty Corporation.

**"PCA"** means plant closing agreement.

**"Pension Plans"** means the SERP and/or one or both of the ERISA Pension Plans.

**"Petition Date"** means March 31, 2014.

**"Retiree"** is a retired employee of the Debtor and/or a spouse, surviving spouse, domestic partner, or dependent of such a retiree who is or may be entitled to Retiree Benefits from the Debtor as a result of such retiree's employment with the Debtor.

**"Retiree Benefits"** shall have the meaning ascribed to it by section 1114 of the Bankruptcy Code; provided, however, that in no event shall Retiree Benefits include claims of individuals relating to or arising from one or more Pension Plans.

**"Retiree Claim"** means a claim for Retiree Benefits of a person receiving or entitled to receive such benefits from the Debtor.

**"Retiree VEBA"** means one or more VEBAs established for the benefit of Retirees pursuant to the Plan.

**"SERP"** means The Budd Company Supplemental Pension Plan.

**"TKAG"** means ThyssenKrupp AG, the sole parent of TKNA.

**"TK Finance Settlement Agreement"** means the settlement agreement between TK Finance and the UAW, attached to the Plan as **Exhibit E**.

2

**"TKNA"** means ThyssenKrupp North America, Inc., which, as of the Petition Date, held 100% of the equity interests in the Debtor.

**"TKNA Settlement Agreement"** means the agreement to settle and compromise the Affiliate Claims and the Estate Claims, which agreement is attached to the Plan and fully incorporated into the Plan in the form of <u>Exhibit B</u> to the Plan.

**"UAW"** means the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America and its local unions, the Section 1114(c) Authorized Representative of the UAW Retirees in the Chapter 11 Case.

**"UAW Pension Plan"** means The Budd-UAW Consolidated Retirement Benefit Plan.

**"UAW Retiree Benefits Claim"** means a Retiree Claim of a UAW Retiree.

**"UAW Retiree"** is a Retiree whose Retiree Benefits Claim relate to or arise from work in an employment unit covered by a CBA and/or PCA.

**"UAW VEBA"** means the Retiree VEBA established for the benefit of the UAW Retirees pursuant to the Plan and the benefits provided under the UAW VEBA will be further described in the UAW VEBA Trust Plan.

**"UAW VEBA Effective Date"** means the date on which the UAW VEBA goes into effect.

**"UAW VEBA Trust Agreement"** means the trust agreement setting forth the terms of the UAW VEBA.

**"UAW VEBA Trust Plan"** means the agreement setting forth the terms of benefits to be provided to eligible UAW Retirees, which are funded through the UAW VEBA.

**"VEBA"** means a Voluntary Employees' Beneficiary Association trust.

**"Waupaca"** means ThyssenKrupp Waupaca, Inc., the Wisconsin corporation previously owned by the Debtor.

**"Waupaca Transaction"** means the 2012 sale of Waupaca by Budd to KPS.

B.        **Treatment of Retiree Health Benefits Under the Plan**

1.  If the Court approves the Plan and the TKNA Settlement Agreement, current health benefits to Retirees under Budd's existing benefits plans effectively will be terminated, and replaced without interruption with benefits funded from Retiree VEBAs, as discussed below. Each of the E&A VEBA and the UAW VEBA are expected to invest the cash funded to each in order to provide healthcare benefits to

3

the Retirees in a manner and structure determined and implemented by the E&A
Retiree Committee for the E&A Retirees and the UAW for the UAW Retirees.

2.  The E&A VEBA will be funded with $70 million cash from the Debtor's estate and
    from the TKNA Settlement Agreement. In 2016 and 2017, the E&A VEBA will
    provide medical/hearing/vision and prescription drug benefits to the Post-Medicare
    E&A Retirees through a Blue Cross Blue Shield of Michigan Medicare advantage
    plan. For the Pre-Medicare E&A Retirees, the E&A VEBA will provide
    medical/hearing/vision and prescription drug through a  Blue Cross Blue Shield of
    Michigan group plan with stop loss insurance for claims in excess of $100,000.  The
    dental plan will be a self-insured plan offered through Unicare or another comparable
    provider.  The E&A VEBA will purchase life insurance coverage through Unicare or
    another comparable provider. The life insurance coverage amount  shall be at the
    same dollar amount as the E&A Retiree would have received under the Debtor's E&A
    Retiree Benefit plan. On an annual basis, beginning for the calendar year 2018, the
    E&A VEBA will re-evaluate the types of coverage, the design of the benefits plans,
    and the amounts that E&A Retirees are required to pay for the coverage. There are no
    guarantees that the types of coverage, the particular benefits offered or the amounts
    charged to E&A Retirees for such coverage will not change after 2017. It is expected
    that the funds in the E&A VEBA will last for approximately 25 years, through 2041.
    The average age of the E&A Retirees (including surviving spouses) is 78. After the
    funds are exhausted, coverage for the E&A Retirees will terminate.

3.  The UAW VEBA will be funded with an estimated $179 million cash from the
    Debtor's estate[1], together with $320 million in cash over 8 years under the TKNA
    Settlement Agreement (in addition to the $10 million that the UAW VEBA will
    receive from TK Finance pursuant to the TK Finance Settlement Agreement). The
    UAW has indicated that it believes that the committee of trustees for the UAW
    VEBA ("UAW VEBA Committee") will offer UAW Retirees initial benefits through

---

[1] The Plan provides that the amount of cash received by the UAW VEBA is dependent on the amount of
Effective Date Cash remaining after payment of $55 million to the E&A VEBA and payment of,
among other things, administrative claims.  The result is that the UAW Cash will decrease if the
Effective Date is delayed, or as the Debtor uses available cash to satisfy other claims.

group insurance similar in structure to the VEBAs that cover UAW retirees of companies such as General Motors, Ford, Chrysler and Dana Corporation.  The UAW VEBA Committee will have the ability to modify benefits based upon, among other things, the amount of money paid to the UAW VEBA, as well as other factors such as claim experience, medical and prescription drug inflation, earnings on UAW VEBA trust assets, and unexpected changes in the demographics of UAW VEBA participants.

C.      **Retiree Pension Benefits**

4.  In addition to making payments under the TKNA Settlement Agreement, TKNA is assuming the Pension Plans, including the ERISA Pension Plans and the SERP.  Even without the TKNA Settlement Agreement, TKNA is co-liable under federal law for the ERISA Pension Plans, and, the Debtor believes, contractually liable to make certain payments under the SERP. Accordingly, TKNA is agreeing to make all required contributions and payments thereunder so the Retirees will receive their pension plan payments, uninterrupted, in full and on time. Even if the Plan and the TKNA Settlement are not approved by the Bankruptcy Court, however, the ERISA Pension Plans are insured by the PBGC, a wholly owned United States government corporation that guarantees the payment of certain pension benefits upon termination of pension plans covered by Title IV of ERISA. Under federal law, TKNA and its Affiliates are also liable in the event one or both ERISA Pension Plans are terminated. However, in the event that the ERISA Pension Plans are terminated, the PBGC will assert a claim against Budd that would, if allowed, greatly diminish the amount of cash available to satisfy the Debtor's obligations to Retirees to provide healthcare benefits and other claims against Budd. TKNA and 26 of its Affiliates also will assert claims against Budd that, if allowed, would greatly diminish the amount of cash available to satisfy the Debtor's obligations to Retirees to provide healthcare benefits and the other claims against Budd.

**D.**     **Use of Debtor's Cash and proceeds of the TKNA Settlement Agreement and the TK Finance Settlement Agreement**

5.   The Plan is premised upon the use and distribution by the Debtor of all of its existing cash and TKNA Settlement Agreement proceeds to and for the benefit of its creditors and Retirees.

6.   The Debtor projects it will have $252 million of cash on the projected Effective Date of August 1, 2016. **See __Exhibit 1__ Projected Effective Date Cash, and Projected Plan Cash Receipts and Disbursements**.

7.   The Plan and the TKNA Settlement Agreement provide that the TKNA Settlement Agreement payments will equal $335 million, to be paid over eight (8) years. TK Finance will provide an additional $10 million in cash consideration to the UAW VEBA pursuant to the TK Finance Settlement Agreement.

8.   The Plan and the TKNA Settlement Agreement provide that on the Effective Date, TKNA will pay for the benefit of the E&A VEBA, the first $15 million due under the TKNA Settlement Agreement, which amount, together with $55 million of the Debtor's cash, will be transferred to the E&A VEBA.

9.   Also, the Plan provides that, on the Effective Date, $179 million of the Debtor's cash will be transferred to the UAW VEBA. From and after the Effective Date, all remaining payments due under the TKNA Settlement Agreement will be paid to the UAW VEBA ($320 million paid over 8 years). In addition, the TK Finance Settlement Agreement provides for TK Finance to pay $10 million in cash to the UAW VEBA.

10.  The Plan and the TKNA Settlement Agreement provide that Budd will continue to exist after the Effective Date and will be owned by TKNA. Budd proposes that the UAW will select the individual who will serve as the Independent Fiduciary and who cannot be removed or influenced by TKNA, to enforce the TKNA Settlement Agreement against TKNA for the benefit of the UAW VEBA. Budd proposes that the UAW VEBA will, as an express third-party beneficiary under the TKNA Settlement

6

Agreement, have the right to enforce the TKNA Settlement Agreement against TKNA.

11. The Plan and the TKNA Settlement Agreement provide that if TKNA fails to make a payment under the TKNA Settlement Agreement, the Independent Fiduciary and/or the UAW VEBA may accelerate all remaining payments due under the TKNA Settlement Agreement, draw on the Letter of Credit (which will fund, in cash, to the UAW VEBA the amount of one missed TKNA Settlement Agreement payment) and sue TKNA to collect the amount of all remaining payments under the TKNA Settlement Agreement.

12. The Debtor believes TKNA has more than sufficient resources (including untapped credit lines, cash and property) to make the payments under the TKNA Settlement Agreement. Although, there can be no assurance that TKNA will have sufficient resources to satisfy any demand made or judgment obtained against TKNA, the TKNA Settlement Agreement includes certain protections against nonpayment , including (a) an acceleration provision upon default; (b) the Letter of Credit described above; and (c) a requirement that TKNA make an annual equity certification and financial disclosures. In addition, the Chief Restructuring Officer conducted diligence into TKNA's financial wherewithal to satisfy its obligations under the TKNA Settlement Agreement.

**E.      Releases**

13. The Plan and the TKNA Settlement Agreement provide that TKNA, including its subsidiaries and affiliates (including TKAG), and its current and former officers and directors and employees (including individuals who also served as officers and directors of Budd), as well as its agents and professionals, are receiving releases by the Debtor of any and all claims and Causes of Action held by the Debtor or its Chapter 11 estate (these released parties are more fully set forth in Article X(E) of the Plan and the TKNA Settlement Agreement). TKNA's consent to make the payments described in the TKNA Settlement Agreement is conditioned upon the approval of these releases. Other potential defendants, including Clark Hill, a law firm that

7

represented both Budd and TKNA in Budd's sale of Waupaca, Bank of America
Merrill Lynch ("BAML"), an investment bank that served as a financial advisor to
TKNA and TKAG in the Waupaca Transaction, KPS, the purchaser of Waupaca, and
Perella Weinberg Partners LP, the financial advisor to KPS in the Waupaca
Transaction, are also receiving similar releases.

14.   The releases provided for in the TKNA Settlement Agreement and the Plan do not
release any direct claims that a creditor or Retiree may have against any of the
released parties. In other words, the TKNA Settlement Agreement and the Plan only
release claims that are property of the Debtor's estate, including claims that are only
able to be pursued through derivative standing in the name of the Debtor.

15.   The Causes of Action being released by the Debtor include:

   (a)   Claims and Causes of Action relating to the Debtor's Actual Tax Sharing
   Agreement (see Section VI(E)(1), pp. 34–38).

   (b)   Claims and Causes of Action relating to the Waupaca Transaction (see
   Section VI(E)(2), pp. 38–45).

**F.      Asbestos Claims and Insurance**

16.   Asbestos Claims that are not objected-to during the bankruptcy case on legal grounds,
will "pass through" the bankruptcy case, allowing those Asbestos Claimants to bring
or continue lawsuits against Budd.

17.   The Debtor has multiple insurance policies that will provide more than $100 million
of insurance coverage to satisfy asbestos claims, judgments, or settlements, and to pay
defense costs (*see* section III.F of the Disclosure Statement for more information). In
connection with enforcing the Debtor's insurance policies, the Debtor will, no later
than the date of entry of the Confirmation Order, enter into an Amended Asbestos
Cost Sharing Agreement with multiple insurers, pursuant to which the insurers will
coordinate defense and payment of asbestos claims, judgments, and settlements for

insured claims. Holders of Insured Asbestos Claims (generally, claims brought by holders of Asbestos Claims exposed to Budd's asbestos before November, 1985) shall be paid 100% of the amount of their claim from proceeds of the Asbestos Insurance Policies in accordance with the terms of the Amended Asbestos Cost Sharing Agreement, attached as Exhibit D to the Plan.

18. Holders of Uninsured Asbestos Claims (Asbestos Claims that are not insured, including claimants who were only exposed to the Debtor's asbestos after October, 1985) will be paid 67% of the amount of their Allowed Claim paid from the Uninsured Asbestos Claim Fund until it is exhausted, which will be funded no later than the date of entry of the Confirmation Order by $3,500,000 Cash from the Debtor and ~~assignment by the E&A Retiree Committee of the first $1,500,000 of any~~, on the Effective Date, with an additional $950,000 from the UAW Cash in full and final satisfaction of the Asbestos Committee's Settlement Increase ~~payable to or for the benefit of the E&A Retirees~~Claim (as defined below). The Uninsured Asbestos Claim Fund shall be maintained until the earlier to occur of (a) the date on which less than $1,000 remains in such Asbestos Fund, or (b) the date on which all lawsuits on account of Asbestos Claims brought as of January 1, 2045 have been resolved.

19. The Debtor will fund the Insured Asbestos Claim Fund with $2.2 million in cash, which shall be used for the benefit of the Insurers in accordance with the Amended Asbestos Cost Sharing Agreement. In addition, the Debtor will fund the Asbestos Administration Fund no later than the date of entry of the Confirmation Order with $500,000 to cover the costs of administering the Asbestos Funds in accordance with the terms of the Amended Asbestos Cost Sharing Agreement.

9

20. On the date the Confirmation Order is entered, all pending Asbestos Claims will be deemed withdrawn without prejudice and all objections to Asbestos Claims will be deemed to be withdrawn without prejudice, and all pending Asbestos Claims will "pass through" the Chapter 11 case and revert back to the non-bankruptcy tort system where those claims will be adjudicated.

## G.    Unsecured Creditors

21. Unsecured creditors (not including Retirees or holders of Asbestos Claims) will receive 67% of the allowed amount of their claims.

## III.    SUMMARY OF THE PLAN

### A.    The Debtor's Largest Assets: Cash on Hand and Affiliate Claims

As of March 31, 2016, the Debtor had approximately $272 million in cash. As set forth in monthly reports filed with the Bankruptcy Court, during the course of the Bankruptcy Case to date, the Debtor generally has spent between $4 million and $5 million each month on Retiree Benefits.

The Debtor believes that it holds claims and Causes of Action against ThyssenKrupp North America, Inc. ("TKNA") and other parties that have substantial value.[2] These claims and Causes of Action are described beginning on page 33 below.

### B.    The TKNA Settlement Agreement

To obtain value for the Debtor's largest Causes of Action, the Plan seeks approval of the TKNA Settlement Agreement attached to the Plan as **Exhibit B**. The TKNA Settlement Agreement has been signed by the Debtor and the E&A Retiree Committee.

By way of summary, the TKNA Settlement Agreement provides for, among other things, the following:

1. TKNA will pay on behalf of the Debtor directly to the UAW VEBA for the benefit of the UAW Retirees $320 million Cash, over a period of eight (8) years, starting on the

---

[2] The Debtor's assets include a directors and officers (D&O) liability insurance policy (the "D&O Policy") with a $30,000,000 aggregate limit with a policy period of February 28, 2014 to February 28, 2015. The D&O Policy contains a wind-down endorsement that allows the Debtor to tender claims under the D&O Policy for an additional period of seven years following the end of the policy period. This policy does not cover acts by former directors and officers that are to be released pursuant to the TKNA Settlement Agreement and the Plan.

later of October 3, 2016 or 30 days after the Confirmation Order has become a Final Order, subject to adjustment as set forth in the TKNA Settlement Agreement.

2. TKNA will pay on behalf of the Debtor directly to the E&A VEBA for the benefit of the E&A Retirees $15 million Cash, as soon as possible after the Effective Date, subject to upward adjustment as set forth in the TKNA Settlement Agreement.

3. The Cash contributed by TKNA, as well as what is projected to be more than $200 million of the Debtor's Effective Date Cash, will fund the UAW VEBA and the E&A VEBA, and be used to provide modified healthcare benefits to the UAW Retirees and E&A Retirees (discussed in greater detail below).

4. TKNA will issue the Letter of Credit in an amount not less than $35 million, which Letter of Credit will secure TKNA's payment obligations to the UAW VEBA.

5. TKNA will assume the Pension Plans (which means that the ERISA Pension Plans and the SERP would remain in effect without change). This assumption will have the effect of eliminating the claims against the Debtor filed by the PBGC, asserting liability well over $100 million.

6. TKNA will affirm that it is solely responsible for the Debtor's Workers Compensation Claims.

7. TKNA will assume financial responsibility for Claim number 521 Filed by Waupaca Foundry, Inc. in the Chapter 11 Case.

8. TKNA will continue to provide administrative services to the Debtor under the terms of the Amended Services Agreement (which is attached to the TKNA Settlement Agreement).

9. TKNA and the other Affiliates, including without limitation, TKAG, will waive and release all of their respective Claims and potential Claims against the Debtor, which Claims TKNA asserts may be worth hundreds of millions of dollars, if not more, subject to TKNA's reserved setoff rights as set forth in the TKNA Settlement Agreement.

10. TKNA will continue to own the Equity Interests of the Debtor.

11. TKNA will appoint an Independent Fiduciary selected by the UAW, who will be responsible for enforcing the TKNA Settlement Agreement and will oversee contributions to the Retiree VEBAs pursuant to the Plan.

12. The UAW VEBA and the E&A VEBA are third party beneficiaries of the TKNA Settlement Agreement and have authority to enforce the TKNA Settlement Agreement.

In exchange for the benefits to be received by the Debtor and its creditors, the Debtor would release TKNA, other Affiliates, including TKAG, and their officers, directors, agents and professionals, including Clark Hill and BAML, from all potential claims and Causes of Action, including the Causes of Action related to the Debtor's Actual Tax Sharing Agreement and the Waupaca Transaction that are described in Article VI below. KPS and its affiliates, including Perella Weinberg Partners LP, would also be released if the UAW so elects.

11

### C.     The UAW's Election to Grant the Waupaca Claims Release

The UAW had a right to include or not include the Waupaca Claims Release in the Confirmation Order. If the Waupaca Claims Release were not included in the Confirmation Order, then the Estate would have retained the Causes of Action against KPS and its affiliates, including Perella Weinberg Partners LP, that are described below, and the Independent Fiduciary would have had the authority to pursue such Causes of Action for the benefit of the UAW Retirees. Since the UAW has elected to include the Waupaca Claims Release in the Confirmation Order, such Causes of Action are being released under the Plan and TKNA shall make the Additional Payments to the UAW VEBA totaling $35 million, payable in eight annual installments of $4.375 million each, starting on the later of October 3, 2016 or 30 days after the Confirmation Order becomes a Final Order, as set forth in section 3(b) of the TKNA Settlement Agreement.

### D.     The TK Finance Settlement Agreement

Following the execution of the TKNA Settlement Agreement, the UAW entered into settlement discussions with Budd's Affiliates, including TK Finance. These discussions ultimately led to the execution of the TK Finance Settlement Agreement, attached to the Plan as **Exhibit E**, the terms of which are incorporated into the Plan; provided, however, the portion of paragraph 9 of the TK Finance Settlement Agreement stating that "This Agreement shall not be admissible in any litigation or contested matter, other than one seeking enforcement of this Agreement and/or assertion of rights hereunder" is not applicable or enforceable only in connection with any case or proceeding regarding the Asbestos Committee Settlement Increase Claim (as defined below). The TK Finance Settlement Agreement has been signed by TK Finance and the UAW.

By way of summary, and subject to the express terms and conditions set forth in the TK Finance Settlement Agreement, the TK Finance Settlement Agreement provides, among other things, the following:

1.  TK Finance will pay (i) $4 million on the Effective Date to the UAW VEBA, or an escrow account designated by the UAW, and (ii) an additional $6 million to the UAW VEBA on the later of October 3, 2016 or 30 days after the Confirmation Order has become a Final Order.

2.  The UAW Releasing Parties (as defined in the TK Finance Settlement Agreement) release the Released TKNA Parties from all causes of action that the UAW Releasing Parties could have brought derivatively through the Debtor or the Estate.  The UAW Releasing Parties do not release any causes of action that are unrelated to the Debtor or which the UAW Releasing Parties could assert directly and without acting derivatively through the Debtor or the Estate.

3.  The UAW elects to accept on behalf of the UAW VEBA the Additional Payments under the TKNA Settlement Agreement, and the Confirmation Order shall include the Waupaca Claims Release in the form set forth in Attachment 4 to the TKNA Settlement Agreement.

4. The UAW will support the approval of the TKNA Settlement Agreement by the Bankruptcy Court so long as the TKNA Settlement Agreement has not been modified in a manner that provides for treatment of the UAW Retirees that is materially less beneficial than the treatment provided in the current form.

5. The UAW will support confirmation of an amended chapter 11 plan and amended chapter 11 disclosure statement that reflects the TK Finance Settlement Agreement and that provides for treatment of the UAW Retirees in a manner that is not materially less beneficial than the treatment provided in the Seventh Amended Chapter 11 Plan For The Budd Company, Inc., and will recommend in writing to the UAW Retirees that they vote in favor of such a plan.

6. The effectiveness of the TK Finance Settlement Agreement is conditioned upon a number of things, including (i) the Debtor continuing to estimate, through and including the date of the entry of the Confirmation Order, that the UAW Cash will be no less than $179 million,[3] (ii) the Plan incorporating the TK Finance Settlement Agreement, and (iii) the Bankruptcy Court entering a Confirmation Order that includes the Claims Bar and Indemnity Order in the form set forth in Attachment 3 to the TKNA Settlement Agreement, and the Waupaca Claims Release in the form set forth in Attachment 4 to the TKNA Settlement Agreement

---

[3] The TK Finance Settlement Agreement, among other requirements to effectiveness, requires that the Debtor continue to estimate that the UAW Cash will be no less than $179 million. However, the UAW Cash amount is largely dependent upon factors that are not fully in the control of the Debtor, including, but not limited to, the actual disbursements for the provision of retiree medical benefits to the Retirees through the Effective Date and the actual level of administrative expenses. Furthermore, if the Effective Date is delayed for any reason (e.g., to complete the implementation of the VEBAs), any revised estimate of the UAW Cash would likely be lower to reflect the additional month(s) of disbursements for the provision of retiree medical benefits to the Retirees. Importantly, any reduction in the UAW Cash would likely be substantially due to the payment of additional retiree medical benefits to UAW Retirees.

~~Pursuant to Section 11(c)~~In connection with and premised upon the effectiveness of the ~~TKNA~~TK Finance Settlement Agreement, ~~and Section II.B.4(c)(i) of the Plan,~~the UAW has agreed to contribute $950,000 from UAW Cash on the Effective Date to the Uninsured Asbestos Claim Fund in full and final satisfaction of the Asbestos Committee~~hereby preserves and reserves the right to assert~~'s claim that it is entitled (as assignee of the E&A Retiree Committee) ~~the right~~ to collect $1.25 million from TKNA if the TKNA Settlement Agreement and the TK Finance Settlement Agreement become effective (the "Asbestos Committee Settlement Increase Claim"). ~~TKNA and TK Finance reserves the right to object to and contest~~On the date of the First UAW Payment (as defined in the TKNA Settlement Agreement), TKNA, TK Finance, or an affiliate, shall contribute $50,000 to the UAW VEBA as part of the resolution of the Asbestos Committee Settlement Increase Claim, ~~(and any release or exculpation provision in this Plan shall not estop TKNA or TK Finance from making any objection to or contesting any such claim)~~and such contribution shall not constitute an "Additional Payment" or a "Settlement Increase" under the TKNA Settlement Agreement.

## E.        The Treatment of Retiree Claims

The Plan describes modifications to Retiree Benefits (healthcare benefits), which would occur pursuant to consensual agreements, the Section 1114 Agreements, recognized in the Confirmation Order. The modifications would replace the Retiree Benefits currently available to the UAW Retirees and the E&A Retirees with new benefits that will be funded with Cash from the Debtor and the TKNA Settlement Agreement and contributed to the UAW VEBA and the E&A VEBA, respectively. If the Plan and the TKNA Settlement Agreement are approved: (a) the UAW VEBA will be funded with an estimated $499 million, consisting of an estimated $179 million[4] of Effective Date Cash and $320 million from the Settlement Payments and Additional Payments (the UAW elected to include the Waupaca Claims Release in the Confirmation Order)[5] ; (b) the UAW Settlement Payments and the Additional Payments will be funded annually over 8 years, starting on the later of October 3, 2016 or 30 days after the Confirmation Order has become a Final Order; (c) the E&A VEBA will be funded on the Effective Date with $70 million, consisting of $55 million of Effective Date Cash and $15 million from the Settlement Payments; and (d) the VEBAs will also be funded with any Settlement Increase, with an amount equal to 12.5% of any Settlement Increase going to the E&A VEBA (subject to its assignment of the first $1.5 million of any such Settlement Increase to the Uninsured Asbestos Claim Fund).[6] Pursuant to the TK Finance Settlement Agreement, TK Finance will also provide an additional $10 million to the UAW VEBA.

---

[4] The estimated $179 million of Effective Date Cash for the UAW VEBA assumes an Effective Date of August 1, 2016, payment of Retiree Benefits through the Effective Date consistent with payments made post-petition, and the incurrence of professional fees through the Effective Date consistent with recent experience.

[5] The TK Finance Settlement Agreement provides for the payment of an additional $10 million from TK Finance to the UAW VEBA.

[6] Note that "Settlement Increase" does not include any additional money paid as a result of the UAW's election to grant the Waupaca Claims Release.

If the Plan and the TKNA Settlement Agreement are approved, the UAW Retirees will receive Retiree Benefits pursuant to the terms of the UAW VEBA Trust Plan. The UAW believes that the UAW VEBA Committee will offer UAW Retirees initial benefits through group insurance similar in structure to the VEBAs that cover UAW retirees of companies such as General Motors, Ford, Chrysler and Dana Corporation, though the UAW VEBA Committee is entitled to choose a different healthcare benefits delivery mechanism if it belives doing so is in the best interests of UAW Retirees. The UAW VEBA Committee will have the ability to modify benefits based upon, among other things, the amount of money paid to the UAW VEBA, as well as other factors such as claim experience, medical and prescription drug inflation, earnings on UAW VEBA trust assets, and unexpected changes in the demographics of UAW VEBA participants.

The E&A Retirees will receive Retiree Benefits pursuant to the terms of the E&A VEBA Trust Plan. For the balance of 2016 and 2017, the E&A VEBA will provide medical/hearing/vision and prescription drug benefits to the Post-Medicare E&A Retirees through a Blue Cross Blue Shield of Michigan Medicare advantage plan. For the Pre-Medicare E&A Retirees, the E&A VEBA will provide medical/hearing/vision and prescription drug benefits through a Blue Cross Blue Shield of Michigan group plan with stop loss insurance for claims in excess of $100,000. The dental plan will be a self-insured plan offered through Unicare or another comparable provider. The E&A VEBA will purchase life insurance coverage through Unicare or another comparable provider. The life insurance coverage amount will be at the same dollar amount as the E&A Retiree would have received under the Debtor's E&A Retiree Benefit plan. On an annual basis, beginning for the calendar year 2018, the E&A VEBA will re-evaluate the types of coverage, the design of the benefits plans, and the amounts that E&A Retirees are required to pay for the coverage. The E&A VEBA Trustees will have the right to modify or eliminate benefits and there are no guarantees that the types of coverage, the particular benefits offered or the amounts charged to E&A Retirees for such coverage will not change. It is expected that the funds in the E&A VEBA will last for approximately 25 years, through 2041. The average age of the E&A Retirees (including surviving spouses) is 78. After the funds are exhausted, coverage for the E&A Retirees will terminate.

For the avoidance of doubt, no unused assets of the UAW VEBA or the E&A VEBA will revert to the Debtor or TKNA.

The Plan also provides for the assumption of the Pension Plans (pension benefits) by TKNA, in accordance with the TKNA Settlement Agreement, including the UAW Pension Plan, the E&A Pension Plan, and the SERP. The funding of the Pension Plans will become the sole responsibility of TKNA, with the timing and amount of the funding for the two ERISA Pension Plans continuing to be subject to ERISA and the Code (including applicable regulations) and funding of the SERP continuing to be subject to the terms of the SERP. As a result of the assumption of the Pension Plans by TKNA, full pension benefits for the UAW Retirees and E&A Retirees will continue uninterrupted.

Even if the TKNA Settlement is not approved by the Bankruptcy Court, the ERISA Pension Plans are insured by the PBGC, a wholly owned United States government corporation that guarantees the payment of certain pension benefits upon termination of pension plans

covered by Title IV of ERISA. Under federal law, TKNA and its Affiliates are also liable in the event one or both ERISA Pension Plans are terminated. TKNA cannot be compelled to assume sponsorship of the ERISA Plans.   In the event that the ERISA Pension Plans are terminated, the PBGC has asserted claims against Budd that, if allowed, would greatly diminish the amount of cash available to satisfy Budd's obligation to provide healthcare benefits to its retirees and other claims against Budd.  TKNA and 26 of its Affiliates also have asserted claims against Budd, that if allowed, would further reduce the cash available to provide benefits to Budd's retirees and to pay other claims.  Finally, what an individual retiree would receive if the PBGC were required to administer the ERISA Plans depends on a number of factors including a retiree's age at retirement, the amount of the retiree's pension and the funding level in the ERISA Pension Plans.

## F.    Asbestos Claims Given Access to Asbestos Insurance Policies and Uninsured Asbestos Claim Fund

Asbestos Claims will be liquidated by a court of competent jurisdiction (not the Bankruptcy Court) and satisfied by: (1) proceeds of Asbestos Insurance Policies, which remain in effect and provide coverage for defense and indemnity costs of Asbestos Claims, and (2) the Uninsured Asbestos Claim Fund, which provides $3,500,000 (~~supplemented by up to the first $1,500,000 of any Settlement Increase allocable to the E&A Retirees~~plus the additional $950,000 to be provided from the UAW Cash on the Effective Date) for defense and indemnity costs of Asbestos Claims that are not covered by the Amended Asbestos Cost Sharing Agreement or the Asbestos Insurance Policies. In addition, no later than the date of entry of the Confirmation Order, the Debtor shall fund (i) the Asbestos Administration Fund with $500,000 in cash to cover the costs of administering the Asbestos Funds in accordance with the terms of the Amended Asbestos Cost Sharing Agreement, and (ii) the Insured Asbestos Claim Fund with $2.2 million in cash, which shall be used for the benefit of the Insurers in accordance with the Amended Asbestos Cost Sharing Agreement. Except from the Uninsured Asbestos Claim Fund, no holder of an Asbestos Claim shall have the right to seek payment on account of such Asbestos Claim from the Debtor or its property (other than under an Asbestos Insurance Policy in accordance with the Plan), even if there are insufficient funds in the Uninsured Asbestos Claim Fund to pay the holder of an Asbestos Claim the Distribution to which he or she otherwise would be entitled under this Plan. The Amended Asbestos Cost Sharing Agreement sets forth details regarding the manner in which Asbestos Claims will be administered.

Budd historically maintained substantial insurance coverage with policy periods spanning 1950-1985.  Subject to their terms, conditions and exclusions, these policies provide coverage for defense, settlement and judgments associated with asbestos-related bodily injury claims. Some policies provide defense costs in excess of limits. The Debtor and several of its primary and umbrella and excess insurers have reached an agreement as to payment, handling and allocation of future defense and indemnity for asbestos-related bodily injury claims as set forth in the attached Amended Asbestos Cost Sharing Agreement. As of the filing of this Disclosure Statement, eight (8) insurers have indicated to the Debtor that they will enter into the Amended Asbestos Cost Sharing Agreement if approved as part of this Plan, and the policies subject to the Amended Asbestos Cost Sharing Agreement are listed on its Exhibit 1.

The total limit of the policies identified on Exhibit 1 is estimated to be approximately $90 million per occurrence and $140 million in annual aggregate limits. The insurers have confirmed

16

that from these policies they have spent approximately $10 million. Accordingly, subject to applicable aggregate, per occurrence or other limits, including non-cumulation provisions, Budd anticipates that the remaining limits of the Subject Policies (as defined in the Amended Asbestos Cost Sharing Agreement) should total more than $130 million in annual aggregate limits, and approximately $80 million in per occurrence limits.

The Amended Asbestos Cost Sharing Agreement also provides for the ability to add additional insurers or additional policies at a later date. The Debtor and certain of its insurers have had discussions with five (5) additional insurers that, if subject to the Amended Asbestos Cost Sharing Agreement, could provide millions of additional aggregate limits

**G.      Classified Claims: Classification and Treatment**

The Plan classifies holders of Claims and Equity Interests into the following eight categories.

**1.      Class 1 Non-Tax Priority Claims**

**Estimated[7] Number of Allowed Claims – 0**

**Estimated Aggregate Allowed Amount - $0**

**Estimated Percentage Recovery – 100%**

(a)      *Classification*: Class 1 consists of all Non-Tax Priority Claims. The Debtor estimates there will be no Allowed Non-Tax Priority Claims.

(b)      *Treatment*: Each holder of an Allowed Class 1 Non-Tax Priority Claim shall receive, in the sole discretion of the Debtor, in full satisfaction, settlement, release, extinguishment, and discharge of such Claim: (i) Cash equal to the amount of such Allowed Non-Tax Priority Claim on or as soon as practicable after the latest of (x) the Effective Date, (y) the date that such Claim becomes Allowed, and (z) a date agreed to by the Debtor and the holder of such Claim; or (ii) such other, less favorable treatment on such other terms and conditions as may be agreed upon in writing by the holder of such Claim and the Debtor, or as the Bankruptcy Court may order.

(c)      *Voting*: Class 1 is not Impaired, and holders of Non-Tax Priority Claims are not entitled to vote to accept or reject the Plan.

**2.      Class 2 Secured Claims**

**Estimated Number of Allowed Claims – 0**

**Estimated Aggregate Allowed Amount - $0**

**Estimated Percentage Recovery – 100%**

---

[7] Estimates of the number of Allowed Claims, amounts of Allowed Claims, and recoveries for each Class of Claims are set forth below. Estimates have been calculated based upon a number of assumptions and no representation can be or is being made with respect to whether the estimates shown will actually be realized.

(a) *Classification*: Class 2 consists of all Secured Claims. The Debtor estimates there will be no Allowed Secured Claims. The Indiana Department of Revenue Filed one Secured Claim, but the Debtor is unaware of any collateral securing such Claim. Accordingly, this Claim is and will be treated as a Class 6 General Unsecured Claim.

(b) *Treatment*: Each holder of an Allowed Class 2 Secured Claim shall receive, in the sole discretion of the Debtor, in full satisfaction, settlement, release, extinguishment and discharge of such Claim: (i) Cash equal to the amount of such Allowed Secured Claim on or as soon as practicable after the latest of (x) the Effective Date, (y) the date that such Secured Claim becomes Allowed, and (z) a date agreed to by the Debtor and the holder of such Class 2 Secured Claim; (ii) treatment that such Secured Claim is reinstated; (iii) the property securing such Secured Claim, with any deficiency to result in a Class 6 General Unsecured Claim; or (iv) such other, less favorable treatment on such other terms and conditions as may be agreed upon in writing by the holder of such Claim and the Debtor, or as the Bankruptcy Court may order.

(c) *Voting*: Class 2 is not Impaired, and holders of Secured Claims are not entitled to vote to accept or reject the Plan.

**3.**     **Class 3 UAW Retiree Benefit Claims**
     **Estimated Number of Allowed Claims – Approximately 4,000[8]**

     **Estimated Aggregate Allowed Amount – Unliquidated[9]**
     **Recovery – modified Retiree Benefits**

(a) *Classification*: Class 3 consists of UAW Retiree Benefits Claims.

(b) *Allowance of UAW Retiree Benefits Claims for Voting*: Each UAW Retiree Benefits Claim shall be allowed solely for purposes of voting on the Plan in the amount of $1.

(c) *Treatment:* In satisfaction of the UAW Retiree Benefits Claims, the UAW VEBA shall be established and funded as set forth in the Plan for the benefit of the UAW Retirees. The UAW VEBA shall be governed by the UAW VEBA Trust Agreement, which shall: (i) be in form and substance reasonably acceptable to the Debtor and the UAW; (ii) substantially conform to the trust agreement adopted in connection with the

---

[8] This number represents retirees and surviving spouses. Under the Plan, however, dependents of living retirees are also entitled to their own UAW VEBA allocation even though such dependents may not have a bankruptcy claim.

[9] The claim amounts listed on existing Schedule F for Budd's retiree obligations "represent the present value of future benefit payments as of September 30, 2013 under IAS 19 (International Accounting Standards), as calculated by the Debtor's actuary, Towers Watson, as of September 30, 2013." See Schedules of Assets and Liabilities of The Budd Company, Inc., filed on April 15, 2014 [Docket No. 73]. On or around the date that the Bankruptcy Court approves this Disclosure Statement, the Debtor will file an amended Schedule F, reflecting that the Class 3 UAW Retiree Benefit Claims are unliquidated.

emergence from chapter 11 of Dana Corporation; and (iii) provide for the establishment of the UAW VEBA Committee to manage the affairs of the UAW VEBA, which UAW VEBA Committee shall be the Settlor of the UAW VEBA trust.

The UAW VEBA Committee will be comprised of five (5) individuals consisting of three (3) independent members, Suzanne Daniels, Francine Parker and Gary Petroni, with expertise in health care, employee benefits, asset management, human resources, labor relations, economics, and/or law, and two (2) additional members to be appointed by the UAW. The UAW VEBA Committee shall have the ability to establish investment guidelines for the UAW VEBA assets, hire investment managers, and take actions to enforce the rights of the UAW VEBA as third-party beneficiary under the TKNA Settlement Agreement.

The UAW believes that the UAW VEBA Committee will offer UAW Retirees initial benefits through group insurance similar in structure to the VEBAs that cover UAW retirees of companies such as General Motors, Ford, Chrysler and Dana Corporation. From and after the UAW VEBA Effective Date, the UAW VEBA Committee shall have sole discretion to determine the healthcare benefits delivery model to be implemented by the UAW VEBA for the benefit of the UAW Retirees. The UAW VEBA Committee will have the ability to modify benefits based upon, among other things, the amount of money paid to the UAW VEBA, as well as other factors such as claim experience, medical and prescription drug inflation, earnings on UAW VEBA trust assets, and unexpected changes in the demographics of UAW VEBA participants.

Until the UAW VEBA Effective Date, the Debtor shall continue to provide Retiree Benefits to the UAW Retirees pursuant to the terms and conditions of the Debtor's existing retiree medical plans, the cost of which shall be paid by the Estate. Claims for Retiree Benefits that are incurred but not paid prior to the UAW VEBA Effective Date shall likewise be paid by the Estate pursuant to the terms and conditions of the Debtor's existing retiree medical plans.

(d) *Voting*: Class 3 is Impaired, and holders of UAW Retiree Benefits Claims are entitled to vote to accept or reject the Plan.

4.    **Class 4 E&A Retiree Benefit Claims**

**Estimated Number of Allowed Claims – Approximately 1,000**

**Estimated Aggregate Allowed Amount – Unliquidated[10]**

**Recovery – modified Retiree Benefits**

(a) *Classification*: Class 4 consists of E&A Retiree Benefits Claims.

(b) *Allowance of E&A Retiree Benefits Claims for Voting*: Each E&A Retiree Benefits Claim shall be allowed solely for purposes of voting on the Plan in the amount of $1.

(c) *Treatment*:

(i)    *In General:* In satisfaction of the E&A Retiree Benefits Claims, the E&A Retirees will receive Retiree Benefits through the E&A VEBA. From and after the E&A VEBA Effective Date, each E&A Retiree will receive Retiree Benefits funded by the E&A VEBA pursuant to the terms of the E&A VEBA Trust Plan, as the same may be amended from time to time. The E&A VEBA will be managed by a board of five trustees, which will initially be the current members of the E&A Retiree Committee (Jacqueline Delowery, Mercedes Godin, William Kroger, James Wahlman, and Thomas Whomsley). The members of the E&A Retiree Committee also will be the members of the E&A VEBA Committee on the E&A VEBA Effective Date, which E&A VEBA Committee will be the sponsor of the E&A VEBA Plan.

From and after the Effective Date until the E&A VEBA Effective Date, the Debtor shall continue to provide Retiree Benefits to the E&A Retirees pursuant to the terms and conditions of the Debtor's existing retiree medical plans, the cost of which shall be paid by the Estate. Claims for Retiree Benefits that are incurred but not paid prior to the E&A VEBA Effective Date shall likewise be paid by the Estate pursuant to the terms and conditions of the Debtor's existing retiree medical plans.

(ii)    *Settlement Increase:* The E&A Retiree Committee, on behalf of the E&A Retirees, consents to and assigns to the Uninsured Asbestos Claims Fund the first $1.5 million of any Settlement Increase payable to or for the benefit of the E&A Retirees under the TKNA Settlement Agreement.

---

[10] The claim amounts listed on existing Schedule F for Budd's retiree obligations "represent the present value of future benefit payments as of September 30, 2013 under IAS 19 (International Accounting Standards), as calculated by the Debtor's actuary, Towers Watson, as of September 30, 2013." See Schedules of Assets and Liabilities of The Budd Company, Inc., filed on April 15, 2014 [Docket No. 73]. On or around the date that the Bankruptcy Court approves this Disclosure Statement, the Debtor will file an amended Schedule F, reflecting that the Class 4 E&A Retiree Benefit Claims are unliquidated.

(d) *Voting*: Class 4 is Impaired, and holders of E&A Retiree Benefits Claims are entitled to vote to accept or reject the Plan.

**5.      Class 5 Asbestos Claims**

**Estimated Number of Allowed Claims – Unknown**

**Estimated Aggregate Allowed Amount – $ Unknown**

**Estimated Percentage Recovery – 100% for Insured Asbestos Claims;
67% for Uninsured Asbestos Claims**

(a) *Classification*: Class 5 consists of Asbestos Claims.

(b) *Allowance*: Without regard to whether an Asbestos Claim has been Allowed or Disallowed by the Bankruptcy Court or another court of competent jurisdiction in the Bankruptcy Case prior to the date of entry of the Confirmation Order, each Asbestos Claim must be filed and prosecuted by the claimant in a court of competent jurisdiction (not the Bankruptcy Court) in order to receive compensation, and the extent of the Debtor's liability for such Asbestos Claim shall be resolved by such a court de novo without regard to whether such Asbestos Claim was previously Disallowed or was not evidenced by a proof of claim filed in the Bankruptcy Case.

Upon the entry of the Confirmation Order, any holder of an Asbestos Claim, without regard to whether such Asbestos Claim has been Allowed or Disallowed by the Bankruptcy Court or another court of competent jurisdiction in the Bankruptcy Case, shall be relieved of all stays or injunctions provided for in the Plan and the Confirmation Order and may thereafter pursue such Claim against the Debtor in the state or federal court of competent jurisdiction for the sole purposes of determining the extent and validity of such Asbestos Claim, with any recovery, if any, limited to (i) the proceeds of Asbestos Insurance Policies and (ii) the Uninsured Asbestos Claim Fund.

(c) *Treatment*:

(i)      *Insured Asbestos Claims*:  Upon the entry of (a) a Final Order by a court of competent jurisdiction determining the extent of the Debtor's liability for an Insured Asbestos Claim, or (b) a definitive written settlement agreement with the Debtor consented to by Participating Carriers determining the extent of the Debtor's liability for an Insured Asbestos Claim, the holder of such Insured Asbestos Claim shall receive Cash equal to 100% of the amount of its Insured Asbestos Claim from the proceeds of Asbestos Insurance Policies in accordance with the terms of the Amended Asbestos Cost Sharing Agreement. Any right to recover or pursue recovery on account of any Asbestos Claim from an Asbestos Insurance Policy shall be subject to all coverage and other defenses asserted by a Participating Carrier, as determined by a court of competent jurisdiction. No later than the date of entry of the Confirmation Order, the Debtor will fund the Insured Asbestos Claim Fund with $2.2 million in cash, which shall be used for the benefit of the Insurers in accordance with the Amended Asbestos Cost Sharing Agreement.

(ii)     *Uninsured Asbestos Claims*:  No later than the date of entry of the Confirmation Order, the Debtor shall fund the Uninsured Asbestos Claim Fund in the amount of $3.5 million ~~and the E&A Retiree Committee has assigned to~~ In addition, the Uninsured Asbestos Claim Fund ~~its right to the first $1.5 million of any~~ shall receive on the Effective Date an additional $950,000 from the UAW Cash in full and final satisfaction of the Asbestos Committee's Settlement Increase Claim. Upon the entry of (a) a Final Order by a court of competent jurisdiction determining the extent of the Debtor's liability for an Uninsured Asbestos Claim, or (b) a definitive written settlement agreement with the Debtor determining the extent of the Debtor's liability for an Uninsured Asbestos Claim, the holder of such Uninsured Asbestos Claim shall receive Cash equal to 67% of the amount of its Uninsured Asbestos Claim (consistent with the percentage recovery afforded to Class 6 General Unsecured Claims) solely from the Uninsured Asbestos Claim Fund.

Except from the Uninsured Asbestos Claim Fund, no holder of an Asbestos Claim shall have the right to seek payment on account of such Asbestos Claim from the Debtor or its property (other than under an Asbestos Insurance Policy in accordance with the Plan), even if there are insufficient funds in the Uninsured Asbestos Claim Fund to pay the holder of an Asbestos Claim the Distribution to which he or she otherwise would be entitled under this Plan.

(iii)    *Voting*: Class 5 is Impaired, and holders of Asbestos Claims are entitled to vote to accept or reject the Plan. All Asbestos Claims, without regard to whether such Asbestos Claims have been Disallowed as of the Voting Record Date, shall be allowed in the amount of $1 solely for the purpose of voting on the Plan.

**6.     Class 6 General Unsecured Claims**

**Estimated Number of Allowed Claims – 11**

**Estimated Aggregate Allowed Amount – $7,500,000**

**Estimated Percentage Recovery – 67%**

(a) *Classification*: Class 6 consists of General Unsecured Claims.

(b) *Description*: The Debtor believes that the significant majority of General Unsecured Claims asserted consist of Claims (1) asserted by the MDEQ, EPA, or other Persons related to alleged environmental damage / response costs; and (2) miscellaneous Claims for professional services and other services related to the operation of the Debtor prior to the Petition Date.

(c) *Treatment*: Each Allowed Class 6 General Unsecured Claim shall receive from the Debtor and in full satisfaction, settlement, release, extinguishment, and discharge of such Claim, Cash equal to the amount of 67% of the Allowed amount of such Allowed Class 6 General Unsecured Claim on or as soon as practicable after the later of (x) the Effective Date, (y) the date that such Claim becomes Allowed.

(d) *Voting*: Class 6 is Impaired, and holders of General Unsecured Claims are entitled to vote to accept or reject the Plan.

7.   **Class 7: Claims Assumed by TKNA**

**Estimated Number of Allowed Claims – 78**

**Estimated Aggregate Allowed Amount – $228 million**

**Estimated Percentage Recovery – 100%**

(a) *Classification*: Class 7 consists of Claims that TKNA will assume under the TKNA Settlement Agreement, which are: (i) approximately 24 Claims of Retirees arising under the SERP, which plan TKNA is assuming as of the Effective Date; (ii) Claims arising under either of the ERISA Pension Plans (both of which TKNA is assuming as of the Effective Date); (iii) Claim number 521 Filed by Waupaca Foundry, Inc. in the Chapter 11 Case; and (iv) all Workers Compensation Claims (estimated to be 51 claims).

(b) *Description*: Class 7 Claims are: (i) Claims of Retirees arising under the SERP, which plan TKNA is assuming as of the Effective Date; (ii) Claims arising under either of the ERISA Pension Plans (both of which TKNA is assuming as of the Effective Date); (iii) Claim number 521 Filed by Waupaca Foundry, Inc. in the Chapter 11 Case; and (iv) all Workers Compensation Claims.

(c) *Treatment*: Each Allowed Class 7 Claim shall be assumed by TKNA under the TKNA Settlement Agreement and, as of the Effective Date, TKNA shall bear full financial responsibility for payment and/or other satisfaction in full of all such Claims. No holder of a Class 7 Claim shall receive or retain any property of the Estate on account of such Claim.

(d) *Voting*: Class 7 is Impaired, and holders of Class 7 Claims are entitled to vote to accept or reject the Plan.

8.   **Class 8 Equity Interests**

**Estimated Number of Allowed Equity Interests – 1**

(a) *Classification*: Class 8 consists of Equity Interests.

(b) *Treatment*: TKNA shall retain 100% of the Equity Interests in the Debtor, in accordance with the TKNA Settlement Agreement.

(c) *Voting*: Class 8 is Impaired, and holder of Equity Interests is entitled to vote to accept or reject the Plan.

H.       **Unclassified Claims: Allowance and Treatment**

The Plan includes the following categories of Claims that, in accordance with the Bankruptcy Code, are not classified for purposes of voting or distributions under the Plan:

1.      **Administrative Claims**

        **Estimated Additional Administrative Claims – approximately $5.8 million**

        (a)  Time for Filing Administrative Claims

The holder of any Administrative Claim that is incurred, accrued or in existence prior to the Effective Date, other than an Allowed Administrative Claim or a claim incurred in the ordinary course of business, must File and serve on all parties required to receive such notice a request for the allowance of such Administrative Claim on or before the date that is twenty-eight (28) days after the Effective Date. Such request must comply with applicable sections of the Bankruptcy Code, the Bankruptcy Rules, and orders of the Bankruptcy Court, and must include: (a) the name of the holder of the Claim, (b) the amount of the Claim, and (c) the basis of the Claim. Failure to timely and properly File and serve an application for payment of an Administrative Claim may result in such Administrative Claim being forever barred and discharged. Objections to Administrative Claim applications must be filed and served pursuant to the Bankruptcy Rules and served on the requesting party and the Debtor within twenty-eight (28) days after the filing of such application.

        (b)  Allowance of Administrative Claims

An Administrative Claim that is not incurred and paid by the Debtor in the ordinary course of business shall become an Allowed Administrative Claim only to the extent Allowed by a Final Order.

The Debtor estimates that as of the Effective Date there will be approximately $2.9 million of Administrative Claims that will have been incurred under the traditional Retiree Benefits claim programs and that will not have been reported. The Debtor will reserve for these amounts and pay these Administrative Claims as they are received in the ordinary course of business.

        (c)  Payment of Administrative Claims

The Debtor shall pay in Cash in the ordinary course of business and without further order of the Bankruptcy Court all Administrative Claims incurred in the ordinary course of the Debtor's business. All other Allowed Administrative Claims incurred, accrued, or in existence prior to the Effective Date shall be paid in Cash: (1) on the Effective Date or as soon as practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as practicable thereafter); (2) if such Claim is Allowed after the Effective Date, on the date such Claim is Allowed or as soon as practicable thereafter; (3) at such time and upon such terms as may be agreed upon by such holder and the Debtor; or (4) at such time and upon such terms as set forth in any order of the Bankruptcy Court.

The Estate shall pay the cost of all Retiree Benefits incurred by UAW Retirees prior to the UAW VEBA Effective Date, including costs for Retiree Benefits incurred prior to the UAW VEBA Effective Date that are submitted and/or paid on or after the UAW VEBA Effective Date. The Estate shall pay the cost of all Retiree Benefits incurred by E&A Retirees prior to the E&A VEBA Effective Date, including costs for Retiree Benefits incurred prior to the E&A VEBA

Effective Date that are submitted and/or paid on or after the E&A VEBA Effective Date. The Estate shall pay the costs, fees, and expenses of the Debtor, the UAW, the E&A Retiree Committee, and their respective professionals associated with establishing the UAW VEBA and the E&A VEBA. To the extent incurred after the Effective Date, all of the foregoing amounts shall be paid from administrative reserves established by the Debtor prior to its determination of Effective Date Cash.

**2.    Priority Tax Claims**

**Estimated Allowed Claims – approximately $3,000**

All Allowed Priority Tax Claims shall be paid on the later of: (1) the date the Priority Tax Claim becomes an Allowed Priority Tax Claim, or (2) the date a Priority Tax Claim first becomes payable pursuant to any agreement between the Debtor and the holder of such Priority Tax Claim. At the sole option of the Debtor, such holder of an Allowed Priority Tax Claim shall be entitled to receive, on account of such Priority Tax Claim, (i) Cash equal to the unpaid portion of such Allowed Priority Tax Claim, (ii) treatment in any other manner such that its Allowed Priority Tax Claim shall not be Impaired, including periodic payments on a quarterly basis over a period ending not later than five (5) years after the Petition Date, in accordance with the provisions of sections 511 and 1129(a)(9)(C) of the Bankruptcy Code, or (iii) such other treatment as to which the Debtor and such holder shall have agreed upon in writing. Clause (iii) of the preceding sentence shall not be construed to avoid the need for Bankruptcy Court approval of a Priority Tax Claim when such Bankruptcy Court approval is otherwise required by the Bankruptcy Code.

## IV.    PLAN VOTING INSTRUCTIONS AND PROCEDURES

**A.    Notice to Holders of Claims and Equity Interests**

The Bankruptcy Court has approved this Disclosure Statement as providing information of a kind and in sufficient and adequate detail to enable holders of Claims entitled to vote on the Plan to make an informed judgment whether to accept or reject the Plan. The Bankruptcy Court's approval of this Disclosure Statement does not constitute a guaranty of the accuracy or the completeness of the information contained herein or an endorsement of the Plan by the Bankruptcy Court.

**B.    Voting Requirements to Confirm Plan**

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan. Section 1129(a)(7) of the Bankruptcy Code requires that each class of Claims either (a) accepts the Plan or (b) is not Impaired under the Plan. Classes 1 and 2 are not Impaired under the Plan. Under Section 1126 of the Bankruptcy Code, each of Classes 3 through 8 accepts the Plan if creditors holding (i) 2/3 in amount and (ii) 1/2 in number of the Allowed Claims or Equity Interests in such Class that cast ballots vote to accept the Plan.

**C.    Voting Rights**

Pursuant to the provisions of the Bankruptcy Code, only classes of Claims or Equity Interests that are (a) "impaired" by a chapter 11 plan and (b) entitled to receive a distribution under such plan are entitled to vote to accept or reject such plan.  In the Bankruptcy Case,

Classes 3 through 8 are Impaired by and may be entitled to retain property or receive a Distribution under the Plan on account of such Claims or Equity Interests. Accordingly, the holders of Allowed Claims and Equity Interests in Classes 3 through 8 are entitled to vote to accept or reject the Plan. Claims in Classes 1 and 2 are not Impaired by the Plan; accordingly, holders of Class 1 Claims and Class 2 Claims are conclusively presumed to have accepted the Plan and are not eligible to vote on the Plan.

### D.        Solicitation Materials

In soliciting votes for the Plan pursuant to this Disclosure Statement, the Debtor, through the Estate's balloting agent, Epiq Bankruptcy Solutions, LLC (the "Balloting Agent") will send to holders of Claims and Equity Interests who are entitled to vote copies of:  (a) the Disclosure Statement and Plan; (b) the notice of, among other things, (i) the date, time and place of the hearing to consider confirmation of the Plan and related matters and (ii) the deadline for filing objections to confirmation of the Plan (the "Confirmation Hearing Notice"); (c) a Ballot (and return envelope) to be used in voting to accept or to reject the Plan; and (d) other materials as authorized by the Bankruptcy Court.

If you are the holder of a Claim that is entitled to vote, but you did not receive a Ballot, or if your Ballot is damaged or illegible, or if you have any questions concerning voting procedures, you may contact the Balloting Agent:

**By regular mail to:**

> The Budd Company, Inc. Ballot Processing
> c/o Epiq Bankruptcy Solutions, LLC
> P.O. Box 4422
> Beaverton, OR  97076-4422

**By overnight courier or hand delivery to:**

> The Budd Company, Inc. Ballot Processing
> c/o Epiq Bankruptcy Solutions, LLC
> 10300 SW Allen Blvd.
> Beaverton, OR  97005

**By telephone at: (877) 559-8630**

**By email to:**  tabulation@epiqsystems.com  **(please reference "The Budd Company in the subject line of your email)**

### E.        Voting Procedures, Ballots and Voting Deadline

After reviewing the Plan and this Disclosure Statement, you are asked to indicate your acceptance or rejection of the Plan by voting in favor of or against the Plan on the accompanying Ballot.

You should complete and sign your original Ballot (copies will not be accepted) and return it to the Balloting Agent in the envelope provided. Do not return your Ballot to the Debtor.

Each Ballot has been coded to reflect the Claim it represents. Accordingly, in voting to accept or reject the Plan, you must use only the coded Ballot sent to you with this Disclosure Statement.

IN ORDER FOR YOUR VOTE TO BE COUNTED, YOUR BALLOT MUST BE PROPERLY COMPLETED AS SET FORTH ABOVE AND IN ACCORDANCE WITH THE VOTING INSTRUCTIONS ON THE BALLOT AND <u>RECEIVED</u> BY THE BALLOTING AGENT BY DELIVERY TO THE US MAIL OR OVERNIGHT DELIVERY ADDRESSES ABOVE NO LATER THAN _____ **(THE "VOTING DEADLINE")**.  BALLOTS WILL NOT BE ACCEPTED VIA FACSIMILE OR OTHER ELECTRONIC MEANS.

Copies of this Disclosure Statement, the Plan and any appendices and exhibits to such documents are available to be downloaded free of charge at http://dm.epiq11.com/TBC

## F.        Confirmation Hearing and Deadline for Objections to Confirmation

The Bankruptcy Court has scheduled a Confirmation Hearing for _____ **at __:__ _.m. prevailing Central time**. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for the announcement of the adjournment date made at the Confirmation Hearing or at any subsequent adjourned Confirmation Hearing.

Objections to confirmation of the Plan or proposed modifications to the Plan, if any, must:  (a) be in writing; (b) conform to the Federal Rules of Bankruptcy Procedure and the Local Rules of the Bankruptcy Court; (c) state the name and address of the objecting party and the amount and nature of the claim or interest of such party; (d) state with particularity the basis and nature of any objection to the Plan; and (e) be filed electronically, together with proof of service, with the United States Bankruptcy Court for the Northern District of Illinois, 219 South Dearborn, Chicago, IL 60604, and served on the parties listed in the Confirmation Hearing notice, in each case so as to be actually received on or before _____.

## G.        Plan Binding on Creditors and Parties in Interest

If the Plan is approved by the Bankruptcy Court, the Plan will bind all holders of Claims against and Equity Interests in the Debtor, whether or not they were entitled to vote or did vote to accept or reject the Plan and whether or not they receive or retain any distributions or property under the Plan.

## V.        DEBTOR'S BACKGROUND AND EVENTS LEADING TO BANKRUPTCY

## A.        Brief Overview of the Debtor's Business Operations

The Debtor has a long history of manufacturing related to the automobile and other industries.

In 1978, a predecessor of TKAG acquired the Debtor.

The Debtor currently is a wholly owned subsidiary of TKNA, which is a direct subsidiary of TKAG. Thus, the Debtor is a member of the global ThyssenKrupp group. The ThyssenKrupp

group operates in almost 80 countries, employs over 150,000 people world-wide, and in fiscal year ending September 30, 2014, generated sales of approximately €41 billion (Euros). TKNA and its myriad subsidiaries located in the United States employ almost 15,000 people and, in fiscal year ending September 30, 2014, generated sales of almost €7 billion (Euros).

Budd ceased all manufacturing activity in 2006, divested itself of Waupaca, its last operating subsidiary, in 2012 and, as of the Petition Date, did not generate revenue (directly or indirectly) from manufacturing or other operations.

**B.        The Debtor's Retiree Benefit Obligations**

As of the Petition Date, Budd provided Retiree Benefits to UAW Retirees and E&A Retirees.

The Debtor provides Retiree Benefits to UAW Retirees pursuant to the terms and conditions of various CBAs and/or PCAs.  The Claims relating to these Retiree Benefits are classified under the Plan as Class 3 Claims.

The Debtor provides Retiree Benefits to E&A Retirees pursuant to the terms and conditions of various insurance plans, their summary plan descriptions, and, in certain cases, employment agreements with E&A Retirees.  The Claims relating to these Retiree Benefits are classified under the Plan as Class 4 Claims.

The Debtor estimates that, as of the Petition Date, its defined benefit Retiree Benefit obligations under the existing Retiree Benefits plans were approximately $932 million (approximately $830.5 million on account of obligations to UAW Retirees and approximately $101.5 million on account of obligations to E&A Retirees). The Debtor estimates that, as of September 30, 2015, its defined benefit Retiree Benefit obligations under the existing Retiree Benefits plans were approximately $810 million (approximately $733 million on account of obligations to UAW Retirees and approximately $77 million on account of obligations to E&A Retirees).

During the course of the Bankruptcy Case, the UAW Retirees have been represented by the UAW and the E&A Retirees have been represented by the E&A Retiree Committee, each in accordance with section 1114 of the Bankruptcy Code. Pursuant to section 1114 of the Bankruptcy Code, the Debtor has continued to pay Retiree Benefits in full and without modification for the benefit of both the E&A Retirees and UAW Retirees. During the course of the Bankruptcy Case, the Debtor generally has spent between $4 million and $5 million each month on Retiree Benefits, and received the benefit of approximately $500,000 each month in the forms of rebates and premiums paid.

The Plan modifies Retiree Benefits by terminating, on the respective UAW VEBA Effective Date and E&A VEBA Effective Date, the existing UAW and E&A Retiree Benefits Plans. In the case of the UAW Retiree Benefits and the E&A Retiree Benefits, the modification is authorized by section 1114(e)(1)(B) of the Bankruptcy Code as a result of the agreement to such modification by the UAW and the E&A Retiree Committee. From and after the Effective Date until the respective E&A VEBA Effective Date and the UAW VEBA Effective Date, the Debtor shall continue to provide Retiree Benefits to the E&A Retirees and the UAW Retirees

pursuant to the terms and conditions of the Debtor's existing retiree medical plans, the cost of which shall be paid by the Estate. Claims for Retiree Benefits that are incurred but not paid prior to the applicable E&A VEBA Effective Date or UAW VEBA Effective Date shall likewise be paid by the Estate pursuant to the terms and conditions of the Debtor's existing retiree medical plans. After the respective E&A Retiree VEBA Effective Date and the UAW Retiree VEBA Effective Date, the E&A Retirees and the UAW Retirees will have the rights afforded to them under the Retiree VEBAs and will receive Retiree Benefits pursuant to the terms of the E&A VEBA Trust Plan and the UAW VEBA Trust Plan, as the same may be amended from time to time.

As discussed below, the Debtor believes that by providing for the funding of the UAW VEBA and the E&A VEBA, Retirees will have the ability for the rest of their lives to obtain replacement healthcare benefits.

Moreover, the Debtor believes that if it were to continue to pay Retiree Benefits under the existing plans, the Debtor would run out of Cash to fund those plans (even with the Cash Settlement Payments that will be made under the TKNA Settlement Agreement) prior to the end of many of the Retirees' lifetimes. Accordingly, the Debtor proposes to use its Effective Date Cash and the Settlement Payments to fund the Retiree VEBAs in order to provide Retirees with replacement Retiree Benefits. Although the Retiree VEBAs will not be controlled by the Debtor, it is expected that, consistent with common practice, the Retiree VEBAs would invest their plan assets to increase the amount ultimately payable to Retirees. For the avoidance of doubt, no unused assets of the UAW VEBA or the E&A VEBA will revert to the Debtor or TKNA.

## C.    The Debtor's Pension Obligations

The Debtor currently sponsors three defined-benefit Pension Plans. Two of the Pension Plans are the ERISA Pension Plans, each a defined benefit pension covered by Title IV of ERISA. The ERISA Pension Plans are insured by the PBGC, a wholly owned United States government corporation that guarantees the payment of certain pension benefits upon termination of pension plans covered by Title IV of ERISA.

The ERISA Pension Plans are also subject to certain rules and regulations. Among other things, upon any termination of the ERISA Pension Plans, the Debtor and its "controlled group" members, including TKNA and certain other Affiliates, will become jointly and severally liable for the underfunded portion of the ERISA Pension Plans. The Debtor estimates that, as of September 30, 2015, the ERISA Pension Plans had a combined funding deficit of approximately $365 million on a "termination basis."

The ERISA Pension Plans will not be modified or affected by the Plan, and will be continued after the Effective Date in accordance with the respective terms of each ERISA Pension Plan. Under the Plan, on the Effective Date, TKNA shall assume all liabilities associated with the ERISA Pension Plans under ERISA and the Code and shall be obligated to: (a) satisfy each ERISA Pension Plan's minimum funding standards under 26 U.S.C. §§ 412, 430 and 29 U.S.C. § 1082; (b) pay statutory premiums to the PBGC with respect to each ERISA Pension Plan in accordance with 29 U.S.C. §§ 1306 and 1307; and (c) administer each ERISA Pension

Plan in accordance with the provisions of each of the ERISA Pension Plans, ERISA and the Code.

After the Effective Date, TKNA will have the authority to terminate or amend either ERISA Pension Plan in accordance with the respective terms of each ERISA Pension Plan, ERISA, and the Code.  In general, if either ERISA Pension Plan terminates after the Effective Date, TKNA and all members of TKNA's controlled group (as defined in 29 U.S.C. §§ 1301(a)(14)) will be jointly and severally liable to PBGC for any unpaid minimum funding contributions owed to the terminated ERISA Pension Plan(s), and any statutory premiums owed to PBGC, along with any underfunded benefit liabilities of the terminated ERISA Pension Plan(s).

No provision within this Disclosure Statement, the Plan, the Confirmation Order, or section 1141 of the Bankruptcy Code shall be deemed or construed to discharge, release, or relieve the Debtor, TKNA, any member of TKNA's controlled group, or any other entity or person, in any capacity, from any current or future liability with respect to either ERISA Pension Plan, and the PBGC and the ERISA Pension Plans will not be enjoined or precluded from enforcing such liability as a result of the Plan's provisions or confirmation.

PBGC has filed contingent claims against the Debtor (collectively, the "PBGC Claims"), including estimated claims for the ERISA Pension Plans' underfunded benefit liabilities on a termination basis in an unliquidated amount.  Upon the Effective Date, PBGC will be deemed to have withdrawn the PBGC Claims with prejudice. But for the TKNA Settlement Agreement and assumption by TKNA of the Pension Plans under the TKNA Settlement Agreement, these Claims would be Class 6 General Unsecured Claims under the Plan that would receive a Distribution if Allowed. Similarly, TKNA and 26 other Affiliates also filed Claims asserting joint and several liability against the Debtor in the event one or both ERISA Pension Plans are terminated. The allowance of the PBGC Claims and the claims of TKNA and the Affiliates would greatly diminish the amount of cash available to satisfy the Debtor's other claims.

The third Pension Plan is the SERP, which is an underfunded defined benefit plan for the benefit of certain E&A Retirees. The SERP is not covered by the PBGC. Liabilities under the SERP are general unsecured obligations of the Debtor and the benefits are paid only from the Debtor's general assets. The Debtor believes that TKNA has guaranteed certain of the obligations of the Debtor under the SERP. Under the Plan, the SERP will be assumed by TKNA and TKNA will continue to pay in full obligations arising under the SERP, and thus holders of Claims alleging SERP liability will not receive any Distribution from the Estate on account of such Claims, thereby leaving more Cash to satisfy the Debtor's other claims. The Debtor estimates that, as of September 30, 2015, its underfunded obligations under the SERP were approximately $11.2 million.

## D.        The Debtor's Asbestos Liabilities

Over the past several decades, Budd has been named as a defendant in suits involving more than 40,000 claimants alleging exposure to asbestos. The vast majority of such claims were resolved without payment from Budd. As of the Petition Date, approximately 336 suits alleging

injury from asbestos were pending against the Debtor. During the Bankruptcy Case approximately 2,000 Asbestos Claims were filed against the Debtor. All Asbestos Claims are classified as Class 5 Claims under the Plan.

**E.        Events Leading to Commencement of the Bankruptcy Case**

In 2012, Budd sold all of the stock of Budd's wholly-owned subsidiary, Waupaca, to KPS. At the time of the sale, Waupaca owned the sole remaining operating facility under Budd's direct or indirect control, the Waupaca foundry operations.

Also in or about 2012, Budd reviewed its books and analyzed its financial ability to satisfy its legacy liabilities, which consisted primarily of its obligation to pay Retiree Benefits. The Debtor's review indicated that Budd was insolvent on a balance-sheet basis, due to long-term obligations to pay Retiree Benefits and fund the Pension Plans. Because Budd had Cash, however, it continued to pay Retiree Benefits and all other obligations as they came due.

In order to determine if Budd had any valuable Causes of Action that it could pursue to supplement its cash and pay its long term obligations, it retained an independent Chief Restructuring Officer and appointed an Independent Director. In or around the Spring of 2013, Budd's Board of Directors: (a) delegated to the Debtor's Chief Restructuring Officer (then Mr. Charles Moore) the task of commencing an independent investigation of potential claims against the Affiliates (the "Affiliate Investigation"); (b) authorized the retention of Conway MacKenzie Management Services, LLC ("Conway MacKenzie") as crisis manager to assist the conduct of the Affiliate Investigation; (c) authorized the retention of Dickinson Wright PLLC ("Dickinson Wright") as independent special counsel for purposes of assisting the Chief Restructuring Officer to conduct the Affiliate Investigation; (d) appointed Mr. Charles Sweet as Independent Director; and (e) passed a corporate resolution that, among other things, required the consent of the Independent Director to compromise or otherwise resolve the Debtor's claims against the Affiliates. At the time they were retained, none of Conway MacKenzie, Mr. Moore, Dickinson Wright, or Mr. Sweet had any meaningful relationship with any Affiliate, other than by virtue of their work for Budd.

After conducting the Affiliate Investigation,  the Chief Restructuring Officer negotiated in the month prior to the Petition Date, and the Independent Director approved on behalf of Budd: (1) a settlement agreement with TKNA (the "Original TKNA Settlement Agreement"); and (2) a "Prepetition Agreement," pursuant to which, among other things, (a) TKNA assumed certain workers compensation and other liabilities, and (b) Budd and TKNA executed a purported amendment (by execution of the "Non-Debtor TSA Amendment," which was part of the Prepetition Agreement) to a tax sharing agreement to which the Chief Restructuring Officer was led to believe Budd was a party (the "Non-Debtor TSA"). Copies of the Original TKNA Settlement Agreement, the Prepetition Agreement, and the Non-Debtor TSA Amendment, all of which were executed by authorized representatives of TKNA and Budd on or about March 25, 2014, are attached to and described in detail in the Debtor's motion to approve the Original TKNA Settlement Agreement. [*See* Docket No. 11].

Among other things, the Original TKNA Settlement Agreement provided for: (1) assumption by TKNA of the Pension Plans; (2) payment by TKNA of a cash settlement amount of approximately $10 million, which amount was subject to adjustment; and (3) the exchange of mutual general waivers and releases by the Debtor and Affiliates. Budd agreed to the Prepetition

Agreement, the Non-Debtor TSA Amendment, and the Original TKNA Settlement Agreement based on information regarding the Non-Debtor TSA that the Debtor would later find out was untrue, as described below.

## VI.   THE BANKRUPTCY CASE

### A.   Commencement of the Bankruptcy Case

On March 31, 2014 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. Also on the Petition Date, the Debtor filed multiple pleadings, including a motion seeking approval of the Original TKNA Settlement Agreement. [*See* Docket No. 11].

### B.   Recognition and Participation of Creditors

On April 14, 2014, with the support of the Debtor, the Bankruptcy Court entered an order that recognized the UAW as the representative of the UAW Retirees under section 1114 of the Bankruptcy Code and directed the Debtor to pay the reasonable expenses of professionals for the UAW in connection with the Bankruptcy Case. [*See* Docket No. 60].

On April 14, 2014, the Bankruptcy Court granted a motion of the Debtor and directed the office of the United States Trustee to appoint a committee to represent E&A Retirees under section 1114 of the Bankruptcy Code. [*See* Docket No. 61]. On April 30, 2014, the US Trustee constituted the E&A Retiree Committee. [*See* Docket No. 113].

On July 30, 2014, upon order of the Bankruptcy Court, the office of the United States Trustee constituted the Asbestos Plaintiffs Committee. [*See* Docket No. 364].

### C.   The Debtor's Withdrawal of its Motion for Approval of the Original TKNA Settlement Agreement

Subsequent to recognition of the UAW as the representative of the UAW Retirees and appointment of the E&A Retiree Committee, the Bankruptcy Court entered multiple orders establishing dates for discovery related to and hearings on the motion seeking approval of the Original TKNA Settlement Agreement. [*See* Docket Nos. 106, 274, 371, 374, 406, 431, and 436]. During this time, the E&A Retiree Committee and the UAW conducted discovery regarding the merits of the Original TKNA Settlement Agreement, including the potential value of the claims against TKNA and other Affiliates proposed to be released.

During the course of this discovery, counsel to the Debtor discovered that the Non-Debtor TSA was not the actual tax sharing agreement to which Budd and TKNA were parties. As set forth in the Debtor's subsequent statement to the Bankruptcy Court: (1) in contrast to the Non-Debtor TSA, the tax sharing agreement to which the Debtor and TKNA were parties (the "Debtor's Actual Tax Sharing Agreement") was in fact valuable to the Debtor, and (2) as a result of obtaining this new information, the Debtor determined that it would not continue to seek approval of the Original TKNA Settlement Agreement. [*See* Docket No. 447]. As a result, the Bankruptcy Court dismissed the Debtor's motion seeking approval of the Original TKNA Settlement Agreement for want of prosecution on October 17, 2014.  [*See* Docket No. 616].

**D.      The Status Quo Order and the 2004 Investigations**

After the Debtor determined not to seek approval of the Original TKNA Settlement Agreement, the Debtor commenced the TKNA Adversary Proceeding to preserve its rights under the Debtor's Actual Tax Sharing Agreement. Shortly after commencing the TKNA Adversary Proceeding, the Bankruptcy Court entered (upon motion of the Debtor and with the consent of TKNA) the Status Quo Order. The Status Quo Order remains in effect, and absent further order of the Bankruptcy Court, it prevents TKNA from transferring its equity interests in the Debtor or taking other steps to impair the Debtor's rights under and/or interest in the Debtor's Actual Tax Sharing Agreement.

At or about the same time, the Debtor, the UAW, and the E&A Retiree Committee sought and obtained a series of orders of the Bankruptcy Court authorizing them to issue discovery to TKNA and others under Bankruptcy Rule 2004. [*See* Docket Nos. 532, 571, 623, 841, 842]. The Debtor's discovery was principally aimed at investigating the potential value of future payments that could become owed to the Debtor by TKNA under the Debtor's Actual Tax Sharing Agreement and other transactions, including the Debtor's sale of Waupaca in 2012. Discovery conducted by the Debtor, UAW and the E&A Retiree Committee investigated potential claims that the Debtor may hold against TKNA, Affiliates, and others that may not have been uncovered by the Affiliate Investigation. Ultimately, the Debtor, the UAW and the E&A Retiree Committee conducted more than 10 depositions and reviewed more than 30,000 documents.

**E.      Potential Claims Against TKNA and Others**

The discovery conducted by the Debtor, the UAW and the E&A Retiree Committee revealed multiple Causes of Action that the Debtor holds against TKNA, other Affiliates and other parties, including Clark Hill and KPS, that were not uncovered by the Affiliate Investigation.  As discussed immediately below, these Causes of Action largely relate to either: (1) the Debtor's rights under the Debtor's Actual Tax Sharing Agreement (discussed below); or (2) the Debtor's June 29, 2012 sale of the stock of Waupaca to KPS for a cash purchase price of $544 million (discussed below).  The discussion of the Debtor's potential claims and Causes of Action against TKNA, its Affiliates and others in this Disclosure Statement represent the Debtor's position, as to which there is or may be disagreement on the part of TKNA, its Affiliates and others (*e.g.*, Clark Hill and KPS).

**1.      *Claims Related to the Debtor's Actual Tax Sharing Agreement***

TKNA and each of its U.S. Affiliates, including the Debtor, are part of the TKNA Tax Group.  Pursuant to the consolidated return Treasury Regulations (i.e., tax regulations issued by the IRS that constitute the official interpretation of the Code), if one or more members of the TKNA Tax Group has net taxable income in a taxable year, the other members' losses incurred in that same taxable year will offset that taxable income on a pro-rata basis, and, subject to certain limitations, unused losses from other years may be carried forward or backwards as

appropriate to offset income beyond the current-year losses.[11] TKNA has entered into tax sharing agreements with certain members of the TKNA Tax Group, governing, among other things, the terms under which a member shall be paid by TKNA for the use of its losses.

The Debtor's Actual Tax Sharing Agreement provides for the cash payment by TKNA to the Debtor to the extent losses incurred by the Debtor are used to offset the taxable income of other members of the TKNA Tax Group in a given year. Further, in the three years prior to the Petition Date, the Debtor received payments from TKNA in connection with the Debtor's Actual Tax Sharing Agreement on account of losses incurred by the Debtor, even though some of those losses were carried forward to future years and were not used to offset current or past taxable income of other members of the TKNA Tax Group. Accordingly, TKNA has claimed that Budd was overpaid for those years and must refund the amount of such alleged overpayments, which TKNA claims is approximately $59,400,000 for the tax years 2010 forward according to TKNA's March 30, 2015 Proof of Claim.

Each dollar of Retiree Benefits paid by the Debtor was deductible for U.S. federal income tax purposes. As a result, the Debtor's payment of Retiree Benefits each year gave rise to a sizable loss that was available to the TKNA Tax Group to offset the income of other members.

During the Affiliate Investigation, TKNA provided the Chief Restructuring Officer and his advisors (i.e., the Chief Restructuring Officer's then-firm, Conway MacKenzie, Inc.; his legal counsel, Dickinson Wright LLP; and the accounting firm UHY LLP (collectively, the "CRO's Advisors")) with a copy of the Non-Debtor TSA, which is a form of a tax sharing agreement that was used by certain U.S. Affiliates other than the Debtor and which had terms substantially less favorable than the terms of the Debtor's Actual Tax Sharing Agreement. Specifically, the Non-Debtor TSA provided that the signatory Affiliate would be paid for losses used to offset income of other members of the TKNA Tax Group only to the extent that the Affiliate had future income of its own. Unbeknownst to the Chief Restructuring Officer and the CRO's Advisors until well after execution of the Original TKNA Settlement Agreement, the execution of the Non-Debtor TSA Amendment and the Petition Date, Budd never was a party to the Non-Debtor TSA. The analysis of the Chief Restructuring Officer and the CRO's Advisors of issues concerning rights and liabilities for tax sharing payments was based on the terms of the Non-Debtor TSA. Based on, among other things, that analysis, Budd and TKNA entered into the Original TKNA Settlement Agreement and the Non-Debtor TSA Amendment.

Once the Debtor's Actual Tax Sharing Agreement was discovered by the Debtor's counsel (after the Non-Debtor TSA Amendment had been executed), the Debtor determined that on a going forward basis it would be entitled to receive payments from TKNA under that agreement as the Debtor's losses were used by the TKNA Tax Group to reduce its taxable income, and that these payments to the Debtor would not depend upon the Debtor's ability to

---

[11] Where the aggregate current losses of those members with losses ("loss members") do not exceed the taxable income of those members with income ("income members"), each loss member's current loss is used in full to offset the taxable income of the group, and unused losses from prior years (or subsequent years), if any, may be carried forward (or carried back) to offset the remaining taxable income, subject to certain limitations. However, where the loss members' aggregate current losses exceed the income members' aggregate taxable income, each loss member's current loss is used pro-rata (in the ratio that the aggregate taxable income of the income members bears to the aggregate current losses of all loss members).

generate taxable income in the future.  Moreover, the Debtor had over $300 million in cash and expected to spend the majority of that money to pay Retiree Benefits, which payments should be deductible for U.S. federal income tax purposes and therefore should give rise to a significant amount of losses.  The Debtor concluded that it could receive up to $200 million or more (on a non-present value basis) in future payments under the Debtor's Actual Tax Sharing Agreement if it were not terminated for a number of years.  The amount of payments would depend upon the application of a variety of factors discussed below.  This estimate by the Debtor also includes amounts that Debtor believes are owed by TKNA to the Debtor for past years under the Debtor's Actual Tax Sharing Agreement.

Accordingly, the Debtor believes that it holds at least the following Causes of Action related to the Debtor's Actual Tax Sharing Agreement and execution of the Non-Debtor TSA Amendment: (1) a judicial declaration that the terms of the Non-Debtor TSA Amendment are not binding on the Debtor because the amendment purports to amend a contract to which Budd was never a party; (2) alternatively, a judicial declaration that the Non-Debtor TSA Amendment is void due to mutual or unilateral mistake or fraudulent inducement; (3) alternatively, a judicial declaration that TKNA is equitably estopped from enforcing the Non-Debtor TSA Amendment; (4) alternatively, a judicial declaration that the Non-Debtor TSA Amendment is an unenforceable fraudulent transfer under section 547, 548, and/or 544 of the Bankruptcy Code and/or under sections 5(a)(2), 6(a) and/or 6(b) of the Illinois Uniform Fraudulent Transfer Act; and (5) a claim for breach of the Debtor's Actual Tax Sharing Agreement by TKNA for sums that should have been paid to Budd by TKNA to date.

Absent a settlement with TKNA, the Debtor's ability to receive payments under the Debtor's Actual Tax Sharing Agreement from TKNA in the future (and the amount of any such payments) depends upon a number of factors, including without limitation, (1) the amount of future deductible expenses incurred by the Debtor; (2) the future profitability of the TKNA Tax Group and its individual members; (3) the continued ownership by TKNA of the Debtor after the Effective Date of the Plan, which, if not consented to by TKNA, would likely require the incorporation in the Plan of some form of the Status Quo Order; (4) whether the Debtor could continue to be a member of the TKNA Tax Group under the consolidated return Treasury Regulations after the Effective Date of the Plan, even if TKNA continued to own 100 percent of the stock of the Debtor; (5) the Debtor prevailing on the argument, which has been contested by TKNA, that the Debtor's Actual Tax Sharing Agreement is not unilaterally terminable by TKNA following the expiration of the Status Quo Order; (6) the Debtor prevailing on the argument, which has been contested by TKNA, that the Non-Debtor TSA Amendment is not enforceable against the Debtor; and (7) there being no future changes in tax law or regulation that would adversely affect the application of the Debtor's Actual Tax Sharing Agreement, the tax deductibility of future payments the Debtor would make on account of Retiree Benefits or that would reduce corporate tax rates, any of which would affect the value of the Causes of Action.

The Debtor believes that it has a relatively strong basis for arguing that the Non-Debtor TSA Amendment should be deemed void, that the Debtor's Actual Tax Sharing Agreement is valid and enforceable, and that it is entitled to recover payments due under the Debtor's Actual Tax Sharing Agreement for the fiscal years ending September 30, 2013, 2014 and 2015. The amount of such recovery for those years, however, is a relatively small portion of the overall $200 million of potential recovery identified above (the Debtor estimates that the total amounts

due for the fiscal years ending September 30, 2013 and September 30, 2014 is about $25 million, but TKNA estimates the amount at only $21 million). The bulk of the $200 million potential recovery is from projected future tax sharing agreement payments that the Debtor estimates could be due from TKNA. The Debtor's ultimate ability to recover such future sums, however, is subject to significant uncertainty. TKNA may be able to take steps that could cause the Debtor to cease to be a member of the TKNA Tax Group and therefore terminate all future tax sharing payments that would otherwise be due to the Debtor under the Debtor's Actual Tax Sharing Agreement.[12] TKNA has also indicated that, in the absence of a settlement, it intends to litigate its argument that it can terminate the Debtor's Actual Tax Sharing Agreement at will. In addition, potential changes in the applicable tax laws could reduce or eliminate TKNA's ability to deduct the Debtor's benefit payments, which, in turn, could negatively impact the amount of any future tax sharing payments that TKNA might owe to the Debtor under the Debtor's Actual Tax Sharing Agreement.

In addition, TKNA has asserted a Claim in the Bankruptcy Case, seeking to recover approximately $80 million that it claims to have overpaid the Debtor under the Debtor's Actual Tax Sharing Agreement. The Debtor contests this Claim on the grounds that, among other things, the alleged "overpayments" were voluntary capital contributions (i.e., equity investments by TKNA in the Debtor) that were intentionally made by TKNA in full knowledge that they exceeded the amounts called for by the Debtor's Actual Tax Sharing Agreement and that there is no provision in the Debtor's Actual Tax Sharing Agreement allowing TKNA to recover such payments and no documentation suggesting such payments were intended to be treated as loans. There is, however, still a risk that a court may reject these defenses on one or more equitable or other legal theories (e.g., because the Debtor received more than it was entitled to under the Debtor's Actual Tax Sharing Agreement), notwithstanding that the equities appear to favor the Debtor, and require the Debtor to refund the amount of the alleged overpayments to TKNA. If the TKNA Settlement Agreement is approved, TKNA will be releasing this $80 million Claim.

In addition to its Causes of Action arising under or related to the Non-Debtor TSA Amendment and the Debtor's Actual Tax Sharing Agreement, the Debtor contends that TKNA improperly charged Budd in 2013 for approximately $76 million in respect of taxable income (the "Waupaca Gain Payment") that was attributable to Waupaca on a separate company basis and arose from the 2012 sale of stock of Waupaca that was treated as a deemed sale of assets by Waupaca for U.S. federal income tax purposes (the "Waupaca Tax Claim"). The Debtor contends that Budd had no obligation to pay Waupaca's separate company liability to TKNA under the Debtor's Actual Tax Sharing Agreement, any other agreement to which the Debtor was a party, or any decision by Budd's board of directors authorizing TKNA's unilateral determination that Budd should make the Waupaca Gain Payment.[13] Moreover, TKNA prevented Budd from participating meaningfully in the decision to sell Waupaca, without which the

---

[12] If TKNA were to take such steps, TKNA would very likely claim a substantial tax deduction in respect of the stock of the Debtor. If successful, TKNA would receive tax benefits similar to those for which the Debtor otherwise would be paid under the Debtor's Actual Tax Sharing Agreement; however, the Debtor would have no claim to any tax sharing payments from TKNA.

[13] The taxable income recognized by the TKNA Tax Group in connection with the Waupaca Transaction was entirely offset by losses of other members of the TKNA Tax Group, including substantial losses for which TKNA was not required to make any tax sharing payments, and did not result in any liability to pay tax.

relevant taxable gain would not have been realized, and did not consult Budd regarding whether or not to agree with the purchaser to treat the sale of Waupaca stock as a sale of assets for tax purposes, which likely increased the amount of the tax gain recognized in connection with the sale. Alternatively, if Budd was properly charged by TKNA for the Waupaca Gain Payment, the Debtor believes it can be recovered by the Estate as an avoidable preference or fraudulent transfer (and the Waupaca Tax Claim includes this alternative theory of relief).

The Debtor anticipates TKNA will argue that it is not obligated to return the $76 million Waupaca Gain Payment because inter alia: (a) Budd assumed Waupaca's contractual liability to TKNA as part of the liquidation of Waupaca that was deemed to occur for U.S. federal income tax purposes in connection with the sale; (b) if Waupaca, itself, had paid its own liability under its tax sharing agreement with TKNA, Budd would have received the same amount of cash it did through the sale by Waupaca (i) receiving 100% of the sale proceeds, (ii) making the Waupaca Gain Payment to TKNA, and (iii) remitting the balance to Budd, such that requiring TKNA to pay the $76 million to the Debtor now would result in an unfair windfall to the Debtor; and (c) the Waupaca Gain Payment is not a voidable preference because (i) TKNA did not receive more than it would have in bankruptcy and/or (ii) the Waupaca Gain Payment constituted a contemporaneous exchange of value, was made in the ordinary course of business and Budd received new value as a result of the payment.

Given the foregoing, there is a not insubstantial risk that the Debtor may recover nothing in respect of the Waupaca Tax Claim.

## 2. *Claims Related to the Sale of Waupaca ("Waupaca Sale Claims")*

The investigation conducted by the Debtor, UAW and the E&A Retiree Committee during the course of this chapter 11 case revealed potential claims and Causes of Action that may be brought by the Debtor against certain of Budd's current and former officers and directors, TKNA and TKAG and certain of their respective current and former officers, directors and agents, KPS (the ultimate purchaser of Waupaca), Clark Hill and potentially others in connection with the 2012 sale of Waupaca.  In connection therewith, the Debtor contends that certain of Budd's current and former directors and officers failed to act in the best interests of Budd and its creditors by, among other things, being completely disengaged and uninvolved in the decision to sell Waupaca, the resulting sale process and the sale itself.  The Debtor further believes that there existed significant conflicts of interest between Budd and its then directors and officers, on the one hand, and TKNA, TKAG and their then respective directors and officers, on the other hand, which resulted in decisions and actions – including the decision to sell Waupaca, the way in which the sale process was conducted, and the sale itself – that were contrary to the interests of Budd and its creditors.  From conception to closing, TKAG and TKNA directed the sale of Waupaca for TKAG and TKNA's benefit and without regard to the interests of Budd or its creditors. An argument can be made that the sale of Waupaca, including the timing of the sale and the way in which the sale process was conducted, deprived Budd of significant value which Budd could have used to pay some or all of its retiree medical benefit obligations and other obligations.

In sum, the Debtor contends that: (1) TKAG and TKNA orchestrated and forced Budd's premature sale of Waupaca in a tainted sale process for reasons that benefitted TKAG only and without regard for either the fact that Budd was insolvent or the interests of Budd's creditors; and

(2) as a result, TKAG and TKNA forced Budd to needlessly sell Waupaca at a time when, among other things, the market was depressed, and thereby Budd received an unreasonably low sale price. There is also evidence that KPS may have purchased Waupaca for less than reasonably equivalent value due to the tainted nature of the sale process itself and its use of material non-public information.

The Debtor holds the following potential claims and Causes of Action related to the sale of Waupaca: (1) against TKAG, TKNA, and certain of their respective current and former directors, officers, agents, and/or employees, claims for breach of fiduciary duty, aiding and abetting breach of fiduciary duty, conspiring in breach of fiduciary duty, equitable subordination, and veil piercing and/or alter ego liability; (2) against certain current and former officers and directors of the Debtor, claims for breach of fiduciary duty; (3) against Clark Hill, the attorneys for TKNA, TKAG, and the Debtor in connection with the Waupaca sale, claims for malpractice, breach of fiduciary duty, and aiding and abetting breach of fiduciary duty; and (4) against KPS, claims for actual or constructively fraudulent transfer, in addition to other potential Causes of Action. Although there are other potential legal claims that could, as a technical matter, be asserted against the various potential defendants, the Debtor believes that the claims discussed below are of the most significance in terms of potential recoveries for the Estate.

With respect to the claims against certain of Budd's current and former officers and directors, the gist is that these individuals breached their fiduciary duty of care to Budd because they did not take sufficient steps, if any, to ensure that, among other things: (a) selling Waupaca was in the best interests of Budd and its creditors (because Budd was insolvent at the time); (b) Waupaca was not sold prematurely at a time when the market was depressed, such that the resulting sale proceeds would be less than they otherwise could have been had the sale been delayed (as was recommended by the investment bankers retained by TKNA and TKAG); and (c) Waupaca was sold in a fair and untainted process that maximized value for Budd. The Debtor contends that instead of undertaking appropriate analyses, certain of Budd's current and former officers and directors abdicated complete control over the decision-making and sale process to Budd's parent, TKNA, and ultimate parent, TKAG, and simply rubber-stamped their decisions without receiving any independent advice on whether those decisions were in the best interests of Budd and its creditors. In addition, there is a basis to claim that these individuals also breached their fiduciary duty of loyalty to Budd by favoring the interests of Budd's owners, TKNA and ultimately TKAG, over those of Budd and its creditors.

(a)       ***Additional Comments from the Debtor Concerning the Waupaca Claims***

These prospective defendants will likely raise non-negligible defenses to liability (e.g., that they were entitled to delegate control of the sale process to TKNA and TKAG and then to reasonably rely on these entities to maximize the sale price since it was in TKNA's and TKAG's best interests to receive maximum value for Waupaca as Budd's ultimate shareholders. These prospective defendants may also raise certain defenses regarding damages, such as that: (a) the price paid by KPS was higher than first projected by TKAG's independent investment banker; (b) a claim of damages based on the post-sale rise in the value of Waupaca is too speculative given prevailing market conditions, anticipated foreign competition and other factors; and (c) the suggestion that Waupaca was worth hundreds of millions if not billions more than what KPS ultimately paid is belied by the fact that there were multiple bidders in the sale process and it is

unlikely that all of them would undervalue Waupaca by such a wide margin in their own respective bids.

Also, any ultimate recovery from the Budd officers and directors could be limited to insurance policies that may be available, if these defendants do not have material assets. TKNA and/or TKAG could fund the defense for these prospective defendants (thus limiting the possibility of an early settlement with them out of their concern for large litigation costs), particularly if they are sued in the same lawsuit against TKNA and/or TKAG. And since TKAG reportedly has a market capitalization of over $8 billion, the Debtor must assume that TKNA and TKAG have the wherewithal and incentive to mount a strenuous defense to any claim related to the sale of Waupaca. The claims need not necessarily be litigated to final judgment, as the defendants could agree to a new settlement—larger than the TKNA Settlement Agreement—out of a desire to avoid public disclosure of their actions giving rise to the claims or the uncertainty of extended litigation. However, if the claims were to be litigated to final judgment, given the inherently complex legal and factual issues, including the likely need to engage expert witnesses, the prosecution costs will likely be very substantial and litigation to final judgment could take several years, particularly if there are appeals.

With respect to the claims against TKNA, TKAG and certain of their respective current and former officers and directors, the essence is that these entities and individuals: (a) disregarded all corporate formalities by unilaterally and improperly making the decision to sell Waupaca and then conducting the actual sale process, all without any meaningful input from or notice to Waupaca's owner, Budd, and without any regard for whether it was in the best interests of Budd and its creditors; (b) knew that Budd's then officers and directors were breaching their fiduciary duties by allowing TKNA and TKAG to control the sale without any input from them and instructing Budd's directors to approve the sale without any deliberation, and thereby aided and abetted those breaches of fiduciary duty; (c) failed to disclose material information to Budd's then officers and directors that would have impacted their decision on whether or not to approve the Waupaca sale; (d) engaged in actions that tainted the sale process by, inter alia, selectively providing and/or withholding material non-public information to certain bidders; (e) caused Budd to sell Waupaca at a time and in a manner that benefitted only TKAG to the financial detriment of Budd and its creditors, and thereby appropriated for TKAG benefits associated with Waupaca that otherwise properly belonged to Budd.

The Debtor believes that certain of the potential claims against TKNA and TKAG and certain of their respective current and former officers and directors (particularly claims for aiding and abetting breach of fiduciary duty) are strong from a liability perspective. TKAG and the potential defendants who are German nationals might argue that they are not subject to suit in a U.S. court, although due to their extensive actions both taken within the United States and directed toward the United States, such an argument may not be successful. From a damages perspective, these potential defendants may raise the same types of defenses mentioned above with respect to Budd's officers and directors. There is a colorable basis for arguing that the "corporate veil" should be pierced in this case (a result that is sometimes referred to as "alter ego" liability) – in which case TKNA and potentially TKAG would be liable for all of Budd's debts (including all of Budd's obligations to its retirees) – although a successful result cannot be guaranteed. Findings that the corporate veil should be pierced are fairly infrequent and the Debtor expects TKNA and TKAG will raise significant defenses, including that they had no intent to use

Budd as a vehicle to defraud or injure creditors  And, while TKNA and TKAG have the financial ability to pay a large judgment, the ultimate upside recovery distributable to creditors, if any, should be capped at the difference between the Debtor's existing assets and the cost of satisfying the Debtor's creditors.  Anything in excess of that amount would belong to subordinate creditors, including the Debtor's equity holders (i.e., TKNA).  Moreover, as TKNA and TKAG are well financed, the Debtor anticipates they will engage in a robust defense of these claims.  Additionally, as noted above, given the complex legal and factual issues, including the likely need to engage expert witnesses, the prosecution costs will likely be very substantial and litigation to final judgment could take several years, particularly if there are appeals.

With respect to the claims against Budd's counsel, Clark Hill, the substance is that the firm: (a) knew about TKNA's and TKAG's domination of the Waupaca sale process and the lack of any meaningful involvement by Budd's officers and directors, and provided no advice to those officers or directors about what steps they should have taken, including potentially retaining independent counsel and potentially other professionals to advise them on the transaction or appointing one or more independent directors to be in charge of all decisions concerning the Waupaca sale; (b) knew that Budd's officers and directors were uninformed about the specifics of the Waupaca sale process and the sale itself, and did nothing to rectify the situation; (c) failed to advise Budd's officers and directors about the potential conflict of interest that might exist between Budd, TKNA and TKAG concerning the Waupaca sale and Clark Hill's own potential conflict as counsel for all three entities; (d) failed to advise Budd's officers and directors about the specifics of the Waupaca sale process and sale to ensure that they had all available information before being asked to make a decision to approve the sale; and (e) failed to advise Budd's officers and directors about the need to properly analyze whether it was in Budd's best interests to sell Waupaca, and if so, at that time and for that amount, including the need to consult appropriate independent professionals about such issues. While the Debtor believes that these claims are viable, it anticipates that Clark Hill will vigorously defend them.  With respect to damages, the Debtor anticipates that Clark Hill may have a malpractice insurance policy that could be available to satisfy a judgment against it. The Debtor also anticipates that Clark Hill will assert both legal and factual defenses, including that: (a) it did not represent TKAG; (b) it did not represent Waupaca; (c) it did not represent the officers or directors of Budd or TKNA; and (d) obtained informed consent from its clients. Clark Hill may defend against liability and may raise the same defenses to damages as discussed above as to other potential defendants.  In any event, it does not appear that an award of damages against Clark Hill would result in any incremental value to the Estate since, apart for the potential for an award of punitive damages, Clark Hill's damages exposure would be no greater than the exposure of any other potential defendant and, as noted, the total recovery available to creditors would likely be capped at the difference between the Debtor's existing assets and the cost of satisfying the Debtor's obligations to its creditors.

As for the claims against KPS, it is potentially liable as the recipient of an actually fraudulent transfer of Budd's Waupaca stock on the basis that TKNA and TKAG allegedly caused Budd to sell Waupaca as part of an effort to defraud its retiree creditors. KPS is also potentially liable for securities fraud, and other claims, as discussed above.  There is evidence that KPS improperly solicited and received material non-public information from a TKAG executive that led KPS to bid less than it otherwise may have, and there is also evidence that KPS believed Waupaca was worth far more than the purchase price it paid.  However, KPS may argue that it is immune from liability under 11 U.S.C. §546(e) because the sale of Waupaca

constitutes a settlement payment made by or to a financial institution or financial participant, or a transfer made in connection with a securities contract. KPS may also argue that the Debtor cannot assert a viable claim to recover additional value on the grounds that the Debtor could have made more money selling Waupaca had it delayed the sale, since KPS did not have any role in determining the timing. Additionally, KPS may also argue that any claim against it should be limited to the difference, if any, between Waupaca's actual value at the time of the sale (June 2012) and what KPS paid for the company. In connection therewith, KPS will likely point to the fact that it bought Waupaca as the successful bidder in a lengthy bidding process with multiple bidders, each of whom, KPS would likely argue, had every incentive to not let KPS acquire Waupaca at a significant discount and to outbid KPS if Waupaca was actually being undervalued. As with TKNA and TKAG-related potential defendants, KPS is also presumably well-funded and has the ability to mount a significant and costly defense. Also, as with Clark Hill, it does not appear that an award of damages against KPS would result in any incremental value to the Estate since KPS's damages exposure would be no greater than the exposure of any other potential defendant and, as noted, the total recovery available to creditors would likely be capped at the difference between the Debtor's existing assets and the cost of satisfying the Debtor's obligations to its creditors.

Under the TKNA Settlement Agreement, the UAW can elect, as it has under the TK Finance Settlement Agreement, to include the Waupaca Claims Release in the Confirmation Order. As a result of the UAW's election: (1) KPS and its affiliates, including Perella Weinberg Partners LP, as set forth in the TKNA Settlement Agreement, will receive the benefit of Waupaca Claims Release; and (2) TKNA will pay to the UAW VEBA the Additional Payments in the aggregate amount of $35 million (a value the Debtor believes is a reasonable amount to settle the potential claims against KPS).

3.   ***Claims Related to the Recharacterization and Avoidance of Intercompany Transactions (the "Recharacterization Claims")***

During the Affiliate Investigation, the then-Chief Restructuring Officer and the CRO's Advisors identified three transactions totaling $407 million that were characterized as "loan" repayments by the Debtor to TKNA's predecessor (ThyssenKrupp USA, Inc. ("TKUSA")) and one of its affiliates (ThyssenKrupp Finance USA, Inc. ("TK Finance"))). These transfers relate to the following three transactions:

(a)   Thyssen Acquisition Corp. ("TAC"), the Debtor's former parent, allegedly accumulated around $244 million in debt owed to TKUSA as a result of certain intercompany transactions used primarily to fund the pension and OPEB obligations of Transit America, Inc. ("Transit"), an affiliate of the Debtor. (TAC, Transit and the Debtor merged in December 2010, with Budd the surviving entity.) On or about June 30, 2009, TKUSA transferred about $244 million to TAC, which was then used in or about July 2009 to pay the outstanding loan balance with TKUSA.

(b)   As of September 2009, the Debtor allegedly owed TK Finance approximately $105 million as a result of day-to-day intercompany account activity. The majority of the balance purportedly related to $75 million in funds used to

contribute to the UAW pension plan as part of a settlement with the PBGC stemming from the closure of the Debtor's Detroit facility.  Thereafter, TKUSA transferred about $200 million to TAC, which money was down-streamed to the Debtor.  In or about October 2009, the Debtor used $105 million of the $200 million to repay its alleged obligation to TK Finance.

(c)   In or about May 2010, the Debtor purportedly received a $57 million term loan from TK Finance, which funds were then down-streamed to Buddcan Holdings, Inc. ("Buddcan") (another affiliate of the Debtor) allegedly to fund (a) ongoing operating expenses of Buddcan, and (b) a $54 million Buddcan pension escrow. On or about December 31, 2011, the Debtor repaid the purported term loan to TK Finance.

In short, TKNA and TK Finance essentially transferred about $407 million to the Debtor (and/or its then parent) so that the Debtor (and/or its then parent) could repay obligations that the Debtor (and/or its then parent) owed to them.  In other words, TKNA (and TK Finance) were giving the Debtor (and/or its parent) money for the purpose of repaying money that the Debtor (and/or its parent) allegedly owed to TKNA (and TK Finance).

An argument could be made that the transfers from TKNA and TK Finance to the Debtor and its parent were not "loans" but, in fact, capital contributions (or equity investments), and that, as a result, the Debtor and/or its parent had no obligation to transfer those sums back to TKNA or TK Finance.  Assuming that to be the case, the Debtor could further argue that the subsequent transfers of that same money back to TKNA or TK Finance constituted fraudulent transfers because the transfers were either (a) made with the intent to hinder, delay or defraud the Debtor's creditors, including its retirees or (b) made at a time when the Debtor was insolvent and for which it received less than reasonably equivalent value.  Were such a claim asserted, TKNA could defend on the grounds, *inter alia*, that there were no fraudulent transfers because, among other things: (a) the transfers were not made with the intent to hinder, delay or defraud any of the Debtor's creditors by siphoning money out of the Debtor because, if that was the intent, TKNA would never have initially transferred the $407 million to the Debtor in the first place; (b) the Debtor did receive reasonably equivalent value in the form of satisfaction of an equivalent amount of debt owed to TKNA and/or TK Finance; (c) the funds that TKNA funneled through its subsidiaries were always earmarked to be paid back to TKNA and/or TK Finance; and (d) if the transactions are collapsed, the Debtor suffered no damages because TKNA was, in essence, using its own money – as opposed to other assets belonging to the Debtor – to repay itself.  Thus, while a potential claim may be asserted to recover some or all of the about $407 million at issue, the chance of ultimately succeeding is, the Debtor believes, uncertain.

4.       *Debtor's Conclusion Regarding Potential Claims Against TKNA and Others*

Under the TKNA Settlement Agreement, all of the foregoing Causes of Action would be released against TKNA, TKAG, other Affiliates, Clark Hill, and the other defendants (e.g. KPS and its affiliates, including Perella Weinberg Partners LP, in the event the Confirmation Order includes the Waupaca Claims Release) and certain of these entities' respective current and former officers, directors, agents and employees.  In exchange, TKNA would pay the Settlement Payments as set forth in the TKNA Settlement Agreement.  In particular, TKNA would make a stream of payments to the UAW VEBA and the E&A VEBA on behalf of the Debtor in the amount of $335 million and assume Pension Plans and other obligations that likely represent more than $200 million in Claims that otherwise would be Allowed against the Estate.  The UAW VEBA will receive future Settlement Payments under the TKNA Settlement Agreement irrespective of future changes in tax law, future taxable losses of the TKNA Tax Group, or the ability to enforce the Debtor's Actual Tax Sharing Agreement in the absence of a settlement.

The Debtor believes, in the reasonable exercise of its independent business judgment, that the TKNA Settlement Agreement and the Plan represent a reasonable, appropriate compromise considering the potential value of, and the risks of litigating, the claims under the Debtor's Actual Tax Sharing Agreement, the Waupaca Tax Claim, the Waupaca Sale Claims and the Recharacterization Claims.

F.       **Settlement Discussions Among the Debtor, the Retiree Representatives, and TKNA**

On August 11, 2015, counsel to the Debtor, TKNA, the UAW and the E&A Retiree Committee convened and the Debtor, the UAW and the E&A Retiree Committee made a non-exhaustive presentation of the findings of their investigations and outlined the Debtor's potential claims against TKNA, TKAG, and certain of their officers, directors, employees and agents related to the Debtor's Actual Tax Sharing Agreement and the sale of Waupaca.

The Debtor, UAW, the E&A Retiree Committee, and TKNA all participated in negotiations concerning the Waupaca-related claims.  Specifically, in the 4-month period from July 6, 2015 (the date of the last Bankruptcy Rule 2004 examination relating to the sale of Waupaca) and November 19, 2015 (the date on which the Debtor filed its First Amended Chapter 11 Plan [Docket No. 1228]:

(a   the Debtor, TKNA, UAW, and the E&A Retiree Committee held global settlement conferences (in person or via telephone) 6 times (4 of which occurred between October 7 and October 22)[14];

(b   the Debtor, which negotiated on behalf of the Estate with the knowledge and support of the UAW and E&A Retiree Committee, held at least 9 scheduled settlement conferences (in person or via telephone) with TKNA, and 9 joint scheduled settlement conferences (including one substantive email update, and otherwise in person or via telephone) with both the E&A Retiree Committee and UAW;

---

[14] The Debtor has reason to believe that all settlement discussions referenced were confidential settlement discussions subject to Federal Rule of Evidence 408, and thus does not present certain information regarding the substance of the discussions for any purpose not permitted by that rule.

(c   at omnibus hearings on July 7, August 14, September 25, and October 14, the parties informed the Court that settlement discussions were continuing in good faith. Counsel for the UAW attended each of these hearings, and did not express any concern about the negotiations or the UAW's participation in them.

During this time the E&A Retiree Committee and the UAW had separate settlement-related communications with each other, to which the Debtor was not invited and did not participate. The E&A Retiree Committee and the Debtor also had separate settlement communications with TKNA during this time.

The Debtor negotiated the TKNA Settlement Agreement with TKNA (who negotiated on behalf of all potential defendants in the Causes of Action proposed to be compromised by the TKNA Settlement Agreement) and the E&A Retiree Committee.

Subsequent to the Debtor and the E&A Retiree Committee entering into the TKNA Settlement Agreement with TKNA, the UAW engaged in negotiations with Budd's other Affiliates, including TK Finance. Ultimately, these negotiations led to the TK Finance Settlement Agreement under which TK Finance will pay an additional $10 million in cash consideration to the UAW VEBA.

## G.      Evaluation / Estimation of Asbestos Claims and Available Insurance

During the Bankruptcy Case, the Asbestos Committee conducted discovery related to past, present, and future asbestos-related claims against Budd, as well as insurance coverage available for asbestos-related claims against Budd. [*See* Docket No. 535 and 605]. Also during the Bankruptcy Case, the Asbestos Committee and the Debtor each retained valuation experts to estimate the scope and extent of the Debtor's current and future Asbestos Claims.

In September 2015, the Debtor and counsel for various companies that issued or were responsible for Asbestos Insurance Policies mediated several issues related to certain types of Asbestos Claims. As a result of this mediation and related discussions, the Debtor and certain insurers agreed to the Amended Asbestos Cost Sharing Agreement, which memorializes certain elements of the treatment of certain Insured Asbestos Claims under the Plan.

## VII.      IMPLEMENTATION OF THE PLAN OF REORGANIZATION

## A.      Establishment and Funding of VEBAs for the Benefit of Retirees

The Plan is premised upon providing to or for the benefit of the Retirees: (1) Effective Date Cash estimated to be in excess of $200 million; (2) Cash over an 8 year period beginning on the Effective Date in the aggregate amount of $335 million (since the UAW has elected to grant the Waupaca Claims Release in accordance with the terms of the TKNA Settlement Agreement) under a stream of payments to be made by TKNA on behalf of the Debtor pursuant to the TKNA Settlement Agreement (in addition to the $10 million in cash being paid by TK Finance to the UAW VEBA under the TK Finance Settlement Agreement); and (3) additional Cash from the proceeds of Causes of Action and other assets of the Estate liquidated after the Effective Date. This Cash will be made available to or for the benefit of Retirees under the Retiree VEBAs described in the Plan.

Consistent with Bankruptcy Code Section 1129(a)(13) and Section 1114, the Debtor's Plan contemplates that the Bankruptcy Court shall enter a Confirmation Order that incorporates the terms of the Section 1114 Agreements. The Section 1114 Agreements will modify the obligations of the Debtor to provide Retiree Benefits to the E&A Retirees and the UAW Retirees by allowing the Debtor to terminate its obligations under its existing retiree health and welfare plans on the E&A VEBA Effective Date and the UAW VEBA Effective Date and will provide replacement coverage by funding through this Plan the E&A VEBA and the UAW VEBA. The Section 1114 Agreements will not be effective unless and until: (1) the Bankruptcy Court enters the Confirmation Order; and (2) the Effective Date has occurred. After the respective E&A VEBA Effective Date and the UAW VEBA Effective Date, the E&A Retirees and the UAW Retirees will have the rights afforded to them under the Retiree VEBAs and will receive Retiree Benefits pursuant to the terms of the E&A VEBA Trust Plan and the UAW VEBA Trust Plan, as the same may be amended from time to time, in lieu of all rights otherwise afforded to them under the Debtor's existing retiree medical plans (including rights under applicable laws, such as, but not limited to, the Consolidated Omnibus Budget Reconciliation Act of 1986, as amended, ERISA, and the Patient Protection and Affordable Care Act).

Prior to the Effective Date, the UAW VEBA and the E&A VEBA will be established to meet the requirements of Code section 501(c)(9) and ERISA section 3(1). The UAW VEBA Trust Agreement, the UAW VEBA Trust Plan, the E&A VEBA Trust Agreement, and the E&A VEBA Trust Plan will be filed with the Plan Supplement. The Debtor shall pay all costs and expenses of the Debtor, the UAW, and the E&A Retiree Committee (and their respective professionals) associated with establishing the UAW VEBA and the E&A VEBA. Each VEBA document shall be drafted to address the requirements of the UAW VEBA Trust Plan and the E&A VEBA Trust Plan and the requirements for a tax-exempt trust. The Debtor shall provide TKNA with drafts of the UAW VEBA Trust Agreement and the E&A VEBA Trust Agreement prior to submission to the Internal Revenue Service, and shall provide TKNA with copies of all correspondence received from or sent to the IRS in conjunction with the qualification of each VEBA. Each Retiree VEBA will be separate from the other, and assets of the Retiree VEBAs will not be commingled and, for the avoidance of doubt, no unused assets of the UAW VEBA or the E&A VEBA will revert to the Debtor or TKNA. From and after the Effective Date until the respective E&A VEBA Effective Date and the UAW VEBA Effective Date, the Debtor shall continue to provide to the E&A Retirees and the UAW Retirees Retiree Benefits pursuant to the terms and conditions of the Debtor's existing retiree medical plans, the cost of which shall be paid by the Estate. Claims for Retiree Benefits that are incurred but not paid prior to the applicable E&A VEBA Effective Date or UAW VEBA Effective Date shall likewise be paid by the Estate pursuant to the terms and conditions of the Debtor's existing retiree medical plans. The Debtor shall cooperate with the UAW VEBA and the E&A VEBA and provide the UAW VEBA and the E&A VEBA with all records and other information reasonably requested by the UAW VEBA and/or the E&A VEBA in connection with the administration of the UAW VEBA and the E&A VEBA, including but not limited to personally identifiable information, census data, and all contracts that the Debtor has made for the provision of Retiree Benefits.

As soon as practicable after the Effective Date, the Debtor shall deposit or cause to be deposited $55 million into the E&A VEBA and the UAW Cash(and pursuant to the TKNA Settlement Agreement, TKNA shall pay $15 million to the E&A VEBA on behalf of the Debtor)

and the UAW Cash (minus the $950,000 that will be used to fund the Uninsured Asbestos Claim Fund on the Effective Date) into the UAW VEBA. Thereafter: (1) TKNA shall pay, to the UAW VEBA on behalf of the Debtor, $15 million to the E&A VEBA and Cash in the aggregate amount of $320 million (since the UAW has elected to grant the Waupaca Claims Release in the form set forth on Attachment 4 to the TKNA Settlement Agreement) to the UAW VEBA, all payable in accordance with the schedule and subject to the terms and conditions of the TKNA Settlement Agreement, and TK Finance shall pay an additional $10 million in cash in accordance with the terms of the TK Finance Settlement Agreement; (2) the E&A VEBA shall receive 12.5% of any Settlement Increase (subject to its assignment of the first $1.5 million of such Settlement Increase on the date of the First UAW Payment (as defined in the TKNA Settlement Agreement), TKNA, TK Finance, or an affiliate, shall contribute $50,000 to the UAW VEBA on account of its share of the $950,000 payment from UAW Cash to the Uninsured Asbestos Claim Fund) in full and final satisfaction of the Asbestos Committee Settlement Increase Claim; (3) the Debtor shall contribute Net Proceeds of Causes of Action not released pursuant to the Plan to the UAW VEBA; and (4) the Debtor shall contribute Net Proceeds of any other property of the Debtor's estate to the UAW VEBA.

**B.     Execution of TKNA Settlement Agreement**

To implement the Plan, the Debtor, the E&A Retiree Committee, and TKNA have executed the TKNA Settlement Agreement. It is subject to court approval, confirmation of the Plan and the Plan becoming effective pursuant to its terms.

**C.     Rights and Powers of the Independent Fiduciary**

The UAW will select the individual who will serve as the Independent Fiduciary. In accordance with the Amended and Restated Bylaws of The Budd Company, Inc., the Independent Fiduciary shall enforce the TKNA Settlement Agreement, oversee TKNA's payments to the UAW VEBA required by the TKNA Settlement Agreement, and exercise sole authority to pursue, litigate, settle, compromise, and retain and pay professionals from assets of the Debtor to assist in such actions as to all Causes of Action not released pursuant to the Plan. The Independent Fiduciary shall have sole authority on behalf of the Debtor to: (1) to enforce payment of the Settlement Payments, Additional Payments, and any Settlement Increase (if applicable); (2) to enforce the Letter of Credit to be obtained and maintained by TKNA under the TKNA Settlement Agreement from the Effective Date until all Settlement Payments (including any Settlement Increase) and Additional Payments have been made, as more fully described in, and subject to the conditions set forth in TKNA Settlement Agreement; and (3) retain and use Operating Cash to pay reasonable fees and expenses of the Estate approved by the Bankruptcy Court in connection with the Asbestos Committee Settlement Increase Claim (and the Independent Fiduciary shall make such payments as provided by order of the Bankruptcy Court), to pursue Causes of Action not released pursuant to the Plan, and to pay fees due and payable to the U.S. Trustee. The Independent Fiduciary shall have no ability to modify in any way, without the express written consent of the E&A Retiree Committee, the TKNA Effective Date Payment or any other distribution to the E&A VEBA provided for by this Plan.

**D.     Rights and Powers of the Debtor**

46

After the Effective Date, the Debtor shall not require authority of the Bankruptcy Court to act, other than as specifically set forth in the TKNA Settlement Agreement, the Plan, or the Confirmation Order. Specifically, and without limitation, the Debtor shall have the right to, among other things, (1) object to Claims and prosecute, settle, compromise, withdraw or resolve in any manner approved by the Bankruptcy Court such objections; and (2) conduct examinations in accordance with Bankruptcy Rules 2004 or 7001 *et seq.* or otherwise in accordance with applicable law.

### E.     Dissolution of Committees and Retiree Representatives

#### 1.     *The Asbestos Committee*

The duties and powers of the Asbestos Committee, and the duties and powers of its respective Professionals, will terminate on the later of: (1) completion of performance of those actions required to be executed on or about the Effective Date; and (2) resolution of any Fee Applications filed or objected to by the Asbestos Committee, or its respective Professionals; and (3) resolution of the Asbestos Committee Settlement Increase Claim (as defined in Section III.D hereof). The fees and expenses of the Asbestos Committee and its Professionals through the date that the Asbestos Committee is dissolved shall be paid by the Debtor, and after the Effective Date from administrative reserves, after entry of an order of the Bankruptcy Court authorizing such payment. Upon the termination of the duties and powers of the Asbestos Committee, the Asbestos Committee will be dissolved, its members will be deemed released by the Debtor and its Estate from their duties, responsibilities and obligations in connection with the Bankruptcy Case, and the Debtor shall have no further obligation to pay any costs, fees, or expenses of the Asbestos Committee, or its respective members or Professionals.

Upon the dissolution of the Asbestos Committee, no notice to that Committee that might otherwise be required pursuant to an order of the Bankruptcy Court shall be required.

#### 2.     *The E&A Retiree Committee and the UAW*

The duties and powers of the E&A Retiree Committee and the UAW in their respective capacity as authorized representative of Retirees under section 1114 of the Bankruptcy Code, and the duties and powers of their respective Professionals, will terminate on the latest of: (1) completion of performance of those actions required to be executed on or about the Effective Date; (2) resolution of any Fee Applications filed or objected to by either the E&A Retiree Committee, the UAW, or their respective Professionals; and (3) (i) for the E&A Retiree Committee, the E&A VEBA Effective Date; and (ii) for the UAW, the UAW VEBA Effective Date. The fees and expenses of the E&A Retiree Committee, the UAW, and their respective Professionals through the date(s) the E&A Retiree Committee is dissolved and the UAW is relieved of its obligations as the authorized representative of the Retirees shall be paid by the Debtor, and after the Effective Date from administrative reserves, after entry of an order of the Bankruptcy Court authorizing such payment. Upon the respective termination of the duties and powers of the E&A Retiree Committee and the UAW, the E&A Retiree Committee will be dissolved, the UAW will no longer be the authorized representative of the UAW Retirees under section 1114 of the Bankruptcy Code, their members will be deemed released by the Debtor and its Estate from their duties, responsibilities and obligations in connection with the Bankruptcy Case, and the Debtor shall have no further obligation to pay any costs, fees, or expenses of the E&A Retiree Committee, the UAW, or their respective members or Professionals.

Upon the respective dissolution of the E&A Retiree Committee and termination of the UAW's Section 1114 representation of the UAW Retirees, no notice to the E&A Retiree Committee or the UAW that might otherwise be required pursuant to an order of the Bankruptcy Court shall be required.

## VIII.   PLAN PROVISIONS GOVERNING ALLOWANCE OF CLAIMS AND MAKING OF DISTRIBUTIONS

### A.   Liquidation and Treatment of Asbestos Claims

#### 1.   *Funding of Asbestos Funds and Asbestos Administration Fund*

No later than the date of entry of the Confirmation Order, the Debtor shall deposit $2,200,000 Cash into the Insured Asbestos Claim Fund, $3,500,000 Cash into the Uninsured Asbestos Claim Fund (to be supplemented on the Effective Date by an additional $950,000 from the UAW Cash), and $500,000 Cash into the Asbestos Administration Fund. No later than the date of entry of the Confirmation Order, the E&A Retiree Committee shall assign to the Uninsured Asbestos Claim Fund its right to the first $1,500,000 of any Settlement Increase. Each of the Asbestos Funds and the Asbestos Administration Fund shall be maintained until the earlier to occur of (a) the date on which less than $1,000 remains in such Asbestos Fund, or (b) the date on which all lawsuits on account of Asbestos Claims brought as of January 1, 2045 have been resolved. In the event that funds remain in an Asbestos Fund or the Asbestos Administration Fund on the date on which all lawsuits on account of Asbestos Claims brought as of January 1, 2045 have been resolved, then such remaining funds shall be given to the UAW VEBA; *provided, however,* that any amount remaining in the Uninsured Asbestos Claim Fund as of such date up to $1,500,000 shall be given to the E&A VEBA in repayment of any Settlement Increase that actually was paid into the Uninsured Asbestos Claim Fund. Each of the Asbestos Funds and the Asbestos Administration Fund shall be segregated, not commingled with any other Cash or other property of the Debtor, and shall not be used to pay any obligation of the Debtor other than pursuant to (a), (b), or (c) below.

(a)      Insured Asbestos Claim Fund.  The Insured Asbestos Claim Fund shall be used solely in accordance with the terms of the Amended Asbestos Cost Sharing Agreement.

(b)      Uninsured Asbestos Claim Fund.  The Uninsured Asbestos Claim Fund shall be used by the Budd Funds Administrator (i) to pay Defense Costs and make Distributions to holders of Uninsured Asbestos Claims at the Plan Percentage Amount and pursuant to Article II of the Plan until such time as the Uninsured Asbestos Claim Fund is exhausted, and (ii) up to $1 million shall be available for use in a Costs Action brought by the Budd Funds Administrator, subject to reimbursement from recoveries in such Costs Action in excess of any Asbestos Claims payments made as a result of such Costs Action; provided, however, that in no event shall Budd or the Budd Funds Administrator be required to pay Defense Costs or make Distributions to holders of Allowed Uninsured Asbestos Claims after the Uninsured Asbestos Claim Fund is exhausted.

(c)      Asbestos Administration Fund.  The Asbestos Administration Fund shall be used by the Budd Funds Administrator to fund the expenses of discharging the

obligations of the Debtor in connection with the Insured Asbestos Claim Fund, the Uninsured Asbestos Claim Fund, and the Amended Asbestos Cost Sharing Agreement, as provided for in the Amended Asbestos Cost Sharing Agreement.

### 2.    *Appointment and Reporting Requirements of Budd Funds Administrator*

The Budd Funds Administrator shall be selected prior to entry of the Confirmation Order and his or her selection shall be approved in the Confirmation Order. The Budd Funds Administrator shall advise the ACC Designee in writing within thirty days of the end of the first calendar year after entry of the Confirmation Order, and (a) every six months thereafter until exhaustion of Insured Asbestos Claim Fund, of the amount remaining in the Insured Asbestos Claim Fund and (b) every calendar year thereafter of the number of pending Insured Asbestos Claims and newly filed Insured Asbestos Claims during the prior calendar year, but shall not otherwise report to the ACC Designee with respect to the number of or payments made on account of the Insured Asbestos Claims. Within thirty days of the end of the first calendar year after entry of the Confirmation Order, and every six months thereafter until exhaustion of the Uninsured Asbestos Claim Fund and the Asbestos Administration Fund, the Budd Funds Administrator shall send a written report to the ACC Designee identifying: (i) the number of pending Uninsured Asbestos Claims as of the end of such six month period; (ii) the number of Uninsured Asbestos Claims that were resolved, by settlement or otherwise, as of the end of such six month period; (iii) the number of Uninsured Asbestos Claims that were resolved without payment during such six month period; (iv) the dollar amount remaining in the Uninsured Asbestos Claim Fund as of the last day of such six month period; (v) the dollar amount remaining in the Asbestos Administration Fund as of the last day of such six month period; and (vi) an accounting of expenses incurred by the Budd Funds Administrator as of the last day of such six month period.

### 3.    *Formation of Asbestos Springing Trust*

The Amended and Restated Bylaws of the Budd Company, Inc. shall include a provision that in the event of the dissolution of the Debtor, any remaining balance of the Asbestos Funds and the Asbestos Administration Fund, the Debtor's rights and obligations under the Asbestos Insurance Policies, the Debtor's rights and obligations under the Plan with respect to Asbestos Claims, and the Debtor's rights and obligations under the Amended Asbestos Cost Sharing Agreement all shall be transferred into a trust (the "Asbestos Springing Trust"), which shall be established as set forth in the Plan. Upon dissolution of the Debtor, the Asbestos Springing Trust shall: (a) be a successor of the Debtor (under the Plan and otherwise) for all purposes related to treatment and administration of Asbestos Claims, but for no other purpose; (b) have authority to accept service of process related to Asbestos Claims against the Debtor; and (c) be authorized to serve on behalf of the Debtor notice under or in connection with Asbestos Insurance Policies. As a successor to the Debtor, the Asbestos Springing Trust shall obtain the benefit of all injunctions and other protections in the Plan regarding Asbestos Claims and other Claims. The Asbestos Administration Fund shall be used to establish and pay the expenses of the Asbestos Springing Trust. The Asbestos Springing Trust Shall dissolve upon the earlier of: (i) the date on which all lawsuits on account of Asbestos Claims brought as of January 1, 2045 have been resolved (in which event the remaining balances of the Asbestos Funds and the Asbestos Administration Fund shall be transferred to the UAW VEBA*, provided, however, that any amount remaining in*

~~the Uninsured Asbestos Claim Fund as of such date up to $1,500,000 shall be given to the E&A VEBA in repayment of any Settlement Increase that actually was paid into the Uninsured Asbestos Claim Fund)~~, and (ii) the date on which the balance of both Asbestos Funds is less than $1,000. This provision of the Amended and Restated Bylaws of the Budd Company, Inc. shall be subject to amendment only with the approval of the Bankruptcy Court.

### 4. *Injunction on Future Asbestos Claims*

The Confirmation Order shall include an injunction that limits recovery on account of any Asbestos Claim, whether manifested or filed before or after the Petition Date, to the Asbestos Funds and the Asbestos Insurance Policies, and prevents any Person from collecting, recovering, or receiving payment or recovery with respect to any Asbestos Claim from assets of the Debtor or the Estate, other than the Asbestos Funds or one or more Asbestos Insurance Policies.

### 5. *Amended Asbestos Cost Sharing Agreement*

On or before the date of entry of the Confirmation Order, the Debtor shall execute and thereafter perform under the Amended Asbestos Cost Sharing Agreement (a copy of which is attached as **Exhibit D** to the Plan).

### 6. *Litigation of Insured Asbestos Claims After Entry of the Confirmation Order*

After the date of entry of the Confirmation Order, litigation of Insured Asbestos Claims will be administered in accordance with the Amended Asbestos Cost Sharing Agreement. Following the date of entry of the Confirmation Order, the Debtor or its agents shall notify the pertinent Insurer(s) of any Insured Asbestos Claim that the Debtor determines may be an Insured Asbestos Claim. No Insurer shall have any obligation with respect to any Insured Asbestos Claim for which such notice has not been given; *provided however,* that such notice will be deemed to have been given with respect to Insured Asbestos Claims for which any Insurer had undertaken to provide a defense prior to the Petition Date. Following the date of entry of the Confirmation Order, the Participating Carriers, in accordance with the Amended Asbestos Cost Sharing Agreement, shall be authorized to settle and compromise Insured Asbestos Claims without further order of the Bankruptcy Court. With respect to Asbestos Claims that are filed in the tort system for the first time after entry of the Confirmation Order, the Debtor or its agents, or the Budd Funds Administrator shall tender such Asbestos Claims in accordance with section IV.B of the Amended Asbestos Cost Sharing Agreement.

### 7. *Litigation of Uninsured Asbestos Claims After Entry of the Confirmation Order*

After the date of entry of the Confirmation Order, litigation of Uninsured Asbestos Claims will be administered by the Budd Funds Administrator.

Following the date of entry of the Confirmation Order, the Budd Funds Administrator may retain defense counsel retained before the Bankruptcy Case without further order of the Bankruptcy Court to defend Uninsured Asbestos Claims and such defense counsel shall provide such information as requested by the Budd Funds Administrator. Following the date of entry of the Confirmation Order, the Budd Funds Administrator shall be authorized to settle and compromise Uninsured Asbestos Claims without further order of the Bankruptcy Court.

**B.     Allowed Claims, Distribution Rights and Objections to Claims**

**8.     *Allowance Requirement***

Only holders of Allowed Claims are entitled to receive distributions under the Plan. The Debtor has filed and may file additional objections to Claims that have not been previously Allowed or are Allowed by the Confirmation Order. Under the Plan, Insurers shall be granted standing to object to Asbestos Claims. Prior to making any Distribution to holders of Allowed Claims, the Debtor may establish one or more reserves for Disputed Claims. The Debtor shall reserve in Cash or other property for Distribution on account of any Claim so reserved the full asserted amount (or such lesser amount as may be reasonably estimated) of such Claim or expense.

**9.     *Date of Distribution***

All Distributions to holders of Allowed Claims will be made as and when provided in the Plan. Initial distributions will be made as soon as practicable after the Effective Date.

**10.     *Making of Distributions***

Distributions to holders of Allowed Claims will be made: (a) to the last known addresses of such holders; or (b) to the addresses set forth in any filed proof of claim or written notices of address changes delivered to the Debtor by the holder of an Allowed Claim. If any Distribution is returned as undeliverable, no further Distributions to the recipient shall be made unless and until the Debtor is notified of such holder's then current address, at which time all missed distributions shall be made to such holder without interest.

**11.     *Objection Procedures***

Unless otherwise ordered by the Court after notice and a hearing, under the Plan, the Debtor shall have the exclusive right, on and after the Effective Date, to File objections to Claims.

**12.     *Estimation of Claims***

As set forth in the Plan, the Debtor reserves the right to seek to have Disputed Claims estimated by the Bankruptcy Court.

**C.     Disposition of Executory Contracts and Unexpired Leases**

Pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code, all Executory Contracts that exist between the Debtor and any person or Entity shall be deemed rejected by the Debtor as of the Effective Date, other than: (1) the Affiliate Services Agreement, which shall be amended and restated pursuant to the TKNA Settlement Agreement, (2) any Executory Contract that was terminated before the Effective Date or has been assumed or rejected pursuant to an order of the Bankruptcy Court entered before the Effective Date, or (3) the Asbestos Insurance Policies or any other insurance policy of the Debtor (to the extent they are or can be construed as executory). The Confirmation Order (except as otherwise provided therein) shall constitute an order of the Bankruptcy Court pursuant to section 365 of the Bankruptcy Code, effective as of the

51

Effective Date, rejecting all executory contracts of the Debtor. Rejection claims arising out of the rejection of any executory contract or unexpired lease pursuant to the Plan must be filed with the Bankruptcy Court no later than the later of thirty (30) days after the entry of an order rejecting such executory contract or unexpired lease. Any Claim not filed within such time period shall be forever barred.

Any Claim arising out of the rejection of an executory contract or unexpired lease shall, pursuant to section 502(g) of the Bankruptcy Code, be treated as Class 6 General Unsecured Claim under the Plan.

## D.     Reservation of Rights Regarding Claims and Causes of Action

Except as otherwise explicitly provided in the Plan, nothing will affect the Estate's rights and defenses, both legal and equitable, with respect to any Claims, including, but not limited to, all rights with respect to legal and equitable defenses to alleged rights of setoff or recoupment. All such rights, remedies, claims, defenses and Causes of Action shall remain with the Estate after the Effective Date.

Among other Causes of Action held by the Estate disclosed in the Schedules, the Debtor believes that the Estate holds Causes of Action against: (1) Conway MacKenzie, in connection with the resignation of Charles M. Moore as Chief Restructuring Officer; and (2) Martinrea International, Inc., in connection with tax refunds due to the Estate under sale and purchase agreements to which Martinrea International, Inc. is a party.

## IX.     OTHER PLAN PROVISIONS

## A.     Releases, Injunctions, Exculpation and Related Provisions

### 1.     *Compromise and Settlement*

**Pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the Distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise of all Claims and Equity Interests. Specifically, the Plan shall constitute a good faith compromise of all Affiliate Claims and Estate Claims under the terms and provisions of the TKNA Settlement Agreement. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all Claims and Equity Interests and of the TKNA Settlement Agreement, as well as a finding by the Bankruptcy Court that such compromise or settlement is fair, equitable, reasonable and in the best interests of the Debtor, the Estate, and holders of Claims and Equity Interests**.

### 2.     *Exculpation*

**The Exculpated Parties and any property of the Exculpated Parties will not have or incur any liability to any Person for any act taken or omission occurring on or after the Petition Date or for any and all Claims and Causes of Action arising on or after the Petition Date, in connection with or related to the Estate, including, but not limited to, (i) the commencement and administration of the Bankruptcy Case, (ii) the operation of the business of the Debtor or administration of the Estate during the pendency of the**

Bankruptcy Case, (iii) formulating, negotiating, preparing, disseminating, soliciting, implementing, administering, confirming or consummating the Plan, the Disclosure Statement, the TKNA Settlement Agreement, the Amended Asbestos Cost Sharing Agreement, or any other contract, instrument, release or other agreement or document created or entered into in connection with the Plan or any other post -petition act taken or omitted to be taken in connection with the administration of the Estate; (iv) submission of and statements made in, the Disclosure Statement or any contract, instrument, release or other agreement or document entered into, or any action taken or omitted to be taken in connection with the Plan; or (v) any Distributions made pursuant to the Plan, except for acts constituting willful misconduct, gross negligence, or fraud and in all respects such parties shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under the Plan. The entry of the Confirmation Order shall constitute a determination by the Court that the Exculpated Parties shall have acted in good faith and in compliance with the applicable provisions of the Bankruptcy Code, pursuant to, among other provisions of law, sections 1125(e) and 1129(a)(3) of the Bankruptcy Code, with respect to the foregoing, provided, further, that the foregoing provisions of the Plan shall not apply to any acts, omissions, Claims, Causes of Action or other obligations expressly set forth in and preserved by the Plan or Plan Supplement or any defenses thereto.

3. *Injunction*

Subject to Articles II(B)(5)(b) and IV(I)(2) of the Plan and the corresponding injunction in the Confirmation Order, all Persons who have held, hold, or may hold Equity Interests or Claims against the Estate shall, with respect to any such Equity Interests or Claims, be permanently enjoined from and after the Effective Date, from taking any of the following actions (other than actions to enforce any rights or obligations under the Plan): (i) commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind (including, without limitation, any proceeding in a judicial, arbitral, administrative or other forum) against or affecting the Estate, Debtor, or any of their respective representatives or property; (ii) enforcing, levying, attaching (including, without limitation, any prejudgment attachment), collecting or otherwise recovering by any manner or means, whether directly or indirectly, any judgment, award, decree or order against the Estate, the Debtor, or any of their respective representatives or property; (iii) creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against the Estate, the Debtor, or any of their representatives or property; (iv) asserting any right of setoff, directly or indirectly, against any obligation due the Estate, the Debtor, or any of their property, except as contemplated or allowed by the Plan or the Confirmation Order; (v) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan; (vi) pursuing, prosecuting, or recovering proceeds on account of any claims belonging to the Estate; and (vii) prosecuting or otherwise asserting any right, claim, or cause of action released pursuant to the Plan.

4. *Releases by the Estate of the Release Parties*

Effective as of the Effective Date, and except as otherwise set forth in the Plan or the Confirmation Order, the Debtor will be deemed to have forever released, waived and discharged each of the Release Parties from any and all Claims, obligations, suits,

judgments, damages, demands, debts, rights, Causes of Action and liabilities (other than the rights of the Debtor to act in accordance with or otherwise enforce the Plan and the contracts, instruments, releases, indentures and other agreements or documents delivered or executed thereunder), whether for tort, contract, violations of federal or state securities laws, or otherwise, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise that are based in whole or part on any act, omission, transaction, event or other occurrence, taking place on or prior to the Effective Date in any way relating to the Debtor, the Bankruptcy Case, or the Plan.

5.   *Release of the Released TKNA Parties and Injunction*

In accordance with the TKNA Settlement Agreement and the TK Finance Settlement Agreement, and subject to and conditioned upon the occurrence of the Effective Date and, the payment of the E&A Payment, the Debtor, the Estate and payment of the TK Finance Payments, the payment of $950,000 to the Uninsured Asbestos Claim Fund (in accordance with Article IV(A) of the Plan), and the payment of $50,000 to the UAW VEBA (in accordance with Article IV(A) of the Plan), the Debtor, the Estate, the E&A Retiree Committee, and the Asbestos Committee, on behalf of themselves and their agents, members, predecessors, successors, and assigns, and all Persons who have held, hold, or may hold Claims against the Debtor or the Estate, acting derivatively through the Debtor or the Estate, shall be deemed to have unconditionally, absolutely, irrevocably and forever released and discharged the Released TKNA Parties with respect to all causes of action, suits, debts, liabilities, accounts, promises, warranties, damages and consequential damages, agreements, costs, expenses, claims or demands that have been or could have been asserted by or on behalf of the Debtor, the Estate, and/or the E&A Retiree Committee, and/or the Asbestos Committee against the Released TKNA Parties related to or arising out of any act or thing that occurred or failed to occur prior to the Effective Date, whether known or unknown, direct, indirect, or derivative, liquidated or unliquidated, disputed or undisputed, fixed or contingent, inchoate or matured, foreseen or unforeseen, whether based in contract, tort, statute or otherwise, including, without limitation, avoidance actions or other causes of action available under chapter 5 of the Bankruptcy Code and claims arising from or relating to the Debtor's Actual Tax Sharing Agreement, the Non-Debtor TSA Amendment, the Affiliate Services Agreement (as amended and restated by this Plan or the TKNA Settlement Agreement), the Debtor's sale of Waupaca, and/or the ownership and/or control of the Debtor by TKNA or Affiliates or the equity securities of the Debtor (collectively, the "Released Estate Claims"), and any Settlement Increase and/or Asbestos Committee Settlement Increase Claim; provided, however, that nothing contained in this paragraph shall be deemed or construed to be a covenant, release, waiver or discharge of the terms and conditions of this Plan, the TKNA Settlement Agreement, or the Affiliate Services Agreement (as amended and restated by this Plan and the TKNA Settlement Agreement).

In furtherance of the foregoing release, and subject to and conditioned upon the occurrence of the Effective Date, the payment of the E&A Payment, payment of the TK Finance Payments, the payment of $950,000 to the Uninsured Asbestos Claim Fund (in

accordance with Article IV(A) of the Plan), and the payment of the E&A Payment$50,000 to the UAW VEBA (in accordance with Article IV(A) of the Plan), each of the Debtor, the Estate, and the E&A Retiree Committee, and the Asbestos Committee, on behalf of themselves and their agents, members, predecessors, successors, and assigns, and all Persons who have held, hold, or may hold Claims against the Debtor or the Estate, acting derivatively through the Debtor or the Estate, shall be deemed to have unconditionally, absolutely, irrevocably and forever released, waived and discharged each of the Released TKNA Parties from each of the Released Estate Claims; and each of the foregoing Persons are permanently precluded and enjoined from: (i) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind (including, without limitation, any proceeding in a judicial, arbitral, administrative or other forum) against the Released TKNA Parties or any of their property based upon, arising out of or related to the Released Estate Claims; or (ii) enforcing, levying, attaching (including, without limitation, any prejudgmentpre-judgment attachment), collecting or otherwise recovering by any manner or means, whether directly or indirectly, any judgment, award, decree or order against the Released TKNA Parties or any of their property with respect to the Released Estate Claims.

The Released TKNA Parties are TKNA, each Affiliate, and each of their respective current and former officers, directors and employees (including, without limitation, Kevin Backus, Jill Karana, Lawrence Paulson, Robert Aginian, Guido Kerkhoff, Olaf Berlien, Volkmar Dinstuhl, Christian Bender, Christof Boehm, Miroslav Georgiev, Brian Bastien, Heinz Hense, Markus Boening, and Nancy Hutcheson), agents (including, without limitation, Bank of America Merrill Lynch), professionals, members, legal representatives, insurers, attorneys (including, without limitation, Clark Hill PLC) predecessors, heirs, successors and assigns, of each, each in his, her, or its capacity as such, and each of them.

6.   *Release of the Released Estate Parties and of the Asbestos Committee Released Parties*

Subject to and conditioned upon the occurrence of the Effective Date, and expressly subject to the reservation of TKNA's setoff rights as expressly reserved in Section 6 of the TKNA Settlement Agreement, each of the Released TKNA Parties, as of the Effective Date, shall be deemed to have unconditionally, absolutely and irrevocably released the Debtor, the Estate, and their current and former officers (including, without limitation, the Debtor's past and current Chief Restructuring Officers Mr. Carl Lane and Mr. Charles Moore), directors (including, without limitation, the current Independent Director, Mr. Charles Sweet, and directors Brian Bastien and Heinz Hense), agents, professionals, employees, members, legal representatives, attorneys, predecessors, heirs, successors and assigns, each in his, her, or its capacity as such, and each of them, the E&A Retiree Committee, and its members, agents, professionals, legal representatives, attorneys, actuaries, financial advisors, predecessors, heirs, successors and assigns, each in his, her or its capacity as such, and each of them, and the Asbestos Committee, and its members, agents, professionals, legal representatives, attorneys, actuaries, financial advisors, predecessors, heirs, successors and assigns, each in his, her or its capacity as such, and each of them, and the UAW, and its agents, professionals, legal representatives, attorneys,

actuaries, financial advisors, predecessors, heirs, successors and assigns, each in his, her or its capacity as such and each of them (collectively, the "Released Estate Parties"), and the Asbestos Committee, the members of the Asbestos Committee (solely in their capacity as members of the Asbestos Committee), and the Asbestos Committee's agents, professionals, legal representatives, attorneys, actuaries, financial advisors, predecessors, heirs, successors and assigns, each in his, her or its capacity as such, and each of them (the "Asbestos Committee Released Parties"), with respect to all causes of action, suits, debts, liabilities, accounts, promises, warranties, damages and consequential damages, agreements, costs, expenses, claims or demands that the Released TKNA Parties has or ever had or claims to have currently or at any future date against the Released Estate Parties or the Asbestos Committee Released Parties related to or arising out of any act or thing that occurred or failed to occur prior to the Effective Date, whether known or unknown, direct, indirect, or derivative, liquidated or unliquidated, disputed or undisputed, fixed or contingent, inchoate or matured, foreseen or unforeseen, whether arising in law, equity, contract, tort, statute or otherwise, including, without limitation, any claims relating to or arising from the Pension Plans, TKNA's assumption of the Pension Plans, or any funding of the Pension Plans, and claims arising under or related to the Debtor's Actual Tax Sharing Agreement, the Non-Debtor TSA Amendment, and/or the Affiliate Services Agreement (as amended and restated by ~~the~~this Plan and/or the TKNA Settlement Agreement) (collectively, the "Released TKNA/Affiliate Claims"); provided, however, that with respect to the Released Estate Parties, nothing contained in this paragraph shall be deemed or construed to be a covenant, release, waiver or discharge of the terms and conditions of ~~the~~this Plan, the TKNA Settlement Agreement, the Affiliate Services Agreement (as amended and restated by the TKNA Settlement Agreement), or any claim or cause of action that is wholly unrelated to Budd; or of any claim or cause of action relating to work performed by Towers Watson in connection with its Benefits Investment Committee, or by Stevenson ~~Keppelmen~~Keppelman for TKNA in connection with any PBGC related issue~~.~~; provided, further, that with respect to the Asbestos Committee Released Parties neither this release nor the release by the Asbestos Committee, among others, set forth in Article X, Section E, above, shall prejudice or prohibit: (i) any of the Released TKNA Parties from asserting any claim or defense to a claim brought by a holder of an asbestos claim, or by or against an insurer regarding coverage of an asbestos claim and all such claims and defenses are fully preserved; and (ii) the Asbestos Committee or the members of the Asbestos Committee (solely in their capacity as members of the Asbestos Committee) from asserting a claim which could be asserted only directly, and without acting derivatively through the Debtor or the Estate, including without limitation in an action by a Person or by an Insurer regarding coverage of an Asbestos Claim, and all such claims and defenses are fully preserved. Further, the Asbestos Committee Released Parties acknowledge that they are not a party and have no rights under the TKNA Settlement Agreement, the Pension Plans, Debtor's Actual Tax Sharing Agreement, the Non-Debtor TSA Amendment or the Affiliate Services Agreement. For the avoidance of doubt, nothing in this Article X shall be deemed to release an Asbestos Claim or an Affiliate Asbestos Claim, or affect any rights, obligations and/or defenses to such claims under the Amended Asbestos Cost Sharing Agreement, any other agreements or applicable law.

B.    **Preservation of Rights of Action**

Except to the extent that any Claim is Allowed during the Bankruptcy Case or expressly by the Plan, nothing, including, but not limited to, the failure of the Debtor to object to a Claim or Equity Interest for any reason, shall affect, prejudice, diminish or impair the rights and legal and equitable defenses of the Estate or the Debtor with respect to any Claim or Equity Interest, including, but not limited to, all rights of the Estate or the Debtor to contest or defend itself against such Claims or Equity Interests in any lawful manner or forum when and if such Claim or Equity Interest is sought to be enforced by the holder thereof.

## C.   Retention of Jurisdiction

Pursuant to Sections 105, 1123(a)(5), and 1142(b) of the Bankruptcy Code, and notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall, after the Effective Date, retain such jurisdiction over the Bankruptcy Case and all Entities with respect to all matters related to the Bankruptcy Case, the Debtor and the Plan as is legally permissible.

## D.   Amendment, Alteration and Revocation of Plan

Subject to the provisions of the TKNA Settlement Agreement and the limitations contained in the Plan: (1) the Debtor reserves the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules and with the consent of TKNA and the E&A Retiree Committee, to amend or modify the Plan prior to the entry of the Confirmation Order, including amendments or modifications to satisfy section 1129(b) of the Bankruptcy Code; and (2) after the entry of the Confirmation Order, the Debtor may, with the consent of TKNA and the E&A Retiree Committee, upon order of the Bankruptcy Court, amend or modify the Plan, in accordance with section 1127(b) of the Bankruptcy Code, or remedy any defect or omission or reconcile any inconsistency in the Plan in such manner as may be necessary to carry out the purpose and intent of the Plan; *provided, however,* that the E&A Payment and any other distributions to the E&A VEBA provided for by the Plan may not be modified in any way without the express written consent of the E&A Retiree Committee, and the treatment of Asbestos Claims provided for by the Plan may not be modified in any way without the express, written consent of the Asbestos Committee.

The Debtor reserves the right to revoke or withdraw the Plan prior to the entry of the Confirmation Order and to File subsequent chapter 11 plans. If the Debtor revokes or withdraws the Plan or if entry of the Confirmation Order or the Effective Date does not occur, then the Plan shall be null and void in all respects, except that provisions concerning treatment of Asbestos Claims shall, upon entry of the Confirmation Order, remain in effect without regard to occurrence of the Effective Date, and nothing herein shall be deemed an admission, acknowledgement, offer, or undertaking of any sort by the Debtor or any other Entity including with respect to the amount or allowability of any Claim or the value of any property of the Estate.

## E.   Conditions to Effective Date

The Plan specifies conditions precedent to the Effective Date.   Each of the specified conditions must be satisfied or waived in whole or in part pursuant to the Plan.

## F.   Requirements for Confirmation of the Plan

Before the Plan can be confirmed, the Bankruptcy Court must determine at the Confirmation Hearing that the requirements for confirmation, set forth in section 1129 of the Bankruptcy Code, have been satisfied. The Debtor believes that, upon receipt of the votes required to confirm the Plan, the Plan will satisfy all the statutory requirements of chapter 11 of the Bankruptcy Code, that the Debtor has complied or will have complied with all of the requirements of chapter 11, and that the Plan has been proposed and submitted to the Bankruptcy Court in good faith.

## X.    CERTAIN RISK FACTORS TO BE CONSIDERED

The holders of Claims should read and carefully consider the following factors, as well as the other information set forth in this Disclosure Statement (and the documents delivered together herewith and/or incorporated by reference herein), before deciding whether to vote to accept or reject the Plan.  These risk factors should not, however, be regarded as constituting the only risks associated with the Plan and its implementation.

### A.    Risks of the Chapter 11 Plan Generally

#### 1.    *Claims Estimations*

There can be no assurance that any estimated Claim amounts set forth in this Disclosure Statement are correct. The actual Allowed amount of Claims likely will differ in some respect from the estimates set forth in this Disclosure Statement. The estimated amounts are subject to certain risks, uncertainties, and assumptions. Should one or more of these risks or uncertainties materialize, or should any underlying assumptions prove incorrect, the actual Allowed amount of Claims may vary from those estimated herein.

#### 2.    *Status of Laws Governing Health Insurance*

The laws governing health insurance have undergone enormous change in recent years, and there can be no assurance that relevant federal, state, or local laws, regulations, or conditions will remain the same or not change in a way that materially disadvantages Retirees.

#### 3.    *Conditions Precedent to Consummation*

The Plan provides for certain conditions that must be satisfied (or waived) prior to the Effective Date. As of the date of this Disclosure Statement, there can be no assurance that any or all of the conditions in the Plan will be satisfied (or waived). Accordingly, even if the Plan is confirmed by the Bankruptcy Court, there can be no assurance that the Plan will be consummated or that the Effective Date will occur.

#### 4.    *Confirmation Risk*

Even if creditors vote in numbers and amounts sufficient to confirm the Plan, the Bankruptcy Court may choose not to confirm the Plan.

### B.    Risks Related to the TKNA Settlement Agreement

The Plan is predicated upon TKNA performing under the TKNA Settlement Agreement, which requires significant future cash payments secured in part by the Letter of Credit. There can be no assurance that TKNA will continue to be financially sound or continue to perform under

58

the TKNA Settlement Agreement. In the event that TKNA does not satisfy its obligations under the TKNA Settlement Agreement, there is a risk that the UAW VEBA will not be fully funded as contemplated under the Plan. Although, there can be no assurance that TKNA will have sufficient resources to satisfy any demand made or judgment obtained against TKNA, the TKNA Settlement Agreement includes certain protections against nonpayment, including (a) an acceleration provision upon default; (b) the Letter of Credit described above; and (c) a requirement that TKNA make an annual equity certification and financial disclosures. In addition, the Chief Restructuring Officer conducted diligence into TKNA's financial wherewithal to satisfy its obligations under the TKNA Settlement Agreement.

**C.    Risks Related to Proposed Treatment of Asbestos Claims**

There is no guarantee that the Bankruptcy Court will approve the treatment of Asbestos Claims, including, without limitation, the Plan and injunction provisions that limit recovery of future Asbestos Claims to the Asbestos Funds and proceeds of Asbestos Insurance Policies.

**D.    Risks of Alternatives to the Plan**

Alternatives to the Plan are discussed below in Article XII of the Disclosure Statement. Failure to confirm the Plan imposes significant risks on creditors and the Estate, including those discussed below.

**1.    _Risk of Litigating Claims Proposed to be Compromised by the Plan_**

Failure to compromise the Claims and Causes of Action compromised by the TKNA Settlement Agreement is risky. The Causes of Action against TKNA and others that would be compromised by the TKNA Settlement Agreement are large and complex claims that may take years to litigate at significant cost and expense. During this time, the Estate would reserve amounts for continued litigation of such Claims, and likely would establish a reserve in the event that Claims of TKNA are Allowed as a result of such litigation (which is discussed further below). Many of the litigation targets already have indicated defenses to the Causes of Action that would be asserted against them, and certain of the litigation targets have filed claims against the Debtor that may reduce or offset, in some cases, in their entirely, any damages otherwise obtained. Litigation is inherently risky and there is no assurance that any Cause of Action will be successful and lead to an award of damages for the Estate.

**2.    _Risk that Pension Plans are Terminated_**

If the TKNA Settlement Agreement is not approved and the Plan is not confirmed, it is possible that TKNA would not assume the Pension Plans. In that event, because the Debtor will not continue to fund the Pension Plans, it is possible that the PBGC will initiate a termination of the ERISA Pension Plans. In the event of a termination of the ERISA Pension Plans, (1) the PBGC would assume responsibility for the payment of benefits under the ERISA Pension Plans, (2) it is possible that some Retirees' benefits under the ERISA Pension Plans would exceed the statutory maximum guaranteed by the PBGC, which may result in reduced amounts of benefits being paid to such Retirees, (3) the PBGC likely would pursue significant Claims against the Debtor (to the extent permitted under applicable law) and its Affiliates under ERISA, (4) certain of the Affiliates likely would pursue contribution Claims filed against the Debtor in the Bankruptcy Case, (5) it is likely that one or more of the foregoing Claims would be Allowed in

an aggregate amount that may exceed $300 million, and (6) Allowance of such Claim(s) would materially reduce Distributions to holders of other Allowed Claims, including Retirees.

### 3. *Risk that TKNA Claims are Allowed*

If the TKNA Settlement Agreement is not approved, then TKNA would not waive its Claims against the Debtor and likely would pursue such Claims in litigation with the Estate. It is possible that TKNA's Claim would be allowed, potentially in a material amount. If Allowed, such a Claim may reduce any award the Estate ultimately may obtain against TKNA, and likely would reduce Distributions on account of other Allowed Claims.

## XI. CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

THE U.S. FEDERAL INCOME TAX CONSEQUENCES APPLICABLE TO THE IMPLEMENTATION OF THE PLAN ARE COMPLEX AND NOT FREE FROM DOUBT. THE DEBTOR DOES NOT INTEND TO SEEK A RULING FROM THE INTERNAL REVENUE SERVICE. THIS SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND DOES NOT ADDRESS THE U.S. FEDERAL INCOME TAX CONSEQUENCES TO HOLDERS OF CLAIMS AGAINST OR EQUITY INTERESTS IN THE DEBTOR. EACH HOLDER OF A CLAIM OR EQUITY INTEREST IS URGED TO CONSULT HIS, HER, OR ITS OWN TAX ADVISOR FOR THE U.S. FEDERAL, STATE, LOCAL, AND FOREIGN TAX CONSEQUENCES OF THE PLAN TO SUCH HOLDER.

### A. U.S. Federal Income Tax Consequences to the Debtor

#### 1. *Introduction*

The following discussion is a summary of certain U.S. federal income tax consequences of the consummation of the Plan to the Debtor. This summary is based on the Internal Revenue Code of 1986, as amended (the "Code"), the U.S. Treasury Regulations promulgated thereunder, judicial authorities, published administrative positions of the IRS and other applicable authorities, all as in effect on the date of this Disclosure Statement and all of which are subject to change or differing interpretations, possibly with retroactive effect.

This summary does not discuss the U.S. federal income tax consequences of the Plan to holders of Claims against or Equity Interests in the Debtor.

#### 2. *Discussion of Potential Tax Consequences of TKNA Settlement Agreement*

The Settlement Payments made by TKNA to the UAW VEBA and the E&A VEBA should be treated for U.S. federal income tax purposes as tax-free capital contributions made by TKNA to the Debtor followed by the Debtor's payment of these amounts to the UAW VEBA and the E&A VEBA, and the Settlement Payments should be deductible by the Debtor.

The IRS might view the Settlement Payments as TKNA's capital contribution to the Debtor of a debt instrument consisting of a promise to pay in installments without interest. In that case, the IRS could compute the principal amount of the debt instrument as equal to the present value of the installment payments discounted at the mid-term Applicable Federal Rate (currently

1.67 percent), with the difference being so computed constituting original issue discount, accruable in income over the installment payment period.

TKNA's assumption of the ERISA Pension Plans should not give rise to taxable income to the Debtor. Because TKNA is jointly and severally liable for those obligations, the assumption could be viewed as the satisfaction of TKNA's own obligation. In addition, even if TKNA is treated as assuming the Debtor's obligations with respect to the ERISA Pension Plans, the Debtor ought not to be treated as realizing cancellation of indebtedness income ("COD income") under a Code exception that provides that COD income is not recognized to the extent that the payment of the liability would have given rise to a deduction. The Debtor is not entitled to deduct amounts it owes its Pension Plans prior to payment and, therefore, this exception should be available to it.

**B.     U.S. Federal Income Tax Implications to the VEBAs**

To qualify as tax-exempt trusts, each of the Retiree VEBAs must obtain a favorable determination letter recognizing such VEBA's tax-exempt status from the IRS. The application for a determination letter may be submitted to the IRS at any time within fifteen months of the VEBA's establishment. Although it is possible that the IRS might decline to issue such a favorable determination letter, the Debtor believes that the Retiree VEBAs would meet the requirements to obtain determination letters from the IRS. Contributions could be made to the Retiree VEBAs from time to time and benefits could be paid from the Retiree VEBAs prior to the receipt of the determination letters.

**C.     U.S. Federal Income Tax Consequences to Retirees**

The Debtor believes that payments to Retirees from the Retiree VEBAs to reimburse the Retirees for otherwise unreimbursed health insurance premiums and qualified medical expenses should not be included in the Retirees' taxable income and, therefore, should not be subject to federal income taxation. Qualified medical expenses are medical expenses that the IRS allows taxpayers to deduct from taxable income for the year under IRC Section 213. Medical expenses are expenses paid for the costs of diagnosis, cure, mitigation, treatment or prevention of disease, and the costs for treatments affecting any part or function of the body. The expenses must be primarily to alleviate or prevent a physical or mental defect or illness, and not just for the benefit of general health. Some examples of qualified medical expenses include copayments for doctors' visits or prescription drugs, any amounts for medical care not covered by health insurance such as cost-sharing or expenses for services not covered under a health plan, and medical devices and equipment such as crutches, hearing aids, or prosthetic devices.

**XII.     FEASIBILITY OF THE PLAN, BEST INTERESTS OF CREDITORS, AND CONFIRMATION OF THE PLAN WITHOUT CONSENT OF ALL CREDITORS**

**A.     Feasibility of the Plan**

In connection with confirmation of the Plan, the Bankruptcy Court will be required to determine that the Plan is feasible pursuant to section 1129(a)(11) of the Bankruptcy Code, which means that the confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtor. Because the Plan provides for the

structured liquidation of the Debtor's assets and Distribution of the proceeds to creditors, the Debtor asserts that the Plan is feasible.

## B.      Acceptance of the Plan

As a condition to Confirmation, the Bankruptcy Code requires that each Class of Impaired Claims vote to accept the Plan, except under certain circumstances.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds ($^2/_3$) in dollar amount and more than one-half ($^1/_2$) in number of Allowed claims in that class that actually voted to accept or to reject the Plan. Holders of Claims who fail to vote are not counted as either accepting or rejecting the Plan.

## C.      Best Interests Test

Even if a plan is accepted by each class of Claims, the Bankruptcy Code requires a bankruptcy court to determine that the plan is in the best interests of all holders of claims or interests that are impaired by the plan and that have not accepted the plan.  The "best interests" test, as set forth in section 1129(a)(7) of the Bankruptcy Code, requires a bankruptcy court to find either that all members of an impaired class of claims or interests have accepted the plan or that the plan will provide a member who has not accepted the plan with a recovery of property of a value, as of the effective date of the plan, that is not less than the amount that such holder would recover if the debtor were liquidated under chapter 7 of the Bankruptcy Code.

A Chapter 7 liquidation would produce no greater liquidation proceeds than the proceeds that will be produced under the Plan. Moreover, the Debtor believes that costs and expenses incurred by a Chapter 7 trustee and his professionals in liquidating and administering the Estates would be duplicative of work already performed by the Debtor and his professionals. Accordingly, the Debtor believes that the "best interests" test of section 1129 of the Bankruptcy Code is satisfied.

## D.      Confirmation and Consent to Modify Retiree Benefits

The Plan modifies Retiree Benefits provided to UAW Retirees and E&A Retirees, and changes the obligations of the Debtor from "defined benefit" obligations to "defined contribution" obligations. Under the Plan, Plan Cash is distributed to Retirees through the mechanism of Retiree VEBAs. The Debtor has reached agreements with the E&A Retiree Committee about the terms of the E&A Section 1114 Agreement modifying E&A Retiree Benefits in a manner consistent with the terms of the Plan and with the UAW about the terms of the UAW Section 1114 Agreement modifying UAW Retiree Benefits in a manner consistent with the terms of the Plan. Accordingly, the Debtor believes that the Plan satisfies section 1129(a)(13) of the Bankruptcy Code.

## E.      Confirmation Without Acceptance of All Impaired Classes: "Cramdown"

In the event any Class of Impaired Claims rejects the Plan, the Debtor may seek confirmation of the Plan pursuant to the "cramdown" provisions of the Bankruptcy Code.

## XIII.   ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

The Debtor believes that the Plan is fair and equitable and in the best interests of all holders of Claims. If, however, the requisite acceptances are not received, or the Plan is not confirmed and consummated, the theoretical alternatives include: (a) formulation of an alternative plan or plans of reorganization; (b) liquidation of the Debtor under chapter 7 of the Bankruptcy Code; or (c) an extended stay of the Debtor in chapter 11 to allow the Debtor to pursue Causes of Action against TKNA and others prior to exiting chapter 11.

### A.      Alternative Plan(s) of Reorganization

If the requisite acceptances are not received or if the Plan is not confirmed, the Debtor or any other party in interest could attempt to formulate and propose a different plan or plans of reorganization. An alternative Plan may not provide for the Settlement Payments and other benefits provided by the TKNA Settlement Agreement. An alternative chapter 11 plan predicated on litigation with TKNA and others would be subject to the risk, cost, delay and uncertainty of litigation discussed above and below. Moreover, while an alternative chapter 11 plan was developed, the Debtor would continue to incur professional costs in the Bankruptcy Case. The Debtor believes that the Plan allows creditors to realize the greatest possible value under the circumstances.

### B.      Litigation of Affiliate Claims

If the Plan does not become effective, it is possible for the Debtor to remain in chapter 11 administration while it pursues its Causes of Action against TKNA and others. The benefit of such a course of action would be to allow the Estate to liquidate potentially valuable Causes of Action. Continued administration in chapter 11, however, is expensive and risks the benefits available to the Debtor under the TKNA Settlement Agreement. Moreover, litigation is inherently uncertain and risky. Among other risks, risks of litigation of the Causes of Action that would otherwise be settled and compromised under the TKNA Settlement Agreement include the following:

1.      The Cash proceeds of the Causes of Action against the TKNA Released Parties net of fees and expenses could be less, and perhaps materially less, than the value that TKNA will provide under the TKNA Settlement Agreement.

2.      The Cash available for Distribution to Retirees and other creditors after such litigation may be insufficient to provide replacement benefits to those that would be available to Retirees for their lifetimes under the Plan.

3.      If such litigation were to commence, TKNA may not assume the Pension Plans, which could give rise to a multi-hundred million dollar Claim in favor of the PBGC. The PBGC Claims, if allowed, would share pro rata with recoveries to other unsecured creditors (including Retirees) and would materially diminish the amount of Cash the Estate would have to pay for Retiree Benefits.

The Debtor believes that the relative certainty of the Retiree's recovery under the Plan, namely projected lifetime Retiree Benefits at meaningful levels that are comparable to those

63

currently being provided to Retirees, is preferable to engaging in expensive, lengthy, and risky litigation.

## C.    Interim Modification of Retiree Benefits

If the Plan is not confirmed the Debtor may seek to modify benefits under section 1114 of the Bankruptcy Code to conserve its remaining Cash while in chapter 11. Any such modification would reduce Retiree Benefits (compared to the Retiree Benefits provided now) and there would be no assurance that such modified benefits would continue for the foreseeable lives of all Retirees or would not be subject to further modification after the Debtor realized or failed to realize value on account of its non-Cash assets.

The Debtor cannot indefinitely sustain its current level of Retiree Benefits without obtaining recoveries from Causes of Action by way of settlement or litigation that are substantially greater than even the $345 million provided under the TKNA Settlement Agreement and the TK Finance Settlement Agreement. If the Retiree Benefits are not modified, many Retirees will end up receiving no healthcare benefits from the Debtor. Furthermore, the healthcare benefits will cease when the Retirees are at a more advanced age and most financially vulnerable. The Debtor's current proposal to provide modified benefits through VEBAs will provide greater flexibility for choosing benefits, regardless of how much additional funding is received on account of a TKNA settlement or, if none, proceeds of the Causes of Action. In short, the VEBA structure is a more efficient way to provide healthcare benefits to Retirees, and assures that the Retirees will receive replacement benefits for a very long time.[15] Thus, the modifications are necessary to assure long-term healthcare benefits for the Retirees.

## D.    Litigation of Retiree Benefit Issues

Certain of the plans that provide Retiree Benefits to the Retirees include provisions that the Debtor asserts may permit it to amend, modify, and/or terminate Retiree Benefits provided thereunder. Under these provisions, the Debtor may have the right to reduce or terminate Retiree Benefits to a significant majority of Retirees. Under the Plan, the Retiree VEBAs will not include any provisions that allow for modification by the Debtor, and Retiree Benefits as modified by the Plan will not be subject to future modification or termination by the Debtor under the terms of the Retiree VEBAs. If the Plan is not confirmed, the Debtor may seek to amend, modify or terminate Retiree Benefits currently provided, either in accordance with section 1114 of the Bankruptcy Code or under other applicable law.

## E.    Liquidation under Chapter 7

If the Plan is not confirmed or does not become effective, the Debtor's case may be converted to a case under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would

---

[15] Pursuant to the proposed modifications, Budd's current cash allocable to Retiree healthcare will be transferred out of Budd's control to the VEBAs for the provision of future healthcare benefits and the c urrent benefits plans will be terminated. The alternative – leaving the current plans in place – leaves Budd in control of those plans (and the cash).  Arguments exist that these plans, by their own terms, might be terminable at Budd's discretion, which could result in the termination  of the Retirees' health benefits if the requirements of § 1114 of the Bankruptcy Code are satisfied. Accordingly, without modifications proposed by the Debtor, a scenario exists where in the future many, most, or all Retirees could be left without any healthcare benefits.

be elected or appointed to liquidate the Debtor's assets for distribution in accordance with the priorities established by the Bankruptcy Code. The Debtor believes that a liquidation under chapter 7 is inferior to the Plan because, among other reasons: (1) a Chapter 7 trustee would incur additional costs and expenses of liquidation; (2) section 1114 of the Bankruptcy Code is not applicable to cases under chapter 7 of the Bankruptcy Code, thus (a) the UAW and the Retiree Committee would lose their respective status as Retiree representatives and Retirees would not have the benefit of their official standing and representation, (b) a Chapter 7 trustee would not be able to continue to pay Retiree Benefits under section 1114 of the Bankruptcy Code, and (c) a Chapter 7 trustee would not be able to modify Retiree Benefits under section 1114 of the Bankruptcy Code, likely rendering Cash Distributions to Retirees taxable; (3) conversion to Chapter 7 would remove the Debtor from the TKNA Tax Group, thus destroying the value to the TKNA Tax Group of the Debtor's future tax losses, the payment for which pursuant to the Debtor's Actual Tax Sharing Agreement constitutes a significant basis of the TKNA Settlement Agreement and a significant basis of potential recovery under an alternate chapter 11 plan; and (4) Chapter 7 would disenfranchise creditors, who currently have a right to vote on a plan that will determine how the significant Cash and valuable Causes of Action will be administered for their benefit.

Also attached as **Exhibit 2** is a detailed Liquidation Analysis.

## XIV.    THE SOLICITATION ORDER AND DISPUTED CLAIMANTS

### A.    Solicitation Order

Upon approval of this Disclosure Statement, the Bankruptcy Court entered an order that, among other things, determines the dates, procedures and forms applicable to the process of soliciting votes on the Plan and establishes certain procedures with respect to the tabulation of such votes (the "Solicitation Order"). Parties in interest may obtain a copy of the Solicitation Order through the Bankruptcy Court's electronic case filing system, by downloading the Solicitation Order from the Debtors' case website at http://dm.epiq11.com/TBC or by making written request upon the Debtors' counsel or the Balloting Agent.

### B.    Voting Rights of Disputed Claimants

Holders of Claims in Class 6 that are (a) asserted as wholly unliquidated or wholly contingent in Proofs of Claim filed prior to the Distribution Record Date or (b) whose Claims are asserted in Proofs of Claim as to which an objection to the entirety of the Claim is pending as of the Distribution Record Date are not permitted to vote to accept or reject the Plan except as provided in the Solicitation Order. Pursuant to the procedures outlined in the Solicitation Order, Disputed Claimants may obtain a Ballot for voting on the Plan only by filing a motion under Bankruptcy Rule 3018(a) seeking to have their Claims temporarily Allowed for voting purposes (a "Rule 3018 Motion").  Any such Rule 3018 Motion must be filed and served upon counsel to the Debtor and the Balloting Agent no later than _____.  The Ballot of any creditor filing such a motion will not be counted unless temporarily allowed by the Bankruptcy Court for voting purposes, after notice and a hearing.

## XV.    RECOMMENDATION AND CONCLUSION

For all of the reasons set forth in this Disclosure Statement, the Debtor believes that confirmation and consummation of the Plan is preferable to all other alternatives and urges all holders of Claims in Classes 3 through 8 to vote to ACCEPT the Plan and to complete and return their ballots so that they will be RECEIVED on or before _____.

Dated: ~~April 27,~~ May 4, 2016

**PROSKAUER ROSE LLP**                       The Budd Company, Inc.
Jeff J. Marwil (IL 6194054)
Jeremy T. Stillings (IL 6279868)
Brandon W. Levitan (IL 6303819)            x */s/ Carl S. Lane*
70 W. Madison St., Suite 3800
Chicago, IL 60602                          By:  Carl S. Lane
Phone:  (312) 962-3550
Facsimile:  (312) 962-3551                 Its:  Chief Restructuring Officer

*Counsel for Debtor*

67

Document comparison by Workshare Compare on Wednesday, May 04, 2016
7:23:01 PM

| Input: | |
|---|---|
| Document 1 ID | interwovenSite://DMS/current/56093046/1 |
| Description | #56093046v1<current> - Budd - Disclosure Statement to 9th Amended Plan |
| Document 2 ID | H:\NRPortbl\current\8871\56093046_2.docx |
| Description | H:\NRPortbl\current\8871\56093046_2.docx |
| Rendering set | Standard |

| Legend: |
|---|
| Insertion |
| Deletion |
| Moved from |
| Moved to |
| Style change |
| Format change |
| Moved deletion |
| Inserted cell |
| Deleted cell |
| Moved cell |
| Split/Merged cell |
| Padding cell |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 101 |
| Deletions | 90 |
| Moved from | 2 |
| Moved to | 2 |
| Style change | 0 |
| Format changed | 0 |
| Total changes | 195 |